C:\Case Files\Jacques\Capital motions\Opening brief re capital motions (03-29-2010).wpd

## UNITED STATES DISTRICT COURT
## DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 2:08-cr-00117 (WKS) |
| | ) | |
| MICHAEL S. JACQUES, | ) | |
| Defendant. | ) | |

### MOTION, WITH INCORPORATED MEMORANDUM, TO STRIKE
### OR MODIFY THE NOTICE OF INTENT TO SEEK THE DEATH PENALTY

The undersigned counsel to the defendant, Michael S. Jacques, hereby respectfully

move for the following relief:

1.  An order striking the notice of intent to seek the death penalty because more than two decades of experience with the federal death penalty has demonstrated that it operates in an arbitrary, capricious, irrational and discriminatory manner;

2.  An order striking the notice of intent to seek the death penalty because the Supreme Court's decision in *Ring v. Arizona* has rendered the Federal Death Penalty Act of 1994 ("FDPA"), in the absence of ameliorative action by Congress, inoperative;

3.  An order striking the notice of intent to seek the death penalty because even if the FDPA can be rendered constitutional by a finding by the grand jury of gateway and statutory aggravating factors, the "special findings" in the indictment should be stricken and the  death notice should be dismissed because the government has not obtained an indictment consistent with the requirements of the Fifth Amendment;

4.  An order striking the notice of intent to seek the death penalty because the FDPA fails to provide a structure which permits jurors to make a reasoned choice between execution and a sentence of life in prison without the

possibility of release;

5.      An order striking the notice of intent to seek the death penalty because of the unacceptable risk of executing the innocent;

6.      An order striking the non-statutry factors;

7.      An order striking or modifying certain of the statutory and non-statutory aggravating, or, in the alternative, directing the government to provide further information regarding the factual basis and/or requiring a hearing, as set forth more particularly in these  papers;

8.      An order striking the notice of intent to seek the death penalty because thecasue  people of the State of Vermont have opted not to allow capital punishment in their state; and,

9.       An order finding that evolving standards of decency have reached a point where capital punishment is no longer constitutional.

In support of the motions, counsel will rely upon the following memorandum of law, the appendix separately filed herewith that is too large for filing via ECF, and a CD containing the verdict sheets from 207 federal death-penalty cases that is also too large for filing via ECF.  The appendix and CD will be sent via overnight delivery to the clerk and the United States Attorney either on today's date or tomorrow, March 30, depending on when the documents are physically ready for delivery.

## TABLE OF CONTENTS

PRELIMINARY STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

INTRODUCTION TO THE ARGUMENT

    A.    The Supreme Court's modern death-penalty jurisprudence: 1972
        to the present... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

        1    .Death is different. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        2.    A constitutional death-penalty scheme must provide for
            meaningful appellate review.. . . . . . . . . . . . . . . . . . . . . . . . . . 7

        3.    A constitutional death-penalty scheme may not employ
            aggravating circumstances that are vague, duplicative,
            overly broad, or which do not justify the imposition of a
            more severe sentence on the defendant as compared to
            others found guilty of murder. . . . . . . . . . . . . . . . . . . . . . . . . 9

        4.    No unreasonable limitation may be placed on the right of
            the accused to present relevant mitigating evidence
            during the penalty trial.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

    B.    The return of the federal death penalty. . . . . . . . . . . . . . . . . . . . . . . 15

    C.    Relevant appellate decisions... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    D.    The Second Circuit's *Fell* decisions. . . . . . . . . . . . . . . . . . . . . . . . . 22

POINT ONE:

    BECAUSE MORE THAN TWO DECADES OF
    EXPERIENCE WITH THE FEDERAL DEATH PENALTY
    HAS DEMONSTRATED THAT IT OPERATES IN AN
    ARBITRARY, CAPRICIOUS, IRRATIONAL AND
    DISCRIMINATORY MANNER, THIS COURT SHOULD
    DECLARE THE FDPA UNCONSTITUTIONAL.

    A.    Introduction: the failure of the federal death penalty

experiment.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

B.      Revisiting the constitutional premise of *Furman
        v. Georgia.*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

C.      More than two decades of experience with the
        federal death penalty.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

D.      What these figures mean.. . . . . . . . . . . . . . . . . . . . . . . . . . 29

E.      The absence of a principled basis for
        distinguishing between cases where the federal
        death penalty is imposed from cases where it is
        not imposed renders the federal death penalty
        unconstitutional.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

F.      The Federal Death Penalty is unevenly applied on
        a regional basis and suffers from intractable
        problems of racial discrimination in the targeting
        of minority defendants and a demonstrated
        race/gender-of-victim effect.. . . . . . . . . . . . . . . . . . . . . . . . . 39

        1.      Introduction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

        2.      The 2000 DOJ Study.. . . . . . . . . . . . . . . . . . . . . . . . 41

        3.      The federal death penalty after 20 years... . . . . . . . . . . . 46

        4.      The persistent capricious
                circumstance of region.. . . . . . . . . . . . . . . . . . . . . . . . 48

        5.      The unabated practice of targeting minorities for the
                federal death penalty, the long-documented "white-
                victim effect," and the emergence of a "white female
                victim effect" further demonstrate the arbitrary and
                irrational operation of the federal death penalty. . . . . . . . . 50

                (a)     Introduction – The law on race and the death
                        penalty.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

iv

(b)     The effect of race and gender of victim in the
        application of the FDPA.. . . . . . . . . . . . . . . . . . . . . . 57

G.    Conclusion: the federal death penalty experiment
      has failed.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

POINT TWO:

THE SUPREME COURT'S *RING* DECISION HAS
RENDERED THE FEDERAL DEATH PENALTY
UNCONSTITUTIONAL AND THE ACT MAY NOT BE
SAVED BY A JUDICIAL "CONSTRUCTION" THAT
CREATES A NEW CRIMINAL OFFENSE WHOSE
ELEMENTS AND INTERTWINED PROCEDURES HAVE
NEITHER BEEN CONSIDERED, NOR ENACTED INTO
LAW, BY CONGRESS.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

A.    Introduction and summary of the argument... . . . . . . . . . . . . . . . . . 65

B.    Aggravating factors necessary to a capital verdict are essential
      elements of the capital offense, and must be pleaded in the
      indictment and proved to a jury beyond a reasonable doubt. . . . . . 69

C.    The FDPA does not provide for presentation of aggravating
      factors to a grand jury (and thereby including them in an
      indictment), but instead vests exclusive authority to identify
      aggravating factors exclusively with the prosecutor. . . . . . . . . . . . 74

D.    Jackson and the Separation of Powers Doctrine demonstrate that
      the FDPA cannot be amended by the prosecutor or the courts to
      permit presentation of aggravating factors to a grand jury
      because it is for the legislature to define crimes and punishment,
      and presentation of aggravating factors to a grand jury is
      contrary to the unambiguous intent of Congress as expressed in
      the FDPA. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

      1.    Congress, not the courts or prosecutors, is vested with
            legislative authority to define federal criminal offenses
            and the punishment for such conduct.. . . . . . . . . . . . . . . . . 76

2. _Jackson_ provides a direct and "all fours" analogy to the circumstances present herein, and compels invalidation of the FDPA.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

3. The Non-Delegation Doctrine provides further compelling support for the conclusion that the FDPA's defects cannot be cured by judicial action.. . . . . . . . . . . . . 84

4. The grand jury lacks any authority to issue "special findings."... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 86

E. Courts of appeals decisions to the contrary have been wrongly decided, and neither severability analysis, nor the post-_Apprendi_ drug cases, nor the doctrine of "constitutional avoidance" can save the FDPA.

1. The decisions by the courts of appeal have been wrongly decided.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87

2. The post-Apprendi drug-quantity cases do not authorize presenting the FDPA's aggravating factors to a grand jury.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 89

3. Severability analysis cannot save the FDPA from unconstitutionality.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 91

4. The doctrine of "constitutional avoidance" is inapplicable... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93

vi

POINT THREE

EVEN IF THE FDPA CAN BE RENDERED CONSTITUTIONAL BY A FINDING BY THE GRAND JURY OF GATEWAY AND STATUTORY AGGRAVATING FACTORS, THE "SPECIAL FINDINGS" IN THE INDICTMENT SHOULD BE STRICKEN AND THE DEATH NOTICE SHOULD BE DISMISSED BECAUSE THE GOVERNMENT HAS NOT OBTAINED AN INDICTMENT CONSISTENT WITH THE REQUIREMENTS OF THE FIFTH AMENDMENT.

A.    Introduction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 96

B.    The grand jury was not given the choice of holding Mr. Jacques to answer for a capital crime because it was unaware of the consequences of its "Special Findings.".. . . . . . . . . . . . . . . . . . . . . 96

C.    The Government did not obtain an indictment alleging all elements of a capital crime.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

D.    The non-statutory aggravating factors alleged in the death notice must be dismissed because they are not supported by the indictment.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104

POINT FOUR

THE FPDA FAILS TO PROVIDE A STRUCTURE WHICH PERMITS JURORS TO MAKE A REASONED CHOICE BETWEEN A SENTENCE OF LIFE IN PRISON WITHOUT THE POSSIBILITY OF RELEASE AND EXECUTION.. . . . . . . . . . . . 111

POINT FIVE

IN LIGHT OF OVERWHELMING EVIDENCE THAT CONTINUED ENFORCEMENT OF THE FEDERAL DEATH PENALTY WILL LEAD TO THE EXECUTION OF A MEANINGFUL NUMBER OF INNOCENT PEOPLE, THE FEDERAL DEATH PENALTY SHOULD BE DECLARED UNCONSTITUTIONAL.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

A.    Introduction and background... . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

B.    The *Quinones* decision.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

C.    The risk of executing the innocent. . . . . . . . . . . . . . . . . . . . . . . . . 121

D.    The real question: How many innocent people is it acceptable to
      execute so that the Government may execute others who are
      undoubtedly guilty?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 123

POINT SIX

      THE   NON-STATUTORY   AGGRAVATING   FACTORS
      MUST BE STRICKEN... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 126

A.    By its terms, the FDPA does not authorize the utilization of non-
      statutory aggravating factors. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 122

B.    Non-statutory aggravating factors do not constitutionally limit
      and guide the discretion of the jury, thus permitting wholly
      arbitrary and capricious death sentences in violation of the
      Eighth and Fourteenth Amendments.. . . . . . . . . . . . . . . . . . . . . . . 128

C.    Permitting the Department of Justice to define non-statutory
      aggravating circumstances after the crime but before trial
      violates the ban on ex post facto laws.. . . . . . . . . . . . . . . . . . . . . . 130

POINT SEVEN

      AS SPECIFIED BELOW, CERTAIN OF THE STATUTORY
      AND NON-STATUTORY AGGRAVATING FACTORS SET
      FORTH IN THE GOVERNMENT'S NOTICE MUST BE
      DISMISSED AND/OR, IN THE ALTERNATIVE, THIS
      COURT SHOULD REQUIRE A DETAILED OFFER OF
      PROOF   AND/OR   A   HEARING   TO   TEST   THE
      "PARTICULAR RELEVANCE" AND RELIABILITY OF THE
      EVIDENCE TO BE OFFERED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 132

A.    The role of aggravating factors. . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

viii

1.      General principles: function and relevance.. . . . . . . . . . . . . . . . . . 133

2.      This court may require the government to submit a proffer of its
        evidence, in the form of an informative outline, or to conduct
        hearings.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

B.    Particular challenges to aggravating factors alleged in this case.. . . . . . . 130

        1.      Death during the commission of another crime. . . . . . . . . . . . . . 145

        2.      Especially heinous, cruel and depraved. . . . . . . . . . . . . . . . . . . . 146

                (a)     The nature of this aggravating factor. . . . . . . . . . . . . . . . 146

                (b)     The need for a further explanation from the government
                        as to the factual basis for this factor . . . . . . . . . . . . . . . . 150

        3.      "Substantial planning or premeditation.". . . . . . . . . . . . . . . . . . . 150

        4.      Vulnerable victim.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

        5.      The sexual abuse and manipulation of J1. . . . . . . . . . . . . . . . . . . 152

        6.      Misleading the State of Vermont. . . . . . . . . . . . . . . . . . . . . . . . . 152

        7.      The use of J1 to commit kidnapping and murder. . . . . . . . . . . . . 153

        8.      Witness elimination. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 153

        9.      Exploitation of a family relationship with Ms. Bennett. . . . . . . . 154

        10.     Orchestrating J1's sexual assault by another adult male. . . . . . . . 154

        11.     The allegations of decades old, largely unadjudicated, sexual
                misconduct. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 154

                (a)     The allegations regarding "J2.". . . . . . . . . . . . . . . . . . . . 155

                (b)     The allegations regarding "J3.". . . . . . . . . . . . . . . . . . . . 156

ix

(c)     The allegations regarding "J4" and "other girls living in
                Barre, Vermont at the time.". . . . . . . . . . . . . . . . . . . . . . . 157

        (d)     The kidnapping and rape of A2.. . . . . . . . . . . . . . . . . . . . 157

    12.     Possession of child pornography. . . . . . . . . . . . . . . . . . . . . . . . . 157

    13.     Lack of remorse. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

    14.     Low potential for rehabilitation. . . . . . . . . . . . . . . . . . . . . . . . . . 163

    15-16.  The two obstructions of justice.. . . . . . . . . . . . . . . . . . . . . . . . . 164

    17.     Victim Impact Evidence.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 164

    (a)     The factor, as alleged, is unconstitutionally vague, lacks
            specifics, and is broader than permitted by statute. . . . . . . . . . . . 164

    (b)     The victim impact non-statutory aggravating factor is alleged in
            nearly every capital prosecution and does not sufficiently
            narrow the class of murderers for whom the death penalty is
            available.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 166

    (c)     The victim impact evidence should be excluded under the Eighth
            Amendment's heightened standard of reliability and under 18
            U.S.C. § 3593. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

C.  Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 169

POINT EIGHT

BECAUSE THE PEOPLE OF THE STATE OF VERMONT HAVE
REJECTED CAPITAL PUNISHMENT, THIS CASE SHOULD NOT
BE PERMITTED TO PROCEED AS A FEDERAL CAPITAL
PROSECUTION... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 170

POINT NINE

THIS COURT SHOULD DECLARE THE DEATH PENALTY UNCONSTITUTIONAL AS CRUEL AND UNUSUAL PUNISHMENT AND A *PER SE* DENIAL OF DUE PROCESS IN ALL CASES................................................ 171

CONCLUSION...................................................... 174

CERTIFICATE OF SERVICE. ........................................ 175

<u>PRELIMINARY STATEMENT OF THE CASE</u>

Michael S. Jacques is alleged to have kidnapped and murdered 12-year old Brooke Bennett on June 25, 2008, in violation of 18 U.S.C. § 1201(a)(1).  The indictment alleges that Ms. Bennet was "drugged, sexually assaulted, and [then] murdered."  (A2.)[1]  Her body was discovered in a make-shift grave seven days later.  The indictment further alleges that Mr. Jacques videotaped a juvenile engaging in sexually explicit conduct on four separate occasions (counts 2-5), in violation of 18 U.S.C. § 2251(a) and, in count six, that Mr. Jacques possessed child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B)(i).  The indictment contains a "Notice of Special Findings" that mirror preliminary factors and elements of the FDPA.

On August 25, 2009, the Government filed a notice of intent to seek the death penalty. (A10.)  In addition to alleging that Mr. Jacques was 18 or older at the time of the offense, the notice sets forth the "gateway factors" set out at 18 U.S.C. § 3591(a)(2), four statutory aggravating factors, and 17 non-statutory aggravating factors.  (A10-15.)

---

[1]  "A" to designate the appendix filed in support of these motions.

INTRODUCTION TO THE ARGUMENT

**A.    The Supreme Court's modern death-penalty jurisprudence: 1972 to the present.**

In 1972, the United States Supreme Court, unwilling to tolerate the arbitrary and capricious imposition of capital punishment, struck down all existing death-penalty schemes as incompatible with the guarantees of the Eighth and Fourteenth Amendments to the United States Constitution. *Furman v. Georgia*, 408 U.S. 238 (1972).  Each of the five justices who concurred in the *Furman* Court's one paragraph *per curium* opinion advanced separate reasoning.  However, as the Court has recognized for more than 25 years, the comparison drawn by Justice Stewart in *Furman* between receiving a sentence of death and being struck by lightning is the very essence of *Furman*:[2]

> These death sentences are cruel and unusual in the same
> way that being struck by lightning is cruel and unusual.  For, of
> all the people convicted of rapes and murders, . . . many just as
> reprehensible as these, the petitioners are among a capriciously
> selected handful upon whom the sentence of death has in fact
> been imposed.  My concurring Brothers have demonstrated that,

---

[2] I n *Zant v. Stephens*, 462 U.S. 862 (1983), the Court stated:

> A fair statement of the consensus expressed by the Court
> in *Furman* is that "where discretion is afforded a sentencing
> body on a matter so grave as the determination of whether a
> human life should be taken or spared, that discretion must be
> suitably directed and limited so as to minimize the risk of wholly
> arbitrary and capricious action."

*Id*. at 874, *quoting* plurality opinion of Justices Stewart, Powell and Stevens in *Gregg v. Georgia*, 428 U.S. 153, 189 (1976).

> if any basis can be discerned for the selection of these few to be
> sentenced to die, it is the constitutionally impermissible basis of
> race . . .   I simply conclude that the Eighth and Fourteenth
> Amendments cannot tolerate the infliction of a sentence of death
> under legal systems that permit this unique penalty to be so
> wantonly and so freakishly imposed.

*Furman*, 408 U.S. at 309-10 (Opinion of Stewart, J., concurring; citations and footnotes omitted).   Members of the *Furman* Court also took note that the death penalty was often sought selectively, "feeding prejudices against the accused if he is poor and despised, and lacking political clout, or if he is a member of a suspect or unpopular minority . . . ." *Furman*, 408 U.S. at 255 (Douglas, J., concurring).   Justice White, also concurring in the result, cited the infrequent utilization of the death penalty as an important factor contributing to his vote to strike down capital punishment:

> That conclusion, as I have said, is that the death penalty is
> exacted with great infrequency even for the most atrocious
> crimes and that there is no meaningful basis for distinguishing
> the few cases in which it is imposed from the many cases in
> which it is not.

408 U.S. at 313 (White, J., concurring).

Reacting to *Furman*, many states with a long history of capital punishment and *de jure* segregation – primarily those in the deep South – rushed to enact new capital punishment schemes.[3]   Four years after *Furman*, the issue of capital punishment returned to the Court,

-------------------

[3]   For a discussion of the Florida experience in this regard, *see* David Von Drehle, *Among the Lowest of the Dead: the Culture of Death Row*  (Times Books/Random House 1995).   In reaction to *Furman*, the governor of Florida called the Florida Legislature into special session which was to continue until that body voted out a new death-penalty bill.

this time in the cases of five men who had been prosecuted and sentenced to death – all in the South –  under newly-enacted post-*Furman* statutes.[4]  On July 2, 1976, the Court issued opinions in those five cases.  In three of the cases, the Court concluded that the states had successfully met the constitutional concerns raised in the *Furman* opinion. *Gregg v. Georgia*, 428 U.S. 153 (1976); *Jurek v. Texas*, 428 U.S. 262 (1976); *Proffitt v. Florida*, 428 U.S. 242 (1976).  The other two state schemes were struck down, principally because they required automatic imposition of a sentence of death in particular classes of murder without allowing for the "particularized consideration of all relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death." *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976) (Opinion of Justices Stewart, Powell and Stevens); *Roberts v. Louisiana*, 428 U.S. 325 (1976).

In the more than three decades since *Gregg,* the United States Supreme Court has decided well in excess of 100 death-penalty cases and has thereby created (and continues to create) a substantial and complex body of death-penalty law.  From that body of law,

_____

[4]     The death penalty, at least in the 20th and 21st centuries, has been a primarily Southern phenomena, historically rooted in racial discrimination, and continues to be a Southern phenomena more than nine years into the 21st century.  Figures current as of March 16, 2010 show that since *Gregg* was decided in 1976, there have been 1,199 executions carried out in this country.  Of these, 989 – more than 80% – have taken place in the South, principally in what is referred to as "the death belt."  Two individual states – Virginia and Texas – account for a combined total of 557 executions, nearly half of all post-*Gregg* executions.  There are presently 3,279 death row inmates in our prisons.  *See*, Death Penalty Information Center ("DPIC"), "Facts About the Death Penalty," (Axxx.)  There have been three executions of federal prisoners: Timothy McVeigh (June 11, 2001); Juan Garza (June 19, 2001); and Louis Jones (March 18, 2003).

4

however, four core principles of death-penalty jurisprudence emerge: (1) death is a different kind of punishment and, therefore, every stage of a capital case must be marked by heightened standards of reliability, review, and scrutiny; (2) a constitutional death-penalty scheme must provide for meaningful appellate review; (3) vague, duplicative, or all-encompassing aggravating factors are constitutionally invalid since such factors do not genuinely narrow the class of murders for which the death penalty is appropriate, or otherwise justify the imposition of a death sentence on one defendant as compared to others found guilty of murder; and (4), no limitation may be placed on a defendant's right to present relevant evidence in mitigation of a sentence of death. A discussion of each of these principles follows.[5]

1.    Death is different.

The bedrock principle of capital jurisprudence is that "death is different." This view of capital cases informs and guides the entire body of capital jurisprudence and capital-case litigation.  Simply stated, death-penalty cases are not the same as other cases and cannot be treated the same as other cases.[6]  Commencing with the 1976 quintet of cases that mark the beginning of post-*Furman* death-penalty jurisprudence, the Supreme Court has taken

---

[5]  For a helpful *précis* of this area, *see* "Thirty-Fourth Annual Review of Criminal Procedure," 38 GEO. L.J. ANN. REV. CRIM. PROC. 1, 783-817 (2009).

[6]  Justice Stevens, citing seven separate decisions, notes, "Our opinions have repeatedly emphasized that death is a fundamentally different kind of penalty from any other that society may impose."  *Harris v. Alabama*, 513 U.S. 504, 516 n.1 (1995) (Stevens, J., dissenting).

numerous opportunities to emphasize its recognition of the difference between death as a

punishment and all others.  In *Woodson*, for example, striking down North Carolina's initial

post-*Furman* death-penalty scheme, the Court observed:

> The penalty of death is qualitatively different from a sentence of
> imprisonment, however long. Death, in its finality, differs more
> from life imprisonment than a 100-year prison term differs from
> one of only a year or two.

428 U.S. at 305.  The following year, in *Gardner v. Florida*, 430 U.S. 339 (1977), the

proposition was reiterated:

> [D]eath is a different kind of punishment from any other which
> may be imposed in this country.  From the point of view of the
> defendant, it is different in both its severity and its finality.
> From the point of view of society, the action of the sovereign in
> taking the life of one of its citizens differs dramatically from any
> other legitimate state action.  It is of vital importance to the
> defendant and to the community that any decision to impose the
> death sentence be, and appear to be, based on reason rather than
> caprice or emotion.

*Gardner*, 430 U.S. at 357-58.

The notion that "death is different" is not simply the dramatic recitation of an obvious

truth. Rather, the principle triggers sharply increased levels of judicial attention to every step

of the process through which the irrevocable sanction of death is sought and carried out.  The

post-*Furman* Court has described capital jurisprudence as mandating a "heightened standard

of reliability" for the entire process through which a government marshals the legal and

moral authority to terminate a life.  *See also, United States v. Fell (Fell I)*, 360 F.3d 135, 143

(2d Cir. 2004) The need for heightened reliability is "the natural consequence of the

6

knowledge that execution is the most irremediable and unfathomable of penalties;  that death is different." *Ford v. Wainwright*, 477 U.S. 399, 411 (1986).  As stated in *Caldwell v. Mississippi*, 472 U.S. 320 (1985), "[T]he qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination."  *Id*. at 329.  *See also Monge v. California*, 524 U.S. 721, 731 (1998), reiterating the "acute need for reliability in capital sentencing proceedings."

In practice, the death penalty should be reserved for the worst of the worst.  *See Roper v. Simmons,* 543 U.S. 551, 568 (2005) ("Capital punishment must be limited to those offenders who commit 'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'" (quoting *Atkins v. Virginia,* 536 U.S. 304, 319 (2002)).  In *Kennedy v. Louisiana,* 128 S.Ct. 2641 (2008), the Court reiterated the principle that, "Evolving standards of decency must embrace and express respect for the dignity of the person, and the punishment of criminals must conform to that rule."  128 S.Ct. at 2649.  Otherwise, "When the law punishes by death, it risks its own sudden descent into brutality, transgressing the constitutional commitment to decency and restraint."  *Id.* at 2650.

2. <u>A constitutional death-penalty scheme must provide for meaningful appellate review</u>.

It is a fair summary of the overall thrust of the *Gregg-Jurek-Proffitt* trilogy that capital sentencing schemes will successfully withstand constitutional challenge only to the following extent:  (1) that the particular scheme genuinely narrows the class of murderers for whom the ultimate penalty is available;  and (2), provides the heightened procedural safeguards that

7

avoid the evils identified in *Furman*, principally the arbitrary, capricious and/or discriminatory imposition of the death penalty.  *See, e.g., Zant v. Stephens*, 462 U.S. at 890.

One additional vitally important procedural safeguard, emphasized by the Court from the earliest post-*Furman* cases forward, is the availability of "meaningful appellate review." *Pulley v. Harris*, 465 U.S. 37, 55 (1984) (Stevens, J., concurring).  While *Pulley* ultimately held that a specialized form of capital appellate scrutiny known as "proportionality review" was not required by the Eighth and Fourteenth Amendments,[7] the Court has been steadfast in its view that meaningful appellate review is an essential component of a constitutional death-penalty scheme.  In *Zant*, for example, the Court explained that its approval of Georgia's capital-sentencing procedure in *Gregg* as

> rest[ing] primarily on two features of the scheme: That the jury was required to find at least one valid statutory aggravating circumstance and to identify it in writing, and that the State Supreme Court reviewed the record of every death-penalty proceeding to determine whether the sentence was arbitrary or disproportionate.

*Zant*, 462 U.S. at 876.  In *Godfrey v. Georgia*, 446 U.S. 420 (1979), the Court discussed three independent criteria as indispensable to a finding that a particular capital scheme effectively and constitutionally channeled the sentencing authority's discretion.  Among these was the availability of rational appellate review of the "process for imposing a sentence of death."

---

[7] In *Pulley*, the Court defined capital proportionality review as an inquiry to determine whether a sentence of death in a particular case is disproportionate to the penalties imposed in similar cases.  *Pulley*, 465 U.S. at 43, 44.

8

*Godfrey*, 446 U.S. at 428.  In *Parker v. Dugger*, 498 U.S. 308 (1991), the Court re-visited and re-affirmed the importance of meaningful appellate review in determining the constitutionality of a death-penalty scheme:

> We have emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally.

498 U.S. at 321.

3.   A  constitutional  death-penalty  scheme  may  not  employ  aggravating circumstances that are vague, duplicative, overly broad, or which do not justify the imposition of a more severe sentence on the defendant as compared to others found guilty of murder.

The FDPA requires a penalty-phase jury to decide, initially, whether or not certain "particularly relevant" aggravating factors have been unanimously established beyond a reasonable doubt, and then to weigh any aggravating factors against any mitigating factors.[8] 18 U.S.C. § 3593(e).  It is the "weighing" process which leads the jury to decide whether or not the sentence should be death.  As noted in *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988), however, "[t]he use of 'aggravating circumstances' is not an end in itself, but a means of genuinely narrowing the class of death-eligible persons and thereby channeling the jury's discretion."  In light of the critical narrowing function performed by aggravating factors, it follows that if a particular factor is vague to the point of defying definition or,

---

[8]   The weighing of aggravating factors against mitigating factors, while required by the FDPA is not required by the Constitution.  *See, e.g.*, *Blystone v. Pennsylvania*, 494 U.S. 299 (1990).

9

alternatively, could be interpreted by a particular sentencing authority – whether judge or jury – as applicable to any, and therefore *all* murders, that factor fails to perform a constitutional narrowing function and is invalid.

The Supreme Court has also been consistent in recognition of the principle that "an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder," *Zant v. Stephens*, 462 U.S. at 877. At the most fundamental level, aggravating circumstances must rationally distinguish "those who deserve capital punishment from those who do not." *Arave v. Creech*, 507 U.S. 463, 474 (1993). In *Godfrey v. Georgia*, *supra,* for example, the defendant was sentenced to death upon a finding that the murder was "outrageously or wantonly vile, horrible or inhuman." 446 U.S. at 422. In striking down this aggravating circumstance and vacating the sentence of death, Justice Stewart's opinion for the plurality reasoned that the language of this particular aggravating circumstance failed to provide "inherent restraint on the arbitrary and capricious infliction of the death sentence," since virtually every murder could be said to meet those criteria. *Id.* at 428-29. Concluding that the facts and circumstances of the murder in *Godfrey* did not stand out from other murders, the Court held there was "no principled way to distinguish this case, in which the death penalty was imposed, from the many in which it was not." *Id.* at 433. In *Tuilaepa v. California,* 512 U.S. 967 (1994), the Court reiterated the two constitutional tests which aggravating factors must satisfy: (1) a valid aggravating factor

10

may not apply to every defendant convicted of murder, but only to a rationally-selected sub-class of murderers; and (2) the circumstances must be defined with clarity. *Id.* at 972.

The constitutionality of aggravating factors that are quite similar in language may rise or fall on how that language is construed, limited and/or otherwise presented to the sentencing authority. In *Proffitt*, for example, a death sentence imposed in Florida under an aggravating factor defined as "especially heinous, atrocious, or cruel" was held to be constitutional because, as construed and narrowed by the Florida Supreme Court, its inherent vagueness and overbreadth were corrected. By contrast, in *Maynard v. Cartwright*, 486 U.S. 356 (1988), an Oklahoma aggravating circumstance virtually identical in language to the one upheld in *Proffitt* was struck down as overly-broad and unconstitutionally vague since its potential reach had not been effectively narrowed through judicial construction or jury instructions. *See also*, *Shell v. Mississippi*, 498 U.S. 1 (1990) (trial judge's attempt to limit the reach of Mississippi's "especially heinous, atrocious, or cruel" aggravating factor was constitutionally insufficient).

Aggravating factors, therefore, serve a vital function in death-penalty jurisprudence. *See* Note, "Criminal Law: An Evolutionary Analysis of the Role of Aggravating Factors in Contemporary Death Penalty Jurisprudence – From *Furman* to *Blystone*," 32 WASHBURN L.J. 77 (1992). In *Gregg v. Georgia*, *supra*, 428 U.S. at 189, the Court stated, "Where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to

11

minimize the risk of wholly arbitrary and capricious action."

    4.    <u>No unreasonable limitation may be placed on the right of the accused to present relevant mitigating evidence during the penalty trial</u>.

A fourth and final aspect of a constitutional death-penalty scheme is that virtually no limitation may be placed on the right of the accused to present for the sentencer's consideration all relevant mitigating evidence. This established tenet of capital jurisprudence is rooted in *Lockett v. Ohio*, 438 U.S. 586 (1978), where, two years after *Gregg*, a plurality of the Court held that "in all but the rarest kind of capital cases," a sentencing authority could not "be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record . . . as a basis for a sentence less than death." *Id*. at 113-14 (emphasis omitted); *see also Skipper v. North Carolina*, 476 U.S. 1 (1986); *Eddings v. Oklahoma*, 455 U.S. at 112. In *McCleskey v. Kemp*, 481 U.S. 279 (1987), the Court held that a constitutional death-penalty scheme

> cannot limit the sentencer's consideration of *any relevant circumstance* that could cause it to decline to impose the penalty. In this respect, the State cannot channel the sentencer's discretion, but must allow it to consider *any relevant information* offered by the defendant.

*Id*. at 305-06 (emphasis added); *see also Green v. Georgia*, 442 U.S. 95 (1979) (evidence rules may not be invoked to bar otherwise relevant mitigating evidence).

In *Buchanan v. Angelone*, 522 U.S. 269 (1998), Chief Justice Rehnquist, writing for a majority of the Court 20 years after *Lockett*, stated:

> in the [penalty] phase, we have emphasized the need for a broad

> inquiry into all relevant mitigating evidence to allow an individualized determination.
>
> * * *
>
> In the [penalty] phase, our cases have established that the sentencer may not be precluded from considering any constitutionally relevant mitigating evidence.

*Id*. at 276 (citations omitted).  In *Williams v. Taylor*, 529 U.S. 362 (2000), the Court noted that mitigating evidence can serve to lessen a defendant's "moral culpability" even where such evidence "does not undermine or rebut the prosecution's death-eligibility case."  *Id.* at 398.

The unbroken line of cases supporting liberal admission of mitigating evidence was most recently extended by *Tennard v. Dretke*, 542 U.S. 274 (2004), where the Court rejected the notion, originating with the Texas Court of Criminal Appeals and repeatedly endorsed by the Fifth Circuit, that evidence is not mitigating unless there is a nexus between the evidence and the crime.  In *Tennard*, a six-member majority of the Court reversed the Fifth Circuit and bluntly criticized that court's longstanding practice of imposing a restrictive standard of relevance for mitigating evidence at the penalty-phase of Texas capital cases. *Tennard* reiterated that the threshold of relevance for mitigating evidence is minimal, stating:

> When we addressed directly the relevance standard applicable to mitigating evidence in capital cases in *McKoy v. North Carolina,* 494 U.S. 433, 440-441, 108 L. Ed. 2d 369, 110 S. Ct. 1227 (1990), we spoke in the most expansive terms. We established that the "meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding" than in any other context, and thus the general

13

evidentiary standard – "'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence'"– applies. *Id.*, at 440, 108 L. Ed. 2d 369, 110 S. Ct. 1227 (*quoting New Jersey v. T. L. O.*, 469 U.S. 325, 345, 83 L. Ed. 2d 720, 105 S. Ct. 733 (1985)). We quoted approvingly from a dissenting opinion in the state court: "'Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value.'" 494 U.S., at 440, 108 L. Ed. 2d 369, 110 S. Ct. 1227 (*quoting State v. McKoy*, 323 N. C. 1, 55-56, 372 S.E.2d, 12, 45 (1988) (opinion of Exum, C. J.)). Thus, a State cannot bar "the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death." 494 U.S., at 441, 108 L. Ed. 2d 369, 110 S. Ct. 1227.

Once this low threshold for relevance is met, the "Eighth Amendment requires that the jury be able to consider and give effect to" a capital defendant's mitigating evidence. *Boyde v. California,* 494 U.S. 370, 377-378, 108 L. Ed. 2d 316, 110 S. Ct. 1190 (1990) (*citing Lockett v. Ohio*, 438 U.S. 586, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978); *Eddings v. Oklahoma*, 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982); *Penry I*, 492 U.S. 302, 106 L. Ed. 2d 256, 109 S. Ct. 2934 (1989)); *see also Payne v. Tennessee,* 501 U.S. 808, 822, 115 L. Ed. 2d 720, 111 S. Ct. 2597 (1991) ("We have held that a State cannot preclude the sentencer from considering 'any relevant mitigating evidence' that the defendant proffers in support of a sentence less than death. . . . [V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances." (*quoting Eddings, supra*, at 114, 71 L. Ed. 2d 1, 102 S. Ct. 869)).

*Id.* at 284-85. In *Smith v. Texas*, 543 U.S. 37 (2004), decided five months after *Tennard*, the Court reiterated its rejection of the "nexus" requirement, stating, "[w]e rejected the Fifth Circuit's 'nexus' requirement in *Tennard* . . . ." *Smith v. Texas*, 543 U.S. at 45. More

14

recently, the Court reaffirmed this point in an opinion authored by Justice Alito:

> [O]ur cases have firmly established that sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offense in the future.

*Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007); *see also*, *Ayers v. Belmontes*, 549 U.S. 7, 21 (2006), where the Court described a jury's penalty-phase task as weighing "the finite aggravating factors against the *potentially infinite mitigators*." (Emphasis added.). From this Circuit, in the *en banc Fell* opinion (*Fell III*), Judge Raggi noted for the majority, "[T]he law liberally permits a capital defendant to put mitigating evidence before a jury," recognizing, however, that there are some limits that district courts may properly put on such evidence. *Fell III*, 571 F.3d at 280. This court has noted that, "A capital defendant is entitled to present any relevant migrating evidence in support of a sentence less than death." *United States v. Fell*, 372 F.Supp.2d 786, 787 (D. Vt. 2005).

### B.    The return of the federal death penalty.

In the wake of *Furman*, and in the absence of corrective congressional action, it was widely assumed that the capital aspects of existing federal criminal statutes were not constitutional and, in fact, all federal capital prosecutions ceased. Matters remained that way until, on November 18, 1988, Congress enacted the first post-*Furman* federal death penalty as part of the Anti-Drug Abuse Amendments ("ADAA"), authorizing capital punishment for

murders occurring in the context of drug trafficking.[9]  21 U.S.C. § 848(e).  The reach of the federal death penalty was greatly expanded on September 13, 1994, when President Clinton signed into law the Federal Death Penalty Act of 1994, 18 U.S.C. § 3591 *et seq.*  In March, 2006, the separate procedural provisions of the ADAA, 21 U.S.C. §§ 848(g)-(r), were repealed.

The FDPA permits the death penalty to be considered in the following circumstances:

> § 3591. **Sentence of death** – (a) A defendant who has been found guilty of – (2) any . . . offense for which a sentence of death is provided, if the defendant as determined beyond a reasonable doubt at the hearing under section 3593 –
>
> (A) intentionally killed the victim;
>
> (B) intentionally inflicted serious bodily injury that resulted in the death of the victim;
>
> (C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act;  or
>
> (D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person,

---

[9]  In practice, there had been a *de facto* moratorium on federal capital prosecutions for the decade prior to *Furman*.  For an exhaustive history of the federal death penalty, including an overview of both the FDPA and ADAA, *see* R.K. Little, "The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role," 26 FORDHAM URBAN L.J. 347 (1999).  Professor Little is a former Justice Department attorney who served under Attorney General Reno on the Attorney General's Review Committee on Capital Cases, the body that reviews all capital cases and presents a recommendation to the Attorney General as to whether the case should be designated as a capital prosecution.

16

> other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act, . . .

In order to set into motion what Justice Blackmun called "the machinery of death,"[10] the government must serve and file a pretrial notice that the death penalty will be sought and specify in that notice those aggravating factors which the government will seek to prove if the case goes to a penalty trial. 18 U.S.C. § 3593(a). Additionally, the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002) requires grand jury findings on at least the state-of-mind elements and statutory aggravating factors and, as argued *infra*, the balancing of aggravating and mitigating factors. If a defendant is found guilty of an offense of the kind enumerated in § 3591, a separate sentencing hearing must be conducted. The death penalty hearing may take place before the trial judge or before a jury. A defendant may waive jury-sentencing, however, only if the government consents. 18 U.S.C. § 3593(b)(3). A trial court may convene a separate penalty jury where the original jury has been discharged "for good cause." 18 U.S.C. § 3593(b)(2)(C).

The penalty hearing is, for all intents and purposes, a separate trial at which both sides may call witnesses and present "information." The statute first requires the government to establish that the defendant is "eligible" for the death penalty. To do so, the government

---

[10] *See Callins v. Collins*, 510 U.S. 1141, 1145 (1994) ("From this day forward, I no longer shall tinker with the machinery of death.") (Blackmun, J., dissenting from the denial of *certiorari* in a Texas capital case and announcing his view that the death penalty is, as applied and administered, unconstitutional.) Justice Blackmun had dissented in *Furman*.

must convince the jury, unanimously and beyond a reasonable doubt, that one of the "intent" findings set forth in § 3591(a)(2)(A) - (D) exists.  If the jury so finds, it must next unanimously find beyond a reasonable doubt that at least one of the statutory aggravating factors set forth in § 3592(c)(1) through (16) also exists.  18 U.S.C. § 3593(c).  If the jury does not unanimously find, in sequence, that, beyond a reasonable doubt, both statutory requirements have been met, the penalty trial is over and the court must impose a sentence other than death.  If, however, the government successfully carries its burden of proof in establishing both the existence of an intent factor under § 3591, and one or more of the "(c)" aggravating factors, the jury may also consider whether the government has established beyond a reasonable doubt any *non*-statutory aggravating factor – arguably limited to victim-impact – for which pre-trial notice was provided pursuant to 18 U.S.C. § 3593.

In attempting to provide guidance as to what a jury may consider at a penalty trial, congress spoke, as noted, in terms of "information," not "evidence."  "Information" may be presented to the jury, by either side, "regardless of its admissibility under the rules governing admission of evidence at criminal trials, except that information may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."  18 U.S.C. § 3593(c).  Thus, judges continue their role as evidentiary gatekeepers and retain their discretion to exclude unreliable, confusing, time-wasting, or

unfairly prejudicial evidence. *See Fell I,* 360 F.3d at 143.[11]

If the government meets its threshold burdens, the jury is required to consider mitigating factors. The statute, at § 3592(a)(1) - (8), provides seven specific mitigating factors and one *Lockett*-derived "catch-all" provision, *viz.* that "other factors in the defendant's background, record or character or any other circumstance of the offense mitigate against imposition of the death sentence." 18 U.S.C. § 3592(a)(8). Mitigating factors must be established by the defendant by a preponderance of the evidence. 18 U.S.C. § 3593(c). Findings with respect to mitigating factors need not be unanimous, and any member of the jury who finds the existence of a mitigating factor may consider it in the final weighing process set out in subsection§ 3593(e), regardless of the number of other jurors who concur that the factor has been established. *See*18 U.S.C. § 3593(d), giving effect to *Mills v. Maryland*, 486 U.S. 367 (1988). By contrast, findings with respect to aggravating factors must be unanimous. 18 U.S.C. § 3593(d).

---

[11] This is a significant variation on the language of F.R.EVID. 403, which permits a court to exclude otherwise relevant evidence only its probative value is "*substantially* outweighed by the danger of unfair prejudice . . ." [Emphasis added.] In *United States v. Gilbert*, 120 F.Supp.2d 147 (D.Mass. 2000), Judge Ponsor took note of this distinction, commenting:

> The balance of probative value and unfair prejudice must be weighed more carefully in a death penalty case than in normal cases. Under the statute, the probative value need not be "substantially" outweighed by prejudice, as F.R.EVID. 403 generally requires.

*Id.* at 151; *see also, United States v. Sampson*, 335 F.Supp.2d 166, 177 (D.Mass. 2004).

Once the jury has completed these threshold tasks, it next decides whether the aggravating factor in fact outweigh the mitigating factors and, if so, whether the balance of aggravating factors over the mitigating factors is "sufficient to justify a sentence of death, or in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death."  18 U.S.C. § 3593(e).  In other words, a jury's finding that the aggravating factors outweigh the mitigating factors would not be enough to return a capital verdict absent a subsequent finding that the  degree of the outweighing suffices to impose a sentence of death.

Thus, the FDPA is a weighing death penalty statute which requires a penalty phase jury to decide, initially, whether certain aggravating factors have been unanimously established beyond a reasonable doubt and, if so, to weigh those aggravating factors against any mitigating factors. 18 U.S.C. § 3593(e).  It is, once again, the weighing process which leads to the jury's ultimate decision whether the defendant should be sentenced to death.  The ADAA had contained the following provision:

> The jury or the court, regardless of its findings with respect to aggravating and mitigating factors, is never required to impose a death sentence and the jury shall be so instructed.

21 U.S.C. § 848(k) (repealed).  Most federal trial judges have given similar instructions in FDPA cases.[12]   *See United States v. O'Driscoll*, 2002 U.S. Dist. LEXIS 25862, at *3, *4

------

[12]  Judge Sand recommends that such an instruction also be provided in FDPA cases and, in practice, most courts do so. *See* 1 L. SAND, MODERN FEDERAL JURY INSTRUCTIONS ¶ 9A.04, and commentary at 9A-80, 81.

(M.D. Pa. 2002) (district court held "it is difficult to see how this provision could be required as a matter of law in a death penalty case involving large scale drug-trafficking and not be required in other death penalty cases.").   *See also United States v. Sampson*, *supra,* 335 F.Supp.2d at 200-203.

After considering all issues, the jury votes and returns its findings.  Unless the jury unanimously recommends death or life without the possibility of release, the Court must impose a sentence of less than death, up to life without possibility of release.[13]  A jury unable to agree on a unanimous death verdict spares the defendant's life.[14]  Whether the jury "recommends" a verdict of life or death, that decision is binding upon the court. 18 U.S.C. § 3594.  The FDPA does not provide for judicial override of the jury's capital sentencing decision.  *Id.*

No matter how the deliberations turn out, each juror is required to sign a certificate that their decision was not influenced by the "race, color, religious beliefs, national origin or sex of the defendant or of any victim. . . . ." 18 U.S.C. § 3593(f).  In the event of a death sentence, the defendant has a right of appellate review, 18 U.S.C. § 3595, under which the

---

[13]   The sole alternative to a sentence of death in this case is life imprisonment.

[14]   This was one of the holdings of the only FDPA case to reach the Supreme Court. *See Jones v. United States,* 527 U.S. 373 (1999) (If the jury reports itself unable to agree on penalty, the sentencing function reverts to the trial judge who may not impose a sentence of death; there is no re-trial.)  In *Sattazahn v. Pennsylvania*, 537 U.S. 101 (2003), the Court ruled that if a non-unanimous penalty-phase jury spares a defendant's life, the prosecution may again seek a sentence of death if the defendant wins a new trial of the underlying offense.  A *Sattazahn* case has not yet arisen under the FDPA.

reviewing court is permitted to grant relief from a sentence of death if: (1) the death sentence was "imposed under the influence of passion, prejudice, or any other arbitrary factor," (2) "the admissible evidence and information adduced does not support the special finding of the existence of the required aggravating factor," or (3)" the proceedings involved any other legal error requiring reversal of the sentence that was properly preserved for appeal under the rules of criminal procedure." 18 U.S.C. § 3595(c)(2). The Third Circuit has held that the FDPA does not mandate an appeal from a sentence of death and that an appeal, once filed, may be withdrawn. *United States v. Hammer*, 226 F.3d 229 (3d Cir. 2000).

## C.    Relevant appellate decisions.

To date, death sentences imposed pursuant to both the FDPA and ADAA have been reviewed in all circuits except the Courts of Appeal for the Third and District of Columbia Circuits. *See United States v. Sampson*, 486 F.3d 13 (1st Cir. 2007) (affirming death sentence); *United States v. Fell*, 531 F.3d 197 (2d Cir. 2008) (affirming death sentence); *United States v. Mitchell*, 502 F.3d 931 (9th Cir. 2007) (affirming death sentence; *United States v. Brown*, 441 F.3d 1330 (11th Cir. 2006) (affirming death sentence); *United States v. LeCroy*, 441 F.3d 914 (11th Cir. 2006) (affirming death sentence); *United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005) (affirming death sentence); *United States v. Bourgeois*, 423 F.3d 501 (5th Cir. 2005) (affirming death sentence); *United States v. Allen*, 406 F.3d 940 (8th Cir. 2005) (*en banc*) (affirming death sentence); *United States v. Lee*, 374 F.3d 637 (8th Cir. 2004) (affirming death sentence); *United States v. Robinson*, 367 F.3d 278 (5th Cir. 2004) (affirming

death sentence); *United States v. Barnette*, 390 F.3d 775 (4th Cir. 2004), *vacated and remanded*, 126 S.Ct. 92 (2005); *United States v. Higgs*, 353 F.3d 281 (4th Cir. 2003) (affirming death sentence); *United States v. Nelson*, 347 F.3d 701 (8th Cir. 2003) (affirming death sentence); *United States v. Jackson*, 327 F.3d 273 (4th Cir. 2003) (affirming death sentence); *United States v. Bernard*, 299 F.3d 467 (5th Cir. 2002) (affirming death sentence); *United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000) (vacating death sentence); *United States v. Johnson*, 223 F.3d 665 (7th Cir. 2000) (affirming death sentence); *United States v. Paul*, 217 F.3d 989 (8th Cir. 2000) (affirming death sentence); *United States v. Barnette*, 211 F.3d 803 (4th Cir. 2000) (vacating death sentence); *United States v. Causey*, 185 F.3d 407 (5th Cir. 1999) (reversing convictions and sentences of death in first case indicted pursuant to FDPA); *United States v. Battle*, 163 F.3d 1 (11th Cir. 1998) (affirming death sentence); *United States v. Webster*, 162 F.3d 308 (5th Cir. 1998) (affirming death sentence); *United States v. McVeigh*, 153 F.3d 1166 (10th Cir. 1998) (affirming death sentence); *United States v. Hall*, 152 F.3d 381 (5th Cir. 1998) (affirming death sentence).

**D.    The Second Circuit's *Fell* decisions**

In this Circuit, although there have been dozens of post-1988 authorized cases, and 21 capital trials involving a total of 26 defendants (Axxx), there have only been two sentences of death returned by Second Circuit juries.  One of those cases, *United States v. Donald Fell* was, of course, presided over by this court.  *Fell* is the only modern federal sentence of death

23

to have been reviewed on its merits by the Second Circuit.[15] There are three published Second Circuit opinions in the *Fell* line, as well as several opinions published by this court at various stages of the *Fell* case litigation.[16]

In *United States v. Fell (Fell I)*, 360 F.3d 135 (2004), the Circuit reversed this court's decision to strike the FDPA as unconstitutional.  In the course of its opinion, the Court emphasized the importance of "heightened reliability" in capital sentencing proceedings.  360 F.3d at 143.  In its second opinion, *United States v. Fell (Fell II)*, 531 F.3d 197 (2d Cir. 2008), the Circuit upheld Mr. Fell's conviction and sentence of death.  In doing so, the Circuit noted that most of the errors presented on appeal had not been preserved and was therefore reviewing, in the main, on a plain-error standard.  *Fell II*, 531 F.3d at 209.  The opinion largely confines itself to claims of trial error and resolves very little in terms of the many

---

[15]   The other case within this circuit where a jury returned a sentence of death, *United States v. Ronnell Wilson* (E.D.N.Y.), was argued in the Second Circuit on November 5, 2009 *See also*, *United States v. Pepin*, 541 F.3d 193 (2d Cir. 2008) (Ruling on government's interlocutory appeal of trial court's decision to exclude, pre-trial, certain aggravating factors. Mr. Pepin ultimately proceeded to trial and received a life sentence.)

[16]   In one of those opinions, this court took proper note of the meaning of appellate level decisions as they bear on what a trial court *must* do versus what a trial court *may* do.  *United States v. Fell*, 372 F.Supp.2d 766, 769 (D. Vt. 2005).  Thus, in considering how appellate courts have ruled on particular recurring issues, it is well to keep in mind that the appellate  law in the area of the FDPA is skewed in favor of pro-prosecution outcomes.  That is so because an issue will not be presented on appeal unless the following events occur: (1) a defendant asked for particular relief; (2), the trial judge denied the relief requested, often a matter of broad discretion; and (3), the defendant was sentenced to death.  Thus, favorable exercises of judicial discretion never reach the appellate level and rarely make their way into published decisions.  This is especially so since, as noted *infra*, two-thirds of federal capital cases that reach a penalty phase result in life verdicts where there is obviously no appeal that implicates any capital issues.

broader challenges to the FDPA brought here.  Indeed, the only broad issues that the Second

Circuit reached, and decided, in *Fell II* were whether the FDPA required that non-statutory

aggravating factors be alleged in the indictment, 531 F.3d at 238, and whether the FDPA is

unconstitutional for failing to mandate "trifurcation" of the proceedings, 531 F.3d at 239.

Thus, virtually all constitutional challenges to the FDPA remain undecided in the Second

Circuit as well as the United States Supreme Court.  Finally, in *United States v. Fell*, 571 F.3d

264 (2d Cir. 2009) (*en banc*), the Circuit explained its decision to deny, by a 6-3 vote, *en banc*

review.

<u>LEGAL ARGUMENT</u>

<u>POINT ONE</u>

BECAUSE MORE THAN TWO DECADES OF EXPERIENCE WITH THE FEDERAL DEATH PENALTY HAS DEMONSTRATED THAT IT OPERATES IN AN ARBITRARY, CAPRICIOUS, IRRATIONAL AND DISCRIMINATORY MANNER, THIS COURT SHOULD DECLARE THE FDPA UNCONSTITUTIONAL.

**A.    Introduction: the failure of the federal death penalty experiment.**

A post-*Furman* and *Gregg* federal death penalty has now been in effect for more than 20 years.  Three people have been executed and an additional 57 men and women are subject to an active federal death sentence.  It can now be said, with confidence, that the federal death penalty experiment has failed.  As it has played out in federal courtrooms around this country, the FDPA has been exposed as arbitrary, capricious, irrational, discriminatory in impact and, in the final analysis, fundamentally incapable of answering in a rational and predictable way the profound and fundamental question of who should live and who should die.  This court should strike it down.

**B.    Revisiting the constitutional premise of *Furman v. Georgia.***

As stated earlier, the essence of the Supreme Court's *Furman* decision was captured in Justice Stewart's concurring opinion:

> These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual.  For, of all the people convicted of rapes and murders, . . . many just as reprehensible as these, the petitioners are among a capriciously selected handful upon whom the sentence of death has in fact been imposed.  My concurring Brothers have demonstrated that,

26

> if any basis can be discerned for the selection of these few to be
> sentenced to die, it is the constitutionally impermissible basis of
> race . . .   I simply conclude that the Eighth and Fourteenth
> Amendments cannot tolerate the infliction of a sentence of death
> under legal systems that permit this unique penalty to be so
> wantonly and so freakishly imposed.

*Furman v. Georgia*, 408 U.S. at 309-10 (Opinion of Stewart, J., concurring; citations and

footnotes omitted).  To this may be added Justice White's finding that, "[T]he death penalty

is exacted with great infrequency even for the most atrocious crimes, and that there is no

meaningful basis for distinguishing the few cases in which it is imposed from the many cases

in which it is not."  *Id.* at 313 (Opinion of White, J., concurring).  In fact, the infrequency of

death sentences was noted by each of the five concurring Justices in the *Furman* majority.

*See, Furman*, 408 U.S. at 248 n. 11 (Douglas, J., concurring); *id.* at 291-95 (Brennan, J.,

concurring);[17] *id.* at 309-10 (Stewart, J., concurring); *id.* at 312 (White, J., concurring); and,

*id.* at 354 n. 124 and 362-63 (Marshall, J., concurring).

The argument that the federal death penalty should be struck down because it is so

infrequently sought or imposed should not be misunderstood as an argument calling for

profligate use of the federal death penalty.  As Justice Brennan stated in *Furman*:

---

[17]  In 1972, Justice Brennan, positing a nation of 200 million people that carries out
50 executions per year, noted that "when government inflicts a severe punishment no more
than 50 times a year, the inference is strong that the punishment is not being regularly and
fairly applied,"  408 U.S. at 294, and, "When the punishment of death is inflicted in a trivial
number of the cases in which it is legally available, the conclusion is virtually inescapable
that it is being inflicted arbitrarily.  Indeed, it smacks of little more than a lottery system."
*Id.*  We are now a nation of 280 million people.  In the more than two decades since the
return of the federal death penalty, out of a universe of thousands of potential federal capital
cases, there have been 66 federal death verdicts.  Three federal prisoners have been executed.
There are presently 57 inmates on federal death row under an active sentence of death.

>The States claim, however, that this rarity is evidence not of arbitrariness, but of informed selectivity.

>Informed selectivity, of course, is a value not to be denigrated. Yet, presumably the States could make precisely the same claim if there were 10 executions per year, or five, or even if there were but one. That there may be as many as 50 per year does not strengthen the claim. When the rate of infliction is at that low level, it is highly implausible that only the worst criminals who commit the worst crimes are selected for this punishment. No one has yet suggested a rational basis that could differentiate in these terms the few who die from the many who go to prison. Crimes and criminals simply do not admit of a distinction that can be drawn so finely as to explain, on that ground, the execution of such a tiny sample of those eligible. Certainly the laws that provide for this punishment do not attempt to draw that distinction; all cases to which the laws apply are necessarily "extreme."

408 U.S. at 293-94 (Brennan, J., concurring).

At the time *Furman* was decided, as the opinion itself reflects, 15-20% of convicted murderers and rapists were actually sentenced to death in those jurisdictions where the death penalty was available for such offenses. *Furman*, 408 U.S. at 386 n. 11 (Burger, C.J., dissenting, citing four sources to support the statistic). Justice Powell, also dissenting, cited similar statistics. *Id.* at 435 n. 19. For his part, Justice Stewart utilized Chief Justice Burger's statistical analysis to lend further support to his ultimate conclusion that the death penalty was, indeed, in an Eighth Amendment sense, "unusual." As stated recently by Circuit Judge Gregory of the Fourth Circuit:

>When the government selects a few offenders from such a large pool for execution, it cannot further its legitimate penalogical interests; instead it merely inflicts gratuitous pain and suffering.

28

*United States v. Caro*, ___ F.3d ___ (4th Cir. 03/17/2010), slip op. at p. 62 (Gregory, Cir.J., dissenting).

In *Furman*, arbitrariness and caprice were seen as the inevitable side-effects of a rarely-imposed punishment of death.  Recall, also, Justice White's observations, premised his review of hundreds of state and federal death-penalty cases in what was then 10 years on the Court:

> That conclusion, as I have said, is that the death penalty is exacted with great infrequency even for the most atrocious crimes and that there is no meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not.

408 U.S. at 313 (White, J., concurring);  *see also*, Justice Scalia's concurring observation in *Walton v. Arizona*, 497 U.S. 639, 658 (1990), *overruled on other grounds*, *Ring v. Arizona*, 536 U.S. 584 (2002), that the key opinions in *Furman* "focused on the infrequent and seeming randomness with which, under the discretionary state systems, the death penalty was imposed."  In *Gregg*, the plurality reiterated this understanding of *Furman*, noting, "It has been estimated that before *Furman* less than 20% of those convicted of murder were sentenced to death in those States that authorized capital punishment."  *Gregg v. Georgia*, 428 U.S. 153, 182 n. 26 (plurality opinion).   This understanding was repeated in *Woodson v. North Carolina*, *supra*, 428 U.S. at 295 n.31.

After more than two decades of experience (1988-2010) with a post-*Gregg* federal death penalty, it is a simple truth that the federal death penalty is sought and imposed far more rarely than in the cases examined by *Furman*.  Being sentenced to death in the federal system

is truly akin to being struck by lightning.[18] Indeed, as argued *infra*, no meaningful basis may be discerned for distinguishing those cases – even among the most extreme[19] – where death is imposed from those cases in which it is not.

---

[18] The August 2006 edition of *National Geographic* published a chart on the odds of dying by various means.  For example, there is a 1 in 5 change of dying from heart disease, and a 1 in 84 chance of dying in a car accident.  Far down the list is the chance of dying by lethal injection, 1 in 62,468.  The very next item on the list sets the odds of being killed by lightning as 1 in 79,746.  *Id.* at p. 21.

[19] In the District of Colorado, Timothy McVeigh was sentenced to death and executed for utilizing a truck bomb to blow up the Murrah Federal Building in Oklahoma City, killing 168 people and injuring hundreds.  In the Southern District of New York, two men associated with Usama bin Laden and al-Qaeda were spared the death penalty after being convicted of simultaneous terrorist attacks, utilizing truck bombs, that destroyed two American embassies in East Africa, killing 224 – including 12 Americans – and injuring thousands. Zacharias Moussaoui was spared the death penalty in the Eastern District of Virginia despite a jury finding that he was responsible for the thousands of deaths that occurred as a result of the September 11, 2001 terrorist attacks.  Eric Rudolph – the Olympic and abortion-clinic bomber – entered a guilty plea to a life sentence, as did Theodore Kaczynski, the Unabomber.  *See* further discussion in the point *infra*.

### C.     More than two decades of experience with the federal death penalty.

The *current* state of the federal death penalty – after more than 20 years of experience

– is summarized in the following table:

THE STATUS AND DISPOSITION OF ALL POTENTIAL
FEDERAL CAPITAL CASES FROM 1988 TO  2010 [20]

```
   •    TOTAL POTENTIAL CASES . . . . . . . . . . 3,138
   •    PENDING REVIEW BY THE DEPARTMENT OF JUSTICE. 252
   •    CASES AUTHORIZED FOR CAPITAL PROSECUTION ..  465
   •    PRESENTLY PENDING OR IN TRIAL . . . . . . . 38
   •    TRIAL: LIFE SENTENCE. . . . . . . . . . . 134
   •    TRIAL: DEATH SENTENCE.. . . . . . . . . . . 68
   •    EXECUTIONS . . . . . . . . . . . . . . . .  3
   •    CLEMENCY . . . . . . . . . . . . . . . . .  1
   •    FEDERAL DEATH ROW, ACTIVE DEATH SENTENCE .. . 57

Source: Declaration of Kevin McNally (A30-32.)
```

### D.     What these figures mean.

In *Furman*, the Court found the death penalty to be an arbitrary, capricious and a

decidedly "unusual" infringement of Eighth Amendment protections.  It was the Court's view

that the very infrequency with which the death penalty was sought and imposed served to

guarantee arbitrary and capricious application of the ultimate penalty.  This conclusion was

reached on the basis of a showing that fewer than 20% of defendants convicted of capital

_____

[20] *See* Declaration of Attorney Kevin McNally.  (A29.)  The figures cited are current as of March 16, 2010.  Also appended hereto is a brief summary of every authorized federal capital case , current as of July 2009, in the following three categories: (1) cases in which a federal jury returned a death verdict (A90; 107); (2) cases in which juries or a judge rejected a death sentence (A109); and (3), cases in which a defendant whose case was originally authorized for capital punishment was permitted to plead guilty to a sentence of less than death (A149) or the notice was withdrawn (A184).

crimes were actually sentenced to death.  In the federal system, the figure is lower by a factor

of 10.   In fact, far fewer than 20% of those eligible for federal capital punishment are even

*exposed* to the death penalty, by way of capital authorization, let alone actually sentenced to

death.   Taking the highest figure for actual death sentences returned against federal

defendants by federal juries at 68, it may be seen that approximately 2.3% (66/2915) of all

potentially death-eligible federal defendants are actually sentenced to death.   In terms of

actual federal executions to date – three – the figure is infinitesimal.[21]   In terms of decisions

reached by juries and judges, even among the "worst of the worst" targeted for the federal

death penalty, life sentences result in two-thirds (132/200) of the cases that proceed to a

penalty-phase.[22]   (A32.)

Thus, utilizing an analysis that was persuasive to the Supreme Court in *Furman,* the

federal death penalty is sought and imposed in an arbitrary, capricious and "unusual" manner.

---

[21]   The baseline figure includes 38 authorized cases that are pending or in trial. It is reasonable to predict that a certain number of those cases will be resolved by a plea agreement and that a certain number will proceed to trial, with an overall statistical likelihood of very few resulting in death sentences.  It is also reasonable to assume that some of the 57 federal prisoners now under active sentence of death will succeed in appellate or post-conviction challenges to their convictions or sentences.

[22]   In the states that make up the Second Circuit, only Connecticut has an active state death penalty scheme.  Since 1988, there have been a total of 22 federal death penalty trials within the Second Circuit, involving a total of 26 defendants.  Juries have imposed just two sentences of death. (McNally declaration at A35.)  Noteworthy among the cases is *United States v. bin Laden, et al.,* a case tried in the Southern District of New York, where two defendants faced the death penalty for their roles in the simultaneous terrorist bombing of United States embassies in East Africa resulting in 224 deaths, including 12 Americans, thousands of injuries, and the destruction of the United States Embassies in Dar es Salaam, Tanzania and Nairobi, Kenya.   The jury declined to impose sentences of death.

*Cf., Roper v. Simmons*, 543 U.S. 551, 567 (2005) (execution of juveniles violates the Eighth Amendment, in part because of "the infrequency of its use even where it remains on the books."); *Atkins v. Virginia*, 536 U.S. 304, 316 (2002) (execution of mentally retarded violates the Eighth Amendment, in part because "even in those states that allow the execution of mentally retarded offenders, the practice is uncommon.").

Because the federal death penalty is so infrequently sought, imposed, or carried out, it operates in an unconstitutionally arbitrary and capricious manner. Whether the most accurate analogy is being struck by lightning or participating in a deadly lottery, the federal death penalty does not operate in a rational manner. On this basis, the court should strike it down.

**F.    The absence of a principled basis for distinguishing between cases where the federal death penalty is imposed from cases where it is not imposed renders the federal death penalty unconstitutional.**

The Supreme Court has held that the constitution will not tolerate sentences of death that are imposed in a manner that is arbitrary or capricious. In *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982), the Court referred to the other side of this approach, requiring "that capital punishment be imposed fairly, and with reasonable consistency, or not at all." More recently in *Kennedy v. Louisiana*, *supra*, the Court warned, "When the law punishes by death, it risks its own sudden descent into brutality, transgressing the constitutional commitment to decency and restraint." 128 S.Ct. 2650. For that reason, the Court wrote, "[C]apital punishment must 'be limited to those offenders who commit "a narrow category of the most serious crimes" and whose extreme culpability makes them 'the most deserving of

33

execution.'" *Id.*  As will be demonstrated, the FDPA has failed to meet this constitutional standard and operates in an arbitrary and irrational manner.

An examination of the federal death penalty in practice shows that there is little consistency or predictability in the manner in which federal juries (and in two cases, federal judges) have imposed, or not, the federal death penalty or, indeed, which cases are allowed to plead out to life terms or less and which proceed to trial.  Included in the appendix to this brief are thumbnail compilations, prepared by the Federal Death Penalty Resource Counsel Project, of the facts and circumstances of the present status or resolution of every completed authorized federal death penalty case since 1988.  (A90-203.)  This Court has also been supplied (or will be shortly) with a CD containing verdict sheets reflecting findings in aggravation and mitigation in the penalty-phases of 207 completed federal death penalty prosecutions.  These verdict sheets provide valuable insight into the hopelessly irremediable problem of arbitrariness and caprice that marks the administration of the federal death penalty system.  There is no rhyme, reason, or predictability to who is sentenced to death and who is not.

This argument is not refuted by simply pointing out that there are always  difficulties inherent in comparing cases.  A review of summaries of the cases  and the verdict sheets supplied to this court should put that reflexive and simplistic argument to rest.

- *United States v. Timothy McVeigh*, (D. Colo.).  The Oklahoma City bombing case.  168 dead.  Hundreds injured.  Tried, convicted, sentenced to death, executed.

- *United States v. Terry Nichols*, (D. Colo.). McVeigh's co-defendant.  Tried,

34

convicted,  sentenced to life.

- *United States v. Khalfan Mohamed and Daoud Rashed al`-Owhali*, (S.D.N.Y.).  Two defendants associated with Usama bin Laden and al Qaeda convicted in simultaneous terrorist truck-bombings in 1998 of two American embassies in East Africa.  224 killed, including 12 Americans; thousands injured.  Tried, convicted, sentenced to life.

- *United States v. Eric Rudolph*, (N.D. Ala).  The Olympic and abortion-clinic bomber.  Victims included a police officer.  Arrested after five-year manhunt. Described by Attorney General Ashcroft as "America's most notorious fugitive."  Negotiated guilty plea for life sentence.

- *United States v. Zacharias Moussaoui*, (E.D.Va.).  Defendant convicted of causing thousands of deaths in the September 11, 2001 attacks on the United States. Sentenced to life by jury.

- *United States v. Theodore Kaczynski*, (E.D.Ca.).  The Unabomber.  Three murders by mailbombs.  Plea agreement.  Sentenced to life.

- *United States v. Joseph Minerd,* (W.D.Pa.).  Arson/pipebomb murder of pregnant girlfriend, her fetus and three-year old daughter.  Tried, convicted, sentenced to life.

- *United States v. Coleman Johnson*, (W.D.Va.).  Pipe-bomb used to kill pregnant girlfriend and their unborn child to avoid child support.  Tried, convicted, sentenced to life.

- *United States v. Christopher Dean*, (D.Vt.).  Defendant sends pipebomb through the mails killing victim and disfiguring victim's mother.  Plea agreement.  Sentenced to life.

- *United States v. Billy Cooper*, (S.D.Miss.).  Car-jacking double homicide. Tried, convicted, sentenced to life.

- *United States v. Christopher Vialva and Brandon Bernard*, (W.D. Texas). Car-jacking double homicide.  Tried, convicted, sentenced to death.

- *United States v. Gary Sampson*, (D. Mass.).  Two murders during separate car-jackings.  Plead guilty, sentenced to death by jury.

- *United States v. David Paul Hammer,* (M.D.Pa.)  Prison inmate guilty of strangling to death cellmate at USP/Allenwood.  Sentenced to death.

- *United States v. Michael O'Driscoll*, (M.D.Pa.).  Prison inmate guilty of stabbing to death fellow inmate at USP/Allenwood.  Same judge, same courtroom,  same defense attorneys as *Hammer*.  Sentenced to life.

- *United States v. Storey*, (D. Kansas).  Prison inmate with Aryan Brotherhood ties kills fellow prisoner at USP/Leavenworth.  Plea agreement.  Sentenced to less than life sentence.

- *United States v. Douglas Black and Steven Riddle*, (D.Colo.).  Inmates at USP/Florence attack two suspected "snitches," one killed one injured.  Plea agreements.  Substantially less than life sentences.

- *United States v. William Sabalan and Rudy Sablan*, (D.Colo).  Two cousins housed at USP/Florence kill their cellmate, eviscerate his body, hang his entrails around the cell, and, on videotape, display the victim's heart and liver to responding officers.  Defendants tried separately.  Life verdicts in each case.

- *United States v. Barry Mills*, *et al.* (C.D. Calif.).  A RICO mega-indictment targeting 40 members of the Aryan Brotherhood prison gang and charging 17 murders.  Initially 27 defendants were death-eligible and 14 defendants were actually authorized for capital prosecutions.  After two lengthy trials, juries spared the first four defendants facing the death penalty – the alleged leaders of the gang – and the government has withdrawn its efforts to seek death as to the remaining authorized capital defendants.

- *United States v. Fu Xin Chen, Jai Wu Chen and You Zhong Peng*, (E.D.N.Y.).  Chinese gang members who kidnap, rape and murder victims held for ransom.  Fu Xin Chen and Jai Wu Chen enter plea agreements.  Attorney General withdraws death authorization shortly before Peng trial.  Peng convicted after trial.  All three sentenced to life.

- *United States v. Louis Jones*, (N.D.Texas).  Decorated Gulf War veteran with no prior record abducts, rapes and kills young woman soldier.  Tried, convicted, sentenced to death, executed.

- *United States v. Chevy Kehoe and Daniel Lee*, (D.Ark.)  Triple murder of two adults and small child in connection with activities of white supremacist organization.  Tried and convicted together.  Kehoe – considered more

culpable – sentenced to life.  Lee sentenced to death by the same jury.

- *United States v. Gurmeet Singh Dhinsa*, (E.D.N.Y.).  Millionaire Sikh businessman hires killers of two employees cooperating with authorities in criminal investigation of defendant.  Tried, convicted, sentenced to life.

- *United States v. Trinity Ingle and Jeffrey Paul*, (W.D.Ark.).  Murder of elderly retired National Parks employee.  Victim shot while bound and gagged.  At separate trials, Ingle is convicted and sentenced to life; Paul is convicted and sentenced to death.

- *United States v. Kristen Gilbert*, D.Mass.)  VA nurse murders four patients and attempts to murder three more.  Tried, convicted, sentenced to life.

- *United States v. LaFawn Bobbitt and Rashi Jones*, (E.D.Va.).  Fatal shooting of bank teller during robbery.  Security guard also shot and blinded.  Tried, convicted, sentenced to life.

- *United States v. Bille Allen and Norris Holder*, (W.D.Mo.).  Fatal shooting of bank teller during robbery.  Tried, convicted, and both defendants sentenced to death.

The disparities are particularly striking in cases where murder has taken place in the context of drug-dealing.

- *United States v. Corey Johnson, James Roane, and Richard Tipton*, (E.D.Va.)  Eleven drug-related murders.  Tried, convicted, sentenced to death.

- *United States v. Dean Anthony Beckford*, (E.D.Va.).  Six drug-related murders.  Tried, convicted, sentenced to life.

- *United States v. Clarence Heatley and John Cuff*, (S.D.N.Y.).  Fourteen drug-related murders.  Plea agreement.  Sentenced to life.

- *United States v. Alan Quinones and Diego Rodriguez*, (S.D.N.Y.)  Torture murder of suspected informant. Tried, convicted, sentenced to life.

- *United States v. Elijah Williams and Michael Williams* (S.D.N.Y.) Execution-style triple murder by father and son.  Tried, convicted, sentenced to life.

37

- *United States v. Thomas Pitera*, (E.D.N.Y.).  Seven drug-related murders in organized crime and large-scale drug trafficking context.  Victims tortured and bodies dismembered.  Tried, convicted, sentenced to life.

- *United States v. German Sinisterra and Arboleda Ortiz*, (W.D.Mo.).  One drug-related murder and one attempted murder.  Tried, convicted, sentenced to death.

- *United States v. John Bass* (E.D.Mich.).  Four drug-related murders.  Tried, convicted, sentenced to life.

- *United States v. Kevin Grey and Rodney Moore*, (D.D.C.).  Thirty-one drug-related murders.  Tried, convicted, sentenced to life.

- *United States v. Daryl Johnson*, (N.D.Ill.).  Two drug-related murders.  Tried, convicted, sentenced to death.

- *United States v. Peter Rollock*, (S.D.N.Y.).  Eight drug-related murders, including some ordered by defendant while incarcerated.  Plea agreement.  Sentenced to life.

- *United States v. Tommy Edelin*, (D.D.C.).  Fourteen drug-related murders.  Tried, convicted, sentenced to life.

- *United States v. Reynaldo Villarreal and Baldemar Villarreal*, (E.D.Texas).  Drug-related murder of law enforcement officer.  Tried, convicted, sentenced to life.

- *United States v. Shahem Johnson and Raheem Johnson*, (E.D.Va.)  Brothers tried for five drug-related murders.  Tried, convicted, sentenced to life.

- *United States v. Juan Raul Garza*, (S.D.Texas).  Three drug-related murders.  Tried, convicted, sentenced to death, executed.

- *United States v. Claude Dennis*, (E.D.Va.).  Six drug-related murders.  Tried, convicted, sentenced to life.

- *United States v. Emile Dixon*, (E.D.N.Y.)  Two drug-related murders, including machine-gunning death of suspected informant.  Tried, convicted, sentenced to life.

38

- *United States v. Anthony Jones*, (D.Md.).  Six drug-related murders.  Tried, convicted, sentenced to life.

- *United States v. Walter Diaz and Tyrone Walker* (N.D.N.Y.).  Two defendants kill a drug-dealer as part of 848 CCE and flee to New York City where, in a failed effort to steal a car, they shoot and kill a woman in lower Manhattan. Later in same day the defendants fired at, but missed, a retired school teacher in Coney Island in a failed armed robbery. Defendant Walker was also found by the jury to have beaten to death an elderly man during a burglary when Walker was 19 years-old.  Both defendants tried, convicted, sentenced to life.

These are just selected cases from the larger appendix capturing the universe of all federal cases authorized for capital prosecution.  This argument, however, draws its full force from the cumulative effect gained from reviewing the summaries of authorized cases complied in the appendix and the verdict sheets produced in CD format.  By definition, since all of these cases were authorized by the Attorney General of the United States for capital prosecution, these are (or should have been) the "worst of the worst" the federal system has to offer.  Indeed, it is likely there is not a crime on the list as to which a prosecutor could not (and probably did) argue in summation, "If this case doesn't call for the death penalty, what case does?"  And yet, in case after case – indeed, in the overwhelming *majority* of such cases – juries returned life verdicts and, to an even greater extent, plea agreements were offered and accepted.

The point is that one cannot read these mind-numbing matter-of-fact chronicles of the many ways in which man can demonstrate his inhumanity to his fellow man without coming to the realization that *all* of the cases are by their own terms horrible, and *all* involved the infliction of agony on victims and survivors. Yet, for indiscernible reasons, some defendants

39

were sentenced to death, while overwhelming majority were not.  If any basis can be discerned, it is, as the following discussion illustrates, race, region, and gender.

In *Walker v. Georgia*, 129 S.Ct. 453 (2008), Justice Stevens, dissenting from the denial of *certiorari*, noted that Georgia had sharply curtailed the scope of its statutory proportionality review of death sentences, and noted, "The likely result of such truncated review . . . is the arbitrary or discriminatory imposition of death sentences in contravention of the Eighth Amendment."  *Id*. at 457.  *See* B. Sarma, "*Furman's* Resurrection: Proportionality Review and the Supreme Court's Second Chance to Fulfill *Furman's* Promise," 2009 Cardozo L. Rev. De Novo 238 (2009).  Indeed, as argued in the Cardozo article:

> Almost forty years have passed since *Furman*, and nobody seriously argues that the Court's decision to regulate procedure has solved the constitutional problem of arbitrariness. In fact, evidence indicates that the application of the death penalty is just as arbitrary today as it was when the Court decided *Furman*.  If *Furman* inspired positive changes in its immediate wake, those changes have been all but eviscerated in the past two decades.

*Id*. at 242.

A potential solution to the problem of disproportion and arbitrariness in the imposition of the federal death penalty is for this court to declare that the FDPA must be interpreted so as to allow for proportionality and comparative review of the universe of federal death sentences to determine if they are imposed irrationally.[23]  A finding that such is the case

---

[23] In *Pulley v. Harris*, 465 U.S. 37 (1984), the Court ruled that proportionality review was not required by the Eighth Amendment, at least in a state (California) that did not permit

would lead to a conclusion that the FDPA cannot meet the requirements of *Furman* and would have to be invalidated until Congress could devise a mechanism for checking the arbitrary and irrational imposition of the ultimate punishment.  This court is urged to undertake such a review and, at its conclusion, void the FDPA.

> **F.     The Federal Death Penalty is unevenly applied on a regional basis and suffers from intractable problems of racial discrimination in the targeting of minority defendants and a demonstrated race/gender-of-victim effect.**

1.     <u>Introduction</u>.

From the earliest days of the government's efforts to enforce a national death penalty, patterns began to develop of uneven and apparently discriminatory application.  The federal death penalty was being utilized almost exclusively by federal prosecutors in the south and, not surprisingly, federal death verdicts were being returned almost exclusively in those traditional "death-belt" jurisdictions.  Added to this arbitrary factor was the invidious circumstance of race, since the federal death penalty, as it was rolled out in the 1990's, was targeting a disproportionately large number of minority groups, particularly African-Americans and Hispanics.

By 1994, when the obvious racial disparities apparent from the Justice Department's prosecution of federal death penalty cases could no longer be ignored, the House Subcommittee on Civil and Constitutional Rights investigated and concluded as follows:

> Race continues to plague the application of the death penalty in

---

non-statutory aggravating factors.  This Court need not "overrule" *Pulley* to engage in the review proposed by defendant.  It may proceed simply as a matter of interpreting the proper application of the FDPA.

the United States.  On the state level, racial disparities are most obvious in the predominant selection of cases involving white victims.   On the federal level, cases selected have almost exclusively involved minority defendants.

"Racial Disparities in Federal Death Penalty Prosecutions 1988-1994," Staff Report by the Subcommittee on Civil and Constitutional Rights, Committee on the Judiciary, 103rd Congress, 2nd Session, March 1994.  That report also noted, on the issue of the targeting of minority people for federal capital prosecutions, that as of 1994 there had been 37 defendants authorized for capital punishment under the § 848(e) (ADAA) scheme, of whom 33 (87%) were black or Hispanic.  *Id.*

Earlier evidence of the potential race-effect of the death penalty had been provided by the General Accounting Office.  At the time Congress enacted the § 848(e) (ADAA) death penalty, the GAO was directed to undertake a study of the potential influence of race on the death penalty. 21 U.S.C. § 848(o)(2) (Repealed).  The GAO in fact undertook that study in 1990 and concluded as follows:

Our synthesis of the 28 studies shows a pattern of evidence indicating racial disparities in the charging, sentencing and imposition of the death penalty after the *Furman* decision.

In 82 percent of the studies, race-of-victim was found to influence the likelihood of being charged with capital murder or receiving the death penalty, i.e. those who murdered whites were found to be more likely to be sentenced to death than those who murdered blacks.  This finding was remarkably consistent across data sets, states, data collection methods and analytic techniques.  The finding held for high, medium, and law quality studies.

Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities" (GAO/GGD-90-

57, Feb. 1990) at p. 5.  In his 1999 law review article, Professor Rory Little, writing with the perspective of one who had actually served on Attorney General Reno's Capital Case Review Committee, noted that serious questions about regional and racial disparities had not been ameliorated by the administrative process within the Justice Department.  R.K. Little, 26 FORDHAM URBAN L.J., *supra*, at 450-90.

Thus, from the very beginning of the modern federal death penalty, the government has been on notice that its targeting and enforcement patterns are problematical.

2.     The 2000 DOJ Study.

In a press conference that took place on June 28, 2000, President Clinton was asked about a highly-publicized execution that had taken place the previous week in Texas and whether he believed it was time "for the American people to stop and reassess where we stand on implementation of the death penalty."  In response, the President said the following about the application of the federal death penalty, acknowledging concerns about race and regional practices:

> The issues at the federal level relate more to the disturbing racial composition of those who have been convicted and the apparent fact that almost all the convictions are coming out of just a handful of states, which raises the question of whether, even though there is a uniform law across the country, what your prosecution is may turn solely on where you committed the crime.  I've got a review underway of both those issues at this time.

(Transcript of the President's 6/28/2000 press conference.)

On September 12, 2000, the Department of Justice released the comprehensive study

43

alluded to by President Clinton in his remarks.  The study set forth in exhaustive detail how the federal death penalty had been administered for the 12 years from 1988 to the summer of 2000.[24]  The essence of the 2000 DOJ Study's findings was that the federal death penalty had been disproportionately sought against minority-group defendants and irrationally sought on a regional basis.  At the time, the Study reported, federal death row consisted of 19 men, of whom four were white, 13 black, one Hispanic and one "other."  Consistent with the historical roots of the death penalty, 12 of the 19 defendants on federal death row at the time of the DOJ Study had been sentenced to death in the South.  Virginia and Texas had contributed four defendants apiece.  No other jurisdiction, at the time of the Study's release, had sentenced more than a single defendant to death.[25]

In terms of which defendants actually faced the federal death penalty, the 2000 Study showed that of the 159 cases where the Attorney General had authorized a capital prosecution, 44 defendants where white (27.7%), 71 were black (44.7%), 32 were Hispanic (20.1%) and another 26 were categorized as "other" (7.5%).  *See,* Table 1A at p. T-2 of DOJ Study.  Thus, as of the summer of 2000, more than 70% of the federal defendants targeted for the death penalty had been non-whites.

---

[24]  The Department filed a supplemental report on June 6, 2001 after the change in administration.  Additionally, on June 7, 2007, the Justice Department transmitted statistics and more recent findings on the admin striation of the federal death penalty to Senator Feingold in preparation for oversight hearings.   Each of the aforementioned reports is available in complete form on the DPIC web-site: http://www.deathpenaltyinfo.org/federal-death-penalty#statutes, last visited March 23, 2010.

[25]  The race and region figures have not changed appreciably in the 10 years since the 2000 Study's release.  *See* discussion *infra*.

In addition to the racial disparity in federal death-penalty prosecutions, the study found a regional bias in the enforcement of the federal death penalty.  The DOJ Study revealed the following on the issue of regional disparity:

- From 1995 onward, of the 94 separate federal districts in the federal system, only 49 had ever submitted a case recommending capital prosecution.  (DOJ Study at 14.)

- Twenty-two federal districts had never submitted a case for review at all.[26] (DOJ Study at T-59.)

- Twenty-one federal districts, although submitting one or more cases for review, had never sought permission to seek the death penalty in any case.[27]

*Id.*

The release of the report drew the following public comment from officials at the

---

[26]   The potential universe of federal capital prosecutions is vast.  This case, for example, involves an intra-state kidnapping that is federal only by virtue of the use of electronic means of communication.  Virtually any murder committed in the course of a federal firearms violation is a potential federal death penalty case.  18 U.S.C. § 924(j).  In *United States v. Chanthadara,* 230 F.3d 1237 (10th Cir. 2000), where the government proceeded on a Hobbs Act theory of federal prosecution, the defendant was sentenced to death for a murder committed in the course of the robbery of a restaurant, an unfortunately garden variety type of criminal behavior.  That sentence of death was vacated on appeal on other grounds (and the defendant later sentenced to life imprisonment), but the potential number of cases that could be prosecuted on this theory is staggering.  Any murder committed while engaged in a narcotics conspiracy involving more than 50 grams of crack cocaine or 5 kilograms of heroin remains a potential federal capital case.  21 U.S.C. § 848(e).

[27]   The recommendation that accompanies a submission is of great importance.  In 91% of cases where the local United States Attorney did not want to prosecute the case as a death-penalty case, that recommendation was followed by the Attorney General.  (DOJ Study at 43.)  In 83% of cases where death-penalty authorization was requested, that recommendation was also followed by the Attorney General.  *Id.*  These figures are based on the 575 defendants whose cases were reviewed by the Attorney General from 1995-2000.  In the "pre-protocol" period – November 1988 through January 27, 1995 – the only cases reviewed were those where the local United States Attorney affirmatively had requested capital-authorization.  The approval rate for those cases was 90%.  (DOJ Study at 10.)

Justice Department and the White House:

> Saying she was "sorely troubled" by stark racial disparities in
> the federal death penalty, Attorney General Janet Reno today
> ordered United States attorneys to help explain why capital
> punishment is not applied uniformly across ethnic groups.

M. Lacey and R. Bonner, "Reno Troubled by Death Penalty Statistics," *N.Y. Times*,

September 13, 2000.  The *Times* also reported the reaction of then Deputy Attorney General

Eric Holder, who was, at the time, the highest-ranking African American at the Justice

Department:

> "I can't help but be personally and professionally disturbed by
> the numbers that we discuss today," Deputy Attorney General
> Eric Holder said.  "To be sure, many factors contributed to the
> disproportionate representation of racial and ethnic minorities
> throughout the federal death penalty process.  Nevertheless, no
> one reading this report can help but be disturbed, troubled, by
> this disparity."

*Id*.  CNN reported that Attorney General Reno wanted "a broader analysis."[28]  White House

deputy press secretary Jake Siewert responded to the release of the report in the following

manner: "'At first glance, those numbers are troubling.  We need to know what's behind the

numbers.'"[29]  During his confirmation hearings the year following the Study's release,

Attorney General Ashcroft also noted that evidence of racial disparity in the federal death

---

[28]   In *United States v. Bass,* 266 F.3d 532 (6th Cir. 2001), *reversed*, 532 U.S. 1035
(2002) (per curium), the Sixth Circuit quoted at length the public statements of Attorney
General Reno and Deputy Attorney General Holder in response to the release of the DOJ
Study.  266 F.3d at 538.

[29]   Considering the impact of the study, Judge Sand in *United States v. bin Laden*,
126 F. Supp.2d 256, 258 (S.D.N.Y. 2000) found the statistical evidence "indeed troubling,"
but ultimately rejected a challenge to that capital prosecution.

penalty "troubled [him] deeply."  Quoted in *United States v. Bass, supra*, 266 F.3d at 538 n.1.

"Troubled" and "disturbed" public officials, however, do not cure constitutional violations or remedy arbitrary and invidious practices. As this discussion continues, it will be seen that 10 years later, nothing has changed.  If anything, to quote the title of Mr. McNally's DePaul Law Review article, a non-existent problem has gotten worse.

      3.    <u>The federal death penalty after 20 years</u>.

After more than 20 years of a federal death penalty, it is undeniable and clear that the undeniable patterns of race and region that disturbed and troubled government officials a decade ago persist.  It seems utterly plain that these problems are intractable. The following tables reflect the present state of affairs:

```
          TABLE I: 1988-2010
   THE RACE OF THE 465 DEFENDANTS
   TARGETED FOR FEDERAL EXECUTION:

   African-Americans: 238 (51%)
   Caucasians:        121 (26%)
   Latinos:            85 (18%)
   "Others":           21 ( 5%)
```

(A32).)

In terms of targeting decisions, therefore, 74% of those selected for capital prosecutions are members of minority groups.  At the time of 2000 DOJ Study, the figure was 70%.

As to the regional basis of federal capital prosecutions, the FDPA remains a largely Southern phenomena.  Nearly two-thirds of federal death verdicts have come out of the traditional "death belt" states.

**TABLE II: 1988-2010**
**SOUTHERN JURISDICTIONS AND**
**NUMBERS OF FEDERAL DEATH VERDICTS:**

```
Texas -         12
Missouri -       8
Virginia -       7
Georgia -        4
Oklahoma -       3
Louisiana        3
Arkansas -       2
Maryland -       2
N. Carolina -    2
S. Carolina -    2
W. Virginia -    2
```

(A32.)

2.    The persistent capricious circumstance of region.

Historically, the death penalty has been a largely Southern phenomena; that remains the case today. As of early October, 2009, there had been 1,199 post-*Furman* executions carried out in the United States. (A17.) Of these executions, 80% have taken place in Southern states. A19.) Two states alone, Texas and Virginia, have accounted for nearly half (46%) of all post-*Gregg* executions. (A19.) With this historical perspective in mind, it is no surprise that those federal jurisdictions in states with an established "culture of death" reflect that culture, consciously or not, in decisions to pursue the death penalty. Neither is it surprising that federal juries accustomed to seeing death sentences routinely returned in their own communities would do the same. Regional bias, however, is inimical to a supposedly national penalty that is, theoretically at least, sought and imposed using consistent national standards. This was the primary point of disagreement between the majority and dissenting judges in *Fell III*.

48

The "ideal" of a national standard aside notwithstanding, the federal death penalty in 2010 continues to be a Southern phenomena and federal districts from the South predictably "lead the charge" in seeking and receiving authorization to take cases capital and in convincing juries to return death verdicts. Thus, 11 southern federal jurisdictions account for an astonishing 65% (44 of 68) of the federal death verdicts returned by juries since the 1988 return of the federal death penalty. The reality is nothing has changed in any appreciable way since the 2000 DOJ Study; the federal death penalty remains a disproportionately Southern phenomena.

It thus appears – whether one takes a micro or macro view – that the irrational caprice of geographical location has as much to do with facing the federal death penalty as does the crime committed. To quote the former President, "[W]hat your prosecution is may turn solely on where you committed the crime." It also appears that trying to "fix" one part of a the geography problem may give rise to others. *See*, B. Wesier and W. Glaberson, "Ashcroft Pushed Executions in More Cases in New York," *N.Y. Times,* 2/6/03 (Reporting on efforts by the Attorney General to require federal prosecutors in New York and Connecticut to seek death more often; (A82);  B. Weiser and W. Glaberson, "Decisions on Death Cases Raise Questions of Race," *N.Y. Times*, 2/14/03 (Pointing out that the 12 defendants as to whom Attorney General Ashcroft overruled a New York area federal prosecutor's decision not to seek the death penalty were all African-American or Hispanic).

A death penalty that operates on an arbitrary basis is unconstitutional.

3.   <u>The unabated practice of targeting minorities for the federal death penalty, the long-documented "white-victim effect," and the emergence of a "white female victim effect" further demonstrate the arbitrary and irrational operation of the federal death penalty.</u>[30]

(a)   *Introduction – The law on race and the death penalty.*

Twenty-three years ago, dissenting in *McCleskey v. Kemp*, 481 U.S. 279 (1987), Justices Brennan Marshall, Blackmun and Stevens hypothesized an attorney-client conversation where an African-American defendant charged with capital murder asked his attorneys what the chances were that he would be sentenced to death.  Based on the statistical analysis presented to the Court in *McCleskey*, it was the four dissenters' conclusion that, at some point in the dialogue, defense counsel would have to level with their client and tell him that his race would play an important role – perhaps a determinative one – in whether he lived or died:

> The story could be told in a variety of ways, but [the client] could not fail to grasp its essential narrative line: there was a significant chance that race would play a prominent role in determining if he lived or died.

*McCleskey*, 481 U.S. at 322 (Opinion of Brennan, Marshall, Blackmun and Stevens, J.J., dissenting).[31]  In *McCleskey*, a rigorous statistical study of Georgia's capital sentencing practices found that killers of whites, regardless of their own race, were more likely to be

---

[30]   If the government disputes the factual basis of this argument, Defendant requests a hearing.

[31]   After his retirement from the bench, Justice Powell stated that he regretted voting with the majority, and authoring the Court's 5-4 opinion upholding the death-penalty in *McCleskey*.  *See,* Jeffries, *Justice Lewis F. Powell, Jr.* (1994) at pp. 451-52.

sentenced to death than killers of African-Americans.  One of the major statistical models relied on by McCleskey showed that "defendants charged with killing white victims (whatever their own race) were 4.3 times as likely to receive a death sentence as defendants charged with killing blacks." 481 U.S. at 287.

More than a century ago, in *Yick Wo v. Hopkins*, 118 U.S. 356 (1886), the Court observed that application of seemingly neutral laws "with an evil eye and an unequal hand, so as practically to make unjust and illegal discrimination between persons in similar circumstances" amounts to a denial of equal protection.  *Id.* at 373-74. The historical truth is that in the United States capital punishment and race have always  been inextricably intertwined.  That state-of-affairs is likely to continue, regrettably, until we can say honestly that racism has disappeared from our society.  *See, e.g.*, C. J. Ogletree (Ed.) and A. Sarat, *From Lynch Mobs to the Killing State: Race and the Death Penalty in America* (New York University Press 2006); R. K. Little, "What Federal Prosecutors Really Think: The Puzzle of Statistical Race Disparity Versus Specific Guilt, and the Specter of Timothy McVeigh," 53 DEPAUL L. REV. 1591 (2004); K. McNally, "Race and the Federal Death Penalty: A Nonexistent Problem Gets Worse," 53 DEPAUL L. REV. 1615 (2004); C. J. Ogeltree, "Black Man's Burden: Race and the Death Penalty in America," 81 OREGON L.REV. 15 (2002); G. L. Pierce, M. L. Radlet, "Race, Region, and Death Sentencing in Illinois," 81 OREGON L.REV. 39 (2002);  S. Bright, "Discrimination, Death and Denial: The Tolerance of Racial Discrimination in the Infliction of the Death Penalty," 35 SANTA CLARA L.REV. 433 (1995); D. Baldus, "Reflections on the 'Inevitability' of Racial Discrimination in Capital Sentencing

and the 'Impossibility' of its Prevention, Detection and Correction," 51 WASH. & LEE L.REV.

359 (1994); Bienen, Weiner, Denno, Allison and Mills, "The Reimposition of Capital

Punishment in New Jersey: The Role of Prosecutorial Discretion," 41 RUTGERS L.REV. 27,

100-57 (1988).

In *Furman*, Justice Douglas had traced this correlation[32] and concluded:

> In a Nation committed to equal protection of the laws
> there is no permissible "caste" aspect of law enforcement.  Yet
> we know that the discretion of judges and juries in imposing the
> death penalty enables the penalty to be selectively applied,
> feeding prejudices against the accused if he is poor and
> despised, lacing political clout, or if he is a member of a suspect
> or unpopular minority, and saving those who by social position
> may be in a more protected position.  In ancient Hindu law, a
> Brahman was exempt from capital punishment, and in those
> days, "[g]enerally, in the law books, punishment increased in
> severity as social status diminished." We have, I fear, taken in
> practice the same position . . . .

*Furman*, 408 U.S. at 255 (Douglas, J., concurring; footnotes omitted.)  As late as 1991 –

more than 15 years after *Furman* – the execution of a white man for the murder of a black

man was front-page news as an event that had not occurred in the nation for half-a-century.

*See*, "Rarity for U.S. Executions: White Dies for Killing Black," *N.Y. Times*, September 7,

1991, p.1, col. 1.  DPIC reports that since executions resumed in the wake of *Gregg*, there

---

[32]  Just how ugly this gets was identified in a study of death verdicts returned in
Philadelphia.  The study, lead by Professor Jennifer Eberhardt of Stanford University,
concluded that convicted murderers with stereotypical African-American features and dark
skin were more likely to receive the death penalty for killing a white person than lighter-
skinned African-American defendants with more Caucasian features.  J. Eberhardt, P.G.
Davies, V. J. Purdie-Vaughns, S.L. Johnson, "Looking Deathworthy: Perceived
Sterotypicality of Black Defendants Predicts Capital-Sentencing Outcomes,"   17
PSYCHOLOGICAL SCIENCE 383 (Spring 2006).

have now been 15 executions of a white defendant for killing a black victim; but there have been 243 executions of black defendants who killed a white victim.  (A18.)

Mr. Jacques' showing in these motions, whether or not the evidence of a racial bias to the federal death Penalty continues to "disturb" or "trouble" anyone in the Justice Department, is sufficient to establish a case of arbitrariness in the enforcement of the federal death penalty.  It is difficult to imagine how, other than racism, one can explain the arbitrary manner in which the federal death penalty has been administered in terms of who is targeted. *Batson v. Kentucky*, 476 U.S. 79, 93-94 (1986).  To all appearances, there is "a clear pattern, unexplainable on grounds other than race." *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 266 (1977).

In terms of eradicating racism, in the past 100 years, no judicial responsibility has laid greater claim on the moral and intellectual energies of the federal courts than "the prevention of official conduct discriminating on the basis of race." *Washington v. Davis*, 426 U.S. 229, 239 (1976).  The Supreme Court and the lower federal courts have striven to eliminate all forms of state-sanctioned discrimination, "whether accomplished ingeniously or ingenuously." *Smith v. Texas*, 311 U.S. 128, 132 (1940).  The federal courts have staunchly forbidden discrimination, not only where it had been imposed by statute, *see*, e.g., *Brown v. Board of Education*, 346 U.S. 483 (1954), *Nixon v. Herndon*, 273 U.S. 536 (1927), but also "look[ed]" beyond the face of . . . [a] statute . . .  where the procedures implementing a neutral statute operate . . . on racial grounds." *Batson v. Kentucky*, 476 U.S. 79, 88 (1986); *Turner v. Fouche*, 396 U.S. 346 (1970); *Yick Wo. v. Hopkins*, 118 U.S. 356, 373-74 (1886).

The Supreme Court has repeatedly emphasized that "the core of the Fourteenth Amendment is the prevention of meaningful and unjustified official distinctions based on race." *Hunter v. Erickson*, 393 U.S. 385, 391 (1969).  This case, as a federal prosecution, is not subject to the Equal Protection Clause of the Fourteenth Amendment – which is addressed to state action – but the Due Process Clause of the Fifth Amendment which has long been held to embody this requirement, by implication.  *Bolling v. Sharpe*, 347 U.S. 497, 499 (1954); *see Weinberger v. Wisenfeld*, 420 U.S. 636, 638 n.2 (1975) ("[Our] approach to Fifth Amendment equal protection claims has . . . been precisely the same as to equal protection claims under the Fourteenth Amendment.")  In the area of criminal justice, where racial discrimination "strikes at the fundamental values of our judicial system and our society as a whole," *Rose v. Mitchell*, 443 U.S. 545, 556 (1979), the Supreme Court has "consistently" articulated a "strong policy . . . of combating racial discrimination."  *Id.* at 558.As a white man, Mr. Jacques does not assert a personal Equal Protection claim.  The law is clear that he could not.  Nonetheless, a convincing demonstration that the federal death penalty operates with an impermissible racist effect is demonstrated evidence that it operates fundamentally unfairly and with arbitrariness and caprice.  Mr. Jacques obviously has standing pursuant to the Eighth Amendment and Fifth Amendment Due Process not to be subjected to an arbitrary system of capital punishment.

The most obvious and destructive form that such discrimination can take is systematically unequal treatment of criminal defendants based upon their race.  *See McLaughlin v. Florida*, 379 U.S. 184, 190 n.8 (1964), citing *Strauder v. West Virginia*, 100

U.S. 303, 306-08 (1880); *Ho Ah Kow v. Nunan*, 12 Fed. Cas. 252 (No. 6546) (C.C.C.D.Cal. 1879). Indeed, state criminal statutes, including the infamous Black Codes which prescribed harsher criminal penalties for African-Americans than for whites, were among the main evils that led to the enactment of the Fourteenth Amendment and related post-Civil War federal legislation. *See General Building Contractors Ass'n. Inc. v. Pennsylvania*, 458 U.S. 375, 386-87 (1982). The Supreme Court has insisted "that racial classification, especially suspect in criminal statutes, be subjected to the 'most rigid scrutiny' and, if they are ever to be upheld . . . be shown to be necessary to the accomplishment of some permissible state objective, independent of the racial discrimination which it was the object of the Fourteenth Amendment to eliminate." *Loving v. Virginia*, 388 U.S. 1, 11 (1967); *see Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 272 (1979); *McLaughlin v. Florida*, 379 U.S. at 198 ("I cannot conceive of a valid legislative purpose under our Constitution for a state law which makes the color a person's skin the test of whether his conduct is a criminal offense.") (Stewart, J., concurring).

None of this is new, or surprising. Nonetheless, it is worth the time to pause to recall the history and the significance of this issue. There is present in this case strong evidence – evidence produced by the government – that minority defendants are many times more likely than white defendants to face the death penalty at the hands of the federal government, because of their race. No state has a racial pattern of using capital punishment that is nearly so stark and disturbing. This is an urgent problem that demands the "most rigid scrutiny" described in *Loving*.

The Eighth Amendment's prohibition of the arbitrary use of the death penalty imposes constitutional limitations on capital punishment that do not apply to lesser punishments.  *See*, e.g., *Woodson v. North Carolina*, 428 U.S. 280 (1976) and *Roberts v. Louisiana*, 428 U.S. 325 (1976) (mandatory death sentences – but not other mandatory sentences – are unconstitutional); *Lockett v. Ohio*, 438 U.S. 586 (1978) (sentencer must be free to give "independent mitigating weight" to any fact about the defendant or the offense, in a capital case); *Bullington v. Missouri*, 451 U.S. 430 (1981) (imposition of a death sentence after reversal of a sentence of life imprisonment is unconstitutional, although there is no similar *per se* ban on harsher sentencing on retrials of other criminal cases); *Turner v. Murray*, 476 U.S. 28 (1986) (capital defendants in interracial murders – but not non-capital murder defendants – are automatically entitled to have potential jurors questioned about the effects of possible racial biases).

Secondly, it is obvious that racial discrimination is a species of the arbitrariness condemned in *Furman*.  This is apparent from the opinions of the Justices in the majority and of those in dissent alike.  For example, Justice Douglas concluded that the capital statutes before him were "pregnant with discrimination," 408 U.S. at 157, and thus ran directly counter to "the desire for equality . . .  reflected in the ban against `cruel and unusual punishments` contained in the Eight Amendment."  *Id.* at 255.  Similarly, Justice Stewart lamented that "if any basis can be discerned for the selection of these few sentenced to die, it is the constitutionally impermissible basis of race."  *See id.* at 364-366  (Marshall, J., concurring); *id.* at 389 n.12 (Burger, C.J. dissenting); *id.* at 449-50 (Powell, J., dissenting).

Later Supreme Court cases have applied this interpretation.  Thus, for example, in *Zant v. Stephens*, *supra*, the Court explained that *Furman*  would be violated if a state based its capital sentencing on "factors that are constitutionally impermissible or totally  irrelevant to the sentencing process, such as . . .  the race . . .  of the defendant."  462 U.S. at 885.

Taken together, then, these two points can be summarized as follows:  The Cruel and Unusual Punishments Clause of the Eighth Amendment imposes a constitutional prohibition against racial discrimination in the use of the death penalty that is at least as strict as the general proscription of racial discrimination in the (implicit) equal protection clause of the Fifth Amendment.    Where a death penalty appears to operate so as to institutionalize racism, it offends the same constitutional values that yielded *Furman* and this nation's short-lived abandonment of capital punishment.

    (b)    *The effect of race and gender of victim in the application of the FDPA.*

For obvious reasons, a capital punishment scheme which explicitly provided that the death penalty is more appropriate where the victim is white or white and female would not be constitutional.  On the question of race-of-victim, research that is consistent across decades has demonstrated that those who kill whites are more likely to face a sentence of death and to be sentenced to death than those who kill members of minority groups.[33]  A race-

---

[33]  Figures compiled by the Federal Death Penalty Resource Counsel Project, current as of March 5, 2010,  reflect that 61% of those on federal death row were convicted of murdering white victims.  www.capdefnet.org/fdprc/pubmenu.asp?menu_id=984&id=2094 (Last visited March 19, 2010.)  In *United States v. Sampson*, 275 F. Supp.2d 49, 89-94 (D. Mass. 2003) and *United States v. Sampson*, 332 F. Supp.2d 325, 335-40 (D. Mass. 2004), the court rejected a white-victim argument, based on much less data, but also noted that "a rigorous, honest study of the federal system illuminating this issue would be valuable." *Id.* at 339.  No such study has been undertaken.

of-victim effect has been repeatedly found to be present in capital prosecutions, including the federal system[34]. Recent studies have begun to demonstrate that there is also a gender-based irrationality to capital punishment schemes as well, with the net effect that those who are guilty of murdering white females are substantially more likely to face the death penalty and be sentenced to death than those who kill non-whites and males. This is further evidence of the arbitrary, capricious and biased nature of the death penalty.

Studies of state capital schemes have uniformly detected a significant race-of-victim effect. *See, e.g.* R. Paternoster, G. Pierce, & M. Radelet, "Race and Death Sentencing in Georgia, 1989-1998, in "American Bar Association: Evaluating Fairness And Accuracy In State Death Penalty Systems: The Georgia Death Penalty Assessment Report," appendix at S-T (2006)[35] (with respect to capital prosecutions in Georgia, "[t]he data show that among all homicides with known suspects, those suspected of killing whites are 4.56 times as likely to be sentenced to death as those who are suspected of killing blacks"); Andrew Welsh-Huggins, "Death Penalty Unequal - Study: Race, Geography Can Make a Difference," *The Cincinnati Enquirer* (May 7, 2005) (analysis of death penalty verdicts in the state of

---

[34] For a comprehensive discussion of the white-victim effect, *see* D. Baldus and G. Woolworth, "Race Discrimination and the Legitimacy of Capital Punishment: Reflections on the Interaction of Fact and Perception," 53 DePaul L. Rev. 1411, 1423-1428 (2004). Utilizing statistics current at the time of the study, the authors noted that the nation-wide average for execution of those who killed whites was in the 83% range, while whites were victims of murder in only approximately 45% of all such cases. *Id* at 1423. *See also,* K. McNally, "Race and the Federal Death Penalty: A Non-existent Problem Gets Worse," 53 DePaul L. Rev. 1615 (2004).

[35] Available on line at:
http://www.abanet.org/moratorium/assessmentproject /georgia/finalreport.doc

Ohio from 1981 to 2002 reveals that "[o]ffenders facing a death penalty charge for killing a white person were twice as likely to go to death row [compared to those charged with having] killed a black victim. Death sentences were handed down in 18 percent of cases in which the victims were white, compared with 8.5 percent of cases when victims were black"); G.L. Pierce & M. Radelet, "The Impact of Legally Inappropriate Factors on Death Sentencing in California Homicides," 46 SANTA CLARA L. REV. 1 (2005) noting that the killers of whites were over three times more likely to be sentenced to death than those who killed blacks and 4 times as likely than those who killed Latinos.  In addition, research commissioned by state governments in, for example, California, Maryland, Nebraska and Illinois have found that defendants convicted of killing white victims are more frequently sentenced to death than defendants convicted of killing non-white victims. *See, e.g.,* Paternoster et al., "An Empirical Analysis of Maryland's Death Sentencing System with Respect to the Influence of Race and Legal Jurisdiction," http://www.newsdesk.umd.edu/pdf/finalrep.pdf.)

     As a result of these studies, and others, it is clear that "[d]eath row's racial disparity, however, is not the result of race-neutral application of the death penalty or a perverse form of affirmative action to favor black defendants. Rather, a racial hierarchy clearly exists among cases based upon who the victim is." *See* J. Blume, T. Eisenberg, and M. T. Wells, "Explaining Death Row's Population and Racial Composition," 1 JOURNAL OF EMPIRICAL LEGAL STUDIES 1, 167 (March 2004).[11]

     Although the significance of victim race in death sentencing outcomes has been

discussed for at least twenty years, very little prior research has examined whether the combined effect of victim race and gender improperly skews sentencing outcomes in capital cases. This area has only recently gained the attention of researchers.  Research has identified just three empirical studies, all very recent, that considered the joint effects of victim race and gender in capital prosecutions. Relying on state court data in Colorado, Georgia and Ohio, each study found that defendants were treated most harshly when a white female victim was present. A Colorado study examined prosecutors' decisions to seek the death penalty after conviction, while Georgia and Ohio studies looked at capital sentencing outcomes.

In a 2006 study of Colorado death penalty cases from 1980 to 1999, researchers found that prosecutors were more likely to seek the death penalty in cases involving white, female victims than they were in cases involving victims of any other race/gender combination. S*ee* Hindson, Potter and Radelet, "Race, Gender, Region and Death Sentencing in Colorado, 1980- 1999," 77 COL. L. REV. 549 (2006). The authors concluded:

> the death penalty is sought for defendants who kill white females at a rate much higher than it is sought for any other victims. White females, who account for only 17.9 percent of all homicide victims, make up 34.5 percent of victims in death penalty cases. Thus, death sentences are pursued against those who kill white women at almost twice the rate as their rate of homicide victimization.

*Id.* at 577.

A November 2007 study[36] analyzed state court data from Georgia cases in the 1970's

---

[36]   Williams, DeMuth and Holcomb, "Understanding the Influence of Victim Gender in Death Penalty Cases: The Importance of Victim Race, Sex-Related Victimization and Jury Decision Making," 45 CRIMINOLOGY 4, 865 (2007).

and concluded:

> Defendants who murder females are more likely to receive a
> death sentence than defendants who murder males. Furthermore,
> we show that large differences exist in the likelihood of
> receiving a death sentence when the variables "victim race" and
> "victim gender" are considered jointly. Cases that involve white
> female victims are treated the most harshly . . . ."

Williams, DeMuth, Holcomb, 45 *Criminology* 885.  In a 2004 Ohio study, the same research

group found that death sentences were a product of a strong association between one victim

race-gender group – white female victims – and the imposition of a death sentence. Holcomb,

Williams, DeMuth, "White Female Victims and Death Penalty Research," 21 *Justice*

*Quarterly* 877-902 (2004).

In December 2008,[37] the defendants in *United States v. Valerie Friend and George*

*Lecco* , 05-cr-00107 (S.D.W.Va.), a case involving the murder of a white female victim,

brought a motion to bar the death penalty on the basis of an asserted arbitrary and

discriminatory victim-related race and gender effect.[38]  The motion was denied by the trial

judge without an opinion.  Based on an analysis of over 400 authorized federal capital cases,

it was determined by a qualified expert statistician, Lauren Cohen Bell, Ph.D., that

defendants in federal capital cases whose victims were white females were more than three

---

[37]  Efforts are underway to update the findings, but there is no reason to believe that
the passage of 27  months has appreciably altered 20 years of data.  The declarations
submitted in support of the motion in that case are submitted herewith beginning at A37.

[38]  Although both defendants were initially sentenced to death by the jury, the trial
court set the verdicts aside due to juror misconduct. Ms. Friend subsequently entered into a
plea agreement with the government, resulting in withdrawal of the death notice.  Mr. Friend
is scheduled for re-trial in May 2010.

times as likely to be sentenced to death than other federal capital defendants.  (A33.)  This finding was, moreover, found to be "highly statistically significant, systemic, and not the result of chance."  (A33.)  The examination of the cases revealed, as well, that as of December 2007, federal capital cases involving white female victims constituted 43% (26 of 61) of those sentenced to death in the federal system, but only 9% (61/626) of all potential defendants since 2000.  Thus, the death-sentencing rate is many times higher than the death-sentencing rate for non-white female victim cases.

As stated previously, the issue of the "white victim effect" has been raised before. What is new is the detailed information about the "white female victim effect" which is presented here. When the gender of the victim is considered, the evidence of an arbitrary and capricious operation of the federal death penalty becomes apparent. When the penalty decisions of juries are examined, the results are nothing short of astonishing.

Accordingly, this Court should find that the existence of a "white female victim" effect renders any death sentence in this case presumptively unconstitutional and/or in violation of 18 U.S.C. §§3593(f).

### G.    Conclusion: the federal death penalty experiment has failed.

What the federal studies – perhaps most especially the verdict sheets – illustrate is the inherently contradictory nature of two lines of Supreme Court cases.  *See* Mary Sigler, "Contradiction, Coherence and guided Discretion in the Supreme Court's Capital Sentencing Jurisprudence," 40 AMER.CRIM.L.REV 1151 (2003).  In *Gregg*, the Court posited the concept of "guided discretion" as a check on the untrammeled discretion given juries in the pre-

*Furman* era, requiring that a sentencing body's discretion "must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189. However, in cases such as *Lockett v. Ohio*, 438 U.S. 586 (1978) and *Eddings v. Oklahoma*, 455 U.S. 104 (1982), the Court held that while a jury's discretion to impose a sentence of death must be guided and channeled, a jury's discretion to impose a *life* sentence could not be limited.

This battle has been fought in the Supreme Court principally by Justices Scalia and the late Justice Blackmun. *See, e.g.,* Justice Scalia's concurrence in *Callins v. Collins*, *supra*, 510 U.S. at 1141-42, and his dissent in the since-overruled *Walton v. Arizona*, 497 U.S. 639, 657-73 (1990). It is Justice Scalia's basic view that cases such as *Lockett* and *Eddings* are incompatible with the idea of guided discretion and that those cases should be overruled. Other critics, however, point out that if the lines of cases are in fact irreconcilable, it is the death penalty that must be overruled. *See*, Steven G. Gey, "Justice Scalia's Death Penalty," 20 FLA.ST.U.L.REV. 67 (1992).

It is Mr. Jacques' argument here that the inherently incompatible nature of these two lines of cases has resulted in a return – at least in the federal system, the only system his counsel challenge – to arbitrary and capricious death sentences. He thus joins Justice Blackmun in making the point that both goals – guided discretion in imposing death, but no limitation on the information a jury may consider to spare a defendant's life – while required by the Constitution, are, in a real world, unattainable. *See Callins v. Collins*, *supra*, 497 U.S. at 1155 ("All efforts to strike an appropriate balance between these conflicting Constitutional

commands are futile.")

The federal death penalty experiment is a failure and should be declared unconstitutional.  The process should begin with a decision from this court dismissing the death-notice in this case.  Alternatively, this court should conduct a hearing at which time a full and searching inquiry of the data presented here can take place – no discovery is requested – in order to determine whether there is a convincing and constitutionally-sufficient justification for the past, current, and apparently enduring, arbitrary, cruel, invidious, and patently "unusual," state of the federal death penalty.

POINT TWO

THE SUPREME COURT'S *RING* DECISION HAS
RENDERED THE FEDERAL DEATH PENALTY
UNCONSTITUTIONAL AND THE ACT MAY NOT BE
SAVED BY A JUDICIAL "CONSTRUCTION" THAT
CREATES A NEW CRIMINAL OFFENSE WHOSE
ELEMENTS AND INTERTWINED PROCEDURES HAVE
NEITHER BEEN CONSIDERED, NOR ENACTED INTO
LAW, BY CONGRESS.[39]

> **"It is the legislature, not the court, which is to
> define a crime and ordain its punishment."**

– *United States v. Wiltberger*, 18 U.S. 76, 93 (1820) (Marshall, C.J.).

**A.    Introduction and summary of the argument**.

In enacting the FDPA in 1994, and the predecessor ADDA scheme in 1988, Congress

granted exclusive statutory authority to allege aggravating factors to the prosecutor.  If that

aspect of the FDPA is not operative, the statute lacks any congressionally-approved method

of alleging aggravating factors.  But that is exactly the case. In the wake of *Ring v. Arizona*,

*supra*, the FDPA[40] lacks any legislatively-selected method of initiating a capital prosecution.

---

[39] An earlier version of this argument was apparently rejected by this Court in *United States v. Fell*, 217 F.Supp.2d 469, 484 (D. Vt. 2002), but was not considered by the Second Circuit on appeal.  (The only appellate argument presented on the issue to the Second Circuit was whether *Ring* required the grand jury to pass on non-statutory aggravating factors.  *Fell II*, 531 F.3d at 236-238.)  Further, it does not appear that this Court was presented with legal argument concerning the impact of *United States v. Jackson*, 390 U.S. 570 (1968) on this issue.

[40] For the purposes of this argument, the abbreviation FDPA will be utilized to refer to both the 1988 and 1994 federal death-penalty schemes.  Although the procedural provisions of the ADAA have been repealed, both statutes are relevant to demonstrate Congressional intent that the prosecution have exclusive authority concerning aggravating factors.

While the Constitution requires that the elements of capital murder be presented to a grand jury and charged in an indictment, Congress, in passing the FDPA, chose another route . And it is up to Congress to make the necessary corrections.   Thus, the Federal Death Penalty is presently unconstitutional and this court should resist and reject the government's efforts to invent a "*Ring* fix."

It is fundamental to our system of government that "[i]t is the legislature . . . which is to define a crime and ordain its punishment." *United States v. Wiltberger*, 18 U.S. 76, 93 (1820) (Marshall, C.J.).  In *Ring*, the Court held that, with respect to the framework of Arizona's death penalty statute, the "enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense'. . . ." *Ring*, 536 U.S. at 585, *quoting Apprendi v. New Jersey*, 530 U.S. 466, 494 n.19 (2000).[41]  That holding, coupled with the Court's earlier holding in *Jones v. United States*, 526 U.S. 227, 251-52 (1999), that all elements of a federal offense "must be charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt[,]"[42] *see also Harris v. United States*,

---

[41]   The FDPA and Arizona capital schemes are similar in that each establishes death as a possible sentence in the statute defining the offense, *see, e.g.,* 18 U.S.C. §§ 924(j), 1959(a)(1) and 21 U.S.C. § 848(e), and then sets forth the further fact-finding and procedural steps necessary to establish a particular defendant's – and the set of relevant facts' – eligibility for a capital sentence.  As in the Arizona system addressed and invalidated in *Ring*, under the FDPA the fact that a jury returns a guilty verdict in a case of capital murder does not, without more, allow for imposition of a death sentence.  It is the further fact-finding, and intertwined procedures, that determine, in the post-*Ring* era, what constitute the new elements of "federal capital murder," a crime that presently exists only by judicial fiat.

[42]   *Ring* did not discuss the grand jury issue since the case arose in the context of a state statute to which the Fifth Amendment's Indictment Clause does not apply.  *Hurtado v. California*, 110 U.S. 516 (1884).

66

536 U.S. 545 (2002) ("those facts setting the outer limits of a sentence and of the judicial power to impose it are elements of the crime for constitutional analysis"), in effect rendered the FDPA unconstitutional because under *Ring* the statute's aggravating factors that, like the factors at issue in the Arizona statute, are necessary for a death sentence are elements of the capital offense, and must be charged in the indictment and proved to a jury beyond a reasonable doubt.  Under the FDPA, and for the purposes of this discussion only, therefore, the "elements" of capital murder are *at least*[43] murder + intent + one or more statutory aggravating factors.  By way of example from this case, there is a capital-murder charge alleged whose elements consists of: (1) murder-during a kidnapping, 18 U.S.C. § 1201(a)(1); (2) one or more of the intent factors set out at 18 U.S.C. § 3591(a)(2); plus (3), for example, the statutory aggravating factor that the murder was committed after substantial planing and pre-meditation,18 U.S.C. § 3592(c)(9).   Since the indictment alleges four statutory aggravating factors, there are four "counts" of a crime we can call "capital murder" alleged in the indictment.  Yet these crimes have never been enacted as such by Congress.  They have been instead, and improperly, "implied" by the judiciary.

---

[43] Elsewhere in this brief, counsel argues that the elements of capital murder include decisions reached by the jury right up to and including the point where it makes a fact-finding that the aggravating circumstances outweigh the mitigating circumstances.  In truth, the "selection" or ultimate sentencing decision is not made until the jury reaches the final decision-point of determining "whether all the aggravating factors found to exist *sufficiently* outweigh all the mitigating factors found to exist to justify a sentence of death . . . ."  18 U.S.C. § 3593(e) (emphasis added).  A simple "outweighing" is insufficient.  Obviously, there are enormous practical difficulties in devising a system where a grand jury can consider and weigh booth aggravating and mitigating factors.  That is precisely why the legislature needs to amend this statute, not the courts or the Department of Justice.

The FDPA, of course, nowhere provides for presentation of aggravating factors to a grand jury.  But neither is the statute not silent on the issue of how such factors are to be alleged. On that score, the FDPA explicitly reserves the selection and notice of aggravating factors to the exclusive discretion of the prosecutor.  This court must not allow the government to re-write the FDPA to its own liking.  Instead, the FDPA must be declared unconstitutional pending further congressional action.

In a closely analogous circumstances, the Supreme Court, in *United States v. Jackson*, 390 U.S. 570 (1968), proscribed the very practice now at issue, *i.e.*, where a district court was asked to engage in the judicial amendment of a capital statute in order to preserve its constitutionality.  In that case, the court declined to do so.  As a result, the Supreme Court's admonition in *Jackson* is equally powerful and appropriate here:

> It is unnecessary to decide here whether this conclusion [the Government's proposed "fix" of the death-penalty aspects of the federal kidnapping statute] would follow from the statutory scheme the Government envisions, for it is not the scheme that Congress enacted.

390 U.S. at 573.

The principles which flow logically and inexorably to the conclusion that the FDPA cannot survive *Ring* will be presented below in the following order:

(1)    in *Ring* and related cases such as *Jones* and *Harris*, the Supreme Court held that aggravating factors necessary to a capital verdict are essential elements of the capital offense, and must be pleaded in the indictment and proved to a jury beyond a reasonable doubt;

(2)    the FDPA does not provide for presentation of aggravating factors to a grand jury (and thereby including them in an indictment), but instead vests authority

68

to identify aggravating factors exclusively with the prosecutor;

(3)     the FDPA cannot be amended by the prosecutor or the courts to permit presentation of aggravating factors to a grand jury because, as the Supreme Court held in *Jackson*, and consistent with centuries of constitutional jurisprudence and statutory construction, it is for the legislature, not the courts or the prosecutor, to define crimes and punishment and the contours of a statute, and the presentation of aggravating factors to a grand jury is contrary to the unambiguous intent of Congress as expressed in the FDPA;  and

(4)     contrary decisions from Courts of Appeals (this is an issue of first impression in the Second Circuit) have been wrongly decided because they have failed either to (a)  address *Jackson* and the fundamental separation of powers principles incorporated therein;  and/or (b) acknowledge, much less reconcile, the explicit allocation of authority to the prosecutor to determine the propriety of aggravating factors.  Nor do severability analysis or the post-*Apprendi* drug cases, or the principle of "constitutional avoidance" save the FDPA;  indeed, those doctrines and the cases, as well as post-*Ring* Supreme Court cases, including *United States v. Booker*, 543 U.S. 220 (2005), and *Blakely v. Washington*, U.S. 542 U.S. 296 (2004), establish that a judicially imposed solution cannot redefine or reconfigure a federal criminal statute to do what Congress has not intended.

**B.     Aggravating factors necessary to a capital verdict are essential elements of the capital offense, and must be pleaded in the indictment and proved to a jury beyond a reasonable doubt.**

In *Ring*, in which the Supreme Court overruled *Walton v. Arizona*, 497 U.S. 639 (1990), and in subsequent cases, the Court established beyond dispute that aggravating factors necessary to imposition of the death penalty under the FDPA must be charged in the indictment, and proved to the satisfaction of a jury beyond a reasonable doubt. As noted earlier, the  Supreme Court explained in both *Ring* and *Harris* that facts which increase the maximum penalty faced by the defendant create new, different, and "greater offense[s]."  In *Harris*, 536 U.S. at 555-566, the Court noted repeatedly that any "fact" which increases the

maximum possible penalty beyond that authorized by the findings implicit in the jury's

verdict of guilt is an element of an offense:

> [r]ead together, *McMillan* [*v. Pennsylvania*, 477 U.S. 79 (1986)]
> and *Apprendi* mean that those facts setting the outer limits of a
> sentence and of the judicial power to impose it are elements of
> the crime for constitutional analysis.

536  U.S. at 567.  Concurring in *Ring*, Justice Scalia famously observed:

> [All] facts essential to imposition of the level of punishment that
> the defendant receives – whether the statute calls them elements
> of the offense, sentencing factors, or Mary Jane – must be found
> by the jury beyond a reasonable doubt.

*Ring*, 436 U.S. at 610 (Scalia, J., concurring.)

     Similarly, in *Apprendi*, the Court had observed that, "[t]he judge's role in sentencing

is constrained at its outer limits by the facts alleged in the indictment and found by the jury.

Put simply, facts that expose a defendant to a punishment greater than that otherwise legally

prescribed [are] by definition 'elements' of a separate legal offense." 530 U.S. at 483, n. 10.

*See also Harris*, 536 U.S. at 560 (stating that the principle "by which history determined

what facts were elements . . . defined elements as 'fact[s] legally essential to the punishment

to be inflicted,'") *quoting United States v. Reese*, 92 U.S. 214, 232 (1876) (Clifford, J.,

*dissenting*).

     In *Jones*, the Court had presaged what has since occurred by holding that all elements

of a federal offense "must be charged in the indictment, submitted to a jury, and proven by

the Government beyond a reasonable doubt."  526 U.S. at 227.  *See also United States v.*

*Cotton,* 535 U.S. 625  (2002) (in federal prosecutions, any fact increasing the maximum

punishment "must also be charged in the indictment").[44]

Thus, *Ring* and *Harris* have established beyond dispute that the facts alleged in the "Special Findings" section of the superseding Indictment in this case constitute elements of an offense, since they "are facts that expose [this] defendant to a punishment greater than that otherwise legally prescribed . . . ," *i.e.*, the death penalty. That conclusion is further confirmed by the Supreme Court's subsequent decisions in *Blakely* and *Booker*, in which first state and then federal sentencing guidelines factors, respectively, were held to constitute the functional equivalent of elements that required proof to a jury beyond a reasonable doubt. 542 U.S. at 303;  543 U.S. at 244.

Capital cases since *Ring* have continued in the same vein.  For example, in *Sattazahn v. Pennsylvania*, 537 U.S. 101 (2003), in which the Court considered whether double jeopardy was a bar to the second prosecution of a capital case when the Commonwealth of Pennsylvania again sought (and received) a sentence of death after a divided jury at the first trial had spared the defendant's life and the defendant then succeeded in having the underlying conviction set aside on appeal,  with the Court ruling 5-4 that double jeopardy did not bar a second opportunity to seek a death sentence, Justice Scalia –  joined by the Chief Justice and Justice Thomas – discussed the implications of the Court's decision in *Ring*:

> [i]n *Ring v. Arizona*, 536 U.S. 584 (2002), we held that

---

[44] As stated earlier, *Ring* does not address the grand jury issue because the case arose in the context of a state statute, to which the Fifth Amendment's Grand Jury Clause does not apply.  *Hurtado v. California*, 110 U.S. 516 (1884).  However, *Jones* and *Cotton*, discussed above, make it plain that the Fifth Amendment requires the inclusion of such elements in the indictment.

aggravating circumstances that make a defendant eligible for the death penalty "operate as 'the functional equivalent of an element of a *greater offense*.'" *Id.*, at [609] (emphasis added). That is to say, for purposes of the Sixth Amendment's jury-trial guarantee, the underlying offense of "murder" is a distinct, lesser included offense of "murder plus one or more aggravating circumstances": Whereas the former exposes a defendant to a maximum penalty of life imprisonment, the latter increases the maximum permissible sentence to death.

537 U.S. at 111.

The three justices who joined that portion (Part III) of the main opinion[45] concluded that there could be no principled reason to distinguish between what constitutes an offense for purposes of the Sixth Amendment and an "offence" for purposes of the Double Jeopardy Clause of the Fifth Amendment. *Id.*[46]

Yet even the four dissenting justices agreed with Justice Scalia's proposition with respect to capital murder constituting a *greater* offense based on the additional elements – the aggravating factors – needed to prove that offense:

[t]his Court has determined . . . that for the purposes of the Double Jeopardy Clause, capital sentencing proceedings

---

[45] There were three separate opinions in *Sattazahn*. The majority opinion, authored by Justice Scalia and joined in *in toto* by the Chief Justice and Justices Thomas and, with the exception of Part III of the opinion, by Justices Kennedy and O'Connor. Justice O'Connor filed a separate concurrence. Justice Ginsberg filed a dissenting opinion joined by Justices Stevens, Souter, and Breyer.

[46] Justice Kennedy, without explaining his position, did not join Part III of the opinion. Justice O'Connor concurred, stating she did "not join Part III, which would further extend the reach of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), because [she] continue[d] to believe that case was wrongly decided[.]" 537 U.S. at 116-17, *citing her dissent in Ring*. *Id.*

involving proof of one or more aggravating factors are to be
treated as trials of separate *offenses*, not mere sentencing
proceedings. *See, ante,* at [537 U.S. at 736-738, 739-740];
*Ring v. Arizona*, 536 U.S. 584 (2002); *Bullington v. Missouri*,
451 U.S. 430 (1981).

537 U.S. at 126 n. 6 (emphasis in original ) (Ginsburg, J., *dissenting*).

Thus, at least seven justices are in agreement that, under the principles set forth in

*Ring*, capital sentencing schemes that employ aggravating factors create, from a

constitutional perspective, new offenses, greater than ordinary willful homicide, that are

distinguished by the additional *elements* those aggravating factors represent.  Pursuant to

*Jones* and *Cotton*, when those greater offenses are prosecuted under federal law in federal

court, it is equally beyond question that they must not only be proved to a jury beyond a

reasonable doubt, but that they must first be presented to a grand jury and included within

the indictment.

Certainly the structure of the FDPA conforms with that conclusion.  As with the

Arizona scheme at issue in *Ring*, a jury's verdict finding a federal defendant guilty of murder

cannot support a sentence of death without additional fact-finding.  For example, although

a guilty verdict in a case of a carjacking resulting in death carries with it an *authorized*

potential death sentence, such a defendant is not actually exposed to a death sentence unless

and until the jury (or the judge, where a jury has been waived) makes determinations,

unanimously and beyond a reasonable doubt, that the crime was committed with one of the

four "intent" factors listed at 18 U.S.C. § 3591(a)(2)(A-D) and that there is present in the

case at least one of the 16 statutory aggravating factors set forth at 18 U.S.C. § 3592(c)(1-

16).  In addition, arguably, a defendant may not be sentenced to death unless it is also established that the attorney for the Government thinks executing the defendant is a good idea, 18 U.S.C. § 3593(a), that the defendant was not less than 18-years old at the time of the offense, 18 U.S.C. § 3591(a), and that he is not mentally-retarded, *Atkins v. Virginia*, 536 U.S. 304 (2002).  It is also argued in this memorandum, at Point Three, infra, that the ultimate decision on whether aggravating factors substantially outweigh mitigating factors is itself an element of capital murder.

It thus follows that the aggravating factors the government has alleged by superseding indictment in this case are viewed by the government, and for purposes of statutory and constitutional analysis, as elements of a greater offense that requires the proof of those elements before a death sentence can be imposed.

> **C.     The FDPA does not provide for presentation of aggravating factors to a grand jury (and thereby including them in an indictment), but instead vests exclusive authority to identify aggravating factors exclusively with the prosecutor.**

With respect to federal capital offenses prosecuted in federal court, it cannot be argued that *Ring* and the Fifth Amendment's indictment clause do not require that aggravating factors necessary to a death sentence be presented to a grand jury and included in the indictment.[47]  The FDPA neither contemplates affording, nor permits, the grand jury

---

[47]  The Fifth Amendment provides in pertinent part that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on presentment or indictment of a Grand Jury[,]" including those accused of felony offenses.  *See Stirone v. United States*, 361 U.S. 212, 215 (1960) ("[t]he crime charged here is a felony and the Fifth Amendment requires that prosecution be begun by indictment").

any role in determining which aggravating factors are to be alleged in a federal capital prosecution. Pursuant to the FDPA scheme chosen by Congress, a sentence of death may not be sought unless, as set forth in the statute itself, "the attorney for the Government believes that the circumstances of the offense are such that a sentence of death is justified . . . ." 18 U.S.C. § 3593(a). If the "attorney for the government" believes death is warranted, the next step in the legislatively-selected process is for that attorney to serve and file a notice, signed by the attorney for the Government, stating, *inter alia*, that "the Government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified . . . and that the Government will seek a sentence of death; . . . ." 18 U.S.C. § 3593(a)(1).

Although not in and of themselves aggravating factors, the pre-*Ring* FDPA also required proof – and allegation in the notice by government attorneys – of one or more of four "gateway" state-of-mind factors. 18 U.S.C. § 3591(2). The notice, in addition, is required to set forth the aggravating factors– statutory and non-statutory – the government proposes to prove if the defendant is convicted which may include victim-impact evidence. 18 U.S.C. § 3593(a). The ADAA scheme was similar. *See* 21 U.S.C. § 848(h) (Repealed). Consequently, the unambiguous language of the FDPA statutes themselves establishes that Congress, rightly or wrongly, elected to enact a scheme where the decision to set the machinery of death in motion would be reserved to the government's attorneys and no one else, not grand juries, not the court, and not any other individual or entity. Nonetheless, the government seeks to establish in this case a substitute method for introducing aggravating

75

factors now that *Ring* rendered the exclusive statutorily prescribed mechanism selected by Congress constitutionally invalid.  Fidelity to the fundamental principle of separation of powers, embedded deeply in the constitutional form of government our nation has adopted, and detailed below, is even more important when applied to the government's efforts to execute one of its citizens, thereby imposing "the most irremediable and unfathomable of penalties; . . . ." *Ford v. Wainwright*, *supra*, 477 U.S. at 411.

> **D.**   **Jackson and the Separation of Powers Doctrine demonstrate that the FDPA cannot be amended by the prosecutor or the courts to permit presentation of aggravating factors to a grand jury because it is for the legislature to define crimes and punishment, and presentation of aggravating factors to a grand jury is contrary to the unambiguous intent of Congress as expressed in the FDPA.**

As noted, this is not an instance in which Congressional silence permits flexibility in rescuing an otherwise unconstitutional statute from invalidation.  Indeed, given the express and unambiguous language and structure of the FDPA, if, prior to *Ring*, a defendant had argued that the aggravating factors could not be applied unless they were presented to and charged by a grand jury in the indictment, the government's response undoubtedly, and correctly, would have been that the statute does not ascribe any such role to the grand jury, and that the statute plainly reserves that authority solely to the prosecutor.

> 1.   Congress, not the courts or prosecutors, is vested with legislative authority to define federal criminal offenses and the punishment for such conduct.

That view, of course, conforms with centuries of federal criminal jurisprudence. Since at least as early as *United States v. Hudson*, 11 U.S. 32 (1812) (Marshall, C.J.), it has been clear that the Constitution affords Congress the sole power to define and create  all

offenses against the United States, and the punishment therefor. *See also*, *United States v. Worrall*, 2 U.S. (2 Dall.) 384, 393-4 (1798);  *United States v. Wiltberger*, 18 U.S. 76, 93 (1820), ("[i]t is the legislature, not the court, which is to define a crime and ordain its punishment"); *Hudson*, 11 U.S. at 34 ("[t]he legislative authority of the Union must first make an act a crime, fix a punishment to it, and declare the Court that shall have jurisdiction of the offense" and "[t]he power of punishment is vested in the legislative, not in the judicial department").  *See also Bousley v. United States*, 523 U.S. 614, 620-21 (1998) ("under our federal system it is only Congress, and not the courts, which can make conduct criminal"); *Staples v. United States*, 511 U.S. 600, 604 (1994) ("[t]he definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes which are solely creatures of statute") (citation omitted).

As a result, "[o]ne may be subjected to punishment for crime in the federal courts only for the commission or omission of an act defined by statute, or by regulation having legislative authority, and then only if punishment is authorized by Congress."  *Viereck v. United States*, 318 U.S. 236, 241 (1943) (citations omitted).  *See also United States v. Lanier*, 520 U.S. 259, 267-68 n. 6 (1997) ("[f]ederal crimes are defined by Congress, not the courts, . . . .");  *Logan v. United States*, 144 U.S. 263, 283 (1982) ("[a]lthough the constitution contains no grant, general or specific, to congress of the power to provide for the punishment of crimes, [with certain exceptions] . . . no one doubts the power of congress to provide for the punishment of all crimes and offenses against the United States").

Applying these principles in *Bouie v. City of Columbia*, 387 U.S. 347 (1964), in which

the state courts of South Carolina, in a naked effort to prosecute civil rights protesters, had construed an existing statute in a manner that created a new crime, the Supreme Court intervened and set aside the statute, as interpreted, as contrary to *Wiltberger*. *See also Crandon v. United States*, 494 U.S. 152, 158 (1990) ("legislatures, not courts, define criminal liability").

      2.    <u>*Jackson* provides a direct and "all fours" analogy to the circumstances present herein, and compels invalidation of the FDPA.</u>

It is in that context that the Supreme Court's decision in *United States v. Jackson*, 390 U.S. 570 (1968), provides precedent directly and specifically applicable to capital statutes, and to improper attempts to cure them by judicial fiat rather than by legislative action. As stated earlier, this is not the first time that the government has attempted to enlist the judiciary in an effort to rescue, through ersatz construction, a constitutionally flawed federal death penalty.

In *Jackson*, the Court held that when a particular federal sentencing statute is unconstitutional, a court lacks authority to devise its own procedure, unauthorized by statute or rule, simply because the procedure, if properly enacted by Congress, would pass constitutional muster. In *Jackson*, the Court considered the federal kidnapping statute, which contained a mandatory death penalty when a jury recommended it – thereby making the death penalty possible only for those defendants who exercised their right to trial by jury.

In an effort to salvage the death-penalty provision, however, the government proposed a number of alternative "constructions" of the statute and cited *ad hoc* procedures developed

by other district courts as "cures" for the constitutional problems.  However, the court, after finding the statute unconstitutional rejected the government's proposed remedy of directing the trial court to convene a special penalty phase jury after a guilty plea, as well as every other approach proposed by the government because those proposals represented judicial, rather than *legislative* action.  *Id.* at 572–81.[48]

In analyzing and explicating the limits of judicial authority to construe legislation, even when such construction would "save" the legislation from a declaration of unconstitutionality, the *Jackson* Court pointed out that the kidnapping statute "sets forth no procedure for imposing the death penalty upon a defendant who waives the right to jury trial or one who pleads guilty."  *Id.* at 571.

Thus, the Court declined to read into the statute congressional authority for the courts to develop such a procedure.  The Court was concerned principally with overreaching its authority by imposing the alternate sentencing scheme.  According to the Court, "it would hardly be the province of the courts to fashion [such] a remedy[,]" *id.* at 579, absent "the slightest indication that Congress contemplated any such scheme."  *Id.* at 578.

Applying *Jackson*'s analysis to this case, it is manifest that once the provision allocating to the prosecutor the power to charge aggravating factors is declared

---

[48]  For example, the government proposed a "construction" of the statute under which "even if the trial judge accepts a guilty plea or approves a jury waiver, the judge remains free . . . to convene a special jury for the limited purpose of deciding whether to recommend the death penalty."  *Id.* at 572.  The Government also suggested that the court might save the statute by reading it to make imposition of the death penalty discretionary on the part of the sentencing judge.  *Id.* at 575.  The court rejected these proposed reconstructions and adhered, instead, to the plain language of the statute as the best evidence of Congress' intent.

unconstitutional, the FDPA "sets forth no procedure" for alleging aggravating factors. Indeed, as the *Jackson* opinion explained,  "[t]o accept the Government's suggestion that the jury's sentencing role be treated as merely advisory would return to the judge the ultimate duty that Congress deliberately placed in other hands."  *Id.* at 576.

Here, as in *Jackson*, Congress has "deliberately placed in [the prosecution's] hands" the responsibility for alleging aggravating factors under the FDPA.  Consequently, in this case, "construing" the FDPA to allow the grand jury to assume that responsibility would violate the FDPA and contravene Congressional intent without "the slightest indication that Congress contemplated" according the grand jury such a role in the federal capital decision-making process.  Presented with the option, Congress, in light of the change of law from *Walton* to *Ring*, might very well enact a comprehensive death penalty scheme that allocated a role to the grand jury.  Congress might also choose to enact a wholly new and different scheme, one which fully defined the new offense of "capital murder," specified its elements, and set forth comprehensive procedures for trial of those offenses.[49]

Jackson, however, proscribes a court from implementing what Congress *might* do, or what the prosecutor proposes as a "fix" for a constitutionally deficient statute;  instead, *Jackson*, requires that courts, under such circumstances, invalidate, and not legislate,:

---

[49]  Indeed, the dangers of judicial legislation are patently evident from the divergent attempts, following *Ring*, to salvage the FDP despite the obvious defect in the method of alleging aggravating factors.  For example, in *United States v. Jackson*, 327 F.3d 273 (4th Cir. 2003), the court held that the presentation of but one statutory aggravating factor to the grand jury (and inclusion in the indictment) was sufficient to permit the government to seek death on the basis of *several* statutory aggravating factors not so included.  327 F.3d at 284-87.

> [i]t is unnecessary to decide here whether this conclusion would
> follow from the statutory scheme the Government envisions, *for
> it is not the scheme that Congress enacted*.

*Id.* at 573 (emphasis added).

Also, the Court in *Jackson* recognized that the government's proposal "would be fraught with the gravest difficulties." *Id.* at 579. As the Court explained, "it is one thing to fill a minor gap in a statute," but "quite another thing to create from whole cloth a complex and completely novel procedure and thrust it upon unwilling defendants for the sole purpose of rescuing a statute from a charge of unconstitutionality." *Id.* at 580. *See also Blount v. Rizzi*, 400 U.S. 410, 419 (1971) (statute that permitted the Postmaster General to determine that material was obscene struck down by the Court which, in the process of rejecting the government's suggestion that Congress's plain language could be "construed" to allow a judge to make that determination instead of the Postmaster General, explained that "it is for Congress, not this Court, to rewrite the statute").

The very same type of judicial and prosecutorial restructuring of a statute to conform with constitutional imperatives was rejected by the Court in *United States v. Booker*, 543 U.S. 220 (2005). In the course of invalidating the mandatory nature of the federal sentencing guidelines because they permitted a judge to find, by a preponderance of the evidence, facts necessary to an enhanced punishment, the Court did not create a hybrid system, inconsistent with the Sentencing Reform Act (hereinafter "SRA"), under which those sentencing factors would be incorporated in indictments and presented to a jury. Rather, a separate majority in *Booker* (in what has generally been denominated the "remedy opinion," *Booker*, 543 U.S. at

81

245-46) severed the offending section – that which made the guidelines mandatory – but retained the essential character of the remainder of the SRA.[50]

Indeed, in *Blakely v. Washington*, *Booker*'s predecessor, Justice Breyer, who wrote the remedial opinion in *Booker*, recognized quite clearly the practical and due process concerns attendant to charging sentencing enhancement facts and submitting them to a jury. 542 U.S. 296, 334-5 (2004) (Breyer, J., *dissenting*). Justice Breyer's admonition about the practical implications of presenting sentencing factors to a jury absent any legislative or procedural framework is mirrored by the issues raised by the submission of aggravating factors to a grand jury in the similarly barren context of the FDPA – none of which the government recognizes or addresses. For example, there are questions regarding which aggravating factors must be included in the indictment, whether the defendant must plead to those factors, whether the lessened evidentiary standard of the FDPA remains applicable to some or all aggravating factors, and, if so, to the presentation of mitigating evidence, and any procedural changes in the two phases of the trial.

Here, the government's position, by implication, is that prosecutors can fashion their own remedy independent of both Congress' intent and clear and limiting legislative language. This view, however, mirrors the position taken by the government, and rejected by the Supreme Court, in *Booker*:

Severing the requirement that judges, not juries, apply the

---

[50] Here, as discussed *infra*, severance of the invalid section of the FDPA does not save the statute because it cannot function as a capital statute without a mechanism for alleging aggravating factors.

> Guidelines would require courts to make the legal and policy
> decisions necessary to resolve all of those questions.  There is
> no indication that Congress delegated that role to the courts.  It
> is one thing to recharacterize a single factor that increases a
> statutory maximum and treat it as an element of the crime.  It is
> quite another to take an entire system expressly designed to
> channel sentencing discretion and treat it as if Congress was
> attempting to rewrite the criminal code.

*Id.* at 363.

Accordingly, *Jackson* is precisely on point and controls this case.  In enacting the

FDPA, Congress, relying on *Walton*, created a scheme in which the prosecutor was granted

the exclusive authority to make the threshold determination whether to seek the death

penalty, and, once a decision was made to pursue death, which aggravating factors to allege.

Allowing the Government to seek indictment of what Congress unambiguously defined as

sentencing factors would give "to the [grand jury] the ultimate duty that Congress

deliberately placed in other hands," *i.e.,* those of the government attorney – precisely the kind

of end-run that *Jackson* forbids.[51]

As a result, if the FDPA's treatment of aggravating factors is unconstitutional after

*Ring*, then it is undeniable, under *Jackson* and the doctrine of Separation of Powers, that only

Congress can cure the problem, and only by enacting – should it choose to do so in light of

---

[51]   Conversely, if aggravating factors (and other aspects of the FDP, such as the
required "gateway" findings and the age of the defendant) are not elements of the offense,
the grand jury has no business investigating or finding them, since the authority of the grand
jury is limited to determining "if there is probable cause to believe that a crime has been
committed . . . .," *Branzburg v. Hayes*, 408 U.S. 665, 686 (1972) and "whether criminal
proceedings should be instituted against any person." *United States v. Calandra*, 414 U.S.
338, 343-33 (1974).

the changed constitutional landscape augured by *Ring* – a new death penalty scheme.

    3.    <u>The Non-Delegation Doctrine provides further compelling support for the conclusion that the FDPA's defects cannot be cured by judicial action.</u>

A corollary to the Separation of Powers problems posed by the prosecution's proposed unilateral *Ring* fix for the FDPA is the non-delegation doctrine's[52] preclusion of either Executive or the Judiciary action, whether separately or in tandem, substituting either's judgment for that of Congress in relation to prescribing the elements and the procedures for application of the federal death penalty.  As Justice Scalia stated in his dissent in *Mistretta v. United States*, 488 U.S. 361 (1989) :

> It is difficult to imagine a principle more essential to democratic Government than that upon which the doctrine of unconstitutional delegation is founded: Except in a few areas constitutionally committed to the Executive Branch, the basic policy decisions governing society are to be made by the Legislature.
>
>            \*   \*   \*
>
> That Congress cannot delegate legislative power to the President is a principle universally recognized as vital to the integrity and maintenance of the system of Government ordained by the Constitution.

488 U.S. at 415 (Scalia, J., *dissenting*). The majority in *Mistretta* ultimately found that the non-delegation doctrine had not been violated by creation of the United States Sentencing Commission and the guidelines it promulgated, because, in constituting the Commission, Congress had "[laid] down by legislative act an intelligible principle to which the

---

[52] "The non-delegation doctrine originated in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371 (1989); U.S. CONST., ART. 1, § 1.

[Sentencing Commission] is directed to conform, . . ." 488 U.S. at 372, quoting *N.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928); *Mistretta*, 488 U.S. at 374. Nevertheless, the Court reaffirmed the principle that "'the integrity and maintenance of the system of Government ordained by the Constitution's mandate that Congress generally cannot delegate its legislative power to another Branch." 488 U.S. at 371-72, *quoting Field v. Clark*, 143 U.S. 649, 692 (1892).

Thus, *Mistretta* involved the delegation only of authority to determine sentencing factors within the limits of a legislatively determined "intelligible principle." It did not include the authority to determine the very elements of an offense, as would be the case under a hypothetical post-*Ring* FDPA.[53] Plainly, Congress must have the opportunity to determine, in light of *Ring*, the precise elements of federal capital murder and how *Ring* has affected the legislative balancing which produced the FDPA in the first place.

Since Congress could not delegate to the Executive Branch the power to rewrite the FDPA to its post-*Ring* liking, *a fortiori* the Executive Branch can not simply assume that power by attempting to substitute new procedures and elements for those originally provided by Congress, but rendered constitutionally infirm by the *Ring, Jones, Apprendi* trilogy.

---

[53] In *Touby v. United States*, 500 U.S. 160, 164 (1991), the Court upheld Congress' delegation to the Attorney General of the authority to *temporarily* classify a drug as a controlled substance in order to bring its use and/or distribution within reach of criminal prosecution. This delegation of authority was based on the advent of "designer drugs" which were only marginally different in chemical composition from drugs that were already controlled. The Court held that the intelligible Congressional principle at issue not only meaningfully constrained the Attorney General's discretion to define criminal conduct but that, in addition, "Congress ha[d] placed multiple specific restrictions on the Attorney General's discretion to define criminal conduct, . . . ." *Id.* at 167.

4.      The grand jury lacks any authority to issue "special findings."

In this case, the indictment contains a section labeled, "Notice of Special Findings." Grand juries are not, however, permitted to return anything denominated as "Special Findings." The Federal Rules of Criminal Procedure provide that an indictment "shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." F.R.CRIM.P 7(c)(1). In 1979, Rule 7 was amended specifically to allow notice of criminal forfeitures to be alleged by indictment. Obviously, nothing in the text of the Rule, and nothing in the Indictment Clause of the Fifth Amendment, contemplates or permits a grand jury to make "Special Findings" that serve the function of the triggering requirements of the FDPA that are now invalid in light of *Ring*.

In addition, while the Supreme Court's decision in *Schriro v. Summerlin*, 542 U.S. 348 (2004), held that, for purposes of collateral review, *Ring* involved issues of procedure rather than substantive criminal law, 542 U.S. at 354-55, that does not place the method of alleging the FDPA's aggravating factors within the purview of the government's authority or role in a three-branch form of government. Rather, the principles established in *Jackson* continue to apply, and the express language of the statute remains controlling and dispositive. Consequently, the prosecutor's attempt to rescue the FDPA via the grand jury's "Special Findings" is void.

E.     **Courts of appeals decisions to the contrary have been wrongly decided, and neither severability analysis, nor the post-*Apprendi* drug cases, nor the doctrine of "constitutional avoidance" can save the FDPA.**

1.     The decisions by the courts of appeal have been wrongly decided.

While various Courts of Appeals have considered the issue herein and concluded that there is no constitutional or statutory impediment to presenting the FDPA's aggravating factors to a grand jury in order to avoid unconstitutionality under *Ring*, the cursory reasoning in each case has been fatally flawed for two principal reasons:

(a)     the decisions all fail to address *Jackson*, and/or to distinguish its clearly applicable holding and principles;  and

(b)     the decisions ignore the plain language of the FDPA with respect to whether the grand jury is authorized to allege aggravating factors.

For example, in *United States v. Brown*, 441 F.3d 1330 (11th Cir. 2006), the Eleventh Circuit not only failed to mention *Jackson at all*, but also joined other circuits in claiming that while "'nothing in the FDPA requires prosecutors to charge aggravating factors in an indictment, . . . there is nothing in that law inhibiting such a charge.'" 441 F.3d at 1367, *quoting United States v. Robinson*, 367 F.3d 278, 290 (5th Cir. 2004).[54]  *See also United States v. LeCroy*, 441 F.3d 914 (11th Cir. 2006) ("[t]he major flaw in LeCroy's argument is that nothing in the [FDPA] forbids, or is inconsistent with, prosecutors' taking the additional

_____

[54] In *Brown*, the Court also stated the defendant's argument in a manner different than what Mr. Jacques presents here.  In *Brown*, according to the Court, the defendant "argue[d] that the FDP is facially unconstitutional [] because it does not *require* [aggravating] factors to be alleged in the indictment." 441 F.3d at 1367.  Here, Mr. Jacques states the converse: that the FDP is unconstitutional because it requires that aggravating factors be alleged *exclusively in a manner that precludes presentation to the grand jury*.

step of including the statutory aggravating factors in the indictment and submitting same to the grand jury.  Indeed, a statute will seldom expressly provide for submitting elements of an offense to the grand jury"); *United States v. Allen*, 406 F.3d 940, 949 (8th Cir. 2005) ("[w]hile it is true that the FDPA directs the government to charge these factors in a notice of intent to seek the death penalty, nothing in the Act precludes the government from also submitting them to the grand jury for inclusion in the indictment");  *United States v. Barnette*, 390 F.3d 775, 789 (4th Cir. 2004) ("[a] review of the statute itself reveals no language that restricts the government from submitting aggravating factors to the grand jury. Neither does the legislative history indicate any such intent").[55]  The First Circuit's attempt to distinguish *Jackson* is likewise flawed in that, the reasoning requires that the plain language of the statute which ordains a procedure completely at odds with presentment to a grand jury be ignored.  *United States v. Sampson*, 486 F.3d 13 (1st Cir. 2007).

That contention is wrong on two counts: (1) the FDPA not only does not "require" prosecutors to present aggravating factors to the grand jury, it prescribes a precise and exclusive method for alleging aggravating factors:  the prosecutor's exclusive discretion and judgment; and (2) the assertion that "nothing in the [FDPA] inhibit[s]" presentation of aggravating factors to the grand jury ignores the explicit and exclusive statutory delegation to the prosecutor, the rules of statutory construction and the clear and controlling precedent

---

[55]  In both *Allen* and *Barnette*, the defendant's principal (and unsuccessful) argument was that the indictment *failed* to allege an aggravating factor.  406 F.3d at 940; 390 F.3d at 775.  In both cases, the Courts found any error to be harmless, and in *Barnette* the Court also held that the language of the indictment did, in fact, adequately allege an aggravating factor. *Id*.

88

provided by *Jackson*.[56]

Again, this is not an instance in which a statute simply does not "expressly provide for submitting elements of an offense to the grand jury;" rather, the FDPA *expressly and comprehensively provides for another, exclusive method for alleging aggravating factors*. Thus, the decisions upholding the validity of the FDPA were wrongly decided, and this Court should, consistent with *Jackson* and the clear language of the FDPA, declare the statute unconstitutional as applied to Mr. Jacques.

>    2.    The post-Apprendi drug-quantity cases do not authorize presenting the FDPA's aggravating factors to a grand jury.

Nor can the FDPA find refuge in post-*Apprendi* cases that required drug quantity in federal prosecutions under 21 U.S.C. § 841, previously deemed a sentencing factor to be determined by a judge by a preponderance of evidence, to be pleaded in an indictment and proved to a jury beyond a reasonable doubt. *See, e.g., United States v. Thomas*, 274 F.3d 655 (2d Cir. 2001) (*en banc*). *See also United States v. Cotton*, 535 U.S. 625 (2002) (government concedes that it was error not to include drug quantity in all post-*Apprendi* federal drug indictments, but conviction affirmed because the defendant failed to object, and omission constituted harmless error).

In fact, the difference between Title 21's treatment of drug quantity and the FDPA's handling of aggravating factors is striking and dispositive.   Regarding drug quantity,

---

[56]  Significantly, neither *Allen*, nor *Robinson*, nor *Barnette*, nor *LeCroy*, nor *Brown* discuss or even cite *Jackson*.   Thus, none of those decisions can be deemed to have considered the issue sufficiently, or comprehensively. *Contra*, *United States v. Sampson*, 486 F.3d 13 (1st Cir. 2007)

Congress enacted statutes in which the penalty ranges increase directly with the quantity of the specified drug.[57]  For those statutes, though, Congress was completely silent on whether drug quantities were elements of the offense or sentencing factors.  Thus, requiring drug quantities to be alleged by indictment did not alter the structure of the drug laws, or offend Congressional intent.[58]

In fundamental contrast, however, Congress clearly never intended the aggravating factors in the FDPA to constitute elements of the offense.  Rather, Congress, relying on *Walton*, which permitted such aggravating factors to be treated as sentencing factors, patently described them as such, and directed that they be determined and identified in each case *not* by a grand jury (or any other body or institution), but by the prosecutor *alone*.

Moreover, when the Supreme Court has been required to determine whether a statute sets forth elements-of-an-offense, as distinct from sentencing factors, it has looked to Congressional intent.  Accordingly, in *Castillo v. United States*, 530 U.S. 120 (2000), the Court explained that "[t]he question before us is *whether Congress intended* the statutory references . . . to define a separate crime or simply to authorize an enhanced penalty."  530 U.S. at 123 (emphasis added).  *Accord, Jones*, 526 U.S. at 232–39.  *See also Almendarez-*

---

[57] *See, e.g.,* 21 U.S.C. § 841(b)(1)(A) (possession of one kilogram or more of heroin exposes a defendant to a sentence of 10 years to life; possession of less than 50 grams of heroin exposes a defendant to a sentence of 0 - 20 years, 21 U.S.C. § 841(b)(1)(c)).

[58] The same is true of the federal carjacking statute at issue in *Jones*, 526 U.S. at 239, 251-252.  The statute, 18 U.S.C. § 2119, did not make any distinction with respect to whether serious bodily injury was an element or a sentencing factor.  Thus, including that factor in an indictment did not involve the redrafting of a statute as is proposed by the government in this case with respect to the FDPA's aggravating factors.

90

*Torres v. United States*, 523 U.S. 224, 228 (1998);  *Harris*, 536 U.S. at 582.

In both *Harris* and *Almendarez-Torres*, the Court found the aspects at issue to be sentencing factors;  in *Castillo* and *Jones*, they were found to offense elements.  In both sets of cases, the Court proceeded by the same exhaustive statutory, not constitutional, analysis, because the Constitution, though it places limits upon Congress' ability to designate certain facts as sentencing factors, does *not* afford the courts authority to recast statutes so that they fit within those limits.

For example, in *Harris*, the Court comprehensively considered "the distinction the law has drawn between the elements of a crime and factors that influence a criminal sentence." 536 U.S. at 549  The Court reaffirmed that the threshold question of statutory construction is *whether Congress intended* relevant facts to be offense elements or sentencing factors. 536 U.S. at 551.  The Court further explained that the distinction is significant because "*[l]egislatures define crimes in terms of the facts that are their essential elements*, and constitutional guarantees attach to these facts." 536 U.S. at 549  (emphasis added).

Here, Congress's intent is plain and unmistakable.  Consistent with the state of the law pre-*Ring* (and governed by *Walton*), Congress structured the FDPA so that aggravating factors were sentencing considerations that were within the exclusive province of the prosecutor.  As a result, the government is not empowered to subvert Congressional intent and, in effect, create by prosecutorial fiat, a brand new criminal statute.

3.     Severability analysis cannot save the FDPA from unconstitutionality.

Additionally, the severability cases also undercut any analogy to the drug cases

discussed earlier.  Under those cases, the critical question is whether the statute at issue, upon removal of its unconstitutional portion, can function independently.[59]  For example, in *Booker*, as noted, rather than cobble together a hybrid system that would permit presentation of sentencing factors to both grand and petit juries, the Supreme Court severed the sentencing guidelines' mandatory nature because that *preserved* the character of the SRA, and Congress's intent in enacting it, as opposed to creating a new system inconsistent with Congressional intent, and which raised more procedural issues and questions than it resolved.

The structure of the FDPA plainly requires that the government's notice of aggravating factors, and only that mechanism, triggers the entire operation of the FDPA.  Absent that enabling act by the prosecutor, the statute cannot function as a capital statute, since without aggravating factors, the government cannot seek the death penalty.  The same conclusion was reached in *Jackson*, in which the Court found that severing the unconstitutional death penalty provision of the Kidnapping Act left an otherwise fully functional criminal statute, albeit one that could not carry with it a potential sentence of death.

Here, deciding what Congress intended with regard to the FDPA is an easy task – it is obvious from the FDPA that Congress, relying on *Walton*, believed it was creating sentencing factors.  It is equally clear that after *Ring* aggravating factors constitute elements of an offense.  Accordingly, the statute may not be construed;  it must be voided.

---

[59] *See, e.g., Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999); *Leavitt v. Jane*, 518 U.S. 137 (1990); *Alaska Airlines, Inc. v. Brock,* 480 U.S. 678 (1987).

4.   The doctrine of "constitutional avoidance" is inapplicable.

The doctrine of constitutional avoidance applies when "a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [a court's] duty is to adopt the latter." *United States ex rel. Attorney General, v. Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909). Here, since the FDPA is, for the reasons set forth *supra*, plainly not "susceptible of two constructions[,]" the simple answer is that the doctrine of constitutional avoidance does not apply.

In *Harris*, for example, the Court found the doctrine of constitutional avoidance inapplicable because, at the time Congress enacted 18 U.S.C. § 924(c), Supreme Court precedent allowed Congress to label as sentencing factors certain facts which increased the *minimum* punishment for a crime. As the Court explained:

> The avoidance canon rests upon our "respect for Congress, which we assume legislates in the light of constitutional limitations." *Rust v. Sullivan*, 500 U.S. 173, 191 (1991). The statute at issue in this case was passed when *McMillan* [*v. Pennsylvania*, 477 U.S. 79 (1986)] provided the controlling instruction, and Congress would have had no reason to believe that it was approaching the constitutional line by following that instruction. We would not further the canon's goal of eliminating friction with our coordinate branch, moreover, if we alleviated our doubt about a constitutional premise we had supplied by adopting a strained reading of a statute that Congress had enacted in reliance on the premise. And if we stretched the text to avoid the question of *McMillan*'s continuing vitality, the canon would embrace a dynamic view of statutory interpretation, under which the text might mean one thing when enacted yet another if the prevailing view of the Constitution later changed. We decline to adopt that approach.

93

536 U.S. at 556.

Thus, the doctrine of constitutional avoidance was irrelevant to the Court's analysis, and the Court, in accord with Congress' intent, concluded that "brandishing" was a sentencing factor. *See id.* Here, too, Congress relied on the state of the law existing at the time it enacted the FDPA – in *Walton v. Arizona,* 497 U.S. 639, 649 (1990), the Court had permitted a judge to decide sentencing factors in capital cases – and manifested that reliance in reserving for the prosecutor the exclusive authority to allege aggravating factors. Reconstructing the FDPA based on *Ring*'s precedence over *Walton* would constitute the type of "dynamic" statutory interpretation that was precluded by *Harris*, and would vitiate Congress's clear intent.

Consequently, the doctrine of constitutional avoidance is as inapplicable here as it was in *Harris.* As with §924(c), with the FDPA there is no ambiguity about Congress's choice. As stated in *Miller v. French*,  530 U.S. 327, 341 (2000) (quotations omitted), "[w]here Congress has made its intent clear, we must give effect to that intent."

Similarly, in *Commodity Futures Trading Com'n v. Schor*, 478 U.S. 833(1986), the Court stated:

> Federal statutes are to be so construed as to avoid serious doubt of their constitutionality. Where such serious doubts arise, a court should determine whether a construction of the statute is fairly possible by which the constitutional question can be avoided. *It is equally true, however, that this canon of construction does not give a court the prerogative to ignore the legislative will in order to avoid constitutional adjudication; although this Court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute . . .*

94

*or judicially rewriting it.*

478 U.S. at 841 (citations and internal quotations omitted) (emphasis added).

Here, Congress made its intent clear in the FDPA – the allegation of aggravating factors is the province solely of government attorneys. The *Jones-Apprendi-Ring* trilogy has now altered the status of the law, and aggravating factors (and other aspects of the FDPA) are now properly, and constitutionally, elements of an offense not yet enacted by Congress and beyond the authority of the courts (or the prosecutor) to create via "construction" that amounts to judicial and executive legislation.

Accordingly, it is respectfully submitted that the FDPA cannot be rewritten to permit presentation of aggravating factors to the grand jury, and that, because those aggravating factors are elements pursuant to *Ring*, the FDPA is unconstitutional as applied to Mr. Jacques. The capital aspects of this case should be dismissed.

POINT THREE

EVEN IF THE FDPA CAN BE RENDERED CONSTITUTIONAL BY A FINDING BY THE GRAND JURY OF GATEWAY AND STATUTORY AGGRAVATING FACTORS, THE "SPECIAL FINDINGS" IN THE INDICTMENT SHOULD BE STRICKEN AND THE DEATH NOTICE SHOULD BE DISMISSED BECAUSE THE GOVERNMENT HAS NOT OBTAINED AN INDICTMENT CONSISTENT WITH THE REQUIREMENTS OF THE FIFTH AMENDMENT.

A.     **Introduction**.

As outlined above, the indictment does not allege any non-statutory aggravating factors.[60] The indictment also does not state that the "special findings" should subject Mr. Jacques to the death penalty or otherwise indicate that the grand jury intended to return an indictment charging a capital offense. Neither does the indictment allege that the aggravating factors present in this case outweigh the mitigating factors sufficiently to justify imposition of a sentence of death. Under these circumstances, the indictment does not comport with the Grand Jury Clause of the Fifth Amendment and does not charge a capital offense.

B.     **The grand jury was not given the choice of holding Mr. Jacques to answer for a capital crime because it was unaware of the consequences of its "Special Findings."**[61]

The Fifth Amendment provides that "no person shall be held to answer for a capital,

---

[60]  It is acknowledged that in *Fell II* the Second Circuit held that the indictment need not allege non-statutory aggravating factor. 531 F.3d at 238.

[61]  This argument is based in part on an excellent law review article: K. Bren and Tomer, "Ring Around the Grand Jury: Informing Grand Jurors of the Capital Consequences of Aggravating Factors", 17 CAP. DEF. J. 61 (2004).

or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury."  U.S.

Const. Amend. V.  As the Supreme Court has explained:

> [T]he grand jury is a central component of the criminal justice process.  The Fifth Amendment requires the Federal Government to use a grand jury to initiate a prosecution....  The grand jury, like the petit jury, 'acts as a vital check against the wrongful exercise of power by the State and its prosecutors.'  It controls not only the initial decision to indict, but also significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, *including the important decision to charge a capital crime*.

*Campbell v. Louisiana*, 523 U.S. 392, 398 (1998) (emphasis supplied).  *See also, Vasquez v. Hillary*, 474 U.S. 254, 263 (1986) (power to charge capital or noncapital offense lies in the hands of the grand jury); Fed. R. Crim. P. 7(a).

When Congress adopted the Bill of Rights, only the indicting grand jury, by choosing the offense to charge, could make an offense punishable by death.  In 1789, Congress sought to ratify the Fifth Amendment and also passed the first federal criminal laws.  Laws that authorized the death penalty mandated it; they left no other sentencing option.  *See generally*, R. Little, *supra*, 26 Fordham Urban L. J. at 361-63.[62]  This practice was consistent with that of the states, which at the time the Bill of Rights was adopted in 1791, "followed the common-law practice of making death the exclusive and mandatory sentence for certain specified offenses."  *Woodson v. North Carolina*, 428 U.S. at 289.  Thus, the intent of the framers of the Fifth Amendment was that the grand jury retain the power to choose which

---

[62]  An example of one such law provided that "such person or persons on being thereof convicted [of willful murder] shall suffer death."  An Act for the Punishment of Certain Crimes against the United States, ch. 9, § 3, 1 Stat. 112, 113 (1790).

defendants would receive a sentence of death upon conviction.

The grand jury's historical role in choosing which defendant would receive a death sentence upon conviction is well documented.  *See* LaFave, W.R., *et al.*, 1 *Criminal Procedure* 1.5(b) (2d Ed.) (noting that grand juries played a critical role in reducing the number of offenses for which capital punishment could be imposed by downgrading charges to non-capital offenses); Andrew Hirsch, *The Rise of the Penitentiary* (1992) ("[a]t the indictment stage, grand juries often refused to charge person with capital crimes.  They simply downgraded indictments to non-capital charges of their own devising . . .").  The Supreme Court has acknowledged this historical role, writing in *Vasquez*, 474 U.S. at 263, that "the Grand Jury does not determine only that probable cause exists to believe that a defendant committed a crime, or that it does not.  *In the hands of a grand jury lies the power to charge* a greater or lesser offense; numerous counts or a single count; and perhaps the most significant of all, *a capital offense or a noncapital offense. . . . .*"

In this case, the Government presented to the grand jury some of the elements of capital murder so as to make Mr. Jacques "death-eligible" for Eighth Amendment purposes – the intent requirements under 18 U.S.C. § 3591(a)(2) and  the alleged statutory aggravating factors under 18 U.S.C. § 3592(c).  On information and belief, however, the government did not inform the grand jury of the consequences of those special findings, *i.e.*, that by returning the indictment, Mr. Jacques would be held to answer to an offense punishable by death.  Certainly nothing on the face of the  indictment shows that the grand jury was aware that it was being asked to determine if Mr. Jacques should be held to answer for a capital offense.

98

The model grand jury charge of the Administrative Office of the United States Courts indicates that the jury would not have been told that Mr. Jacques would face the death penalty upon conviction.  That charge expressly instructs the jury: "When deciding whether or not to indict, you should not be concerned about punishment in the event of conviction. Judges alone determine punishment."  *See* Tomer, *Ring Around the Grand Jury*, *supra*. Presumably, the grand jury that returned the  indictment against Mr. Jacques was given this instruction.  By not informing the jury that it was returning an indictment charging a capital offense, and misinforming the grand jury about who determines punishment in a federal capital case, the government turned the proceeding that gave only the appearance of complying with the Fifth Amendment, but that deprived Mr. Jacques of his constitutional and statutory rights.

The Supreme Court, in a related context, has refused to countenance such disregard for the Fifth Amendment.  In *Smith v. United States*, 360 U.S. 1, 9 (1959), the Court reversed a kidnapping conviction initiated by information even though it was a capital offense.  The Court stated:

> [t]he Fifth Amendment made the [grand jury indictment] rule mandatory in federal prosecutions in recognition of the fact that the intervention of a grand jury was a substantial safeguard against oppressive and arbitrary proceedings. . . .  [T]o permit the use of informations where . . . the charge states a capital offense, would . . . make vulnerable to summary treatment those accused of . . . our most serious crimes.

*Id*. (citations omitted).  Similarly, to permit the government to obtain from a grand jury an indictment alleging the elements of a capital offense, but not informing the grand jury that

by finding those elements it was holding the defendant to answer to a capital crime, makes vulnerable those accused of the most serious crimes.  If the grand jury is not informed of the capital nature of the offense, it cannot express the conscience of the community or perform its constitutionally assigned role as a "barrier . . . between the liberties of the people and the prerogative of the [government])."  *Harris v. United States*, 536 U.S. 545, 564 (2002) (grand and petit juries "form a 'strong and two-fold barrier'").

The grand jury's constitutional and historical role in deciding whether a defendant should face the death penalty is perhaps more critical now than ever.  Few checks exist on the federal government's power to pursue the ultimate punishment against one of its citizens and fewer opportunities exist for the local community to express its desires about the appropriateness of the death penalty in any given case.  Prosecutorial decision making in capital cases is centralized at the Department of Justice in Washington, D.C.  *See United States v. Navarro-Vargas*, 367 F.3d 896, 902 (9th Cir. 2004) (Kozinski, J., dissenting) ("[a]n independent grand jury – one that interposes the local community's values on prosecutorial decisions that are controlled by policies set in Washington as to the enforcement of laws passed in Washington – seems like an important safeguard that is entirely consistent with the grand jury's traditional function"), *rehearing en banc*, 408 F.3d 1184 (9th Cri. 2005).

Nor is the petit jury in a capital case a meaningful barrier between "the liberties of the people and the prerogative of the [government])."  *Harris*, 536 U.S. at 564.  This is because petit jurors, to-date, have been "death-qualified."  Individuals with disqualifying scruples against the death penalty, no matter how many exist in a given community, have not been

permitted to sit in judgment in a capital case.  Instead, capital juries consist exclusively of

individuals who believe that the death penalty is an appropriate punishment and who express

a willingness to impose it.  Empirical evidence shows that such "death-qualified" jurors are

more prone to believe government witnesses, generally evaluate evidence differently than

other jurors, and give little  meaning to the presumption of innocence, *i.e.*, death qualified

jurors are more conviction prone.[63]  The death-qualifying process also tends to exclude

women and African-Americans from jury service.  *Id*.  The net effect of death qualification

is that capital jurors do not represent the conscience of the local community or its rich

diversity; at best, they represent only those members of the community who share similar

views on the death penalty.  Jurors that represent such a small segment of the community are

ill-equipped to act as a barrier between the "liberties of the people" and the power of a

government, particularly a government so centralized that it can force local prosecutors to

take a capital case to trial against their will.[64]

---

[63]  *See* Jesse Nason, "Mandatory Voir Dire Questions in Capital Cases: A Potential Solution to the Biases of Death Qualification," 10 ROGER WILLIAMS U. L. REV. 211, 219 (2004) (summarizing research on how death-qualified jurors may presume guilt, resolve ambiguities against the defendant, more readily accept the government's version of events, distrust defense witnesses, fill evidentiary gaps with their beliefs that defendant committed the crime; and were more likely to infer premeditation).  *See also United States v. Green*, 324 F. Supp. 2d 311, 329 (D. Mass. 2004) (citing studies that raise problem with whether death-qualified juries are more conviction prone).

[64]  Public opinion polls "consistently show that opposition to capital punishment runs around 45%  to 55% for black Americans, while for whites it is much lower, ranging from 17% in 1992 to 24% in 2000.  That is opposition to the death penalty is about twice as high among black Americans as among white, and a much larger majority of whites than blacks support the death penalty."  Rory Little, "What Federal Prosecutors Really Think: The Puzzle of Statistical Race Disparity Versus Specific Guilt, and the Specter of Timothy McVeigh,"

Thus, the Constitution and the Bill of Rights sets up a carefully crafted system of checks and balance.  Under the Fifth Amendment, the grand jury, like the petit jury, is supposed to "act[] as a vital check against the wrongful exercise of power by the State and its prosecutors." *Campbell v. Louisiana*, 523 U.S. at 398 (citations omitted).  Unless the grand jury is aware of its capital charging power and the consequences of returning an indictment with "special findings" like those in this case, it cannot perform its constitutionally assigned function and make "*the important decision to charge a capital crime.* " *Id*.  Because the grand jury did not perform its constitutionally assigned role of deciding whether Mr. Jacques should be held to answer for a capital crime, the death notice should be dismissed and the  indictment's "special findings" stricken.

**C.** **The Government did not obtain an indictment alleging all elements of a capital crime.**

Even if the grand jury had been aware that it its "special findings" would hold Mr. Jacques to answer for a capital crime, the notices should be dismissed because the Government did not present further necessary elements necessary for the grand jury to make the decision as to whether Mr. Jacques should be subject to the death penalty, *i.e.*, whether (1) the aggravating factors outweigh the mitigating factors and (2), whether they outweighed the mitigating factors *sufficiently* to justify a sentence of death.[65]  The failure of the grand

---

53 DEPAUL L. REV. 1591, 1596 (2004).

[65]   Appended are the closing penalty-phase instructions of the Hon. Stephen C. Robinson, U.S.D.J., delivered in *United States v. Khalid Barnes* (S.D.N.Y.) on May 29, 2008.  (A204.)  In those instructions, Judge Robinson noted that the jury was required, in order to return a sentence of death, find unanimously and beyond a reasonable doubt that the

jury to examine all relevant factors to determine if the death penalty was justified conflicts with the framers' intent, discussed above, that the grand jury retain the power to decide which defendants should receive a sentence of death upon conviction.  Moreover, as argued earlier, the process followed violated Mr. Jacques's Fifth and Sixth Amendment rights to have all elements of the crime submitted to the grand jury for its consideration.  *See Jones v. United States*, 526 U.S. at 251-52.

The elements of capital murder include decisions reached by the jury right up to the point where it makes a fact-finding that the aggravating circumstances actually outweigh the mitigating circumstances to a sufficient degree that a sentence of death is justified.  In truth, then, the "selection" decision is not made until the jury reaches the final decision-point of determining "whether all the aggravating factors found to exist *sufficiently* outweigh all the mitigating factors found to exist to justify a sentence of death . . . ."  18 U.S.C. § 3593(e) (emphasis added).  A simple "outweighing" is not enough.  As a matter of human experience, one can imagine a conscientious juror reaching the conclusion that, although the aggravating circumstances do barely tip the balance in favor of death, the degree to which that balance tips is not sufficient to justify imposition of a sentence of death.  It is not until the moment that finding is made that the defendant's potential punishment increases to death.  Recall Justice Scalia's point:

─────────────────────

aggravating factors outweighed the mitigating factors and that they outweighed the mitigating factors sufficiently to justify imposition of a sentence of death.  (A242.)  These are indisputably fact-findings that increase the punishment.  Without those fact-findings, the maximum punishment faced by a capital defendant is lifetime incarceration.

> [All] facts essential to imposition of the level of punishment that the defendant receives – whether the statute calls them elements of the offense, sentencing factors, or Mary Jane – must be found by the jury beyond a reasonable doubt.

*Ring*, 436 U.S. at 610 (Scalia, J., concurring.)

Obviously, there are enormous practical difficulties in devising a system where a grand jury can consider and weigh both aggravating and mitigating factors. That is precisely why, as argued in these motions, the legislature needs to amend this statute, not the courts and prosecutors. The grand jury's failure to indict on all elements of capital murder – even assuming the viability of a "*Ring* fix," means the notice must be dismissed.

### D.    The non-statutory aggravating factors alleged in the death notice must be dismissed because they are not supported by the indictment.[66]

In *United States v. Green*, 372 F. Supp. 2d 168 (D.Mass. 2005), Judge Gertner examined the issue of whether a non-statutory aggravating factor of unadjudicated criminal activity alleged in a death notice should be stricken under the Fifth Amendment because the factor had not been previously found by the grand jury. Holding that the factor must be stricken, she relied primarily on *Blakely*'s mandate that "every defendant [has] · · · the right to insist that the prosecutor prove to a jury *all facts legally essential to the punishment*." (*Blakely*, 124 S. Ct.. at 2543). (emphasis added). She reasoned that "any aggravating factor is 'legally essential to punishment' because, while not linearly triggering a higher sentence

---

[66]    Counsel again acknowledge and recognize that this issue was decided adversely to the defense position by *Fell II*, 531 F.3d at 236. The issue, however, has not been considered by the Supreme Court and it is also conceivable that the Second Circuit may re-visit the issue.

within the statutory maximum, as Federal Sentencing Guidelines factors do, it may effectively tip the scale from life to death in combination with the other factors at play." 372 F. Supp. 2d at 177-178. She continued:

> The FDPA makes the death penalty jury a sentencing jury, not only conducting fact-finding, as any jury does, but also weighing aggravating and mitigating facts for the purpose of determining punishment, as judges typically do. The penalty jury's unique role muddies the distinction between offense facts, traditionally screened by grand juries, and sentencing facts, which traditionally went unscreened.
>
> The trilogy of *Apprendi*, *Ring*, and *Blakely* further conflates the line between sentencing facts and offense facts. *Blakely* explicitly rejected methodical distinctions between formal offense elements and sentencing factors, holding that all facts "essential" to punishment must be treated to the formalities of grand jury presentment and a jury trial. The Supreme Court specifically deemed it an "absurd result" that "the jury need only find whatever facts the legislature chooses to label elements of the crime, and that those it labels sentencing factors – no matter how much they may increase the punishment – may be found by the judge." *Blakely*, 124 S.Ct. at 2539. Even the government agrees that certain "sentencing facts"– here the listed statutory aggravating factor – must be screened by a grand jury.
>
> Moreover, once a defendant is deemed death-eligible, the FDPA requires that the penalty jury impose the death penalty only if the aggravating factors "sufficiently outweigh" the mitigating factor or factors. 18 U.S.C. § 3593(e). This burden is not optional. Even if the defendant presents no mitigating factors, to return a sentence of death after the first two death-eligibility burdens have been met, the jury must find that the aggravating factors "alone are sufficient to justify a sentence of death." *Id.* Because we will never know exactly how each factor influences the jurors' ultimate punishment determination, logic dictates that all aggravating factors – together – be considered legally essential to the punishment. Indeed, the government's argument that non-statutory factors are not essential is disingenuous; if the government does not require

> additional evidence to convince the jury to vote for death, why
> is it invoking non-statutory factors at all?

*Id*. at 177.

Judge Gertner limited her holding to unajudicated criminal activity, finding on the basis of Supreme Court precedent that unajudicated criminal activity, in particular, required the procedural protection of grand jury screening. *Id*. at 180-182. However, the court's logic is obviously applicable to all non-statutory aggravating factors, as is made clear in *United States v. Mills*, 446 F.Supp.2d 1115 (C.D. Ca. 2006).

In *Mills*, Judge Carter considered whether the Confrontation Clause was applicable to evidence offered to prove non-statutory aggravating factors. He concluded that the Confrontation Clause was applicable based on his analysis that non-statutory aggravating factors were elements under *Apprendi*, *Ring*, and *Blakely*. He began by noting that "[w]hile the Court finds the reasoning in *Green* persuasive, *Green* fails to consider *Booker's* lesson that there are some facts – those which are not binding on the court – that do not rise to the level of constitutional significance. From the Court's perspective, *Booker* and *Blakely* appear to present three potential applications to the issue of confrontation during the selection portion of the penalty phase: (1) pure fact-finding; (2) pure sentencing discretion; and (3) constitutionally significant fact-finding." *Id*. at 1133.

Judge Carter acknowledged that if, as *Green* held,  *Booker* and *Blakely*, applied to pure fact-finding, then the implication was that non-statutory aggravating factors, as well as the ultimate weighing decision on penalty, were elements under the *Ring* line of cases, as argued above:

In *Blakely*, the Court relied on *Apprendi* in striking down Washington's sentencing guideline scheme that permitted the judge to impose a sentence higher than the standard range if he found certain aggravating factors justifying a departure. 542 U.S. at 299, 304-05, 124 S.Ct. 2531. The Court held: Our precedents make clear . . . that the "statutory maximum" for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. . . .*"  In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose without any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," . . . and the judge exceeds his proper authority. *Id*. at 303-04, 124 S.Ct. 2531 (internal citations omitted). . . .

As to pure fact finding, one could take *Blakely* literally, to mean that the judge may impose the death penalty "solely on the basis of the facts reflected in the jury verdict or admitted by the defendant." *Blakely*, 542 U.S. at 303, 124 S.Ct. 2531; see 18 U.S.C. § 3594 (requiring court to impose sentence on recommendation of jury). Thus, the Sixth Amendment's protections would no longer stop once the jury has found a statutory aggravating factor and a statutory intent factor. Even if these facts have been found, the judge still cannot impose a death sentence under the FDPA until the jury has found that "all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of a mitigating factor, whether the aggravating factor or factors alone are sufficient to justify a sentence of death." See 18 U.S.C. §§ 3593(e), 3594. Thus, if steps three through six are fact finding, placement of the weighing after the jury has already engaged in the eligibility determination is not dispositive.

*Id*. at 1131-33.[67]

---

[67]  In a footnote, the court noted that "[s]everal state supreme courts have determined that 'weighing' is a factual determination" citing *State v. Whitfield*, 107 S.W.3d 253, 261

Instead of reaching this issue, he focused instead on non-statutory aggravating factors, which he reasoned were elements because they involved "constitutionally significant fact finding":

> Under the Act, the jury is required to find these facts unanimously and beyond a reasonable doubt. 18 U.S.C. § 3593(c).  The jury may consider only the factors upon which it has rendered such a finding when it weighs the factors in aggravation and mitigation. 18 U.S.C. § 3593(d). Further, a jury renders these findings after a contested adversarial hearing that bears many of the features of a trial.  See 18 U.S.C. § 3593(b)-(e). The Court finds that these features of the Act render steps three and four significantly different than the judicially found facts that inform a court's calculation of the now non-binding Guidelines. In essence, the FDPA completely limits the jury's discretion until it has rendered its findings on the aggravating factors (whether statutory or non-statutory). Only upon finding these facts is the jury permitted to move on to the more discretionary task of finding the mitigating factors, and the broadly discretionary task of weighing aggravation against mitigation. 18 U.S.C. § 3593(c)-(e). Because of these fundamental structural differences, findings on the aggravating factors bear many of the hallmarks of constitutionally significant facts falling under the ambit of *Blakely*.

> It is possible that the jury could return a verdict of death without finding any additional aggravating facts, provided the proven aggravator alone is sufficient to outweigh whatever mitigation has been found. See 18 U.S.C. § 3593(e). However, given the allocation of fact-finding and discretionary tasks under the FDPA, the Court finds that this possibility alone is not sufficient to render these facts constitutionally insignificant for the purposes of confrontation.

---

(Mo.2003); *Woldt v. People*, 64 P.3d 256, 265-66 (Colo.2003); *Johnson v. State*, 118 Nev. 787, 802-03, 59 P.3d 450 (2002).

*Id*. at 1134-1135.

The reasoning of *Green* and *Mills* are persuasive and should be followed here. Although *Green* only addressed one particular class of non-statutory aggravating factors and *Mills* addressed the Sixth Amendment Confrontation Clause, *Green* correctly points out that "The FDPA already complies with *Ring's* holding in the sense that it requires a jury to find both statutory and non-statutory aggravating factors. Although *Ring* does not address the Fifth Amendment, other Supreme Court and circuit court opinions have paired Fifth and Sixth Amendment protections. And, as *Ring* and some state courts following it have suggested, these procedural protections apply to more than one aggravating factor when the government presents multiple aggravating factors." 372 F. Supp. 2d at 179. *See also*, *United States v. Barrett*, 496 F. 3d 1079, 1107 (10th Cir. 2007) ("The Court's *Apprendi* line of cases reveals that the reasonable doubt standard is appurtenant to the right to jury trial.")

In this case, as indicated above, the death notice alleges numerous non-statutory aggravating factors.  None of them are alleged in the indictment.  Because Mr. Jacques was entitled under the Fifth Amendment Indictment Clause to grand jury screening of these factors, the non-statutory aggravating factors alleged in the Death Notice must be stricken.

POINT FOUR

THE FPDA FAILS TO PROVIDE A STRUCTURE WHICH
PERMITS JURORS TO MAKE A REASONED CHOICE
BETWEEN A SENTENCE OF LIFE IN PRISON WITHOUT
THE POSSIBILITY OF RELEASE AND EXECUTION.

The FDPA has created a scheme that mixes concepts, burdens of proof, and an overall process which is likely incomprehensible to jurors. In the penalty phase of the trial, 12 jurors previously indoctrinated in the traditional culture of unanimity will be expected to understand that, unlike in the guilt phase, a lack of unanimity is not a failure but a legally cognizable outcome. Jurors schooled in the burden of proof in the guilt phase, *beyond a reasonable doubt*, will be expected in the penalty phase to apply that burden to aggravating factors and another burden, *preponderance of the evidence*, to mitigating factors. Jurors will be expected to segregate the mental state threshold factors from aggravating and mitigating factors, and from the weighing process, by not considering them, in determining the appropriateness of a death sentence. In the final analysis, jurors are asked, under the FDPA, to determine at what point aggravating factors outweigh mitigating factors "sufficiently" to justify a sentence of death. It is unreasonable to expect even the most conscientious and reasonably intelligent jurors to parse this melange of concepts and come out with an understanding of the process or a principled verdict. This very real possibility of confusion causes the FDPA to be unconstitutional. In essence, the FDPA has returned the process to an era of un-guided discretion.

Because death is qualitatively different from other forms of punishment, the greater need for the reliability of the process by which a death sentence is arrived at has been long

110

recognized.  *E.g., Woodson v. North Carolina*, 428 U.S. at 303-305.  The Eighth and Fourteenth Amendments therefore require that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."  *Gregg v. Georgia*, 428 U.S. at 189 (opinion of Stewart, Powell, and Stevens, JJ.).

A death penalty sentencing scheme that creates an unreasonable risk that jurors will misunderstand their role and their assignments violates the Eighth Amendment and the Due Process Clause.  *See Simmons v. South Carolina*, 512 U.S. 154 (1994).  In order for a jury's decision to impose a death sentence to withstand Eighth Amendment scrutiny, the jury's discretion must be "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action."  *Godfrey v. Georgia*, 446 U.S. at 427.

Study after study shows that jurors, no matter how sincere and well-intentioned, misunderstand what they are supposed to do during the penalty phase of a death penalty trial. One such study was detailed in C. Haney, L. Sontag and S. Constanzo, "Deciding to Take a Life: Capital Juries, Sentencing Instructions, and the Jurisprudence of Death," 50 JOURNAL OF SOCIAL ISSUES 149-176 (1994).  The authors interviewed 57 capital jurors from 19 death penalty trials conducted under a California system that was very similar to the FDPA construct.  Among the study's findings were the following:

- One third of the California jurors sampled focused in the penalty phase discussion solely on the nature of the crime itself in a way that essentially created a presumption of death;

- For many of the jurors, the absence of mitigation was the only reason given for the imposition of a death sentence, shifting the burden to the accused;

- The sampled jurors used their instructions to limit their consideration of some of the evidence admitted during the penalty phase, and to insulate themselves from the impact of their decision;

- Many of the sampled jurors dismissed mitigation evidence outright because they believed that mitigation evidence failed to "fit into" the rubric contained in the instructions, indicating a failure to understand what constituted mitigating evidence;

- 80% of the sampled jurors rejected mitigation evidence from their consideration because it did not directly reduce the defendant's responsibility for the crime;

- 60% of the sampled jurors rejected mitigation evidence because it did not completely account for the defendant's actions;

- Less than one third of the interviewed jurors demonstrated a workable understanding of what constituted mitigation evidence; and

- 80% of the juries returning a death verdict did so believing that life imprisonment without the possibility of parole did not really mean life without parole.

Other studies have demonstrated a similarly alarming and comprehensive misunderstanding of the sentencing mission in general, and mitigation in particular, among jurors deciding death penalty cases. *See, e.g.*, C. Haney and M. Lynch, "Comprehending Life and Death Matters: A Preliminary Study of California's Capital Penalty Instructions," 18 LAW AND HUMAN BEHAVIOR 411-436 (1994); "Dictionaries and Death: Do Capital Jurors Understand Mitigation?", UTAH LAW REVIEW 1 (1995); J. Luginbuhl, "Comprehension of Judges' Instructions in the Penalty Phase of a Capital Trial: Focus on Mitigating Circumstances," 16 LAW AND HUMAN BEHAVIOR 203 (April 1992); M. Constanzo and S.

112

Constanzo, "Jury Decision Making in the Capital Penalty Phase: Legal Assumptions,

Empirical Findings and a Research Agenda," 16 LAW AND HUMAN BEHAVIOR 185 (1992).

Juries in actual death penalty cases often believe, completely erroneously, that once an

aggravating factor has been found, death is mandatory.  *See, e.g.,* U. Bentele and W.J.

Bowers, "How Jurors Decide on Death: Guilt is Overwhelming; Aggravation Requires

Death; and Mitigation is No Excuse," 66 BROOKLYN L.REV. 1011, 1031-41 (2001).[68]  Indeed,

statistically valid surveys of capital-case jurors show that a substantial number of jurors who

actually serve on capital cases *automatically* vote for death if the defendant is found guilty

of murder.  *See, e.g.,* W. S. Geimer & J. Amsterdam, "Why Jurors Vote Life or Death:

Operative Factors in Ten Florida Death Penalty Trials," 15 AM. J. CRIM. L. 1, 41 (1989), ("A

significant number of jurors in death penalty cases believed that the death penalty was

mandatory or presumed for first degree murder" . . . "In the cases in which the jury

recommended death, over half of the jurors believed that death was to be the punishment for

first degree murder, or at least that death was to be presumed appropriate unless defendant

could persuade the jury otherwise"); S. P. Garvey, "Aggravation and Mitigation in Capital

---

[68]    The article draws on the findings of the Capital Jury Project, an ongoing study funded by the National Science Foundation of decision-making by actual jurors in actual capital cases.  As noted in the article, at the time it was written the ongoing CJP had completed interviews of 1,155 capital jurors from 340 trials in 14 states.  66 BROOKLYN L.REV. at 1017.  For a full description of the Project, and its methodology, *see* W.J. Bowers, "The Capital Jury Project: Rationale, Design & Preview of Early Findings," 70 IND. L.J. 1043, 1079 (1995).  Professor William J. Bowers, who holds a Ph.D. in Sociology, is Principal Research Scientist, College of Criminal Justice, Northeastern University, and serves as the Principal Investigator for the Capital Jury Project.  66 BROOKLYN L.REV. at 1011, n. ††.

Cases: What do Jurors Think?"  98 COLUMBIA L.REV. 1538 (1998) ("Many jurors wrongly think they must return a death sentence if they find the defendant's crime was especially heinous, or the defendant is especially likely to present a risk of future danger");  T. Eisenberg, S. P. Garvey & M. T. Wells, "Jury Responsibility in Capital Sentencing: An Empirical Study," 44 BUFF. L. REV. 339, 360 (1996) ("Nearly one-third of the jurors were under the mistaken impression that the law required a death sentence if they found heinousness or dangerousness, a result replicated in the multi-state study of the interview data"); W. S. Bowers, "The Capital Jury Project: Rationale, Design and Preview of Early Findings," 70 IND.L.J. 1043, 1091, n. 32 (1995) ("Many jurors believe that the death penalty is mandatory if the crime is heinous or vicious"); W. J. Bowers, M. Sandys & B. Steiner, "Foreclosing Impartiality in Capital Sentencing: Jurors' Predispositions, Attitudes and Premature Decision-Making," 83 CORNELL L.REV. 1476 (1998) ("There appears to be a presumption that clear unequivocal proof of guilt justifies the death penalty);  T. Eisenberg and M. T. Wells, "Deadly Confusion: Juror Instructions in Capital Cases," 79 CORNELL L. REV. 1, 12; 38, *n.* 12 (1992) ("There is a 'presumption of death'"):

> [Our] data suggest that the sentencing phase of a capital trial commences with a substantial bias in favor of death .  This is not in and of itself an indictment of the death trial phase.  But the tilt towards death suggests that a defendant with a confused jury may receive the death sentence by default, without having a chance to benefit from the legal standards deigned to give him a chance for life.

*Id.* at 38 *n.* 12.  These and other studies show that jurors in death penalty cases misunderstand what they are permitted to consider much more often than not, and that instructions rarely

cure the profound misunderstandings.

The most comprehensive study to date on the actual means by which death sentences are meted out is, as noted earlier, the one undertaken by the Capital Jury Project.  The Capital Jury Project ("CJP") is a consortium of studies of the methods of death penalty juries over a long period of time.  Supported by the National Science Foundation, the CJP had, by 2003, interviewed 1201 members of 354 different juries sitting in death penalty cases in 14 states.  See W. Bowers and W. Foglia, "Still Singularly Agonizing: Law's Failure to Purge Arbitrariness from Capital Sentencing," 39 CRIM. LAW BULLETIN 51 (2003).  In June of 2007, a New Mexico state district judge dismissed the "death notice" in a case in part because of the findings of the CJP.[69]  Those findings include the propensity (more than 50% of the time) by juries to decide the penalty issues before the penalty phase begins, which means that the jurors never allow mitigation into their deliberations; a comprehensive lack of understanding of what constitutes mitigation and how it applies; a broad-based lack of understanding of the instructions given by the judge; and that the jury decision-making process in death penalty cases is so flawed that it violates constitutional principles.  For example, the CJP's comprehensive, on-the-ground research on these issues demonstrate that even in jurisdictions in which the jurors are specifically instructed that they do not have to unanimously find mitigating factors, or that mitigating factors are not restricted to a statutory list, a terrifying percentage of the jurors never grasped those critical features of the law.  39

---

[69]   *State v. Dominguez*, D-0101-CR 200400521, *State v. Good*, D-0101-CR-00522, order entered June 8, 2007.

CRIM. LAW BULLETIN at 68-69.

The CJP's findings provide a window into a process which has been designed with as much care as this politically sensitive issue permits, but which in practice is grossly arbitrary, unfocused and very often influenced by racial factors. The CJP underscores what seems obvious – that this process is insufficiently narrowed and focused to be constitutional. A jury's decision on whether or not a defendant should be put to death appears to have little to do with the instructions given by the court or the care with which the process has been constructed or managed. The FDPA is unconstitutional as applied.

The Supreme Court's decisions in various death penalty cases are based on assumptions shown by the CJP's research to be unfounded. For example, in *Boyde v. California*, 494 U.S. 370 (1990), the Court's decision was based on inaccurate assumptions about how the jurors assessed categories of information presented during trial. Likewise, the court's decision in *Tuilaepa v. California*, 512 U.S. 967 (1994) included the conclusion that instructions given to the penalty phase jurors to guide their handling of aggravating factors, mitigating factors and the various burdens of proof were "phrased in conventional and understandable terms." *Id*. at 976. Conventional as the instructions may be, the CJP research clearly demonstrates that they are not understandable to jurors. In *Tuilaepa*, the Court said that whether a penalty phase instruction is constitutional depends on whether it has a "common sense core of meaning . . . that criminal juries should be capable of understanding." *Id*. at 975. The perhaps most shocking lesson from the CJP is that criminal juries are incapable of understanding and applying the trial court's instructions. By the reasoning of

116

*Tuilaepa*, the instructions, and the process and overarching scheme which has produced them, is unconstitutional. The Supreme Court's decisions upholding the death penalty are based on assumptions which are belied by the most reliable empirical evidence available.

Rory Little, an Associate Deputy Attorney General from 1996-1997 who served on the capital case review committee, wrote an article about this process. In Little, R., *supra,* 26 Ford. Urb. L.J. 347, he writes that considering the "generality of these statutory aggravating factors and their commonality in many murders are considered together with the added authority to invoke non-statutory aggravating factors, it is the rare federal defendant that could not, in theory, be sentenced to death simply upon conviction of any killing offense." *Id*. at 402.

This Court should declare the FDPA unconstitutional and permit this case to proceed as a non-death penalty case. In the alternative, Mr. Jacques requests that an evidentiary hearing be scheduled to permit the presentation of expert testimony and empirical evidence in support of the argument that the FDPA is so incomprehensible to jurors as to prevent, or substantially impair, their performance in the task of deciding between a death sentence and a life sentence.

<u>POINT FIVE</u>

IN LIGHT OF OVERWHELMING EVIDENCE THAT
CONTINUED ENFORCEMENT OF THE FEDERAL DEATH
PENALTY WILL LEAD TO THE EXECUTION OF A
MEANINGFUL NUMBER OF INNOCENT PEOPLE, THE
FEDERAL DEATH PENALTY SHOULD BE DECLARED
UNCONSTITUTIONAL.[70]

**A.      Introduction and background.**

The dead can never be exonerated.  The issue posed is whether our constitution can

tolerate the appreciable risks of executing the innocent.  The Hon. Michael Ponsor, U.S.D.J.,

presided over the first post-*Gregg* federal death-penalty case brought in the District of

Massachusetts, *United States v. Gilbert*, 120 F. Supp.2d 147 (D. Mass. 2000).  Writing about

that experience on the op-ed page of *The Boston Globe* on July 8, 2001, Judge Ponsor said

the following:

> The experience left me with one unavoidable conclusion:
> that a legal regime relying on the death penalty will inevitably
> execute innocent people – not too often, one hopes, but
> undoubtedly sometimes.  Mistakes will be made because it is
> simply not possible to do something this difficult perfectly, all
> the time.  Any honest proponent of capital punishment must face
> this fact.

---

[70]      Although this issue may be seen as foreclosed by the Second Circuit's decision in *United States v. Quinones*, 313 F.3d 49 (2nd Cir. 2002), it is respectfully noted that in the eight years that have passed since that decision, a steadily increasing number of innocent prisoners have been released from this nation's death rows.  The Death Penalty Information Center, has documented 139 cases of innocent defendants released from various death rows. (A18.)  From 1973-1999, there was an average of 3.1 exonerations per year.  Since 1999, roughly the time of the *Quinones* litigation, that rate has increased to 5 per year.  In 2009 alone, nine death row prisoners were exonerated. It reasonable to infer that in the eight years since the Second Circuit decided *Quinones*, an additional 40 defendants have been exonerated and released from death row.  *See* DPIC Year End Report 2009.  (A22.)

### B.     The *Quinones* decision.

On July 1, 2002, the Hon. Jed S. Rakoff, U.S.D.J. of the Southern District of New York issued an opinion finding that the risk of executing the innocent was of sufficient constitutional magnitude that the federal death penalty could not be enforced.  *United States v. Quinones (Quinones II)*, 205 F. Supp.2d 256 (S.D.N.Y. 2002).[71]  Summarizing his findings in *Quinones II*, Judge Rakoff wrote:

> [T]he best available evidence indicates that, on the one hand, innocent people are sentenced to death with materially greater frequency than was previously supposed and that, on the other hand, convincing proof of their innocence often does not emerge until long after their convictions.  It is therefore fully foreseeable that in enforcing the death penalty a meaningful number of innocent people will be executed who otherwise would eventually be able to prove their innocence.  It follows that implementation of the Federal Death Penalty Act not only deprives innocent people of a significant opportunity to prove their innocence, and thereby violates procedural due process, but also creates an undue risk of executing innocent people and thereby violates substantive due process.

*Id.* at 257.[72]  Although Judge Rakoff's decision was eventually reversed by the Second

---

[71]  In an earlier opinion in the same case, Judge Rakoff had announced his tentative findings on this issue and permitted the government a further opportunity to be heard on the issue.  *United States v. Quinones (Quinones I)*, 196 F. Supp.2d 416, 420 (S.D.N.Y. 2002).

[72]  There is an additional reason, not discussed in Judge Rakoff's opinions,  for concern over the time between sentence and execution in the federal system as that time period bears on the opportunity to establish innocence.  In the state systems, condemned prisoners may resort to direct and collateral state court review of their convictions and sentences of death – a process that may consume many years – before entering the federal system via habeas corpus, as provided by 28 U.S.C. § 2254.  In the federal system, there is one round of direct appeal and one round of post-conviction challenge, as allowed by 28 U.S.C. § 2255, and that is all.

Circuit,[73] this Court is urged to determine whether, in fact, the federal death penalty is likely to lead to the execution of one or more innocent people.[74]

**C.     The risk of executing the innocent.**

Only the most naive would take the position that the American system of justice is free from the possibility of error.[75]  It would be the height of arrogance to presume the federal system immune from these problems.  There were significant doubts about the innocence of David Ronald Chandler, the very first federal defendant to have been sentenced to death in the era of the "modern" (post-1988) death-penalty.  Mr. Chandler was originally sentenced to death in 1991.  In 1999, the Eleventh Circuit vacated his death sentence on grounds of ineffective assistance of counsel at the penalty phase.  *Chandler v. United States*, 193 F.3d 1297 (11th Cir. 1999).  That opinion was itself vacated, however, by a 6-5 vote of the Court sitting *en banc*, and the sentence of death was re-affirmed.  *Chandler v. United States*, 218 F.3d 1305 (11th Cir. 2000) (*en banc*).  After the Supreme Court denied *certiorari* review, and citing Attorney General Reno's serious concerns about whether Mr. Chandler was actually

---

[73]  *United States v. Quinones*, 313 F.3d 49 (2nd Cir. 2002) (reversing, on government's appeal, district court's order declaring the FDPA unconstitutional); opinion on panel re-hearing, 317 F.3d 86 (2nd Cir. 2003)

[74]  *See United States v. Sampson*, *supra*, 275 F. Supp.2d at 56-57.

[75]  In J. Dwyer, P. Neufeld, and B. Scheck, *Actual Innocence* (Doubleday 2000), the authors tracked the cases of numerous innocent people convicted of crime and identified the following eight factors most commonly involved where the innocent are convicted: (1) mistaken eyewitness testimony; (2) false confessions; (3) falsified scientific testing; (4) "snitch" witnesses who lied for advantage; (5) junk science; (6) police and prosecutorial misconduct; (7) lackluster or impaired performance by defense counsel; and (8), systemic racial bias.  It may hardly be said that the federal system is free from any of these factors.

innocent of the crime for which he had been prosecuted and condemned to death, President Clinton, on January 20, 2001, commuted Mr. Chandler's death sentence to one of life imprisonment, noting that "the defendant's principal accuser later changed his testimony, casting doubt on the defendant's guilt."  W.J. Clinton, "My Reasons for the Pardons," *N.Y. Times*, February 18, 2001.

Moreover, it is not simply that the system of capital punishment in this country is fraught with factual error, it is also fraught with legal error.  Professor James Liebman of Columbia University, who lead a team of researchers, studied the rate of error in state and federal capital cases and found that in an astonishing 68% of cases, death-penalty prosecutions were subject to outcome-determinative legal error.  J.S. Liebman, *et al.*, "A Broken System: Error Rates in Capital Cases, 1973-1995 (2000); *see also*, J.S. Liebman, *et al.*, "A Broken System, Part II: Why There Is So Much Error In Capital Cases, And What Can Be Done" (2002).[76]  In the federal system, eight death sentences have been set aside on post-trial motion, appeal or on post-conviction challenge.

In *Quinones II*, Judge Rakoff reached the logically unassailable conclusion that the number of DNA exonerations – *i.e.,* cases where scientific evidence was available to establish innocence conclusively – means that there is more than an appreciable risk that the innocent will be executed (and have been) "given what DNA testing has exposed about the

---

[76]  In *Quinones II*, Judge Rakoff described the Liebman study as "the most careful and comprehensive study in this area, and one based, moreover, almost exclusively on public records and court decisions," *id.* at 268, noting also that the Liebman study had been cited by Justice Breyer in his concurring opinion in *Ring v. Arizona*, who described the study as one that has generally been favorably received by scholars.  *Id.* at n. 16.

unreliability of the primary techniques developed by our system for the ascertainment of guilt

. . . ." *Id.* at 264-65.  Responding earlier to the government's argument that the availability

of pre-trial DNA testing had magically  "solved" the problem of the wrongfully-convicted

defendants, the Court stated as follows:

> This completely misses the point.  What DNA testing has proved, beyond cavil, is the remarkable degree of fallibility in the basic fact-finding processes on which we rely in criminal cases.  In each of the 12 cases of DNA-exoneration of death row inmates referenced in *Quinones*, the defendant had been found guilty by a unanimous jury that concluded there was proof of his guilt beyond a reasonable doubt; and in each of the 12 cases the conviction had been affirmed on appeal, and collateral challenges rejected, by numerous courts that had carefully scrutinized the evidence and the manner of conviction.  Yet, for all this alleged "due process," the result in each and every one of these cases, was the conviction of an innocent person who, because of the death penalty, would shortly have been executed (– some came within days of being so –) were it not for the fortuitous development of a new scientific technique that happened to be applicable to their particular cases.

*Id.* at 264.

As conclusively demonstrated in *Quinones I* and *Quinones II*, the actual holding of

the Court in *Herrara v. Collins*, 506 U.S. 390 (1993) does not bar either the substantive or

procedural due process bases of the *Quinones* opinion.  *See* discussion in *Quinones II*, 205

F. Supp.2d at 261-64; *see also* the analysis in *United States v. Sampson, supra*, 275 F.

Supp.2d at 49.

### D.  The real question: How many innocent people is it acceptable to execute so that the Government may execute others who are undoubtedly guilty?

This is really the crux of this issue.  No one looking at the studies and cases regarding

the numbers of demonstrably innocent people convicted and sentenced to death can argue

that it is anything but overwhelmingly probable that some of the 1,199 people executed in

this country since 1976, and some of the 3,279 who wait on our death rows,[77] and some of

the thousands executed prior to 1976, were overwhelmingly likely to be wholly innocent of

wrongdoing.[78]   The real question is whether that is a price worth paying for the "privilege"

of having a system of capital punishment.   Mr. Jacques' counsel respectfully suggest that

executing the occasional innocent person is, by an order of magnitude, too great a price to

pay for the ability to execute capriciously-selected truly guilty individuals.   Concluding his

op-ed piece, Judge Ponsor stated:

> I love our system, and I am proud to serve in it.  As I believe this
> trial demonstrated, no structure of law anywhere or at any time,
> has tried so earnestly to protect the rights of those involved in it.
> But I have a hard time imagining anything as complicated as a
> capital trial being repeated very often, even by the best system,
> without an innocent person eventually being executed.
>
> The simple question – not for me as a judge, but for all of us as
> citizens – is: Is the penalty worth the price?

To allow the machinery of death to grind inexorably onwards, in the face of

incontrovertible proof that our system convicts and condemns to death the innocent, is

unacceptable in a society of evolving standards of decency.   On this basis, this court should

---

[77]   These figures are current as of march 16, 2010.

[78]   The Supreme Court's decision in *Gregg v. Georgia*, 482 U.S. 153 (1976)
supposedly eliminated the arbitrary and capricious imposition of death sentences that lead
to the outright ban on capital punishment announced in *Furman v. Georgia*, 408 U.S. 238
(1972).

strike down the FDPA..

<u>POINT SIX</u>

THE   NON-STATUTORY   AGGRAVATING   FACTORS
MUST BE STRICKEN.

Non-statutory aggravating factors play a specialized role in the jury's decision-making process at the penalty trial of a federal death penalty case.  The first decision a jury must make as it moves toward a death verdict is whether any of the intent elements set out at § 3591(a)(2) are present in the case.  The (a)(2) elements involve state-of-mind determinations that require the government to prove that the killing at issue was intentional.  If the government fails to prove to the jury's unanimous satisfaction beyond a reasonable doubt that one (and only one) of the (a)(2) elements is present, the jury goes no further and the death penalty may not be imposed.  If, however, the government does succeed in establishing an (a)(2) element, the jury proceeds to its second decision-point, namely whether one or more of the specific aggravating factors set out at § 3592(c)(1) through (16) has been established to the jury's unanimous satisfaction beyond a reasonable doubt.

It is only if the government establishes, in sequence, both the existence of an (a)(2) element and one or more of the (c)(2) through (16) factors that the jury may consider so-called non-statutory aggravating factors.[79]  At that point in the process, the statute permits the jury to return a special finding identifying "any other aggravating factor for which notice has been provided under subsection (a) which is found to exist."  18 U.S.C. § 3593(d).  In

_____

[79]  The government's failure to establish either category of aggravating factor means that the sentence may not be death and the jury, therefore, need not reach the issue of mitigating circumstances and does not engage in weighing.

this case, the government has put the defendant on notice that it will seek to prove, as the basis for the death penalty, both statutory and non-statutory aggravating factors. (a71-73).

**A.      By its terms, the FDPA does not authorize the utilization of non-statutory aggravating factors.**

As interpreted by the government in this case, the FDPA allows the Government, at virtual whim, to utilize non-statutory aggravating factors in pursuit of a death sentence.  In this case, as discussed at length *infra*, the government has set forth 17 non-statutory aggravating factors.  (A12-14.)  However, a close reading of the FDPA reveals that the statute does not allow the Government to pursue non-statutory factors beyond victim-impact.

The FDPA statutory scheme requires the government, as part of its notice obligations, to file with the Court, and serve upon the defendant, a document that, *inter alia*, sets forth:

> [T]he aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death.
>
> The factors for which notice is provided under this subsection may include factors concerning the effect of the offense on the victim and the victim's family, and may include oral testimony, victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim, and the victim's family, and any other relevant information.

18 U.S.C. § 3593(a).  The statute then sets out 16 specific aggravating factors as relevant to this kind of case.  18 U.S.C. § 3592(c).  The use of non-statutory aggravating factors – with, as noted, the possible exception of victim-impact evidence[80] – is simply not authorized by

---

[80]   Section 3593 allows for victim-impact evidence as a factor for which notice may be given.  18 U.S.C. § 3593(a)(2).

the statute.  This is so because § 3592(c) of the statute contradicts § 3591(a) of the statute. The former provides that the jury "may consider whether any other aggravating factor for which notice has been given exists."  18 U.S.C. § 3592(c).  But § 3591(a) provides that a defendant may be sentenced to death only after a consideration by the jury of "the  factors set forth in § 3592 . . . ."  Section 3592 contains, as noted above, a listing of 16 statutory aggravating factors and 16 such factors only.  Therefore, non-statutory factors may not be considered by a jury since they are not – and could not be – set out in § 3592.[81]

In *United States v. Nguyen,* 928 F.Supp. 1525, 1535 (D.Kans. 1996), the trial judge described, and rejected, the above-stated statutory argument as "hyper-literal."  Yet, if Congress is going to go into the business of authorizing death sentences and executions, it has a concomitant responsibility to speak in language which is clear and unambiguous. Whatever political capital there is to be made on pursuit of the death penalty must be earned by clear legislative direction.  Because the statute does not authorize non-statutory aggravating factors – except in the case of victim-impact – the non-statutory aggravating factors in this case must be dismissed.

> **B.    Non-statutory aggravating factors do not constitutionally limit and guide the discretion of the jury, thus permitting wholly arbitrary and capricious death sentences in violation of the Eighth and Fourteenth Amendments.**

As indicated above, the Eighth Amendment requires that "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should

---

[81]    This view of the requirements of the FDPA is reinforced by the fact that the section of the Act concerning appellate review, § 3595, makes reference only to aggravating factors considered by the jury under § 3592.

127

be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg v. Georgia*, 428 U.S. at 189. In particular, the Supreme Court's Eighth Amendment jurisprudence since *Gregg* has explained that while sentencers may not be prevented from considering any relevant information offered as a reason for sparing a defendant's life, the decision to impose death must be guided by "carefully defined standards that must narrow a sentencer's discretion." *McClesky v. Kemp*, 481 U.S. 279 at 304. By simultaneously promoting both individualized sentencing decisions and uniform application of the death penalty, these two principles are designed to provide a "meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not." *Furman v. Georgia*, 408 U.S. at 313. (White, J., concurring).

By contrast, construing section 3592(c) as authorizing the government to unilaterally expand the list of aggravating factors on a case-by-case basis injects into capital proceedings precisely the uncertainty and disparate case results that *Furman* found to violate the Eighth Amendment. The statute provides no guidance to prosecutors in determining how to define or select non-statutory aggravating circumstances factors in a particular case. Under such a scheme, the factors that might persuade jurors in any given case to impose death are not limited to "clear and objective" criteria, *Gregg*, 428 U.S. at 197, but are restricted only by the imagination of the prosecutor. Particularly in conjunction with the evidentiary free-for-all created by the scope of "information" admissible at the penalty phase, the statute's standard-less procedure creates an impermissible risk that the death penalty will be imposed arbitrarily and capriciously, in violation of the Eighth Amendment.

128

The arbitrariness this procedure injects into the weighing process mandated by the statute is clear. The government's unconstrained ability to allege various non-statutory aggravating factors injects impermissible randomness into the process. To permit different prosecutors, in each individual case, to create and select the factors that may be placed on "death's scale," *Stringer v. Black, supra*, injects the very arbitrariness and capriciousness into the sentencing process that *Furman* sought to eradicate.

**C.  ___ Permitting the Department of Justice to define non-statutory aggravating circumstances after the crime but before trial violates the ban on ex post facto laws.**

Article I, Section 9, clause 3 of the United States Constitution states: "No . . . ex post facto law shall be passed." Section 3592 permits the prosecution to manufacture out of whole cloth aggravating factors to be applied retroactively to crimes committed before the aggravating factors are identified. A defendant's right to notice and to fair warning of the conduct that impacts upon his liberty or his life is a basic principle long recognized by the Supreme Court. *See, e.g., Bouie v. City of Columbia*, 378 U.S. 347, 350-51 (1964); *In re Oliver*, 333 U.S. 257, 273 (1948). The statutory scheme which the government hopes to use to deprive Mr. Jacques of his life "makes more burdensome the punishment for a crime, after its commission . . . ." *Beazell v. Ohio*, 269 U.S. 167 (1925). See *Lindsey v. Washington*, 301 U.S. 397 (1937) (statutory change from discretionary to mandatory death penalty held barred by ex post facto clause when retroactively applied). Although the Eighth Circuit has rejected this argument by reasoning that aggravating factors are not elements but sentencing considerations, *United States v. Allen*, 247 F.3d 741, 759 (8th Cir. 2001), this analysis cannot

survive *Apprendi*, *Ring*, *Booker*, and *Blakely*. The non-statutory aggravating factors a jury

finds at the prosecutor's urging are just as necessary to a jury's finding that the death penalty

shall apply as are statutory aggravating factors.

POINT SEVEN

AS SPECIFIED BELOW, CERTAIN OF THE STATUTORY
AND NON-STATUTORY AGGRAVATING FACTORS SET
FORTH IN THE GOVERNMENT'S NOTICE MUST BE
DISMISSED AND/OR, IN THE ALTERNATIVE, THIS
COURT SHOULD REQUIRE A DETAILED OFFER OF
PROOF AND/OR A HEARING TO TEST THE
"PARTICULAR RELEVANCE" AND RELIABILITY OF THE
EVIDENCE TO BE OFFERED.

The notice of aggravating factors filed in this case contains allegations of four

statutory and 17 non-statutory aggravating factors. Certain of the non-statutory factors allege

unadjudicated criminal conduct which dates back more 30 years ago, a time when Mr. Jacques

was a teen-ager and even younger.

As argued below, some of the aggravating factors alleged in this case should be

dismissed as vague, duplicative, unascertainable, lacking factual support, or otherwise not

relevant to a jury's determination of sentence. Others, even if arguably relevant, are unfairly

prejudicial. Others are so remote as to be irrelevant to the sentencing determination

potentially to be made by a jury in this case. In several instances, in order for this court to

exercise its gatekeeping function in assuring that the "heightened reliability" standard of

capital cases is met,[82] defendant seeks an evidentiary hearing or, at least, an offer of proof

that amounts to an informative outline of the government's factual basis for various of the

statutory and non-statutory aggravating factors set out in the notice.

---

[82] *See, e.g., Ford v. Wainwright,* 477 U.S. at 411; *United States v. Fell (Fell II)*, 531
F.3d at 219 n. 12; *United States v. Fell (Fell I)*, 360 F.3d at 143, 145; *United States v. Fell*,
372 F.Supp.2d at 763.

A.      **The role of aggravating factors.**

1.      General principles: function and relevance.

_____Over the years, federal courts, including this one, have developed an approach to what does and does not constitute proper evidence in aggravation of murder such as to justify imposition of a sentence of death.  *See*, *e.g., United States v. Fell*, 372 F.Supp.2d at 763-764, where this court, after surveying the law, highlighted the most salient aspect of statutory and non-statutory aggravating evidence, simple relevance:

> First, the information must be "relevant," meaning that it must be "sufficiently relevant to the consideration of who should live and who should die." [*United States v. Davis*, 912 F.Supp. 983 (E.D. La. 1996)] at 443.  Aggravating factors in death penalty cases must be "particularly relevant to the sentencing decision," not merely relevant, in some generalized sense, to whether the defendant might be considered a bad person. *Gregg v. Georgia*, 428 U.S. 153, 192 (1976).

*Id.* at 763 (parallel citations omitted).  Many of the aggravating factors alleged in this case – particularly the non-statutory aggravating factors – seem more directed at proving that Michael Jacques is a bad person than they are relevant to a legal proceeding where the issue is whether his life should be terminated.

Generally speaking, as this Court recognized in *Fell*, "an aggravating circumstance must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. at 877.  In *Gregg v. Georgia*, the Court noted that aggravating factors must be "*particularly* relevant to the sentencing decision," *Gregg*, 428 U.S. at 128 (emphasis added), and "not merely relevant, in some generalized sense, to

whether the defendant might be considered a bad person." *United States v. Gilbert*, 120 F.Supp.2d at 150-51. Aggravating factors must assist the jury in distinguishing "those who deserve capital punishment from those who do not," *Arave v. Creech*, 507 U.S. at 474.  In *Godfrey v. Georgia*, *supra*, the defendant was sentenced to death upon a finding that the murder was "outrageously or wantonly vile, horrible or inhuman."  446 U.S. at 422.  In striking down this aggravating circumstance and vacating the sentence of death, Justice Stewart's opinion for the plurality concluded that the language of this particular aggravating circumstance failed to provide "inherent restraint on the arbitrary and capricious infliction of the death sentence," since virtually every murder could be said to fit that criteria.  *Id.* at 428-29.  Moreover, since the facts and circumstances of the murder in *Godfrey* did not stand out from other murders, there was "no principled way to distinguish this case, in which the death penalty was imposed, from the many in which it was not."  *Id.* at 433.  In *Tuilapea*, *supra*, the Court reiterated the two constitutional tests which aggravating factors must meet: (1) a valid aggravating factor cannot not apply to every defendant convicted of murder, but only to a rationally-selected sub-class of murderers;  and (2) the circumstances must be defined in such a way by the statute so as not to be vague.  *Id.* at 972.

Several courts have attempted to relate these general principles of capital jurisprudence to federal capital prosecutions. In *United States v. Davis*, 912 F.Supp. 938 (E.D.La. 1996), the government alleged as a non-statutory factor in the capital prosecution of a New Orleans police officer that the officer "lacked remorse" and had a "low potential

133

for rehabilitation."[83]   In ultimately striking that factor, the Court thoughtfully reviewed the limits which could be imposed on the government's resort to non-statutory aggravating factors, stating:

> [A]re there then no limits on the "other" information that can be introduced at the penalty phase of a capital case?  The answer is clearly no.  The statute requires that any such information must be "relevant."   And by relevant, it must mean sufficiently relevant to the consideration of who should live and who should die.  What might be relevant in an administrative disciplinary proceeding, or even in a sentencing hearing where the choices are between varying terms of imprisonment, is not necessarily sufficiently relevant to deciding who should be sentenced to death.

*Id.* at 943.

The Court in *Davis* noted, as well, that a weighing statute carries with it the danger of numerosity, *i.e.*, the more that gets tossed on death's side of the balance, the greater the temptation is for jurors to consider the evidence in a *quantitative*, as distinct from *qualitative*, manner:

> The statute [FDPA] is a "weighing" statute.  Once the evidence of all the aggravating and mitigating factors is in, the jury is to consider whether all of the former factors "outweigh" the latter.  § 3593(e).  To carefully define the statutory aggravating factors, but then allow wholesale introduction of non-statutory aggravating information would defeat the goal of guided and measurable jury discretion and return us to an unconstitutional system where the death penalty is "wantonly" and "freakishly" imposed.  It cannot be presumed that Congress intended to create a statute that is so self-defeating, much less one that would be unconstitutional.  Additionally, as noted in Gregg, juries have little, if any, experience with sentencing and "are

---

[83] Each is also alleged in this case.  (A13-14.)

134

> unlikely to be skilled in dealing with the information they are given." 96 S.Ct. at 2934. Any guidance that can be provided – particularly in a decision so fundamental and profound as that made in a capital case – must be provided. *All of the above mandates that judicial discretion be exercised and the non-statutory factors be carefully screened. In doing so, this court must seek to fulfill the intent of Congress and at the same time construe the statute in a manner that maintains its constitutionality.*

*Davis*, 912 F.Supp. at 943 (footnote omitted; emphasis added).

Other district court judges (including, as noted above, this court in *Fell*) have expressed similar concerns, and have then dismissed aggravating factors, on a case-by-case basis. In *United States v. Gilbert*, 120 F.Supp.2d 147 (D.Mass. 2000), Judge Ponsor, striking several of the Government's proposed non-statutory aggravating factors, summarized as follows:

> Put simply, the stricken factors lack sufficient gravity, reliability, or probative value to deserve consideration during deliberations on the death penalty, if the jury reaches the question.

*Gilbert*, 120 F.Supp.2d at 149. In *United States v. Cuff*, 38 F.Supp.2d 282 (S.D.N.Y. 1999), then-Chief Judge Mukasey dismissed a non-statutory aggravating factor that the death penalty was justified in that case because several of the charged murders had been committed with a firearm. Chief Judge Mukasey observed:

> A predicate to fulfilling the constitutional conditions for an aggravating factor is that the disputed factor be an aggravating factor in the first place. Use of a firearm in connection with a homicide does not meet that predicate for the simple reason that, in any rational sense, it does not make a homicide worse, whether one looks at it from the standpoint of the crime, the victim or the perpetrator.

135

*Id.* at 288; *see also*, *United States v. Nguyen, supra*, 928 F.Supp. at 1544 (Striking "low potential for rehabilitation"); *United States v. Chanthadara, supra*, 928 F.Supp. at 1058 (Same result, co-defendant's case), sentence of death vacated on *Witherspoon* grounds, *United States v. Chanthadara*, 230 F.3d 1237 (10th Cir. 2000).

In *United States v. Friend*, 92 F.Supp.2d 534 (E.D.Va. 2000), Judge Payne reviewed the constitutional principles that govern the presentation of non-statutory aggravating factors in a federal capital prosecution. The Court first summarized the "'two sometimes-competing, but nonetheless fundamental, constitutional principles'" that control capital cases. *Id.* at 538, quoting *United States v. Beckford*, 964 F.Supp 993, 999 (E.D.Va. 1997). The Court stated:

> The first of these principles demands a heightened reliability in capital sentencing because the sentence of death is final, and therefore qualitatively different from other punishments. The second principle emphasizes the importance, indeed the constitutional necessity, for presenting to the sentencing jury as much information as possible to assure that the sentence is individualized.

*Friend*, at *id.* (footnotes and citations omitted). With specific regard to the role of aggravating factors, the Court deduced from the Supreme Court's capital jurisprudence four essential aspects that an aggravating factor must posses in order to pass constitutional muster: (1) an aggravating factor must not be overly broad, *i.e.*, quoting *Tuilaepa v. California*, 512 U.S. at 972, it "'may not apply to every defendant convicted of a murder; it must apply only to a sub-class of defendants convicted of murder;'" (2) an aggravating factor may not be unconstitutionally vague, as "ascertained by whether an aggravating factor is defined in terms too vague to proved adequate guidance to the sentencer;" (3) aggravating factors "must be

focused on circumstances that are considered by civilized society to be 'particularly relevant to the sentencing decision,'" quoting *Gregg v. Georgia, supra*, 428 U.S. at 192, and "must be relevant in assisting the jury in distinguishing 'those who deserve capital punishment from those who do not,'" quoting *Arave v. Creech*, 507 U.S. at 474 ; and (4), "it is essential that an aggravating factor be measured in perspective of the fundamental requirement of heightened reliability that is the keystone in making 'the determination that death is the appropriate punishment in a specific case.'" Quoting *Woodson v. North Carolina, supra,* 428 U.S. at 474. *United States v. Friend*, 92 F.Supp.2d at 541.  Having undertaken that analysis, Judge Payne noted that the concept of heightened reliability had a particularly important role to play "when assessing a non-statutory aggravating factor – which, by definition, lacks the stamp of approval that Congress has bestowed upon the statutory aggravating factors – . . ." *Id.* at 542.

Aggravating factors – especially when utilized in a weighing jurisdiction –  may not be alleged in duplicative fashion.  This is to avoid the effect of having the same conduct or circumstance found and weighed repeatedly.  Duplicative aggravating factors – like invalid aggravating factors – undermine the integrity of the weighing process, since the same factor is weighed more than once by the jury.  *See, United States v. McCullah*, 76 F.3d 1087 (10th Cir. 1996) (Reversing a federal sentence of death).  The effect of duplicative factors – like invalid factors – is to place "a thumb [on] . . . death's side of the scale."  *Stringer v. Black, supra,* 503 U.S. at 232.  In *McCullah*, the court stated:

> [D]ouble counting of aggravating factors, especially under a
> weighing scheme, has a tendency to skew the weighing process

> and creates the risk that the death sentence will be imposed
> arbitrarily and thus, unconstitutionally. [citation omitted] As the
> Supreme Court of Utah pointed out, when the same aggravating
> factor is counted twice, the "defendant is essentially condemned
> 'twice for the same culpable act,'" which is inherently unfair.
> *Parsons v. Phillips*, 871 P.2d 516, 519 (Utah) (quoting *Cook v.
> State*, 369 So.2d 1251, 1256 (Ala. 1979), *cert. denied*, ___ U.S.
> ___, 115 S.Ct. 431, 130 L.Ed.2d 322 (1994).

*McCullah*, 76 F.3d at 1111-12.  The *McCullah* court also noted that "the mere finding of an

aggravating factor cannot but imply a qualitative value to that factor."  *Id*. at 1112.  In

essence, the more aggravating factors there are – and a scheme which allows prosecutors to

allege non-statutory factors guarantees numerosity – the further the death-side of the balance

will tip, even if the same conduct has been subtly, or not so subtly, recast and reborn as an

ostensibly new and separate consideration.

    In *United States v. Jones*, 132 F.3d 432 (5th Cir. 1998), the Court reached the

conclusion that the trial court had erroneously allowed duplicative aggravating factors to go

to the jury, but that the error was harmless.  This ruling was affirmed by the Supreme Court

in *Jones v. United States*, 527 U.S. 373 (1999).  For other cases applying this rule, *see, e.g.,*

*United States v. bin Laden, supra*; *United States v. Glover*, 43 F.Supp.2d 1217 (D. Kansas

1999).

    These general principles have been cited and endorsed by the Second Circuit in its

*Fell* opinions.  See, e.g., *Fell II,* 531 F.3d 219 n. 12*; Fell I*, 360 F.3d at 135.  Additionally,

in *United States v. Pepin*, 514 F.3d 193 (2d Cir. 2008), the Court sustained Judge Weinstein's

decision in a federal death penalty case to preclude the government from offering, at the

penalty-phase, evidence that the defendant had sexually abused his girlfriend's child.  514

F.3d at 198.  In *Pepin*, the government argued, in essence, that the district court was without

authority to exclude penalty-phase evidence, especially in light of the Second Circuit's *dicta*

in *Fell I* that, at the penalty phase of a capital case, "more evidence, not less, should be

admitted on the presence or obscene of aggravating and mitigating factors." *Fell I* , 360 F.3d

at 143.  The *Pepin* court responded to that argument as follows:

> But it hardly follows from that general observation that relevant
> evidence is always permitted.  Acceptance of that reasoning
> would eviscerate the trial court's ability to exclude unduly
> prejudicial material from the penalty hearing inasmuch as the
> decision to exclude necessarily means less evidence, not more.

*Pepin*, 514 F.3d at 204.  The *Pepin* court ultimately concluded that the district court had

acted lawfully in excluding the evidence on a pre-trial application and had not abused his

discretion in doing so.  *Id.* at 204-206.

  *Pepin,* therefore, stands squarely for the proposition that this Court has the authority

to strike aggravating evidence and to do so in a pre-trial context.

  2.   <u>This court may require the government to submit a proffer of its evidence, in
       the form of an informative outline, or to conduct hearings.</u>

  There is nothing unusual about a party seeking a preliminary ruling on important

aspects of an adversary's case.  F.R.EVID. 104(a) confers this authority on the district courts.

In the context of a case of this nature and magnitude, it makes eminent sense, respectfully,

for this court to resolve as many issues as possible concerning the scope of the proofs that

will be presented and the allegations that defense counsel must be prepared to investigate and

meet.

  Other district courts have recognized the utility of requiring the government to identify

the nature of its proofs in support of statutory and non-statutory aggravating factors so that

courts may exercise their gatekeeping responsibilities to limit penalty-phase evidence to that

which meets standards of heightened reliability and particular relevance.. In *United States*

*v. O'Driscoll*, 250 F.Supp.2d 432 (M.D.Pa. 2002), the government sought to offer evidence

of a wide variety of unajudicated criminal conduct, including an unajudicated prior murder.

The evidence of uncharged conduct was offered both as free-standing aggravation and in

support of an allegation that the defendant would be a future danger.  In order to discharge

its responsibilities, the trial judge ordered the government to produce the evidence on which

it would rely, resulting in the disclosure of two video-tapes and six volumes of reports and

other documents totaling in excess of 1,000 pages.  *O'Driscoll*, 250 F.Supp.2d  at 434.   In

a pre-*Crawford* ruling, the court noted the following:

> We conclude that where the government attempts to use
> unajudicated acts of violence and misconduct the heightened
> standard of reliability applicable to capital proceedings requires
> that the hearsay rule be fully applicable to the penalty phase
> proceeding.  In other words unajudicated acts of violence cannot
> be proven by hearsay testimony unless a well-recognized
> exception to he hearsay rule is applicable.

*Id*. at 436.  In this regard, the *O'Driscoll* court drew on then District Judge Raggi's

conclusion in *United States v. Pitera*, 795 F.Supp. 546, 565 (E.D.N.Y. 1992) that, "The

heightened standard applicable to capital sentencing proceedings may . . .  demand further

indicia of reliability before a court can say that the probative value of any such hearsay

outweighs its potential prejudice." In setting an analytical framework for the task of deciding

what acts of prior misconduct would be admissible, the *O'Driscoll* court, in addition to

requiring application of the Sixth Amendment and the rules of evidence, held:

> Information regarding unadjudicated acts of violence and misconduct will be found reliable only under the following circumstances:
>
> > (1) a juror would be justified in relying on such information in voting for a sentence of death;
> >
> > (2) the probative value of the information is outweighed by other considerations, such as remoteness of time or danger of unfair prejudice;
> >
> > (3) the information satisfies the Constitution's requirement of heightened reliability for information presented by the government at the sentencing phase of a capital case.

*O'Driscoll*, 350 F.Supp.2d at 436. *See also*, *United States v. Karake*, 370 F. Supp. 2d 275, 279 (D. D. C.2005) ("[I]t has been uniformly recognized that if the death penalty [notice] provides insufficient notice to the defendant, the Court retains inherent authority to require the government to provide more specifics in order to give the defendant the opportunity to prepare for the penalty phase, as well as to provide the court with some frame of reference for ruling on objections to the death penalty notice."); *United States v. Cooper*, 91 F.Supp.2d 90, 111 (D.D.C.2000) (ordering greater specificity as to several aggravating factors); *United States v. Glover*, 43 F.Supp.2d 1217, 1225 (D.Kan.1999) (directing government to amend its death penalty notice to articulate its factual allegations as to certain aggravators); *United States v. Kaczynski*, 1997 WL 716487, at *20 (E.D.Cal. Nov. 7, 1997) (although government had provided discovery regarding prior acts of violence, court also required the government

to provide specification regarding the acts that it intended to rely on during the penalty-phase so that the defendant would not "be forced to defend against these allegations for the first time ... at sentencing. This raises the specter of unfair surprise and potentially prejudices Defendant's ability to defend against the government's efforts to impose the death penalty."). See also *Carlisle v. United States*, 517 U.S. 416, 425-26 (1996) (recognizing courts' "inherent supervisory power"); *United States v. Frank*, supra, 8 F.Supp.2d at 265:

> The FDPA ensures that the Government will not violate . . . constitutional and statutory rules in any particular prosecution by requiring that a defendant have notice of the factors on which the government intends to rely, and by providing a gate-keeping role for the district court. Thus, the Government may not employ simply any non-statutory factor of its choice. Instead, having chosen non-statutory factors it believes appropriate to the case, the Government must submit such factors to the defendant and to the court. If the court determines that any of the factors are inappropriate or run afoul of the Supreme Court's death penalty jurisprudence, the factor will be excluded.

In another example, while rejecting a challenge to evidence of an unadjudicated murder, the Seventh Circuit emphasized that the district court had conducted a two-day hearing to determine the reliability of the evidence. *United States v. Corley,* 519 F.3d 716 (7th Cir. 2008). The district court's published decision describes more fully the strictures it imposed on this evidence. *United States v. Corley,* 348 F. Supp. 2d 970 (N.D. Ind. 2004) (ordering that (1) the standard for admissibility would be whether a reasonable jury could find beyond a reasonable doubt that defendant committed the murder; (2) if the evidence was admitted, jury would be instructed to consider it only if it was proven beyond a reasonable doubt; and (3) the government could not meet its burden at hearing with hearsay testimony

142

(*i.e.*, summary testimony from law enforcement officers), but would have to present live witnesses at hearing). For another, similar decision, *see United States v. Beckford,* 964 F.Supp. 993 (E.D. Va. 1997) (unadjudicated criminal conduct may only be presented to sentencing jury if district court first determines it meets threshold level of reliability. Accordingly, the government would be required to submit a detailed proffer of the evidence before sentencing hearing begins, and defendant permitted to brief and argue opposition to its admission. Court would determine whether jury could reasonably find, by a preponderance, that act occurred, that defendant committed it, and that it was probative). One district court did exclude evidence of four unadjudicated murders attributed to the defendant because its prejudicial impact outweighed its probative value. The underlying facts of the crimes were inflammatory, the crimes were based on fact patterns similar to the capital charge, and the evidence for them came primarily from accomplices and cooperators. *United States v. Gonzalez,* 2004 WL 1920492 (D. Conn. Aug. 17, 2004). *See also United States v. Rodriguez,* 2006 WL 487117 (D. N.D. Feb. 28, 2006) (prohibiting government from presenting aggravating evidence about prior sexual assault and kidnapping for which defendant was tried and acquitted in state court).

Accordingly, the court should direct the government to provide an informative outline of its proofs with regard to certain of the aggravating factors – statutory and non-statutory – it has alleged.  Specifically, the defense seeks a proffer of the government's evidence on the following of the government's statutory and non-statutory aggravating factors:

- The offense was "committed in an especially heinous, cruel, or depraved manner," 18 U.S.C. § 3592(c)(6) (A11);

- The victim was particularly vulnerable due to her youth, 18 U.S.C. § 3592(c)(11) (A12);

- Manipulation and deception of the Vermont Criminal Justice System (A12);

- Murder to eliminate a witness (A12);

- Rape of J3 in 1980-1982 (A13)

- Rape of J4 "in or about 1987" and "sexually inappropriate conduct with other girls living in Barre, Vermont at the time" (A13);

- Lack of remorse (A13); and

- Victim impact (A14).

It is respectfully submitted that, without further information concerning these allegations, this court will be hindered in the exercise of its constitutional gate-keeping function of determining whether the government's proposed evidence would fail the constitution's requirement for heightened reliability in capital proceedings.

**B.     Particular challenges to aggravating factors alleged in this case**.

Applying the above principles, what follows are defendant's specific challenges to the individual aggravating circumstances alleged in this case.[84]

1.     Death during the commission of another crime.

This is plainly and simply duplicative of the elements of the underlying offense.  In a post-*Ring* world, a charge of "capital murder," unenacted by any legislature as that may be, which simply says that committing the underlying crime exposes one to death is

---

[84]  The government has informed defense counsel that it will not proceed on the non-statutory factor alleging the rape of the individual identified in the notice as "A1".

impermissible.  In order to sustain this factor, this court would have to be persuaded that an acceptable capital verdict in this case would consist of (1) a conviction of the underlying offense; (2) one or more of the intent factors; and (3) conviction of the underlying offense.

This court should strike this statutory aggravating factor.

2.      "Especially heinous, cruel, or depraved manner of committing the offense."

(a)      *The nature of this aggravating factor.*

This statutory aggravating factor, 18 U.S.C. § 3592(c)(6), has a specialized meaning in capital jurisprudence.  This is so because, as commonsense suggests, virtually *any* murder may be characterized as heinous, cruel, or depraved.  More than 20 years ago, the Supreme Court found unconstitutionally vague a statutory aggravating factor, then commonly used in many states, that the capital offense was "especially heinous, atrocious or cruel." *Maynard v. Cartwright,* 486 U.S. 356 (1988); *see also Shell v. Mississippi,* 498 U.S. 1 (1990); *Clemons v. Mississippi*, 494 U.S. 738 (1990). The Court in *Maynard* explained that, without any narrowing construction, an "ordinary person could honestly believe that every unjustified, intentional taking of human life is 'especially heinous.'" *Maynard,* 486 U.S. at 364.  The FDPA defines this statutory aggravator as applicable only where the offense was "especially heinous, cruel or depraved *in that it involved torture or serious physical abuse to the victim*." 18 U.S.C. § 3592(c)(4) (emphasis added).  As such, the circuits which have considered the issue have found that it is not unconstitutionally vague under the Eighth Amendment as long as the jury is properly instructed on the requirement of torture or serious physical abuse. *United States v. Mitchell,* 502 F.3d 931 (9th Cir. 2007); *United States v. Sampson,* 486 F.3d

145

13 (1st Cir. 2007); *United States v. Bourgeois,* 423 F.3d 501 (5th Cir. 2005); *United States v. Paul,* 217 F.3d 989 (8th Cir. 2000); *United States v. Webster,* 162 F.3d 308 (5th Cir. 1998); *United States v. Hall,* 152 F.3d 381 (5th Cir. 1998); *United States v. Jones,* 132 F.3d 232 (5th Cir. 1998). The ECHF factor has never been construed by the Second Circuit.

To establish this factor, however, the case law is settled that the defendant must have intended to do more than cause the death of another. And this is where the concept becomes almost impossible to grasp. Instead of "just" intending to murder the victim, the actor's intent must have been to inflict torture or serious physical abuse on the victim, over, above and apart from the killing. 1 Leonard B. Sand, *et al.*, MODERN FEDERAL JURY INSTRUCTIONS, Inst. 9A-11 & n.1 (2008). Several district courts have held or suggested that physical abuse of the victim after death, such as by dismembering the body, may not be relied on to establish this aggravator. *United States v. Taveras,* 488 F. Supp. 2d 246 (E.D. N.Y. 2007); *see also United States v. Taveras,* 584 F.Supp.2d 535 (E.D. N.Y. 2008) (court instructed jury at outset of penalty phase that guilt-phase evidence of post-death dismemberment could not be considered in deciding sentence); *United States v. Pitera,* 795 F.Supp. 546 (E.D.N.Y. 1992); *United States v. Pretlow,* 779 F. Supp. 758 (D. N.J. 1991). The Ninth Circuit has also noted that this view has some force (though it concluded that, if in the presentation of such evidence there was error, it was harmless). *United States v. Mitchell,* 502 F.3d 931 (9th Cir. 2007). *See also* 1 Leonard B. Sand, *et al.*, MODERN FEDERAL JURY INSTRUCTIONS, Inst. 9A-11 & n.1 (2008) ("We do not believe that post-mortem abuse to a murder victim's body constitutes serious physical abuse within the meaning of 18 U.S.C § 3592 (c)(6)."

Additionally, while "torture" necessarily implies the victim was conscious to experience pain, it is unclear how severe the pain needs to be or whether it can be exclusively psychological rather than physical, to qualify. *See United States v. Sampson,* 335 F. Supp. 2d 166 (D. Mass. 2004) (discussing different definitions of torture); 1 Leonard B. Sand, *et al.*, MODERN FEDERAL JURY INSTRUCTIONS, Inst. 9A-11 (2008) (torture includes mental as well as physical abuse); TENTH CIRCUIT CRIMINAL PATTERN JURY INSTRUCTIONS, Inst. 3.08.5 (2005) (torture may include "severe mental or physical pain"). The Tenth Circuit has rejected claims that mental harm be "prolonged," to constitute torture, and that physical abuse "significantly exceed" that necessary to cause death in order to be "serious." *United States v. Chanthadara,* 230 F.3d 1237 (10th Cir. 2000). *See also United States v. Sampson,* 486 F.3d 13 (1st Cir. 2007) (no error in denying instruction defense requested that if the defendant quickly inflicted stab wounds intending to kill his victims, there would be no support for especially-heinous aggravator).  Judge Sand's view is that the "senselessness" of the killing is not a proper consideration under this factor.1 Leonard B. Sand, *et al.*, MODERN FEDERAL JURY INSTRUCTIONS, Inst. 9A-11 & n.1 (2008) ("Our recommended instruction does not include 'senselessness of the killing' as a relevant factor for the jury's consideration.").  Obviously, almost any killing may be defined as "senseless."

It is, thus, settled law that the EHCD aggravating factor is unconstitutionally vague unless accompanied by a proper limiting instruction, and by a narrowing construction. Otherwise, as noted, a jury could reasonably conclude that *any* act of murder would qualify as "heinous."  *See also* Rosen, "The 'Especially Heinous' Aggravating Circumstance in

147

Capital Cases – The Standardless Standard," 64 N.C. L.REV. 941 (1986).   In *Godfrey v. Georgia*, the plurality opinion emphasized that aggravating factors must "channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance' and that 'make rationally reviewable the process for imposing a sentence of death.'"  446 U.S. at 428 (citations omitted).  *See Moore v. Kinney*, 320 F.3d 767, 775 (8th Cir. 2003) ("the sentencer cannot have unfettered discretion, but instead must be guided by an aggravator with a core meaning presented through a definition capable of comprehension, and considered via a process not infected with bias or caprice").  *See also Roper v. Simmons*, 543 U.S. 551, 569 (2005) (noting with respect to prohibitions on executing juveniles and/or the mentally retarded, "[t]hese rules vindicate the underlying principle that the death penalty is reserved for a narrow category of crimes and offenders").  In the wake of *Ring*, analysis of EHCD represents and requires, in effect, an effort to define the precise "sub-elements" of an aggravating factor that is in and of itself, as argued earlier in this memorandum, an element of the undefined and unenacted offense of federal capital murder.[85]

---

[85]     Mr. Jacques makes the point throughout that courts are ill-equipped to make legislative judgments and, by virtue of the constitution's separation of powers doctrine, are barred from doing so.  Sub-elements of capital murder – as is the ECHD factor – should not be so vague that they remain undefined until jury instructions.  In the North Carolina Law Review article cited above, the author, after surveying the manner in which this factor – or its several variants – have been construed in the several states, concludes that, "[t]he only thing the cases have in common is that the reviewing courts have been able to find *something* disturbing in each case," and that "[t]he legislature must provide a standard of sufficient definitiveness to limit the discretion of juries and courts."  64 N.C.L.REV*., supra*, at 989-90 (emphasis in original).

(b)     *The need for a further explanation from the government as to the factual basis for this factor*

As the above review of the law in this area demonstrates, this factor may not be satisfied by simply arguing that this was a "terrible" or "senseless" crime.  Nothing in the post-mortem examination supports any inference that Ms. Bennett was tortured prior to her death.   Some of the discovery provided to date suggests that she was drugged and unconscious when she was killed.  The only witness who was allegedly at the Jacques home that morning, J1, reportedly left prior to the murder.  In the absence of any apparent factual basis in the discovery, and given the potentially inflammatory nature of this aggravating factor, this court should require the government to come forward with an outline of its proofs on this factor so that the court may properly exercise its gate-keeping function.

3.     "Substantial planning or premeditation."

The vice of this statutory aggravating factor and element of capital murder, 18 U.S.C. § 3592(c)(9), is that it requires jurors to fix the illusive and highly subjective point at which "planning and premeditation" crosses an imaginary dividing line and becomes "*substantial* planning and premeditation."  The former may not be used to support a sentence of death; the latter may.  This is a concept of such slippery and nuanced vagueness that the factor should be stricken.

Several circuits have rejected vagueness and overbreadth challenges to the statutory aggravating factor that "the defendant committed the offense after substantial planning and premeditation to cause the death of a person or commit an act of terrorism." 18 U.S.C. § 3592(c)(9). *See United States v. Bourgeois,* 423 F.3d 501 (5th Cir. 2005); *United States v.*

149

*Jackson,* 327 F.3d 273 (4th Cir. 2003); *United States v. Webster,* 162 F.3d 308 (5th Cir. 1998); *United States v. Tipton,* 90 F.3d 861 (4th Cir. 1996); *United States v. McCullah,* 76 F.3d 1087 (10th Cir. 1996); *United States v. Flores,* 63 F.3d 1342 (5th Cir. 1995); *United States v. bin Laden*, 126 F.Supp.2d 297 n.7 (Collecting cases).  But the Supreme Court has not yet addressed this issue. And a few older state court decisions have invalidated aggravating factors based on the vagueness of modifiers like "substantial." *See Arnold v. State,* 224 S.E.2d 386, 391 (Ga. 1976) (aggravating circumstance that the " 'murder was committed by a person . . . who has a *substantial* history of serious assaultive convictions' held "too vague and non-specific to be applied evenhandedly"); *State v. David,* 468 So.2d 1126,1129-1130 (La. 1985) (invalidating aggravating circumstance of "*significant*" history of criminal conduct; "[a] person of ordinary sensibility could characterize almost any record of criminal activity as significant").

This is an open question in the Second Circuit, but based on the vague and perhaps all-encompassing scope of this factor, it should be stricken.

4.    Vulnerable victim.

Brooke Bennett was 12-years old at the time of this offense.  Plainly she was young. However, it is not immediately apparent form discovery or elsewhere how her youth rendered her more vulnerable to the murder. The government alleges that she was, in essence, rendered unconscious through being drugged and thereafter raped and murdered.    Thus, her vulnerability may have played no role in her murder.

In *United States v. Johnson,* 136 F.Supp.2d 553 (W.D. Va.2001), the district court

struck this factor because there was no nexus between the victim's vulnerable condition (pregnancy) and her murder where death was instantaneous from an exploding pipe bomb. More recently, in *United States v. Mikos*, 539 F.3d 706 (7th Cir. 2008), the Court split on this issue, with the majority finding that the victim's obesity made it difficult for her to run or fight back or to seek help after being shot. The dissent saw it the opposite way, concluding that the victim's obesity was unrelated to her death by gunshot. In Judge Sand's model instructions, it is suggested that the jury be told that there must be "a connection between the victim's vulnerability and the offense committed upon the victim." 1 L. SAND, *supra*, ¶9A.14.

In light of the uncertain nature of the proofs on this issue, the court should require the government to come forward with an outline of its proofs so that the court may properly exercise its gate-keeping function and rule on this motion to strike.

5.      The sexual abuse and manipulation of J1.

In a case that is filled with them, this is a particularly prejudicial set of circumstances. This case presents the risk that a jury will sentence Mr. Jacques to death because of his conduct toward J1 and not because he is alleged to have murdered Ms. Bennett. It is urged that this court take a close look at this allegation, applying the standard of whether it is "particularly relevant" to sentencing and, if so, excludible pursuant to 18 U.S.C. § 3593(c).

6.      Misleading the State of Vermont.

There is almost a bizarre quality to this allegation. It appears to be the government's position, in essence, that Mr. Jacques should be put to death because he somehow fooled "the

system" into believing that he was rehabilitated. Research has disclosed no other case in the hundreds of federal capital cases brought in the past 20 years that has alleged a non-statutory factor that remotely resembles this one. Moreover, it suffers from the additional vice that it transforms jurors (assuming the case is tried by a Vermont jury) into the role of victims.

Whatever relevance this allegation has to the sentencing decision is far outweighed by its danger of unfair prejudice. The factor is, further, duplicative of several other of the non-statutory factors set out by the government.

7.    The use of J1 to commit kidnapping and murder.

This allegation is certainly duplicative of the allegation that Mr. Jacques manipulated J1. Her participation in the kidnapping and murder, the government alleges, were part and parcel of the manipulation. Moreover, as with the objection raised to that evidence, this case presents the isk that a jury will sentence Mr. Jacques to death because of his conduct toward and involving J1 and not because he is alleged to have murdered Ms. Bennett. It is urged that this court take a close look at this allegation to determine whether it is "particularly relevant" to sentencing.

8.    Witness elimination.

It appears to be the government's theory that Mr. Jacques deliberately set out to murder Ms. Bennett. Indeed, the government alleges that the murder was substantially planned and pre-meditated. Subject to a further offer or proof, it does not appear from the discovery or other sources that Mr. Jacques was motivated by a wish to eliminate a witness. Neither does that appear to be the government's theory of the case.

152

In light of the uncertain nature of the proofs on this issue, the court should require the government to come forward with an outline of its proofs so that the court may properly exercise its gate-keeping function and rule on this motion to strike.

9.      Exploitation of a family relationship with Ms. Bennett.

Even if this allegation is true, it does not seem to be of sufficient gravity and or relevance to serve as a basis for a sentence of death.  As such, it does not seem "particularly relevant" to a decision as to whether Mr. Jacques should be executed.  This court should exclude this factor.

10.      Orchestrating J1's sexual assault by another adult male.

In a case that is filled with them, this is another example of a particularly prejudicial set of circumstances.  This case presents a grave and present risk that a jury will sentence Mr. Jacques to death because of his conduct toward J1 and not because, he is alleged to have murdered Ms. Bennett.  It is urged that this court take a close look at this allegation, applying the standard of whether it is "particularly relevant" to sentencing and, if so, is it otherwise excludible pursuant to 18 U.S.C. § 3593(c).

11.      The allegations of decades old, largely unajudicated, sexual misconduct.

One reason to exclude evidence of misconduct in a capital proceedings is that the passage of time has diluted the relevance (if any) of the misconduct to the sentencing decision such that whatever the probative value the evidence may carry gives way to the danger of unfair prejudice and an effort simply to portray the defendant as a bad person.  As noted in *O'Driscoll*, one area of inquiry a district court should make is to determine whether

"the probative value of the information is outweighed by other considerations, such as remoteness of time or danger of unfair prejudice . . . ." *United States v. O'Driscoll*, 350 F.Supp.2d at 436.

In the federal system, the general statute of limitations on the prosecution of criminal conduct is five years. 18 U.S.C. § 3282(a). The Sentencing Guidelines, generally speaking, do not include as part of the calculation of an offender's criminal history crimes of conviction that date back more than 15 years. U.S.S.G. § 4A1.2(e) (2009 Edition). The Federal Rules of Evidence impose a presumptive 10-year limitation on a witness' prior felony convictions for purposes of impeaching credibility. F.R.Evid. 609(b). By contrast, in this case, the government has reached back more than 30 years – to as early as 1977[86] – to allege episodes or ongoing instances of unadjudicated sexual misconduct. These are set forth as free-standing non-statutory aggravating factors. Any one of these, if a jury is permitted to find and weigh them, is potentially "the last straw" that puts an individual juror over the top in deciding whether the aggravating factors outweigh the mitigating factors "sufficiently" to justify imposition of a sentence of death. 18 U.S.C. § 3593(e). This court should exclude these prior acts as too remote in time to have significant probative value in the sentencing calculation for a crime that took place in 2008. This court should also, in selected instances, require further information from the government about these events and, in every case, conduct a hearing regarding the reliability of the evidence.

    *(a)    The allegations regarding "J2."*

---

[86] Mr. Jacques' date of birth is March 18, 1966. In 1977 he was 11 years old.

The first allegation in this category is the sexual abuse of J2 from 1977-1984. (A13.) Thus, even utilizing the most recent date, this conduct dates back at least 26 years. At the outside, it dates back 33 years. At the time the alleged misconduct ceased, Mr. Jacques was 17- or 18-years of age. He was 11 when it began. There are other relevant facts and circumstances surrounding these events which may bear on this issue. Counsel will submit a brief sealed supplemental submission on this point so as not to compromise the identity of J2. Discovery provided by the government has allowed the defense to have a reasonably complete understanding of the circumstances of this allegation. Nonetheless, the defense requests a hearing to determine whether the witness has an accurate memory of the events and whether the evidence otherwise meets constitutional standards of relevance and reliability. In any event, the passage of time dictates that this aggravating factor be excluded.

(b)      *The allegations regarding "J3."*

Nothing provided in discovery sheds any light on this allegation, apparently a single event, that occurred at some unspecified date that falls between 1980 and 1982. (A13.) In 1980, Mr. Jacques was 14. Accordingly, counsel request a proffer from the government of its evidence on this issue so that this court may assess its reliability and properly perform its gatekeeping function. Moreover, as with other incidents of this nature, the allegation is remote. Finally, if necessary, the defense requests a hearing to determine whether the witness has an accurate memory of the events so that this court may judge its reliability. Alternatively, this court should strike this factor on the basis of remoteness and a lack of particular relevance to the sentencing function.

  *(c)  The allegations regarding "J4" and "other girls living in Barre, Vermont at the time."*

  This allegation of unadjudicated misconduct dates to 1987.  That is 23 years ago and 21 years prior to the crime for which Mr. Jacques faces the death penalty.  Discovery provided by the government has allowed the defense to have a reasonable understanding of the circumstances of this allegation, at least so far as it involves J4.  Nonetheless, the defense requests a hearing to determine whether the witness herself has an accurate memory of the events or, instead, for example, is testifying strictly from refreshed recollection after reviewing documents.  Alternatively, this court should strike this factor on the basis of remoteness and a lack of particular relevance to the sentencing function.

  *(d)  The kidnapping and rape of A2.*

  This offense, which took place in 1992, is the only example in the notice of actually adjudicated criminal conduct and took place somewhat closer in time than the earlier allegations.  Mr. Jacques was prosecuted and plead guilty to the offense.  However, the offense still dates back 16 years from the time of the murder with which Mr. Jacques is presently charged.  The defense moves to exclude it as too remote to bear rationally on the penalty decision.

  12. <u>Possession of child pornography</u>.

  Even if true, the fact that Mr. Jacques was in the possession of child pornography does not make him more "death-worthy."  Thus, this allegation is not "particularly relevant" to the sentencing decision or should otherwise be excluded pursuant to 18 U.S.C. § 3593(c).

13.   Lack of remorse

The notice cites "lack of remorse" as a reason for imposing a sentence of death.  The notice does not, however, cite any instance in which Mr. Jacques affirmatively demonstrated lack of remorse.  On its face, therefore, this factor may rest upon Mr. Jacques' failure to admit that he committed the offenses charged, his public silence in the face of the Government's accusations, and his failure to make any public expressions of remorse.  Under these circumstances, the use of "lack of remorse" as a non-statutory aggravating factor violates both Mr. Jacques' Fifth Amendment right to remain silent and his Sixth Amendment right to a fair trial, because it imposes an impermissible penalty upon the exercise of those rights.  *See Lesko v. Lehman*, 925 F.2d 1527, 1543-45 (3d Cir. 1991). *See also, United v. Davis*, 912 F.Supp. at 946 ("allegation of lack of remorse encroaches dangerously on an offender's constitutional right to put the government to its proof.")  Moreover, use of lack of remorse as an aggravating factor violates the Eighth Amendment because it is inherently unreliable.

The Fifth Amendment provides that "No person . . . shall be compelled in any criminal case to be a witness against himself. . . ."  A criminal defendant thus has a right to remain silent in the face of accusation, and he may not be punished for exercising this right. *Lefkowitz v. Cunningham*, 431 U.S. 801, 805 (1977) (government "may not impose substantial penalties because a witness elects to exercise his Fifth Amendment right not to give incriminating testimony against himself"); *Malloy v. Hogan*, 378 U.S. 1, 8 (1964) (defendant has right "to remain silent unless he chooses to speak in the unfettered exercise of his own

will, and to suffer no penalty . . . for such silence"). This right is so absolute that a prosecutor cannot even comment on the accused's exercise of the right. *Griffin v. California*, 380 U.S. 609, 615 (1965).

Penalties on the exercise of the Sixth Amendment right to a trial are also impermissible. The Second Circuit has applied the same analysis set forth in *Griffin*, *supra*, in a Sixth Amendment trial context. *Agard v. Portuondo*, 117 F.3d 696, 709-10 (2d Cir. 1997) ("*Griffin v. California*, 380 U.S. at 614, [and its] principles are appropriately applied to a case involving Sixth Amendment rights").

In a capital case, permitting the jury to weigh the accused's lack of remorse against him in deciding whether to impose the death penalty substantially penalizes the exercise of his Fifth Amendment right to remain silent and Sixth Amendment right to a trial. To permit "lack of remorse" – the absence of an admission of guilt and expression of contrition  – to be a factor weighing in favor of the death penalty permits the jury to punish the defendant for exercising his right not to admit guilt and go to trial. To burden a defendant's exercise of his rights under the Fifth and Sixth Amendments by making that exercise a basis for imposing the death penalty clearly violates the Constitution. *United States v. Jackson*, 390 U.S. 570, 582-83 (1968).

This conclusion is entirely consistent with the general sentencing law in the federal courts. Insofar as remorse is considered in sentencing, it can, under current law, be the basis for leniency, but not for *increasing* punishment. The Second Circuit has clearly held, for example, that it is error for a court to enhance a defendant's punishment because he did not

158

admit his guilt and went to trial. *United States v. Cruz*, 977 F.2d 732, 733-34 (2d Cir. 1992). And lack of remorse by itself is not a basis for an upward departure. *United States v. White-head*, 912 F.2d 448, 452 (10th Cir. 1990) (lack of contrition "should not normally be a factor justifying a departure").[87]   The court may, however, grant leniency for admissions of guilt evidencing sincere remorse by reducing punishment below the degree that would otherwise be imposed on the basis of "acceptance of responsibility." U.S.S.G. § 3E1.1. *See United States v. Cojab*, 978 F.2d 341, 343 (7th Cir. 1992).   Thus, remorse, the expression of contrition for the commission of a crime, may be considered in sentencing only as a mitigating factor permitting the reduction of a sentence below the level that would otherwise have been imposed.   Its absence may not be considered as a basis for increasing a sentence, much less for imposing the penalty of death. *See Pope v. State*, 441 So.2d 1073, 1078 (Fla. 1984) (because of danger to exercise of constitutional rights, "[a]ny convincing evidence of remorse may properly be considered in mitigation of the sentence, but absence of remorse should not be weighed either as an aggravating factor nor as an enhancement of an aggra-

---

[87]   A defendant's lack of remorse for the commission of prior crimes, for which he has already been convicted and sentenced, may be considered as part of the basis for an upward departure based a defendant's criminal history and his "propensity to commit future crimes." *United States v. Whitehead*,  912 F.2d at 452.   That is much different, however, from considering lack of remorse for commission of the instant offense.   The "lack of remorse" in the former circumstances consists not in the failure to express contrition for commission of a crime, but rather in the repeated commission of similar crimes after having been caught and punished for them in the past.   Utilized simply as evidence supporting a criminal history departure, this would implicate no Fifth Amendment rights.

vating factor").[88]

As has been suggested earlier, this does not mean, of course, that a defendant's re-morse plays no role at all in sentencing or that the government may never argue that the defendant lacks remorse.  For example, where a court grants a reduction of sentence for "acceptance of responsibility," it may determine the degree of that reduction based on an assessment of the relative level of the defendant's remorse.  *United States v. Jones*, 997 F.2d 1475, 1476-1480 (D.C. Cir. 1993) (*reh. en banc*); *United States v. Jacobson*, 15 F.3d 19, 23 (2d Cir. 1994).  Similarly, the government may argue that a defendant lacks remorse to counter his claim that his remorse constitutes a factor in mitigation.   But, in the circumstances here, the Government may not constitutionally rely on simple lack of remorse to enhance the sentence above its usual level, and it especially may not do so when the enhancement the government seeks is the death penalty.  *See Johnson v. Mississippi*, 486 U.S. 578, 585 (1988) (death sentence "cannot be predicated . . . on 'factors that are constitutionally impermissible'"), *quoting Zant v. Stephens*, 462 U.S. at 885.

The "lack of remorse" factor also violates the Eighth Amendment because, in a capital prosecution, there is a "heightened need for reliability," and allowing the jury to place lack of remorse on the scale in favor of death creates an unacceptable risk that the defendant's sentence will not be reliably obtained, in violation of the Eighth Amendment.  In *Pope v.*

---

[88]  In light of the serious constitutional concerns underlying use of this aggravating factor, it is not surprising that other states prohibit its use as well.  *See, e.g.*, *State v. Brown*, 320 N.C. 179, 198-99, 358 S.E.2d 1, 15 (1987); *People v. Thompson*, 45 Cal. 3d 86, 123-24, 753 P.2d 37, 59-60, 246 Cal. Rptr. 245, 267-68 (1988).

*State*, *supra*, the Florida Supreme Court barred evidence of a defendant's lack of remorse as

aggravation in a penalty phase of a capital case to avoid just such "mistaken" sentences.  In

doing so, it noted:

> Unfortunately, remorse is an active emotion and its absence,
> therefore, can be measured or inferred only from negative
> evidence.  This invites the sort of mistake which occurred in the
> case now before us – inferring lack of remorse from the exercise
> of constitutional rights.

441 So. 2d at 1078.[89]  In *United States v. Davis*, 912 F.Supp. at 938, the court also found lack

of remorse an unreliable factor:

> Lack of remorse is a subjective state of mind, difficult to gauge
> objectively since behavior and words don't necessarily correlate
> with internal feelings.  In a criminal context, it is particularly
> ambiguous since guilty persons have a constitutional right to be
> silent, to rest on a presumption of innocence and to require the
> government to prove guilt beyond a reasonable doubt.

*Id*. at 946.[90]

---

[89]   Even in non-capital cases, some state courts preclude evidence of lack of remorse
to enhance a defendant's sentence where the defendant has entered a denial of guilt.  *See*
*Arizona v. Tinajero*, 935 P.2d 928, 935 (Az. Ct. App. 1997) ("[w]hen a convicted person
maintains his innocence through sentencing, as Tinajero did here, his failure to acknowledge
guilt 'is irrelevant to a sentencing determination' and 'offends the Fifth Amendment privilege
against self-incrimination'")(citation omitted); *People v. Holguin*, 213 Cal.App.3d 1308,
1319, 262 Cal. Rptr. 331, 337 (1989)(defendant's lack of remorse may not be used as a
sentencing factor where the defendant has denied guilt and the evidence of guilt is
conflicting).

[90]   The court permitted the government to show evidence of lack of remorse, other
than the defendant's silence, as part of its "future dangerousness" aggravating factor.  912
F.Supp. at 946. However, the Court cautioned that "Threatening words and warped bravado,
without affirmative acts, are simply too slippery to weigh as indicators of character; too
attenuated to be relevant in deciding life or death; and whatever probative value they might
have is far outweighed by the danger of unfair prejudice and confusion of the issues." *Id*. at

Given the constitutional infirmities of this aggravating consideration, the unreliability it injects into the proceeding, and its duplication of other aggravating factors, it is not surprising that a number of courts have stricken it from a capital case. In *United States v. Walker*, 910 F.Supp. 837, 855 (N.D.N.Y. 1995), the court held that highly prejudicial statements that the government claimed showed lack of remorse, but that were subject to competing inferences, could not be the basis for an independent aggravating factor because in this context they were much more prejudicial than probative and because of the "triviality" of the government's arguments, which would "not bear the weight of being singled out . . . and presented to the jury as non-statutory aggravating factors." Finally, in *United States v. Nguyen*, 928 F.Supp. 1525 (D. Kan. 1996), the court denied a motion to strike this aggravation, but cautioned the Government that its evidence must be "more than mere silence," must be relevant, must be reliable, and "it's probative value must outweigh any danger of unfair prejudice." *Id*. at 1542. The bare allegation made by the government in this case cannot meet the standards set by the Constitution or by these cases, and this court should prohibit use of lack of remorse as an aggravating factor.

14.     Low potential for rehabilitation.

Rehabilitation is really not the issue here. If convicted, but spared a sentence of death, Mr. Jacques will spend the remainder of his life incarcerated in a secure United States Penitentiary. Whether he will or will not be "rehabilitated" is not germane to the sentencing

---

945.

decision.  This non-statutory factor should be stricken.

15-16.  <u>The two obstructions of justice</u>.

The issue here is whether the allegations that Mr. Jacques obstructed justice both before and after his arrest (A14) are not merely relevant but "particularly relevant" to the sentencing decision.  In order to answer the relevance objection in a way that favors the government, this court must be satisfied that it is permissible for a jury to find that Mr. Jacques should be sentenced to death because he obstructed justice.  The obstructions, of course, will be offered by the government at trial as evidence of consciousness of guilt and/or, regarding the pre-arrest conduct, as part and parcel of the criminal conduct with which Mr. Jacques is charged.  This conduct, however, does not satisfy constitutional standards for an aggravating factor that could result in Mr. Jacques' execution.

This court should exclude the obstructions as non-statutory factors.

17.  <u>Victim Impact Evidence</u>.

(a)  *The factor, as alleged, is unconstitutionally vague, lacks specifics, and is broader than permitted by statute.*

The notice alleges, as a non-statutory aggravating factor, that the defendant "caused injury, harm, and loss to Ms. Bennett's family, friends and classmates . . . ."  (A14.)  The FDPA, however, limits permissible the scope of victim-impact evidence to "the effect of the offense on the victim and the victim's family . . . ."  18 U.S.C. § 3593(a).  Thus, as a matter of law, this court must initially limit the possible scope of such evidence to that which Congress determined was appropriate.

Because of the overwhelmingly prejudicial impact of this evidence, courts must be

vigilant to ensure that victim impact evidence stays within constitutionally permissible

bounds. Several courts have found generic language, as in the case here, inadequate because

it does nothing to guide the defendant's penalty phase preparation or assist the court in

performing the crucial task of limiting the scope of victim impact evidence or determining

if it is indeed "aggravating." For example, in *Glover*, the court found inadequate a notice

which alleged as victim impact that the defendant caused "serious physical and emotional

injury to Christy Lewis" and "permanent harm to the family of John Brewer." 43 F. Supp.

2d at 1224. As to the "impact upon the family" allegation, the court wrote:

> [T]he defendant is entitled to greater specificity regarding this
> factor, to wit, which members of the family have suffered, the
> nature of their suffering, and the nature of the 'permanent harm.'
> For example, whether members of the family sought counseling
> or other medical treatment, such as hospitalization, and whether
> and to what extent members of the family suffered financial
> harm, are relevant considerations in discerning whether this
> factor is indeed 'aggravating' in this case.

*Id.* See also *United States v. Rodriguez*, 380 F. Supp. 2d 1041, 1058 (D.N.D. 2005)

(Requests for information concerning the nature of the evidence the government intends to

rely upon to prove the non-statutory aggravating factor regarding victim impact, and for " an

outline of the proposed victim impact evidence from each witness" were "justified to fulfill

Defendant's objective of meaningful notice to adequately prepare a defense and meet the

allegations against him."); *United States v. Llera Plaza*, 179 F. Supp. 2d at 475:

> The government suggests no reason why, in this case, it would
> be unable to produce a summary of its victim impact evidence
> similar to the ones required by [other] courts. Therefore, in order
> to allow the defendants to adequately prepare responses to
> sentencing phase evidence, and in order to allow the court to

> determine if a pre-sentencing hearing will be necessary to review that evidence, the government will be ordered to submit an outline of its proposed victim impact evidence.

*See also, United States v. Bin Laden*, 126 F. Supp. 2d 290, 304 (S.D.N.Y. 2001) ("[a]n oblique reference to victims' 'injury, harm, and loss,' without more, does nothing to guide Defendants' vital task of preparing for the penalty phase of trial"); *United States v. Cooper*, 91 F. Supp. 2d 90, 111 (D.D.C. 2000) (requiring government to amend notice "to include more specific information concerning the extent and scope of the injuries and loss suffered by each victim, his or her family members, and other relevant individuals, and as to each victim's 'personal characteristics' that the government intends to prove").

This court should require the government to present a summary or outline of its proposed victim-impact evidence.

> (b)    *The victim impact non-statutory aggravating factor is alleged in nearly every capital prosecution and does not sufficiently narrow the class of murderers for whom the death penalty is available.*

In addition, the factor, as charged, must be dismissed because it does not meet the statutory criteria for a non-statutory aggravating factor – that it be an "aggravating" circumstance "other" than the crime itself and the remaining aggravating circumstances.  18 U.S.C. § 3592(c) (jury may find "any other aggravating factor for which notice has been given" (emphasis supplied)).  All that this alleged aggravating factor cites is that there was "injury, harm, and loss to [the victim's] family." But every murder of a family member undeniably causes ""injury, harm, and loss " to the victim's family, and that harm is in every case irreparable, since a death has occurred.  *But see*, *Jones v. United States*, 428 U.S. 262

(1999).  The factor thus fails to "channel the sentencer's discretion by 'clear and objective' standards that provide 'specific and detailed guidance," and that 'make rationally reviewable the process of imposing a sentence for death.'" *Lewis v. Jeffers*, 497 U.S. 764, 774 (1990)(quoting *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980)).

It should be noted that *Payne v. Tennessee*, 501 U.S. 808 (1991) did not consider the circumstances under which the use of "victim impact" evidence as an independent factor aggravating a murder and counted separately in a weighing statute, is permissible.  If the harm shown by victim impact evidence is nothing more and nothing less than the harm implicit in any murder, it violates the Eighth Amendment, as well as the statute, to permit the jury to weigh it in deciding whether to impose the death penalty.

> (c)    *The victim impact evidence should be excluded under the Eighth Amendment's heightened standard of reliability and under 18 U.S.C. § 3593.*

As noted by this Court in *United States v. Fell*, *supra*, 372 F.Supp.2d at 763,

> [A]n aggravating factor must meet the "heightened standard of reliability" the Supreme Court has required in death penalty cases. . . .  Thus an aggravating factor is invalid if it cannot be established by reliable evidence. . . .  Similarly, any aggravating factor should be excluded if it is based on evidence whose probative value is outweighed by the danger of unfair prejudice to the defendant, confusion of the issues, or a likelihood that the jury will be misled. See 18 U.S.C. § 3593 (c).

*Id*. at 763 (citations omitted).

The overwhelmingly prejudicial impact of victim impact evidence was noted by Chief Judge Bennett in *United States v. Johnson*, 362 F. Supp. 2d 1043, 1107 (N.Dist. Iowa 2005):

> I can say, without hesitation, that the 'victim impact'

166

testimony presented in [the co-defendant's] trial was the most forceful, emotionally powerful, and emotionally draining evidence that I have heard in any kind of proceeding in any case, civil or criminal, in my entire career as a practicing attorney and federal judge spanning nearly 30 years. Indeed, I cannot help but wonder if *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), which held that victim impact evidence is legitimate information for a jury to hear to determine the proper punishment for capital murder, would have been decided the same way if the Supreme Court Justices in the majority had ever sat as trial court judges in a federal death penalty case and had observed first hand, rather than through review of a cold record, the unsurpassed emotional power of victim impact testimony on a jury. It has now been over four months since I heard this testimony in the Honken trial and the juror's sobbing during the victim impact testimony still rings in my ears.

This is true even though the federal prosecutors in Honken used admirable restraint in terms of the scope, amount, and length of victim impact testimony. To pretend that such evidence is not potentially unfairly prejudicial on issues to which it has little or no probative value is simply not realistic, even if the court were to give a careful limiting instruction. Rather, such potent, emotional evidence is a quintessential example of information likely to cause a jury to make a determination on an unrelated issue on the improper basis of inflamed emotion and bias-sympathetic or antipathetic, depending on whether one is considering the defendant or the victims' families.

362 F. Supp. 2d at 1107 [91]

---

[91]   See also, e.g., Bryan Myers & Edith Greene, "The Prejudicial Nature of Victim Impact Statements," 10 PSYCHOL. PUB. POL'Y & L. 492 (2004) (exploring the extent to which victim impact statements are prejudicial to death sentence determinations); Niru Shanker, "Getting a Grip on Payne and Restricting the Influence of Victim Impact Statements in Capital Sentencing: The Timothy McVeigh Case and Various State Approaches Compared," 26 HASTINGS CONST. L.Q. 711, 740 (1999) ("Thanks in part to poorly articulated parameters in *Payne v. Tennessee*, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) ], victim impact testimony in capital sentencing walks a fine line between allowing particularized attention to the damage caused by the crime on the one hand, and leaving the

If this case is to produce a verdict premised on reason and justice, versus anger and revenge, the scope of victim-impact evidence mus, at a minimum, be monitored with extreme care and caution.

### C.        Conclusion.

For the reasons expressed above, this court should strike the aggravating factors as specified, require the government to come forward with an offer of proof concerning the factual basis for certain of its allegations and, in certain instances, conduct a hearing.

---

jury to be inundated with prejudicial outpourings irrelevant to the defendant's guilt on the other."); Wayne A. Logan, "Through the Past Darkly: A Survey of the Uses and Abuses of Victim Impact Evidence in Capital Trials," 41 ARIZ. L. REV. 143, 145 (1999) ("The state of the law seven years since *Payne* establishes ⋯ [that] many of the worst fears imagined in the wake of *Payne* have been realized. Highly prejudicial victim impact evidence is now routinely before capital juries, with precious little in the way of substantive limits, procedural controls, or guidance in how it is to be used in assessing the 'deathworthiness' of defendants."); Amy K. Jacques, "Thou Shalt Not Kill Any Nice People: The Problem of Victim Impact Statements in Capital Sentencing," 35 AM. CRIM. L. REV. 93, 101-113 (1997) (arguing that capital juries have a tendency to consider improper factors in sentencing, even in the absence of victim impact statements, so that victim impact statements exaggerate the extent to which improper factors influence capital sentencings).

POINT EIGHT

BECAUSE THE PEOPLE OF THE STATE OF VERMONT
HAVE REJECTED CAPITAL PUNISHMENT, THIS CASE
SHOULD NOT BE PERMITTED TO PROCEED AS A
FEDERAL CAPITAL PROSECUTION.

In a recent law review article, Professor Michael Mannheimer has persuasively argued

that the federal government may not proceed with a federal capital prosecution in a state,

such as Vermont, that does not authorize capital punishment.  M. Mannheimer, "When the

Federal Death Penalty is 'Cruel and Unusual,'" 74 U. CIN. L. REV. 8198 (2006).  Those

arguments and historical analysis are adopted by reference.  On that basis, this court should

strike the death penalty.

POINT NINE

THIS COURT SHOULD DECLARE THE DEATH PENALTY
UNCONSTITUTIONAL AS CRUEL AND UNUSUAL
PUNISHMENT AND A *PER SE* DENIAL OF DUE PROCESS
IN ALL CASES.

Mr. Jacques recognizes, as he must, that a majority of the United States Supreme

Court accepts the proposition that the death penalty, under some circumstances, is

constitutional.  This may remain the rule of law in this nation for many years.  Nevertheless,

he argues that the death penalty is unconstitutional in all cases, and as applied to him, for the

following reasons: (1) the death penalty is racist to its very core; (2) the death penalty has in

the past, and inevitably will in the future, lead to the execution of innocent people; (3) the

process by which individuals are selected for capital prosecution vests an unacceptable level

of unreviewable discretion in prosecuting authorities, producing irreconcilable

inconsistencies; (4) there is no principled basis for distinguishing between defendants who

are sentenced to death from defendants who are not; and (5), evolving standards of decency

have reached the point where this court can declare that the death penalty is no longer

consistent with the values embodied in the Eighth Amendment.  In *Atkins v. Virginia*, 536

U.S. 304 (death penalty unconstitutional as applied to the mentally-retarded), the Court

reiterated its authority to review the constitutionality of the death penalty in light of  "'the

evolving standards of decency that mark the progress of a maturing society.'"  *Atkins*, 536

U.S. at 311-12, *quoting Trop v. Dulles*, 356 U.S. 86, 100-101 (1958); *see also*, *Roper v.

Simmons*, 543 U.S. 551 (death-penalty unconstitutional as applied to juveniles under age 18).

In *Callins v. Collins*, *supra*, the late Justice Blackmun, four months prior to his

170

retirement from the Court, dissented from the denial of *certiorari* in a Texas death-penalty

case and expressed at great length why his 20 years of experience on the Supreme Court had

convinced him that this nation's death penalty schemes – even if theoretically permissible

and constitutional – were, in practice and reality, incapable of fair and even-handed

application and therefore retain many of the arbitrary and capricious features, including race,

ostensibly struck down in *Furman* and "corrected" by *Gregg* and its progeny.  Justice

Blackmun stated:

> From this day forward, I no longer shall tinker with the
> machinery of death.  For more than 20 years I have endeavored
> – indeed, I have struggled – along with a majority of this Court,
> to develop procedural and substantive rules that would lend
> more than the appearance of fairness to the death penalty
> endeavor.  Rather than continue to coddle the Court's delusion
> that the desired level of fairness has been achieved, I feel
> morally and intellectually obligated simply to conclude that the
> death penalty experiment has failed.  It is virtually self-evident
> to me now that no combination of procedural rules or
> substantive regulations ever can save the death penalty from its
> inherent constitutional deficiencies.  The basic question – does
> the system accurately and consistently determine which
> defendants "deserve" to die?  – cannot be answered in the
> affirmative.   It is not simply that the Court has allowed vague
> aggravating circumstances to be employed [citation omitted],
> relevant mitigating evidence to be disregarded [citation
> omitted], and vital judicial review to be blocked [citation
> omitted].  The problem is that the inevitability of factual, legal,
> and moral error gives us a system that we know must wrongly
> kill some defendants, a system that fails to deliver the fair,
> consistent, and reliable sentences of death required by the
> Constitution.

510 U.S. at 1145-46.

In a 1995 *en banc* opinion from the Third Circuit, reviewing sentences of death

imposed in Delaware, Circuit Judge Lewis, joined by Circuit Judges Mansmann and McKee,

expressed agreement with Justice Blackmun's conclusions:

> Although I have concluded that the errors in both trials were not harmless and would, accordingly, reverse the death sentences as to both Bailey and Flamer and remand for reweighing, the tortuous analytical route it has taken both the majority and me to set out our respective views in these cases compels me to add that I believe they perfectly illustrate – perhaps epitomize – why, in the words of Justice Blackmun, we should "no longer tinker with the machinery of death." See Callins v. Collins, 127 L. Ed. 2d 435, 114 S. Ct. 1127 (Blackmun, J., dissenting).

> To be sure, Justice Blackmun was correct. I realize that I sit on a court charged with the responsibility of applying the law as it is interpreted by the Supreme Court, and in circumstances such as these, by the highest court of a state. That is precisely what the majority and I have sought to do, despite our disagreement. But there are times when it becomes appropriate for a judge to reflect upon the law that he or she is called upon to apply, and to express views, genuine and unfeigned, that reveal a sincere and earnest belief. And in doing so here, I can only say that more than any I have seen, these cases exemplify the extent to which death penalty jurisprudence has become so complex and theoretically abstract that the only way to try to understand the reasons for and impact of its many subtle distinctions is to resort to carefully crafted hypotheticals. Something is terribly wrong when a body of law upon which we rely to determine who lives and who dies can no longer, in reality, reasonably and logically be comprehended and applied; when, in examining a statutory scheme and analyzing instructions and interrogatories, we are left to reach conclusions by piling nuance upon nuance; when we cannot even agree upon the appropriate standard of review in cases in which lives hang in the balance. Yet this is how cluttered and confusing our nation's effort to exact the ultimate punishment has become. This cannot be what certain fundamental principles of liberty and due process embodied in our Constitution, principles upon which I need not elaborate here, are all about.

> It does not dilute my profound respect for the highest court in the land, an admiration and honor that knows no

172

bounds, to voice an apprehension, sincerely felt, that much more guidance in this serious moral dilemma must be forthcoming. Elusive and complicated distinctions, replete with incomprehensible subtleties of the highest order, must not be the talisman that decides whether one should live or die. Until this guidance is forthcoming, the plaintive voice of Justice Blackmun, truly crying in the wilderness, should continue to haunt and remind us that "the desired level of fairness has [not] been achieved."

*Flamer v. Delaware,* 68 F.3d 736, 772 (3d Cir. 1995) (*en banc*) (Lewis, Cir. J., dissenting).

This Court should declare the federal death penalty unconstitutional.

<u>CONCLUSION</u>

For the reasons set forth above, the motions should be granted in all respects together with any and all such other relief as the Court deems just and proper.  A hearing is requested on all disputed facts and as specifically noted in the motions.

Respectfully submitted,

MICHAEL DESAUTELS, ESQUIRE
Federal Public Defender
126 College Street, Suite 410
Burlington, Vermont 05401
802-862-6990
michael.desautels@fd.org
Counsel to Michael Jacques

*/s/ Michael Desautels*

JEAN D. BARRETT, ESQUIRE
DAVID A. RUHNKE, ESQUIRE
Ruhnke & Barrett
47 Park Street
Montclair, New Jersey 07042
(973)744-1000 (voice)
(973)746-1490 (fax)
jeanbarrett@ruhnkeandbarrett.com
davidruhnke@ruhnkeandbarrett.com
Counsel to Michael S. Jacques

*/s/ Jean D. Barrett*
*/s/ David A. Ruhnke*

<u>Filed via ECF</u>:        Burlington, Vermont
                    March 29, 2010

174

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on this date, the foregoing document was filed via ECF and thereby served on all parties.  It is further certified that on March 30, 2010, the CD referenced in the motion and supporting appendix will be sent via overnight mail addressed to AUSAs Darrow and Nolan at the United States Attorney's Office in Burlington, Vermont.


*/s/ David A. Ruhnke*
DAVID A. RUHNKE

<u>Dated</u>:          March 29, 2010

175