UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 2:08-cr-117 |
| | ) | |
| MICHAEL JACQUES | ) | |

OPPOSITION OF THE UNITED STATES TO DEFENDANT'S MOTION TO STRIKE OR
MODIFY THE NOTICE OF INTENT TO SEEK THE DEATH PENALTY

The United States of America, by and through its attorney, Tristram J. Coffin, United

States Attorney for the District of Vermont, submits this opposition to the defendant's "Motion

(Revised) To Strike Or Modify The Notice Of Intent To Seek The Death Penalty," filed on April

7, 2010 ("the Motion").

I.  INTRODUCTION

The Motion is a sprawling attack on the Federal Death Penalty Act, 18 U.S.C.

§§ 3591-3599 ("FDPA"), and the government's "Notice Of Intent To Seek A Sentence Of

Death" ("Notice"), filed pursuant to § 3593(a) of that statute.  The Motion urges the Court to

strike down the FDPA in whole or in part on various constitutional grounds, and with it the

Notice.  The Motion also protests the content of the Notice.

For all its various theories and angles of argument, the Motion suffers from one

consistent and fatal problem: lack of support in the law.  The defendant's arguments are, by and

large, not the subject of disagreement among federal courts.  Rather, they have been squarely and

unequivocally rejected in binding precedent, or they stand in tension – if not direct opposition –

with long-settled legal principles and overwhelming authority.  Indeed, some of the

1

defendant's claims represent such a marked break with established law that, if accepted, they would be the undoing of our criminal justice system, and, in particular, the trial by jury feature.

For reasons delineated below, the government respectfully asks the Court to deny the Motion.

## II.  STATEMENT OF THE CASE

In June, 2008 Jacques, a 42-year-old Vermont man with a long history of sex offenses against immature females, lured 12-year-old Brooke Bennett to his residence, and then drugged, raped, and murdered her.  Jacques used J1, another minor female whom he had been sexually abusing, to facilitate his kidnaping of Brooke.  He deceived and coerced J1, through a multitude of  email and text messages purportedly from third parties, that the "Breckenridge Program," a powerful cartel, required her to assist.

After several years of sexually exploiting J1, threatening her with "Breckenridge" retribution, in early 2008 Jacques focused his predatory attentions on Brooke.  In May, 2008, Jacques convinced J1 that Breckenridge had ordered the kidnaping of Brooke.  Jacques planned the crime to take place during mid-June, finally selecting June 25.  On June 20, 2008, he caused J1 to send Brooke four text messages deceiving Brooke into believing that a local boy of whom Brooke was fond shared her feelings, and wanted to meet her at a June 25 pool party at the Jacques residence.  Brooke obtained permission from her mother to attend.  Jacques also arranged for Brooke to spend the night before the "party," June 24, at the Jacques residence.

At about 9:15 a.m. on June 25, 2008, effectuating a carefully planned ruse, Jacques and J1 drove Brooke to Randolph Center, Vermont, and dropped her off at a Cumberland Farms convenience store.  Jacques parted from Brooke in front of the surveillance video-camera at the

Cumberland Farms cash register, after directing the girl to walk into nearby Randolph Center. The camera recorded Jacques and Brooke leaving the store in opposite directions. Several minutes later Jacques and J1 circled back into Randolph Center and picked-up Brooke. They drove her back to the Jacques residence, about 10 minutes away. After directing J1 to leave, Jacques had Brooke alone to himself for the remainder of the day, until his family's return at about 9:30 p.m. that evening. During that 12-hour period Jacques drugged, repeatedly raped, and murdered the girl. In the early evening he buried her body in the woods about a mile from his house.

Jacques anticipated that, as a registered sex offender and the last adult seen with Brooke, he would be a subject of the investigation into her disappearance. Prior to the murder he prepared a series of diversions to conceal his involvement. First, he manipulated J1 into joining him in giving police the false story that they had last seen Brooke at Cumberland Farms around 9:15 a.m. on June 25th. He also gave J1 other detailed instructions about lying to police. Second, on the night of June 24th he posted on Brooke's internet My space page a statement – purportedly from her – that the next morning she was going to run away to meet an internet lover. Third, on June 23 (two days before the murder), Jacques directed J1, through messages supposedly from Breckenridge operatives, to obtain a semen sample from her boyfriend. On the day of the murder, Jacques placed the semen, along with Brooke's underwear and one of her shoes, at a pull-off alongside the road several miles from Randolph. On the evening of June 25, as Brooke's family searched for her, he instructed J1 to tell her mother that Brooke had mentioned that location. After police collected the "evidence" at the pull-off location, DNA from the semen was compared with DNA from Jacques. Consistent with the false narrative

3

developed by Jacques that Brooke had met an unknown third-party, the DNA profiles did not match.

By June 29, 2008, the above efforts to divert suspicion had failed, and Jacques was arrested and detained.  During July, 2008, while incarcerated, he devised a new scheme to undermine the investigation.  He planned a series of coordinated emails to J1, law enforcement, and the media.  By phone and letter he solicited an adult friend in Arizona to assist by sending the emails.  Jacques wrote-out each of the emails, along with explicit instructions to his friend about how and when to send them.  One of the emails he wrote for J1, purportedly from Breckenridge, began, "Good Morning Bitch," and threatened that J1's little sister (then nine years-old) would "die like Brooke" if J1 did not continue to give false statements to officials.  Jacques's scheme failed when his friend cooperated.

In October, 2008, a District of Vermont Grand Jury passed down the Indictment, charging Jacques with kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a) (Count 1), producing child pornography, in violation of 18 U.S.C. § 2251(a) (Counts 2 - 5), and knowingly possessing child pornography, in violation of 18 U.S.C. § 2251(a)(4)(B)(I).

Congress provided in § 1201(a) that a violation of the statute resulting in "the death of any person" "shall be punished by death or life imprisonment."  *Id*.  Accordingly, the offense and associated circumstances were reviewed by the United States Attorney General, and the Attorney General's Review Committee on Capital Cases.  The nature of such review, and associated procedures, are set forth in § 9-10.000 of the U.S. Attorney's Manual, entitled, "Capital Crimes."  Following the Attorney General's review and decision, on August 25, 2009 the government, in compliance with § 3593 of the  FDPA, filed the Notice.

III.  THE FEDERAL DEATH PENALTY ACT

In 1994 Congress enacted the FDPA, which prescribes a multi-step sentencing procedure under which a jury, when a defendant is convicted of a capital offense, makes three determinations at a separate sentencing hearing.  18 U.S.C. § 3593(b).

The jury first determines whether a homicide defendant is eligible for the death penalty. That determination has two stages.  First, the jury considers whether the defendant acted with one of four requisite mental states, ranging from an intentional killing, to intentionally engaging in violence "knowing that the act created a grave risk of death," with the victim's death resulting. *Id.* § 3591(a)(2)(A) - (D).  If the jury finds one of the predicate mental states, it goes on to the second consideration: whether the government has proven at least one statutory aggravating factor beyond a reasonable doubt.  *Id.* §§ 3592(c)(1) - (16); 3593(c), (d).  If the jury finds that both a qualifying mental state and a statutory aggravating factor are present, the "eligibility" stage is satisfied.  The jury then proceeds to the third step: the "selection" stage of the sentencing hearing.  *Id.* § 3593(e).

In the selection phase, the jury considers both non-statutory aggravating factors from the government, and mitigating factors from the defense.  The FDPA requires the government to prove the existence of any aggravating factor beyond a reasonable doubt, and the jury's finding of these factors must be unanimous.  *Id.* § 3593(c),(d).  The defendant's mitigating factors need only be proven by a "preponderance of the information," and only to one or more jurors.  *Id*. After consideration of all aggravating and mitigating factors, the jury makes its final determination: whether all of the aggravating factors found to exist "sufficiently outweigh" the mitigating factors, so as "to justify a sentence of death."  *Id.*  § 3593(e).  The jury's sentencing

5

recommendation must be unanimous.  *Id.*

At the sentencing phase of a capital trial any "information" relevant to the sentence, including any mitigating or aggravating factor, is admissible "regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury."  § 3593(c).  During this phase of the trial the parties can rebut information and argue the adequacy of information and the appropriateness of imposing a death sentence.  *Id.*

IV.  ARGUMENT

A.  THE CLAIM THAT THE FDPA OPERATES IN AN UNCONSTITUTIONALLY ARBITRARY AND CAPRICIOUS MANNER IS MERITLESS AND HAS BEEN UNIFORMLY REJECTED.

The defendant's lead argument is that the FDPA has operated in an arbitrary and capricious manner since its enactment, in violation of the Eighth Amendment.  Distilling the argument to its essence, the defendant casts the purported constitutional infirmity in two ways, both concerned with outcome: he claims that the FDPA is invalid first because the federal death sentence is sought infrequently, and imposed even more infrequently; and second because it is meted out indiscriminately to some death-eligible defendants, but not to others, and sometimes as a result of factors such as race and geography.

In all iterations of the argument, Jacques relies heavily – almost exclusively – on concurring opinions in *Furman v. Georgia*, 408 U.S. 238 (1972), which struck down "first generation" state death penalty statutes nearly 40 years ago.  He eschews any analysis of the Supreme Court's robust death penalty jurisprudence since *Furman*, which clarified and colored

6

the meaning and application of that case and upheld various "second generation" capital statutes. He similarly avoids the holdings of the various Circuit Courts of Appeal – including the Second Circuit – squarely and unanimously rejecting his argument.  As these cases demonstrate, the constitutionality of the FDPA hinges not on outcomes, *i.e.*, who and how many are prosecuted for capital crimes, and who and how many are in fact executed, but rather on process: whether the prosecution decision and the discretion of the sentencing body are appropriately guided so as to limit the potential for arbitrariness and promote a  "heightened reliability" in death sentencing. *See, e.g., Murray v. Giarratano*, 492 U.S. 1, 8-9 (1989).  In direct contravention to the defendant's assertions, the Second Circuit has held that, "[t]he FDPA does not undermine 'heightened reliability,' it promotes it."  *United States v. Fell*, 360 F.3d 135, 144 (2d Cir. 2004).

The defendant's argument, in all its permutations, should be rejected.

1.  The FDPA Does Not Operate in an Unconstitutionally Arbitrary and Capricious Manner Because the Death Penalty Is Rarely Sought or Imposed**.**

Jacques asserts that, because the federal death penalty is sought and imposed in so few cases, the FDPA operates arbitrarily and capriciously in violation of the Eighth Amendment.  He relies almost exclusively on statistics and excerpts from the concurring opinions in *Furman*.  The argument is entirely misguided.

The 1972 *Furman* decision struck down a series of state death penalty statutes.  In the decades since, the Court repeatedly has explained the import of *Furman* and the fundamental principle of its capital punishment jurisprudence: "where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and

capricious action."  *Gregg v. Georgia*, 428 U.S. 153, 189 (1976); *see also McCleskey v. Kemp*,

481 U.S. 279, 302, 305-07 (1987) (citing *Gregg*).  The *Furman* Court was not, therefore,

concerned with the exercise of prosecutorial discretion to seek the death penalty or the ultimate

number of cases in which the death penalty was imposed, as the defendant contends, *McClesky*,

481 U.S. at 306-07 & n.28 ("[t]he Constitution is not offended by inconsistency in results based

on the objective circumstances of the crime"), but rather, with the need to channel and limit the

discretion of the sentencing body.  The lack of any such guidance in the statutory schemes at

issue in *Furman* rendered them unconstitutional.

To comply with principles articulated in *Furman* and *Gregg*, a death penalty statute must

"(1) rationally narrow the class of death-eligible defendants; and (2) permit a reasoned,

individualized sentencing determination based on a death-eligible defendant's record, personal

characteristics, and the circumstances of his crime."  *Kansas v. Marsh*, 548 U.S. 163, 173-74

(2006); *see also, e.g., Zant v. Stephens*, 462 U.S. 862, 877 (1983) (capital sentencing scheme

must "genuinely narrow the class of persons eligible for the death penalty and must reasonably

justify the imposition of a more severe sentence on the defendant compared to others found

guilty of murder"); *United States v. Jones*, 527 U.S. 227, 381 (1999); *Maynard v. Cartwright*,

486 U.S. 356, 361-62 (1988).  These requirements serve to inject capital punishment proceedings

with the "heightened reliability" that must accompany the death penalty decision.  *Fell*, 360 F.3d

at 143 (collecting Supreme Court decisions holding that "[t]he finality of the death penalty

requires a 'greater degree of reliability' when it is imposed").

Congress devised the FDPA in 1994 to codify the requirements of *Furman* and other

Supreme Court decisions mandating the narrowing and individualizing functions.  Unlike the

first generation statutes treated in *Furman*, the FDPA establishes a multi-step procedure, reviewed above, explicitly requiring a jury to find beyond a reasonable doubt the existence of a gateway mental state factor and at least one statutory aggravating factor ("eligibility factors") to narrow the class of death eligible defendants. *See* § 3593(e)(2); *United States v. Duncan*, No. CR07-23, 2008 WL 711603, at *2 (D. Idaho Mar. 14, 2008); *United States v. Talik*, No. 06CR51, 2007 WL 4570704, at *2 (N.D. W.Va. Dec. 26, 2007) ("Both the mental states and the aggravating circumstances provided for in the FDPA do genuinely narrow the class of persons eligible for the death penalty"); *United States v. Diaz*, No. CR 05-167, 2007 WL 656831, at *9 (N.D. Cal. Feb. 28, 2007) ("The FDPA thus narrows the class of death eligible defendants twice. First, the jury must find one of the mental states . . . .  Second, the jury must find at least one statutory aggravating factor").

The FDPA requires a jury to consider aggravating factors – statutory and non-statutory – and mitigating factors to channel its discretion and provide for an "individualized determination on the basis of the character of the individual and circumstances of the crime," before weighing aggravators and mitigators to arrive at a final decision. *See United States v. Taylor*, Case No. 04-CR-160, 2008 WL 217115, at *8 (E.D. Tenn. Jan. 24, 2008) (citing *United States v. Cooper*, 91 F. Supp.2d 90, 97 (D.D.C. 2000) (referencing *Zant*, 462 U.S. at 878)); *accord United States v. Sampson*, 486 F.3d 13, 24 (1st Cir. 2007); *United States v. Fields*, 516 F.3d 923, 945-46 (10th Cir. 2008).

In short, the FDPA complies with Supreme Court mandates concerning the death penalty decision-making process.  The Second Circuit has recognized this, holding in *Fell* that the FDPA "standard permits the jury to have before it all possible relevant information about the individual

defendant whose fate it must determine . . . as a result, the FDPA does not undermine

'heightened reliability,' it promotes it."  360 F.3d at 144 (citing *Jurek v. Texas*, 428 U.S. 262,

276 (1976)).  A multitude of other federal courts agree, specifically rejecting challenges similar

or identical to those at bar.  *See United States v. Caro*, 567 F.3d 608, 622-23 (4th Cir. 2010)

(outlining "safeguards" established by the FDPA to meet Supreme Court standards); *Fields*, 516

F.3d at 945-46 ("In reality, statutory factors narrow the class of defendants eligible for the death

penalty") (internal quotations omitted); *Sampson*, 486 F.3d at 23-24 (holding "the FDPA fully

meets the requirements of guided discretion" and federal death penalty protocol "is not

arbitrary"); *United States v. Barrett*, 496 F.3d 1079, 1110 (10th Cir. 2007) (identical procedures

under the Anti-Drug Abuse Act "clearly narrow[] the class of persons eligible for the death

penalty"); *Duncan*, 2008 WL 711603 at *2; *Taylor*, 2008 WL 217115 at *8; *United States v.

O'Reilly*, 545 F. Supp. 2d 630, 2008 WL 284003, at *2 (E.D. Mich. 2008); *Talik*, 2007 WL

4570704 at *2; *Diaz*, 2007 WL 656831 at *9; *United States v. Sablan*, Case No. 00-CR-531,

2006 WL 1028780, at *3 (D. Colo. Apr. 18, 2006), *United States v. Le*, 327 F. Supp.2d 601, 608-

09 (E.D. Va. 2004), *United States v. Llera Plaza*, 179 F. Supp. 2d 444, 451-52 (E.D. Pa. 2001).

Jacques fares no better citing statistics purporting to establish that the death penalty is

rarely sought and obtained in federal court.[1]  This angle of attack, like selective reliance on

*Furman*, has been rejected time and again, from the highest to the lowest levels of the federal

judiciary.  *Gregg*, 428 U.S. at 199 ("The existence of these discretionary stages [of prosecution

of capital case] is not determinative of the issues before us"); *McCleskey*, 481 U.S. at 307 n. 28.

---

[1]  Jacques does not assert that the government's decision to seek the death penalty in this
case is motivated by any improper consideration or motive.

("[t]he Constitution is not offended by inconsistency in results based on the objective circumstances of the crime"); *Sampson*, 486 F.3d at 23-24 ("Nor does the frequency with which the federal death penalty is sought render the FDPA unconstitutional"); *United States v. Mitchell*, 502 F.3d 931, 983 (9th Cir. 2007) ("That federal executions are rare, however, does not render the FDPA unconstitutional"); *United States v. Barnes*, 532 F. Supp.2d 625, 633 (S.D.N.Y. 2008) (bifurcated eligibility and selection decisions comply with *Gregg*; it is not for district court to overturn constitutional act of Congress even if court believes federal death penalty is arbitrary); *United States v. Hammer*, 25 F. Supp. 2d 518, 546-47 (M.D. Pa. 1998) ("The mere fact that the government has only sought the death penalty in a de minimus number of murder cases involving federal inmates is not sufficient to demonstrate that the prosecution of [the defendant] is arbitrary and capricious.  More is required"); *United States v. O'Driscoll*, 203 F. Supp.2d 334, 341 (M.D. Pa. 2002) (rejecting defendant's argument that because of the low number of capital prosecutions, the government's pursuit of the death penalty is arbitrary and capricious); *Sablan*, 2006 WL 1028780, at *11("I find that the FDPA, by requiring the weighing of aggravating and mitigating factors, provides clear and objective standards sufficient to guide the discretion of the jury in capital cases and meets the constitutional requirements set forth in *Furman*, and the fact that the federal death penalty is infrequently sought and imposed does not render it unconstitutional");*Taylor*, 2008 WL 217115, at *4 (defendant did not overcome burden against reasonable inference advanced by government that low number of federal capital defendants reflects careful government selection process).

Accordingly, the defendant's claim that the paucity of FDPA prosecutions and executions makes the statute unconstitutionally arbitrary and capricious should be rejected.

### 2. The FDPA Does Not Lack a Principled Basis for Distinguishing Cases in Which the Death Penalty Is Sought From Those in Which It Is Not.

Jacques claims that the FDPA is unconstitutional because he cannot discern a principled basis for distinguishing between cases where death is imposed and cases where it is not. Motion at 33-41. This argument suffers from the same flaw as his challenge to the rarity of the federal death penalty: discrepancies in outcome do not point up a constitutional defect in a death penalty statute, provided the law appropriately channels and guides the discretion of the sentencing body.

In support of his claim, Jacques relies on selective quotation of two Supreme Court cases, *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982), and *Kennedy v. Louisiana*, 128 S.Ct. 2642, 2650 (2008), and on more than four pages of summaries of federal cases in which the death penalty could have been, and in some cases was, imposed. However, he cites no case that specifically adopts or endorses his viewpoint. This is undoubtedly because the Supreme Court and other federal courts have, over and over, rejected identical arguments made by other capital defendants. *See, e.g.*, *McClesky*, 481 U.S. at 306-07 (defendant cannot prove a constitutional violation by demonstrating that other similarly situated defendants did or did not receive the death penalty); *Sampson*, 486 F.3d at 24-25 (holding that case summaries are "wholly inadequate to prove that the death penalty has been imposed in an arbitrary manner" because they are "devoid of details and fail to account for the objective circumstances of the underlying crimes"); *Barnes*, 532 F. Supp. 2d at 633-34 (holding that arguments premised upon case summaries are "not supported by the case law"); *Taylor*, 2008 WL 217115, at *4-5 (holding defendant has not shown that the FDPA violates the constitutional requirement of fair and consistent sentencing proceedings); *United States v. Solomon*, Case No. 05-CR-385, 2007 WL 1468794, at *2 (W.D.

Pa. May 14, 2007) (refusing to find Eighth Amendment violation where case law does not support defendant's view); *United States v. James*, Case No. 02-CV-0778(SJ), 2007 WL 914249, at *5 (E.D.N.Y. Mar. 24, 2007) (finding FDPA provides a principled basis for seeking the death penalty).

The quotations grafted from *Eddings*, 455 U.S. at 112 ("that capital punishment be imposed fairly, and with reasonable consistency, or not at all"), and *Kennedy*, 128 S.Ct. at 2650 ("When the law punishes by death, it risks its own sudden descent into brutality, transgressing the constitutional commitment to decency and restraint"; "[C]apital punishment must 'be limited to those offenders who commit "a narrow category of the most serious crimes" and whose extreme culpability makes them 'the most deserving of execution'"), are the only legal support the defendant offers.  Motion at 33-34.  The *Kennedy* language does nothing to advance his position; it merely states in different terms the central tenet of the Supreme Court's death penalty jurisprudence: that capital punishment statutes must narrow the class of eligible offenders and permit an individualized determination of each defendants' culpability.

The *Eddings* quotation is taken out of context.  In *Eddings*, the Supreme Court reversed a state death sentence of a 16-year-old defendant because the trial court refused to consider as a mitigating circumstance the defendant's unhappy upbringing and emotional disturbance, including evidence of turbulent family history and beatings by a harsh father.  *See Eddings*, 455 U.S. at 113.   In *Sampson*, the First Circuit ruled on a claim identical to the one Jacques makes here, and specifically explained why the quoted language of *Eddings* should not be used to support the defendant's argument.  It stated that such reliance on *Eddings*:

[I]gnores the remainder of the *Eddings* Court's discussion of consistency, in which the

> Court recognized that "a consistency produced by ignoring individual differences is a false consistency." Indeed, the thrust of *Eddings* is that those who make sentencing decisions must be permitted to focus on the individual characteristics of the defendant and the circumstances of the crime. And, finally, the argument cannot survive *McCleskey*, in which the Court stated that "the Constitution is not offended by inconsistency in results based on the objective circumstances of the crime. Numerous legitimate factors may influence . . . a defendant's ultimate sentence, even though they may be irrelevant to his actual guilt.

486 F.3d at 24-25 (internal citations omitted); *see also Taylor*, 2008 WL 217115, at *4

(analogizing defendant's reliance on *Eddings* to his misguided reliance on *Furman* in support of

arbitrariness challenge to FDPA; holding defendant did not establish FDPA had unfair or

inconsistent procedures, and his "emphas[is] on the effect of the FDPA" was an "unavailing

argument"). Accordingly, the defendant's reliance on *Eddings* is unpersuasive and should be

disregarded by the Court.

More importantly, the conclusion Jacques draws from FDPA case summaries is wrong.

The FDPA *does* provide a principled process for determining when the death penalty should be

imposed – one that affords exactly the discretionary sentencing endorsed by *McCleskey. See* 408

U.S. at 306-07. There are opportunities at each junction of the eligibility and selection procedure

for the sentencing body to exercise discretion favoring the defendant. Thus, unlike the process in

*Eddings*, the FDPA mandates consideration of *any* mitigating factor found by *any* single juror by

a preponderance of the evidence. § 3593 (c) - (e). In sum, the statute prescribes a reasoned

framework to guide the sentencing body in making eligibility and selection decisions.

The defendant's attempt to show arbitrariness or capriciousness by presenting varying

outcomes of other federal death penalty prosecutions should fail.

14

3.  The FDPA Does Not Permit the Government to Seek the Death Penalty on the Bases of Race or Geography.

Jacques claims that the FDPA is unconstitutional because the federal death penalty is sought and imposed on the arbitrary and capricious bases of geography and race.  He appears to bring this claim under both the Fifth and Eighth Amendments.  Motion at 54.  He cites no case law supporting his conclusion, instead cobbling together quotes from various cases that do not support his conclusion, in an attempt to support his preferred narrative.  He also cites to a statistical survey completed by the DOJ in 2000 (the "DOJ Report"), and various Congressional reports, law review articles, and studies  *Id*.

Regardless how one views these studies and surveys,[2] Jacques does not meet the burden established by the Supreme Court in *McCleskey* to support his race-based or geography-based Fifth and Eighth Amendment claims.  Indeed, his argument proceeds as though the *McClesky* decision did not exist.  Jacques proffers the exact reasoning that has been rejected time and again by the federal courts in response to similar, if not identical, claims.  *See, e.g.*, *Sampson*, 486 F.3d at 26-27; *Barnes*, 532 F. Supp. 2d at 635-36; *Taylor*, 2008 WL 217115, at *5-6; *Sablan*, 2006 WL 1028780, at *12; *Llera Plaza*, 179 F. Supp. 2d at 456; *United States v. Edelin*, 134 F. Supp. 2d 59, 89 (D.D.C. 2001).

a.  The Race-Based Fifth Amendment Claim Must Fail

To prevail on a Fifth Amendment claim, a defendant must show that the decision makers *in his case* acted with "discriminatory purpose" and that this purposeful discrimination had a "discriminatory effect" on him.  *See McCleskey*, 481 U.S. at 292.  To demonstrate

---

[2]  The government does not concede that the cited secondary sources support a claim of racial discrimination in the administration of the FDPA.

"discriminatory purpose," the defendant must show that the decision to seek the death penalty against him was motivated at least partially based on race. *See id*. at 298 ("It implies that the decision maker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group.").  To establish "discriminatory effect," the defendant must show that the government did not seek the death penalty against similarly situated individuals of a different race. *See United States v. Armstrong*, 517 U.S. 456, 465 (1996).  What's more, the defendant must satisfy these requirements with "evidence specific to [their] own case." *McCleskey*, 481 U.S. at 292.

In *McCleskey*, the defendant argued that a statistical study (the "Baldus Study"), which showed that Georgia imposed the death penalty with greater frequency on black defendants and killers of white victims, proved that the decision makers in his case acted with discriminatory purpose.  The Supreme Court rejected this assertion, deeming statistical studies "clearly insufficient to support an inference that any of the decision makers in McCleskey's case acted with discriminatory purpose." *Id*. at 297.  The *McCleskey* Court further recognized a risk of racial bias influencing decision making in criminal cases, but found that the risk did not rise to the level of being "constitutionally unacceptable." *Id*. at 308-09.  The Court discussed the many safeguards designed to minimize racial bias in the process and concluded "[a]t most, the Baldus study indicates a discrepancy that appears to correlate with race.  Apparent disparities in sentencing are an inevitable part of our criminal justice system." *Id*. at 309-13.

Jacques, a Caucasian male, does not assert that decision makers in *this* case acted with purposeful discrimination, nor could he.  Nor does his massive reliance on statistical surveys and articles show that decision makers in *this* case acted with purposeful discrimination.  It is well-

16

settled that bare statistical discrepancies such as he cites are insufficient to prove a Fifth Amendment violation with respect to the implementation of the FDPA. *Id.* at 308 ("Statistics at most may show only a likelihood that a particular factor entered into some decisions"); *see also Sampson*, 486 F.3d at 26 (rejecting identical challenge to the FDPA based on the DOJ Report); *Taylor*, 2008 WL 217115, at *6 (also rejecting identical challenge to the FDPA based on the DOJ Report); *Barnes*, 532 F. Supp.2d at 634 (also rejecting identical challenge to the FDPA based on the DOJ Report, holding defendants "cannot establish an equal protection violation using the statistics from the DOJ Report"); *Mitchell*, 502 F.3d at 982 (same conclusion); *United States v. Bin Laden*, 126 F. Supp.2d 256, 260-62 (S.D.N.Y. 2000) (same conclusion).

The government followed a formal protocol in this case, as in all federal death-penalty cases, specifically designed to promote fairness and uniformity in the application of the federal death penalty and to protect against risks of racial discrimination. Under this protocol, contained in the United States Attorneys' Manual at § 9-10.000, the government gives careful consideration whether to seek the death penalty in cases involving potential capital prosecution. The decision to seek the death penalty is subjected to several levels of review, from the charging U.S. Attorney all the way up to the Attorney General. The protocol prohibits bias based on characteristics such as race or ethnic origin and most decision-makers involved in the protocol are unaware of the defendant's race. The district court in *Taylor* outlined this protocol in concluding that the defendant "ha[d] made no attempt to show there was a discriminatory reason" to prosecute the defendant in a capital case. *Taylor*, 2008 WL 217115, at *6.

Accordingly, to the extent Jacques makes a race-based Fifth Amendment claim that the FDPA is unconstitutional, it should be rejected.

b.  The Race-Based Eighth Amendment Claim Must Fail.

To prevail on an Eighth Amendment claim, the defendant's burden is at least as great, if not greater, than that required for a Fifth Amendment equal protection claim.  *See McCleskey*, 481 U.S. at 306-15.  He must show an express "invidious" intention underlying the imposition of the death penalty.  *See id*. at 312-13, 319.  In rejecting an Eighth Amendment claim based on a statistical study indicating race-based discrepancies in capital sentencing, the *McCleskey* Court stated:

> Apparent disparities in sentencing are an inevitable part of our criminal justice system . . . . [O]ur consistent rule has been that constitutional guarantees are met when "the mode for [determining guilt or punishment] itself has been surrounded with safeguards to make it as fair as possible."  Where the discretion that is fundamental to our criminal process is involved, we decline to assume that what is unexplained is invidious.

*Id*. at 312-13 (second alteration in original) (citation omitted) (quoting *Singer v. United States*, 380 U.S. 24, 35 (1965)).

Under *McCleskey*, statistics showing that defendants of different races did not receive the death penalty do not tend to show an Eighth Amendment violation.  *Id*. at 306-07, 312-13.  The statistics submitted by Jacques are no more probative than those rejected in *McCleskey*.  *See Sampson*, 486 F.3d at 26 (rejecting an identical Eighth Amendment claim based upon statistics from the DOJ Report).  The DOJ Report provides no basis for attributing statistical racial discrepancies in FDPA prosecutions to discrimination, rather than to other factors, such as differences in the nature of the crimes involved.  *McCleskey* prohibits this Court from assuming that "what is unexplained is invidious."  481 U.S. at 313; *see also United States v. Edelin*, 134 F. Supp. 2d at 89 (reaching same conclusion to Eighth Amendment challenge).  Accordingly, to the

extent the Defendant makes a race-based Eighth Amendment claim, it should fail.

### c.  The Geography-Based Claim Must Fail.

The same standard of purposeful discrimination governs the geography-based claim.  The gist of this version of the arbitrary and capriciousness theme is that "the federal death penalty . . . continues to be a Southern phenomena and federal districts from the South predictably lead the charge . . . ."  Motion at 49.  Jacques submits no evidence specific to *this* case (in the District of Vermont) showing that similarly situated defendants in other jurisdictions have not been capitally charged.  Moreover, he provides the Court no basis to conclude that capital charging approval rates should be uniform across federal districts, in light of the probability that criminal conduct differs across districts.  *Barnes*, 532 F. Supp.2d at 636.  Finally, as with the race-based claims discussed above, the DOJ Report provides no basis for attributing the statistical discrepancies with respect to geography in FDPA prosecutions to discrimination rather than to other factors, such as differences in the nature of the crimes involved or the background of the offenders. *Sampson*, 486 F.3d at 25-26.

To the extent Jacques makes a geography-based claim for the unconstitutionality of the FDPA, the Court should reject it.

In the final analysis, the claim that the FDPA operates arbitrarily and capriciously, because the death penalty is sought and imposed unevenly, implies that capital punishment can be constitutional only if it is applied with superficial consistency, *Eddings*, 455 U.S. at 112, to all eligible defendants or none of them.  The *McClesky* Court recognized that such claims – whether race-based, geographically-based, statistically-based, or cloaked in some other guise – could be applied to every manner of criminal penalty, and "taken to [their] logical conclusion, throw[] into

serious question the principles that underlie our entire criminal justice system."  481 U.S. at 314-

15.   The practical impossibility of accepting the defendant's position underscores its untenable

legal footing.

> B.  THE FDPA IS CONSTITUTIONAL UNDER *RING* BECAUSE IT DOES NOT
> PRECLUDE A GRAND JURY FROM FINDING STATUTORY AGGRAVATING
> FACTORS AND REQUIRES THE GOVERNMENT TO PROVE THESE FACTORS
> BEYOND A REASONABLE DOUBT.

Jacques mounts a plethora of challenges to the FDPA based upon *Ring v. Arizona*, 536

U.S. 584 (2002).  In *Ring*, the Supreme Court held that, under the Sixth Amendment, the facts

that render a defendant eligible for a death sentence – under the FDPA, the requisite state of

mind factors under 18 U.S.C. § 3591(a)(2) and at least one statutory aggravating factor under 18

U.S.C. § 3592(c) (collectively "eligibility factors") – are the functional equivalents of elements

of the offense and must be found beyond a reasonable doubt by a jury.  536 U.S. at 601-09.

While the Supreme Court has not yet explicitly ruled on the issue, lower courts have held

that, following *Ring*, the eligibility factors must be presented to a grand jury and charged in an

indictment pursuant to the Fifth Amendment.  *See*, *e.g.*, *United States v. Fell*, 531 F.3d 197, 237

(2d Cir. 2008) ("*Fell II*"); *United States v. Higgs*, 353 F.3d 281, 298 (4th Cir. 2003); *Sampson*,

486 F.3d at 21; *United States v. Brown*, 441 F.3d 1330, 1367 (11th Cir. 2006); *United States v.*

*Allen*, 406 F.3d 940, 942-43 (8th Cir. 2005) (*en banc*); *United States v. Robinson*, 367 F.3d 278,

284 (5th Cir. 2004).

As set forth below, the defendant's claims under *Ring* are foreclosed by Supreme Court

precedent and decisions from the circuit courts of appeals, which have upheld the FDPA and

rejected similar or identical challenges.  Indeed, *this* Court has considered and rejected the *Ring*

argument, as Jacques is forced to acknowledge.  Motion at 65 n.39 ("An earlier version of this argument was apparently rejected by this Court in *United States v. Fell*, 217 F. Supp. 2d 469, 483-84 (D. Vt. 2002)").  There is no basis for a contrary ruling in this case.

> 1.  The FDPA Allows the Government to Present Eligibility Factors to a Grand Jury and Legislative Re-Drafting of the Statute Is Not Necessary.

Jacques argues that there is a conflict between the FDPA and *Ring* – namely, that the statute requires prosecutors, not grand juries, to allege death penalty eligibility factors, and that curing the problem would require impermissible legislative redrafting of the statute by executive and judicial branches.  This Court's prior decision rejecting this claim is no outlier, *Fell*, 217 F. Supp. 2d at 483-84; it joins the various courts of appeals that have considered the defendant's thesis and have uniformly rejected it.  *Sampson*, 486 F.3d at 21; *Brown*, 441 F.3d at 1367; *Allen*, 406 F.3d at 949; *United States v. Barnette*, 390 F.3d 775, 788-90 (4th Cir. 2004), *vacated on other grounds*, 546 U.S. 803 (2005); *Robinson*, 367 F.3d at 290.  The defendant acknowledges this.  Motion at 87 ("Courts of Appeals have considered the issue herein and have concluded that there is no constitutional or statutory impediment to presenting FDPA's aggravating factors to a grand jury in order to avoid unconstitutionality under *Ring* . . .").

> a.  The FDPA Does Not Preclude the Government from Presenting Eligibility Factors to a Grand Jury.

Assuming that *Ring* requires a Grand Jury indictment as to eligibility factors, the flaw in the defendant's reasoning is the "assumption that the FDPA *precludes* the grand jury from charging aggravating factors in the indictment."  *Barnette*, 390 F.3d at 789 (emphasis added).  No provision of the FDPA prohibits a grand jury from considering eligibility factors and, on the flip-side, no provision grants the prosecutor exclusive authority to determine the likely existence

of eligibility factors.[3]  The statute is silent with respect to the function of the grand jury.[4]  Thus,

the statute is not rendered facially unconstitutional by *Ring*.  *Sampson*, 486 F.3d at 21 (holding

that there is no irredeemable conflict between the FDPA and *Ring*); *Barnette*, 390 F.3d at 789 (no

language in the statute "restricts the government from submitting aggravating factors to the grand

jury"); *Allen*, 406 F.3d at 949; *Brown*, 441 F.3d at 1367 (there is nothing in the FDPA that

inhibits prosecutors from charging aggravating factors in an indictment and submitting same to

the grand jury); *United States v. LeCroy*, 441 F.3d 914, 921 (11th Cir. 2006) ("nothing in the

[FDPA] forbids, or is inconsistent with, prosecutors taking the additional step of including the

statutory aggravating factors in the indictment); *Fell*, 217 F. Supp. 2d at 484 ("That the FDPA is

silent concerning the grand jury's role in charging death-eligibility factors does not suggest that

Congress intended to forbid grand jury participation or to exclude these factors from an

indictment.  On the contrary, Congress has provided for the grand jury's involvement in charging

federal capital offenses in Rule 7 of the Federal Rules of Criminal Procedure").

> b.  *Ring* Does Not Compel Congressional Redrafting of the FDPA.

Next, and relatedly, Jacques argues that the application of *Ring* to the FDPA requires

impermissible judicial or executive redrafting of the statute.  Again, the courts have routinely

---

[3] While the FDPA does explicitly require the prosecutor to file a Notice of Intent to Seek the Death Penalty, which must include the eligibility factors the prosecutor intends to pursue, this Notice requirement is separate from a constitutional requirement to present the eligibility factors in the indictment.  Nothing in the sections covering the Notice requirement prevents the prosecutor from also presenting the eligibility factors to a grand jury.

[4] The Fourth Circuit has noted that the legislative history of the FDPA does not indicate an intent to restrict the government from presenting the eligibility factors to a grand jury. *Barnette*, 390 F.3d at 789.  Thus, the defendant's arguments that Congress intended the eligibility factors to be sentencing determination rather than elements of the offense are unpersuasive.

rejected his claim.  *See Sampson*, 486 F.3d at 21-22; *Barnette*, 390 F.3d at 789 (rejecting

argument that *Ring* and FDPA are in conflict); *LeCroy*, 441 F.3d at 921 (same); *Diaz*, No. Cr 05-

167, 2007 WL 656831, at *5 (expressly following the other courts that have held that *Ring* does

not require rewriting of the FDPA); *United States v. Rodriguez*, 380 F. Supp. 2d 1041, 1047

(D.N.D. 2005) (*Ring* does not require that any provision of the FDPA be rewritten); *United*

*States v. Williams*, No. CR 06-79, 2007 WL 2916123, at *7 (D. Haw. Oct. 2, 2007) (rejecting

argument that FDPA must be rewritten by Congress in light of *Ring*).

Application of *Ring* is a matter of procedure, not of substantive definition regarding

death-penalty eligibility.  *Sampson*, 486 F.3d at 21.  The Supreme Court set the groundwork for

this conclusion in *Jones*, 526 U.S. at 243 & n.6, a precursor to *Apprendi* and *Ring*.  The *Jones*

Court explained that "[t]he constitutional guarantees that g[a]ve rise to [its] concern [regarding

the need for the jury to find sentencing enhancements beyond a reasonable doubt] in no way

restrict the ability of legislatures to identify the conduct they wish to characterize as criminal or

to define the facts whose proof is essential to the establishment of criminal liability."  *Id.*

To comply with *Ring*, the Department of Justice has enacted a policy for all federal

prosecutors to present the eligibility factors in death penalty cases to a grand jury and charge the

eligibility factors in the indictment.  The government followed these procedures in this case.

These recognized mechanisms for complying with *Ring* do not amount to unconstitutional

redrafting of the FDPA because *Ring* set forth a procedural rule, not a substantive one.  *Schriro v.*

*Summerlin*, 542 U.S. 348, 358 (2004); *Sampson*, 486 F.3d at 21-22 (citing decisions from the 5th,

10th, 8th, 9th, 11th, 1st, and 4th circuits holding that *Ring* is a matter of procedure).  It follows, then,

that the rule against massive judicial rewriting of statutes simply is not implicated here.  As

courts have held across the board, adhering to a longstanding rule of criminal procedure, *i.e.,* grand jury presentment and indictment, when applying the FDPA does not constitute statutory redrafting.

> 2.  The Supreme Court's Decision in *Jackson* is Distinguishable.

In an effort to avoid the overwhelming authority on this issue, Jacques turns to *United States v. Jackson*, 390 U.S. 570 (1968), for support, as have other capital defendants. *Jackson,* however, provides him no reinforcement, because it is wholly inapposite to cases involving the FDPA – as courts have consistently pointed out.  The *Jackson* Court invalidated a provision of the Federal Kidnaping Act, under which only a jury could impose a death sentence.  *Id*. at 572. The defendant argued that the statute effectively violated the his right to a jury trial by encouraging a guilty plea or waiver of right to jury trial to avoid a death sentence.  *Id*. at 572-73. The Court rejected the government's proposal that the statute could be saved by adopting procedures for a "special jury" that would determine whether death was warranted.  *Id*. at 580. The Court held the statute could not be saved by creating "from whole cloth a complex and completely novel procedure."  *Id*.

Here, however, the processes used to comply with *Ring* – presentation to the grand jury of eligibility factors – are neither created from whole cloth, nor novel, nor complex.  Far from novel, the grand jury's role in the criminal justice system to find and charge the elements of a criminal offense is enshrined in the Fifth Amendment to the Constitution ("[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on presentment or indictment of a Grand Jury"), and well-recognized in the common law and statutory law.  There is nothing new or complicated, then, about presenting elements of an offense to a grand jury.  This is the

24

procedure followed in every felony case.  The FDPA explicitly prescribes the other mechanism for complying with *Ring* – proof to a jury beyond a reasonable doubt of facts that increase the sentence beyond the statutory maximum.  *See* 18 U.S.C. §§ 3591(a)(2) & 3593(c).  Therefore, *Jackson* is inapposite.  *See Sampson*, 486 F.3d at 22 (rejecting defendant's reliance on *Jackson* in challenging the FDPA); *Le*, 327 F. Supp. 2d at 610 (rejecting defendant's argument that government's new grand jury practice was improperly created "out of whole cloth").[5]

> 3. *Booker* also Provides No Support**.**

The defendant's use of *United States v. Booker*, 543 U.S. 220 (2005), is also unavailing. In *Booker*, the Court refused to revise the federal sentencing guidelines to create a set of procedures for presenting facts necessary for sentence enhancements to a jury, instead of a judge. 543 U.S. at 246.  Instead, the Court severed from the guidelines the provision making mandatory the effect of sentencing factors not found by a jury.  *Id*. at 245.  To do otherwise, it held, "would [have] so transform[ed] the scheme that Congress created that Congress likely would not have intended the Act as so modified to stand."  *Id*. at 249.

By contrast, grand jury presentment and indictment does not transform the FDPA's scheme or contravene Congress's intentions in enacting the statute.  The *Sampson* court spelled this out in rejecting a *Booker* challenge to the FDPA identical to the one made here.  The *Sampson* court stated:

---

[5] The defendant's citation to *Blount v. Rizzi*, 400 U.S. 410, 419 (1971), is misplaced for the same reason.  In that case, the Court refused to make a substantive change to the statute, namely to eliminate its provision requiring the Postmaster General to determine whether material was obscene.  Grand jury presentment of elements of an FDPA offense to the grand jury entails no such substantive revision of the statute.  *See Sampson*, 486 F.3d at 22 (deeming *Blount* inapposite).

> The statute in question in [] *Booker*, like the statute in *Jackson*, w[as] incompatible with constitutional requirements. *See id*. at 227-29. Saving [the] statute, as proposed by the government, while at the same time complying with constitutional mandates, would have required the Court to perform a complete statutory rewrite, which is a legislative and not a judicial function. In contrast, allowing a grand jury to consider and charge aggravating factors under the FDPA does not have any effect either on the substantive aspects of the statute or on the discrete roles that the statute assigns to the judge, the prosecutor, and the jury respectively.

486 F.3d at 23; *see also Barnette*, 390 F.3d at 789 (holding that the legislative history of the FDPA does not indicate an intent to restrict the government from presenting eligibility factors to the grand jury). This Court should adopt the sound reasoning of *Sampson* and reject the defendant's *Booker* argument.

       4.   The FDPA Does Not Unconstitutionally Delegate Legislative Power to Define Aggravating Factors to the Executive Branch.

As a corollary to his *Ring* arguments, Jacques claims that the FDPA violates the non-delegation doctrine of Article I of the Constitution by authorizing federal prosecutors to "substitute new procedures and elements for those originally provided by Congress." Motion at 85. Although it is not clear from his papers, it would seem that "new procedures" is a reference to grand jury presentment of eligibility factors. As outlined above, this procedure is venerable, not "new," and involves no exercise of legislative power by the Executive. Again, although the defendant does not explain what "new elements" he takes issue with, the government will assume he is referring to non-statutory aggravating factors. This claim is also foreclosed by opinions of the federal courts of appeals, as set forth below.

       a.   The Non-Delegation Doctrine

The Tenth Circuit recently summarized the relevant law of the non-delegation doctrine in

*Barrett*:

> The non-delegation doctrine arises from the constitutional principle of separation of powers, specially Article I, § 1, which provides that 'all legislative Powers herein granted shall be vested in a Congress of the United States.'" *United States v. Jones*, 132 F.3d 232, 239 (5th Cir. 1998) (citing *Touby v. United States*, 500 U.S. 160, 165 (1991), and *United States v. Mistretta*, 488 U.S. 361, 371 (1989). "Under the non-delegation doctrine, Congress may not constitutionally delegate its legislative power to another branch of government." *Id*. (citing *Mistretta*, 488 U.S. at 372). "Congress, however, may seek assistance, within limits, from coordinate branches of government." *Id*. "So long as Congress formulates 'an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform, such legislative action is not a forbidden delegation of legislative power.'" *Id*. (quoting *Mistretta*, 488 U.S. at 372).

496 F.3d at 1108.

> b.  The FDPA Does Not Delegate a Legislative Function.

First, the FDPA does not delegate a legislative function to the prosecutor. *Higgs*, 353 F.3d at 321.  The prosecutor's discretion in defining what is a death-eligible offense is wholly circumscribed by the statute's requirement that the jury unanimously find at least one intent factor and one statutory aggravating factor before the defendant becomes eligible for the death penalty. *Id*. Only after the prosecutor selects and proves those critical, legislatively-defined eligibility factors may he argue that additional, non-statutory aggravators combine with the statutory aggravators to outweigh any mitigating factors that have been submitted for consideration. *Id*. The non-statutory aggravators, which the prosecutor may define, merely assist the jury in its task of determining whether a death-eligible defendant should indeed receive the maximum sentence, and must be found by the jury beyond a reasonable doubt. *See id*.; *United States v. Jones*, 132 F.3d 232, 239-40 (5th Cir. 1998) (holding that government's authority to define non-statutory aggravating factors is not an unconstitutional delegation); *Barrett*, 496 F.3d

at 1108; *Mitchell*, 502 F.2d at 978.

The defendant cites only *Mistretta v. United States*, 488 U.S. 361 (1989), in support of his argument. This is puzzling because *Mistretta* upheld a delegation of congressional power to the United States Sentencing Commission. *Mistretta* militates against the defendant's non-delegation argument.

The Court should follow the circuit courts of appeals and hold that the FDPA does not delegate a legislative function to the prosecutor by allowing the prosecutor to define and select non-statutory aggravating factors.

> c. If there is a Delegation of Legislative Function, it is Properly Guided by Intelligible Principles.

To the extent that the discretion vested in prosecutors by the FDPA to define and pursue non-statutory aggravating factors could be viewed as a delegation of legislative power, such delegation is constitutionally permissible. *Higgs*, 353 F.3d at 321. Any delegation involved is sufficiently circumscribed by intelligible principles to avoid violating separation of powers. *See Higgs*, 353 F.3d at 322; *Mitchell*, 502 F.3d at 979. Limitations on the prosecutor's power include: (1) the defendant must be given notice of the factor(s), §§ 3592(c) and 3593(a); (2) constitutional limitations on the use of aggravating factors established by the Supreme Court; (3) judicial review by the district court of the relevance, reliability, and constitutionality of proposed non-statutory factors; and (4) the requirement that the jury must find the eligibility factors beyond a reasonable doubt before it may consider the non-statutory aggravating factors. *See Mitchell*, 502 F.3d at 979 (citing *Jones*, 132 F.3d at 239-40); *see also Taylor*, 2008 WL 217115, at *9 ("The statutory list of aggravating and mitigating factors focuses on circumstances of the crime

and the character of the offender, including his past criminal history, his capacity and relative

culpability in the offense.  Proposed non-statutory aggravating factors should be consistent with

the type and severity of the statutory factors").

Accordingly, if it is in fact a delegation of legislative power, the prosecutor's authority to

define non-statutory aggravating factors is a constitutional delegation of power.  *See Higgs*, 353

F.3d at 321; *see also Barrett*, 496 F.3d at 1108 (holding in response to a challenge to analogous

provisions of the Anti-Drug Abuse Act that "prosecutorial discretion to promulgate non-statutory

aggravating factors falls squarely within the permissible delegation of power to the Executive

branch").

For either of the reasons stated, the Court should reject the defendant's non-delegation

doctrine claim.

> 5.  There is No Constitutional Error in Alleging Eligibility Factors in a Special
> Findings Section of an Indictment.

Jacques takes issue with the Indictment's "Notice of Special Findings," alleging FDPA

eligibility factors.  He argues that "nothing in the text of [Rule 7 of the Federal Rules of Criminal

Procedure] and nothing in the Indictment Clause of the Fifth Amendment[] contemplates or

permits a grand jury to make 'Special Findings' that serve the function of the triggering

requirements of the FDPA that are now invalid in light of *Ring* . . . .  the principles established in

*Jackson* continue to apply and the statute remains controlling and dispositive."  Motion at 86.

This argument is unsupported, and amounts to a repackaging of the above *Ring* and *Jackson*

claims.  The new guise does not change the result.  This Court has approved Special Findings as

a vehicle to allege aggravating factors under the FDPA.  *See Fell*, 217 F. Supp. 2d at 484

(Indictment with section called "Special Findings" alleging threshold culpability and statutory aggravating factors under the FDPA did not "offend the Indictment Clause, and . . . perform[ed] its function of providing notice to Fell of every element of the capital offenses with which he is charged.")

It is not alone.  Other courts have rejected challenges to the grand jury's "Special Findings" in FDPA cases, while noting the irony of the defendant's choice of battle.  *See, e.g., Sablan*, 2006 WL 1028780, at *3 (observing that the defendant's argument that the grand jury is without authority to render special findings was inconsistent with his prior assertions that facts relative to death eligibility must be charged in the indictment).

In any event, the term "Special Findings" is nothing more than a convention used to alert all parties to the grand jury's findings as to aggravating factors.  It does not alter the underlying constitutional process, nor should it change the substantive constitutional analysis or result.  To invalidate the indictment based on a stylistic choice would surely elevate form over substance. The Court should reject the defendant's challenge to the "Special Findings" terminology.

6.  The Defendant's Criticism of Courts of Appeals Decisions Falls Flat.

The defendant's attempt to maneuver around the behemoth of adverse circuit court precedent concerning *Ring* and the FDPA is unavailing.  He argues, with respect to these decisions – and by extension this Court's opinion in *Fell* – that:

> each has been  fatally flawed for two principal reasons: (1) the decisions all fail to address *Jackson*, and/or to distinguish its clearly applicable holding and principles; and (2) the decisions ignore the plain language of the FDPA with respect to whether the grand jury is authorized to allege aggravating factors.

Motion at 87.

30

The first point is odd, insofar as the First Circuit in *Sampson* dealt squarely with the implications of *Jackson*, and the defendant concedes this, as he must, no more than a page later. Motion at 88.  The government has already excerpted the sound reasoning of the *Sampson* court; the Court should adhere to it.

The second point is equally peculiar.  The mountain of case law undercutting the defendant's reliance upon *Ring* explicitly addresses the plain language of the FDPA.  *See, e.g., Barnette*, 390 F.3d at 789 ("A review of the statute itself reveals no language that restricts the government from submitting aggravating factors to the grand jury").

In the final analysis, Jacques simply disagrees with the uniform conclusion of multiple federal courts concerning the application of *Jackson* to the FDPA.  He insists – the weight of authority notwithstanding – that the absence of express language in the FDPA instructing prosecutors to present aggravating factors to the grand jury, precludes them from doing so.  The practical implications of this view underscore its unfoundedness.  Prosecutors routinely present the elements of the FDPA and other crimes to grand juries in order to obtain indictments that comport with the Fifth Amendment, but criminal statutes "seldom expressly provide for submitting elements of an offense to a grand jury." *LeCroy*, 441 F.3d at 921.  Once again, the defendant's reasoning, taken to its logical endpoint, would grind the wheels of the criminal justice system to a halt.[6]

## C.  THE INDICTMENT COMPLIES WITH THE FIFTH AMENDMENT.

Jacques claims that the Indictment is constitutionality inadequate under the Fifth

---

[6] Because the government does presently rely on post-*Apprendi* drug quantity cases, severability analysis, or the doctrine of "constitutional avoidance," it will not address the defendant's preemptive answer to such reliance.  *See* Motion at 89-95.

Amendment for the following reasons:

(1)    the grand jury was not informed that its special findings could lead to the imposition of the death penalty;

(2)    the grand jury did not consider whether the aggravating factors would outweigh potential mitigating factors; and

(3)    the grand jury did not consider the non-statutory aggravating factors and mitigating factors and include these factors in the Indictment.

Each of these claims lacks merit.

    1. Introduction

At the outset, it is important to note that the government has complied with basic constitutional principles regarding the indictment of capital crimes. The Supreme Court has held that statutory elements of a crime and the facts that are necessary to render a defendant eligible for a death sentence – under the FDPA, the requisite gateway intent factors under § 3591(a)(2) and at least one statutory aggravating factor under § 3592(c) (collectively, the "eligibility factors") – must be proven to a jury beyond a reasonable doubt. *Ring*, 536 U.S. at 609 (extending *Apprendi v. New Jersey*, 530 U.S. 466 (2000), to the capital context and explaining that the eligibility factors are the "functional equivalent to elements of the offense."); *see also Jones*, 526 U.S. at 243 n.6 (recognizing that "any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and found beyond a reasonable doubt"). Federal Courts of Appeals have interpreted *Ring* to require that the government present the eligibility factors to a grand jury and allege the eligibility factors in a capital indictment. *See, e.g.*, *Fell II*, 531 F.3d at 237; *Higgs*, 353 F.3d at 298; *Mitchell*, 502 F.3d at 979; *Sampson*, 486 F.3d at 20-23; *United States v. Purkey*, 428 F.3d 738, 750 (8th Cir. 2005);

*Robinson*, 367 F.3d at 284.

The government complied fully with these requirements.  The grand jury found probable cause to charge in the Indictment all elements of the offense, including eligibility factors found in the Special Findings sections that could subject the defendant to the death penalty.

> 2.  The Government Is Not Constitutionally Required to Inform the Grand Jury that Special Findings Could Result in a Death Sentence.

Jacques asserts that the Indictment is constitutionally deficient because the government may not have informed the grand jury that the charge carried a possible death sentence.  As with other arguments, the defendant cites no authority adopting this viewpoint.  Regardless, the defendant's claim is unpersuasive and contrary to the decisions of multiple federal courts.

> a.  The Government is not Constitutionally Required to Inform a Grand Jury that the Death Penalty is a Possible Consequence of FDPA Special Findings.

Nothing in the Indictment Clause of the Fifth Amendment requires that a grand jury be informed about the range of punishments the defendant will face or that the alleged crime is a capital offense.  The Defendant cites no case holding otherwise.  Rather, he cites a host of precedents establishing the unremarkable and uncontested propositions that (1) the Fifth Amendment requires the government to use a grand jury to initiate a prosecution, including a prosecution for capital crimes; and (2) the grand jury serves as a "vital check" on government overreaching in its decisions to charge crimes, including capital crimes.  Motion at 96-102.

The role of the grand jury simply "is to investigate possible crimes against the sovereign so that it can make a judgment whether a trial on specific charges is necessary."  *United States v. Suleiman*, 208 F.3d 32, 39 (2d Cir. 2000); *see also Branzburg v. Hayes*, 408 U.S. 665, 686-89

(1972) (observing that the grand jury's role is to make an independent factual determination of the existence of probable cause for the essential elements of the offense).  Accordingly, in the FDPA context, a number of courts have rejected defendants' efforts to use these basic constitutional principles as a springboard for claiming that grand juries should be informed about potential penalties.

The reasons for rejecting such claims were soundly presented by the district court in *United States v. Haynes*, 269 F. Supp. 2d 970, 981 (W.D. Tenn. 2003).  The court stated:

> [t]he grand jury's role is not to decide whether probable cause supports the imposition of a particular sentence against a charged individual; rather the grand jury check on prosecutorial power stems from its independent factual determination of the existence of probable cause for the essential elements of the charged offense . . . . grand juries do not make findings or recommendations concerning punishment or sentencing and such considerations should not influence their decision.  It is for the petit jury to make that determination.

*Haynes*, 269 F. Supp.2d at 981; *see also Talik*, 2007 WL 4570704, at *7; *Williams*, 2007 WL 2916123, at *4 (applying same reasoning to reject identical claim); *Diaz*, 2007 WL 656831, at *6 (same).  The Court should follow these persuasive decisions and reject the claim that the grand jury must be informed when charging a capital case.  *See also United States v. Lecco*, 2007 WL 1074775, at *3 (S.D. W. Va. Apr. 5, 2007) (noting that "the Supreme Court has made clear that the Indictment clause of the Fifth Amendment does not require the government to inform the grand jury of the potential penalties that might attach as a result of any special findings").

### b.  The Defendant's Historical References are not Persuasive.

The purpose of the Indictment Clause of the Fifth Amendment is to ensure that the defendant is subject to criminal charges that have been approved by a group of citizens acting independently of the prosecutor or judiciary.  *Stirone v. United States*, 361 U.S. 212, 218 (1960).

34

In modern criminal practice, it is the petit jury, not the grand jury, whose function is to decide the defendant's ultimate fate -- it is the petit jury that convicts or acquits, and, in the capital sentencing context, it is the petit jury that contemplates the morally appropriate sentence upon conviction of a capital crime. *See United States v. Matthews*, 246 F. Supp.2d 137, 147 (N.D.N.Y. 2002).   The grand jury's check on prosecutorial power "stems from its independent *factual* determination of the existence of probable cause for the essential elements of the charged offense." *Haynes*, 269 F. Supp.2d at 981.  The determination of an appropriate sentence under the FDPA is a moral one, not a factual one. *See Fields*, 483 F.3d at 346.

And even assuming that the grand jury  – a creature of the common law and not an innovation of the Fifth Amendment – historically knew when it was charging a capital offense, as the defendant suggests, nothing in the Indictment Clause obliges the government to advise modern grand juries of the possible range of penalties.  Indeed, at common law, grand juries charging certain offenses would have had no need to be specially informed of the punitive consequences of charging certain offenses because, as the defendant points out, those offenses carried mandatory death sentences as the exclusive available punishment. *See Woodson v. North Carolina*, 428 U.S. 280, 289-90 (1976).  This is not so today:  first, mandatory death sentences are unconstitutional after *Woodson*; and second, and perhaps most importantly, this rule has evolved because the Constitution requires highly individualized consideration to impose a death sentence. *See Lockett v. Ohio*, 438 U.S. 586, 605 (1978) ("we cannot avoid the conclusion that an individualized decision is essential in capital cases").[7]

---

[7]And importantly, the Supreme Court has never incorporated the Indictment Clause against the States, which suggests that the Fifth Amendment did not institute a static vision of the grand jury's role or an unalterable system of charging criminal offenses.

The modern capital sentencing regime militates against giving grand juries a role in deliberating on factors that bear only upon the appropriate punishment.  Grand juries will not have access to the same scope of, and context for, evidence as the petit jury – they are not informed of mitigation evidence, for example, or additional aggravating factors beyond those that establish eligibility.  Thus, they are not positioned to give full and proper individualized consideration to all relevant evidence concerning the facts and circumstances of the crime and the character and background of the defendant, as is required in modern capital sentencing jurisprudence.  *See Marsh,* 548 U.S. at 173-74; *Zant*, 462 U.S. at 879.

Accordingly, the Court should reject the defendant's historical arguments that the Indictment violates the Fifth Amendment.

### 3.  The Indictment Alleges All Necessary Elements.

Jacques claims that the Indictment is constitutionally deficient because the government (1) did not present non-statutory aggravating factors to the grand jury; and (2) did not permit the grand jury to determine whether aggravating factors outweighed mitigating factors, and, if so, whether they justified a capital sentence.  As he admits, Motion at 96 n.60, 104 n.66, the Second Circuit and its sister courts have squarely and unequivocally rejected the first argument.  The second argument is also foreclosed by decisions of federal Courts of Appeal.

### a. FDPA Indictments are not Constitutionally Required to Charge Non-statutory Aggravating Factors.

The Second Circuit has held that non-statutory aggravating factors need not be alleged in an FDPA indictment.  *Fell II*, 531 F.3d at 238 ("[G]overnment's failure to include the non-statutory aggravating factors in the indictment did not violate the Fifth Amendment").  Federal

Courts of Appeal throughout the country concurred in that conclusion.  *See Higgs*, 353 F.3d at 299; *Mitchell*, 502 F.3d at 979; *Brown*, 441 F.3d at 1368; *Purkey*, 428 F.3d at 749-50; *United States v. Bourgeois*, 423 F.3d 501, 507 (5th Cir. 2005).  These courts, and a multitude of district courts following their lead, have recognized the fundamental difference between the eligibility factors, which must be included in the indictment, and the non-statutory aggravating factors, which need not be alleged in the indictment.  The Eleventh Circuit explained the distinction in *Brown*:

> The non-statutory aggravating factors, although relevant to determining whether a jury decides to impose the death penalty, do not make a defendant statutorily eligible for any sentence that could not be otherwise imposed in their absence. They are neither sufficient nor necessary under the FDPA for a sentence of death. This rule comports with recent Supreme Court precedent because a non-statutory aggravating factor does not "increase the penalty for a crime beyond the prescribed statutory maximum," *see Apprendi*, 530 U.S. at 490, nor does it somehow allow the imposition of a more severe sentence than could have been imposed without it.  *See Blakely v. Washington*, 542 U.S. 296, 303-04 (2004). Thus a non-statutory aggravating factor is not one of those "facts legally essential to the punishment" that must be included within the indictment.

441 F.3d at 1368; *see also Fell II*, 531 F.3d at 238 (adopting conclusion of other courts that "only those factors which comprise death eligibility - intent and statutory aggravation -must be included in the indictment because those factors must be found before imposition of the maximum penalty"); *Higgs*, 353 F.3d at 299 ("Because non-statutory aggravating factors do not increase the available punishment to which a defendant might be subjected, they are not required to be alleged in the indictment").

This Court should follow this clear authority, including the binding decision of the

Second Circuit in *Fell*,[8] and reject the defendant's claim that the indictment is defective for failure to allege non-statutory aggravating factors.

> b. The Indictment is Not Constitutionally Required to Include an Allegation that There is Probable Cause that the Aggravating Factors Sufficiently Outweigh the Potential Mitigating Factors to Justify a Death Sentence.

For similar reasons, this Court should reject the defendant's claim that the government was constitutionally required to present the weighing "consideration" required by § 3593(e) to the grand jury – that is, to obtain a grand jury finding regarding whether aggravating factors sufficiently outweigh mitigating factors to justify a sentence of death.  The FDPA contains no such requirement.  The weighing process contemplated by § 3593(e) is not an element of the crime; it bears only on the petit jury's decision whether or not to recommend the death sentence. *Talik*, 2007 WL 4570704, at *8; *Diaz*, 2007 WL 656831, at *3.

The Eighth Circuit's decision in *Purkey* is instructive.  In *Purkey*, the court rejected a claim that the FDPA is facially unconstitutional because it does not require the prosecutor to include the outcome of the weighing consideration in the indictment.  The court held:

> it makes no sense to speak of the weighing process mandated by 18 U.S.C. § 3593(e) as an elemental fact for which a grand jury must find probable cause.  In the words of the statute, it is a "consideration," 18 U.S.C. § 3593(e), – that is, the lens through which the jury must focus the facts that it has found to produce an individualized determination regarding "whether the defendant should be sentenced to death, to life imprisonment without possibility of release or some

---

[8]  Jacques appears to invite the Court to break with the Second Circuit and follow the contrary decisions of Judge Gertner in the District of Massachusetts, *United States v. Green*, 372 F. Supp. 2d 168 (D. Mass. 2005), and Judge Carter in the Central District of California, *United States v. Mills*, 446 F. Supp. 2d 1115 (C.D. Ca. 2006), on the theory that "it is . . . also conceivable that the Second Circuit may revisit the issue."  Motion at 104, n.66.  Respectfully, such supposition and citation to out of jurisdiction trial court decisions does not come close to justifying, much less justify, a departure from controlling precedent.

other lesser sentence." *Id.*

*Purkey*, 428 F.3d at 750.

This Court should apply this reasoning to the claim that the government should have presented the weighing process to the grand jury, in advance of trial, before the presentation of any evidence. Such a process simply has no place in grand jury deliberations concerning what crime to charge or whether to charge one at all.

    D.  THE FDPA IS NOT INCOMPREHENSIBLE.

Jacques asserts that the FDPA violates the Fifth, Sixth, and Eighth Amendments because its sentencing scheme is incomprehensible and deprives a jury of the ability to make a reasoned and informed choice between a death sentence and a life sentence.

This claim is contrary to law. The "'crucial assumption' underlying the system of trial by jury is that juries will follow the instructions given them by the trial judge." *Marshall v. Lonberger*, 459 U.S. 422, 438, n.6 (1983) (quoting *Parker v. Randolph*, 442 U.S. 62, 73 (1979)). That assumption is "'rooted . . . in the belief that it represents a reasonable practical accommodation of the interests of the state and the defendant in the criminal justice process.'" *United States v. Casamento*, 887 F.2d 1141, 1151 (2d Cir. 1989) (quoting *Richardson v. Marsh*, 481 U.S. 200, 206 (1987)). The presumption is, therefore, "almost invariabl[e]." *United States v. Jass*, 569 F.3d 47, 55 & n.4 (2d Cir. 2009)); *see also, e.g., Richardson*, 481 U.S. at 206 (citing *Francis v. Franklin*, 471 U.S. 307, 325 n.9 (1985)); *Zafiro v. United States*, 506 U.S. 534, 540-41 (1993).

In a capital case, instructions are constitutionally defective if there is a "reasonable

likelihood" that they misled the jury into sentencing the defendant to death. *Boyde v. California,* 494 U.S. 370, 380 (1990) (holding there was no reasonable likelihood that jurors misinterpreted allegedly ambiguous jury instruction in death penalty case).[9]  Instructions that are only arguably ambiguous or create "only a possibility of . . . [jury] inhibition" do not fall into this category. *Id.* at 379-84; *see also Tuilaepa v. California*, 512 U.S. 967, 976 (1994) (instructions in penalty phase of capital case constitutional because they were "phrased in conventional and understandable terms" and had "commonsense core of meaning").

Jacques cites studies and law review articles in support of his view,[10] but provides no federal case law to support his claim that the FDPA scheme is so incomprehensible as to negate the presumption of juror understanding.  To the contrary, federal courts have rejected this argument across the board.  *See United States v. Mikos,* Case No. 02-137, 2003 WL 22110948, at *17-19 (N.D. Ill. Sept. 11, 2003); *Llera Plaza*, 179 F. Supp. 2d at 449-50.  Indeed, the defendants

---

[9]  Ordinarily, the presumption that juries follow a trial court's instructions is overcome only if there is an "'overwhelming probability' that the jury will be unable to follow the court's instructions . . . and a strong likelihood that the effect of the evidence would be 'devastating' to the defendant." *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (citing *Richardson*, 481 U.S. at 208, and *Bruton v. United States*, 391 U.S. 123, 135 (1968)); *accord United States v. Ford*, 88 F.3d 1350, 1364 (4th Cir. 1996); *United States v. Stone*, 9 F.3d 934, 938 (11th Cir. 1993); *United States v. Perone*, 936 F.2d 1403, 1410 (2d Cir. 1991); *United States v. Colombo*, 909 F.2d 711, 715 (2d Cir. 1990).

[10]  In particular, he relies extensively on a study by the Capital Jury Project, which conducted interviews of capital jurors in reaching its conclusions, as well as a state court decision out of New Mexico, which in turn relied on the CJP study.  Motion at 110-17.  The government is aware of one federal case that agreed with the defendant's view, *Free v. Peters*, 806 F. Supp. 705 (N.D. Ill. 1992), only to be overturned by the Seventh Circuit, *Free v. Peters*, 12 F.3d 700 (7th Cir. 1993).  In any event, the "shocking lesson" that the defendant draws "from the CJP is that criminal juries are incapable of understanding and applying the trial court's instructions." Motion at 116.  That sweeping conclusion is simply inconsistent with the presumptions embedded in Supreme Court precedent and decisions of lower federal courts, *see e.g., Boyde,* 494 U.S. at 380.

in *Mikos* and *Llera Plaza* cited the very empirical studies on which the defendant rests his

argument.  *See Llera Plaza*, 179 F. Supp. 2d at 450 n.5 (and citations to studies therein); *Mikos*,

2003 WL 22110948, at *17-19 & n.6 (same).

Jacques has not – and cannot – offer any evidence that rebuts the well-settled

presumption that the jury will follow *this* Court's instructions at the penalty phase of *this* case.

As the *Mikos* court noted, the juror studies on which the defendant relies are not based upon the

FDPA and instructions given in federal capital trials, but rather on state penalty schemes,

particularly the California death penalty scheme.  *Mikos*, 2003 WL 22110948, at *17.

Finally, the defendant's claim is not ripe.  He cannot know, and does not purport to

suppose, what instructions this Court will give the jury at the penalty phase, should there be one.

*See id*.  As aptly put by the court in *Llera Plaza* in rejecting the same argument based on the

same studies:

> If the case at bar proceeds to a sentencing phase, counsel for the defendants and
> counsel for the government will have the opportunity to participate fully in the
> process of formulating the instructions which will frame the jury's deliberations.
> There is no reason to believe that the jury will find the collaborative  handiwork of
> court and counsel to be incomprehensible.

*Llera Plaza*, 179 F. Supp. 2d at 450.

Accordingly, the Court should reject the claim that the FDPA is incomprehensible.

E.  THE FDPA DOES NOT VIOLATE DUE PROCESS BASED ON A PURPORTED
RISK OF EXECUTING INNOCENT PEOPLE.

Jacques claims that the purported risk of executing innocent individuals renders the

FDPA unconstitutional; he appears to bring this claim under the substantive and procedural due

process guarantees of the Fifth Amendment.[11]  Once again, his argument is foreclosed by

controlling precedent from the Supreme Court and the Second Circuit.  *See United States v.*

*Quinones*, 313.F.3d 49, 52 (2d Cir. 2002) (rejecting defendant's Fifth and Eighth Amendment

argument that the FDPA is unconstitutional because innocent people may be executed, citing

Supreme Court).  Jacques acknowledges this, as he must.  Motion at 118 n.70 ("this issue may be

seen as foreclosed by the Second Circuit's decision in *Untied States v. Quinnones* . . .").

     In *Quinones*, the Second Circuit reversed the decision of the district court, *United States*

*v. Quinones*, 205 F. Supp.2d 256 (S.D.N.Y. 2002), which adopted the argument now made by

Jacques.  The Second Circuit stated:

> We hold that, to the extent the defendants' arguments rely upon the Eighth Amendment,
> their argument is foreclosed by the Supreme Court's decision in *Gregg v. Georgia* . . .
> With respect to the defendants' Fifth Amendment due process claim, we observe that the
> language of the Due Process Clause itself recognizes the possibility of capital
> punishment.  Moreover, the defendants' argument that execution deprives individuals of
> the opportunity for exoneration is not new at all - it repeatedly has been made to the
> Supreme Court and rejected by the Supreme Court.  Most notably, the Supreme Court
> expressly held in *Herrara v. Collins* . . . that, while the Due Process Clause protects
> against government infringement upon rights that are so rooted in the traditions and
> conscience of our people as to be ranked fundamental, there is no fundamental right to
> continued opportunity for exoneration throughout the course of one's life . . . neither the
> Court of Appeals nor the District Court is authorized to disregard or overturn the
> Supreme Court's holding in *Herrara* . . . .

313 F.3d at 52, 69 (citations and quotations omitted) (concluding, as did the Supreme Court in

*Herrara*, that the FDPA cannot be deemed unconstitutional based solely on a statistical or

theoretical possibility that a defendant might be innocent); *see also Sampson*, 486 F.3d at 27

---

[11]  It is not entirely clear what constitutional claim, if any, the defendant is trying to assert.
Nonetheless, based on previous treatment of similar claims by other federal courts, the
government asserts a defense based on the Fifth and Eighth Amendments.

(reaching same conclusion).[12]

In the face of the *Quinones* holding, and unequivocal adverse Supreme Court precedent, the defendant nonetheless relies – and quotes extensively from – the very district court decision *Quinones* overturned, as well as a newspaper editorial written by an out-of-jurisdiction district judge, and offers: "in the eight years that have passed since th[e Second Circuit's decision in *Quinones*], a steadily increasing number of innocent prisoners have been released from this nation's death rows."  Motion at 118-124.

The defendant's fealty to a decision overturned by the Second Circuit and the contrary personal views of a district judge, is unpersuasive at best.  *See Sampson*, 486 F.3d at 27 (rejecting innocence-related challenge to FDPA by defendant who also relied on the district court decision in *Quinones*).  The Court should not credit this strategy.

In any event, presentation of such data has been rejected repeatedly when claims concerning the constitutionality of executing the innocent have been considered.  *Quinones*, 313 F.3d at 64-65 (noting that arguments regarding the risk of executing innocent people pre-date the

---

[12] As the *Quinnones* Court noted, three separate clauses of the Fifth Amendment contemplate the existence of capital punishment.  The Fifth Amendment provides, in relevant part:

(1) The Indictment Clause: "No person shall be held to answer for a *capital*, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury . . .

(2) The Double Jeopardy Clause: "nor shall any person be subject for the same offence to be twice put in jeopardy of *life* or limb . . . "

(3) The Due Process Clause: "nor be deprived of *life*, liberty, or property without due process of law . . . . "

U.S. Const., Amend V; *see also Gregg*, 428 U.S. at 177 ("[I]t is apparent from the text of the Constitution itself that the existence of capital punishment was accepted by the Framers.")

ratification of the Constitution and that the FDPA is an "informed, deliberative legislative action" that was drafted against "repeated assertions from members of Congress that innocent people have been executed").  The Supreme Court has upheld state and federal statutes providing for capital punishment despite an express recognition of the possibility that, because any judicial system is fallible, innocent people might be executed and, therefore, lose any opportunity for exoneration.  *Id*. at 65; *accord Herrera v. Collins*, 506 U.S. 390, 398-99 (1993).  Finally, if the defendant is suggesting that the purportedly new data he presents should cause this Court or the Second Circuit to diverge from establish precedent, that argument, too, is unfounded.  *Quinones*, 313 F.3d at 52 ("[N]either the Court of Appeals nor the District Court is authorized to disregard or overturn the Supreme Court's holding in *Herrara* . . . .")

Accordingly, this Court should reject the defendant's well-worn claim that the FDPA is unconstitutional because it could lead to execution of the innocent.

### F.  THE GOVERNMENT'S AUTHORITY TO ALLEGE NON-STATUTORY AGGRAVATING FACTORS UNDER THE FDPA IS CONSTITUTIONAL.

Jacques claims that the FDPA's provision as to non-statutory aggravating factors is unconstitutional, for multiple reasons.  Each permutation of the claim is foreclosed by decisions of multiple federal courts.

#### 1.  The FDPA Does Not Preclude the Use of Non-Statutory Aggravating Factors "By its Terms."

Jacques claims that the FDPA, by its terms, prohibits the presentation of non-statutory aggravating factors to the jury.  He argues that, because § 3591(a) states that a defendant may be sentenced to death only after jury consideration of "the factors set forth in § 3592," which lists 16 statutory aggravating factors only, non-statutory aggravating factors are barred.  This argument,

in particular, strains credulity, and conveniently highlights one term of the FDPA while ignoring other statutory language furnishing important context.

It is true that § 3591 requires a jury is to consider factors set forth in § 3592 in deciding whether to impose the death penalty.  As courts have recognized, however, § 3592 "lists 16 statutory aggravating factors, and then states '[t]he jury, or if there is no jury, the court, may consider *whether any other aggravating factor for which notice has been given* exists.'" *Barnes*, 532 F. Supp. 2d at 643 (quoting § 3592(c), emphasis in original).  Thus, the "plain text of the FDPA . . . authorizes the use of factors not specifically enumerated in the statute," namely, the non-statutory aggravating factors.  *Id*.; *Robinson*, 367 F.3d at 292 (argument that "the FDPA does not authorize the use of non-statutory aggravating factors [is] meritless"); *United States v. Nguyen*, 928 F. Supp. 1525, 1536 (D. Kan. 1996) (rejecting argument as "strained," and "hyper-literal"); *see also* § 3593(a) ("The factors for which notice is provided . . . may include . . . any other relevant information").  The defendant's proposed interpretation would, moreover, contradict the bedrock cannon that "a statute should be construed, if possible, in such a way that all of its provisions can be given effect, and so that no part of the statute is rendered inoperative or superfluous."  *Nguyen*, 928 F. Supp. at 1536.

The Court should reject the defendant's claim that the FDPA precludes introduction of non-statutory aggravating factors "by its terms."

### 2. Non-Statutory Aggravating Factors Constitutionally Limit and Guide the Jury's Discretion and Do Not Permit Wholly Arbitrary and Capricious Death Sentences.

One hundred and twenty-seven pages into his motion, Jacques reprises his lead theory that the FDPA is unconstitutionally arbitrary and capricious – this time under mantle of a

challenge to non-statutory aggravating factors.  He asserts that the FDPA injects unconstitutional arbitrariness into capital sentencing by allowing prosecutors to "unilaterally expand the list of aggravating factors on a case-by-case basis" and offering no guidance in the selection process. Motion at 128.  Again, he offers no case law in support of this argument.

This version of the arbitrary and capriciousness argument must fail for the same reasons that sunk its predecessors.  As discussed earlier, the FDPA, including its provisions concerning non-statutory aggravating factors, comports fully with the dictates of the Supreme Court regarding death penalty schemes.  Indeed, it essentially codifies the two-step process prescribed by the Supreme Court for death penalty sentencing by (1) narrowing the sentencer's discretion through eligibility factors (*i.e.,* gateway intent factors under § 3591(a) and the statutory aggravating factors under § 3592(c)), and (2) individualizing the sentencing determination.  *E.g., Kansas v. Marsh*, 548 U.S. 163, 173-74 (2006).  The FDPA's non-statutory aggravating factors, in combination with mitigating factors, facilitate the second step, by offering "the fullest information possible concerning the defendant's life and characteristics."  *See Williams v. New York*, 337 U.S. 241, 247 (stating that this is "highly relevant - if not essential" for "modern concepts of individualizing punishment"); *Gregg*, 428 U.S. at 203-04 ("We think it highly desirable for the jury to have as much information before it as possible when it makes the sentencing decision.").

In short, far from tainting the process, non-statutory aggravating factors ensure that the FDPA conforms to the Constitution's individualized sentencing mandate.  *See Fell*, 360 F.3d at 144 (FDPA "standard permits the jury to have before it all possible relevant information about the individual defendant whose fate it must determine . . . as a result, the FDPA does not

undermine 'heightened reliability,' it promotes it" (citing *Jurek*, 428 U.S. at 276)); *Higgs*, 353 F.3d at 320 (rejecting claim that "submission of non-statutory aggravating factors at the penalty phase allows for the random and unguided imposition of the death penalty by jurors").

The Court should reject the defendant's attempt to rehash his claim that the FDPA operates in an arbitrary and capricious manner, by shifting the blame to non-statutory aggravating factors.

### 3.  The Use of Non-Statutory Aggravating Factors Does Not Violate the Ban on Ex Post Facto Laws.

Jacques claims that the FDPA's authorization of non-statutory aggravating factors violates the Ex Post Facto Clause of the Constitution by allowing the prosecution to define aggravators after the commission of the crime.  Motion at 129.  He accurately quotes the relevant black letter law, *e.g., Boui v. City of Columbia*, 378 U.S. 347, 350-51 (1964), but points to no case that adopts or supports his proposed application of that law.  On the contrary, he admits that one court of appeals disagrees with his proposal.  Motion at 129; *see Allen*, 247 F.3d at 759 (specifically rejecting the argument).  There are others.  *See Higgs*, 353 F.3d at 322.   As the Fourth Circuit held:

> Although aggravating factors do make more burdensome the punishment for the crime, non-statutory aggravating factors and mitigating factors are weighed by the jury to make the individualized determination to impose the death sentence upon a defendant who has already been found eligible.  They do not increase the possible punishment or alter the elements of the offense.

*Id.* at 322 (internal quotations and citations omitted).

The Court should follow the sound decisions of the circuit courts and reject the defendant's wholly unsupported argument.

### G.  THE NOTICE'S AGGRAVATING FACTORS PROVIDE ADEQUATE NOTICE AND SUFFER NO OTHER DEFECTS.

Jacques mounts two challenges to the Notice.  He argues that: (1) the government provides inadequate notice of the factual basis for certain aggravating factors, Motion at 143-44, and therefore, the Court should require a detailed pretrial offer of proof, or hold an  evidentiary hearing, to determine the relevance and reliability of evidence in support of the  aggravating facts; and (2) certain aggravating factors should be dismissed as facially deficient because they are vague, duplicative, unascertainable, lacking factual support, or irrelevant.  These  challenges are premature and meritless.  No trial has been scheduled, no penalty phase evidence has been introduced, and the defendant's mitigating factors have not even been filed.  Accordingly, it is impossible to gauge the relevance and prejudice of the information at issue under § 3593(c).

#### 1.  The Government Has Provided Ample Notice as to Non-Statutory Factors.

The statute requiring the government to provide notice of its intent to seek the death penalty does not require provision of evidentiary detail.  § 3593(a).  Rather, it requires the government, at a reasonable time before trial, to provide "a notice . . . stating that the government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified under this chapter and the government will seek death."  *Id.* at § 3593(a)(1).  In addition, the statute requires the notice to "set[] forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death."  *Id.* at § 3593(a)(2).  These provisions mandate notice that the death penalty will be sought, and a statement of the aggravating factors upon which the government will rely; there simply is no requirement that the government detail in advance its evidence of these factors.

Accordingly, under the plain language of the statute, the defendant's claim of inadequate notice and insufficient evidentiary detail must fail.

The case law supports this result.  A defendant is entitled to notice of the charges against him, and the factors that could subject him to capital punishment.  *See Stirone*, 361 U.S. at 218; § 3593(a)(2).  Here, as in all FDPA prosecutions, the Indictment and Notice are the government's mechanisms for satisfying this imperative.

Federal courts across the country agree that the government is not required to preview or or reveal the specific proof it will offer in support of aggravating factors.  *See Higgs*, 353 F.3d at 325 ("[T]he FDPA and the Constitution require that the defendant receive adequate notice of the aggravating factor . . . not notice of the specific evidence that will be used to support it"); *United States v. Battle*, 173 F.3d 1343, 1347 (11th Cir. 1999) ("The Government is not required to provide specific evidence in its Notice of Intent"); *LeCroy*, 441 F.3d at 929-30 (defendant not entitled to notice of evidence supporting aggravating factors); *United States v. Gooch*, No. CR 04-128-23, 2006 WL 3780781, at *21 (D.D.C. 2006) (denying motion to require government to provide factual basis for aggravating factors and distinguishing defendant's attempt to find out, not "what" government will use, but "how" it will use it); *Solomon*, 513 F. Supp. 2d at 539; *Sablan*, 2006 WL 1028780, at *28; *United States v. Mayhew*, 380 F. Supp. 2d 936, 943 (S.D. Ohio 2005); *Taylor*, 316 F. Supp. 2d at 738; *United States v. Roman*, 371 F. Supp. 2d 36, 42 (D.P.R. 2005); *Williams*, 2004 WL 2980027, at *17.

The government has provided adequate notice of the aggravating factors in this case. Indeed, it has gone beyond legal requirements in the detail provided during discovery. Accordingly, the Court should deny the defendant's motion for a pretrial ruling on the sufficiency

of the government's evidence.  Further, the Court should reject the request for an outline of the government's proofs or a pretrial hearing where the government would be required to preview its evidence.

### 2.  If Further Disclosure Is Required, It Should Be in Written Form.

The government does not concede that it should be required to apprise the defendant of the particular evidence it intends to introduce in support of statutory and non-statutory aggravators.  Nonetheless, should the Court decide that the government must provide more detail, the government submits that an evidentiary hearing is a burdensome and unnecessary method to accomplish this goal, and that an outline would be more appropriate.

### a.  Statutory Aggravating Factors

As to evidence of statutory aggravating factors, it would be unfair and unnecessary to require the government to divulge this information in a pretrial hearing.  The defendant is not entitled to an advance hearing to review the government's evidence.  Such a hearing would strain the government's case preparation, the government's witnesses, and others involved in its case.

Statutory aggravating factors are the functional equivalent of elements of the offense, which must be proven beyond a reasonable doubt to the jury.  The vetting of evidence that will support "elements" of the offense in a pretrial hearing would unduly and unfairly burden the government, essentially permitting the defendant to end-run the Federal Rules of Criminal Procedure under the aegis of a complaint of inadequate notice.  Such a break with protocol would also contravene the many decisions cited above, holding that the existence of aggravating factors are not an excuse to a preview of the government's evidence.

By way of the Indictment and Notice, the government has given full and fair notice of the

50

charges and facts supporting the statutory aggravating factors.  In addition, the government has provided and continues to provide full and fair discovery.  It should be  obligated to do no more.

>b.  Non-statutory Aggravating Factors

The Court also should decline to conduct a hearing at which the government would be obligated to detail its evidence as to non-statutory aggravating factors.  Pleadings and discovery afford the defendant more than adequate notice of those matters.  Furthermore, at this early stage of the litigation relevance and prejudice determinations would be premature and uninformed.   If the Court does find that the government must provide more detailed information to the defendant, it should order a method less burdensome than an evidentiary hearing.

The defendant cites some district court decisions requiring the government to provide more detailed information regarding non-statutory aggravating factors to capital defendants, but the courts are divided.  Based on the reasoning of circuit court decisions, such as *Higgs* and *Battle*, *supra*, several district courts have rejected altogether capital defendants' requests for more detailed information or for the court to review the sufficiency of evidence in support of non-statutory aggravating factors.  *See*, *e.g.*, *O'Reilly*, 2008 WL 284003, at *10 (pretrial hearing "unnecessary"); *Solomon*, 513 F. Supp. 2d at 539; *Sablan*, 2006 WL 1028780, *28; *Gooch*; 2006 WL 3780781, at *21; *Taylor*, 316 F Supp. 2d at 738 ("determination as to whether [aggravating] factor can be properly applied to either defendant must await factual development at trial").

Alternatively, if the Court determines that the government must provide more detailed information concerning the non-statutory aggravators, it should require nothing more than a proffer of evidence or outline.  *See Llera Plaza*, 179 F. Supp. 2d at 468 (denying motion for pretrial hearing; requiring government to provide more detailed written notice); *Edelin*, 134 F.

Supp. 2d at 75 (denying motion for evidentiary hearing and relying on full discovery and required

proffer before penalty phase); *United States v. Lujan*, 530 F. Supp. 2d 1224, 1269 (D.N.M. 2008)

(requiring evidentiary outline).  In fact, all but one, *United States v. Corley*, 348 F. Supp. 2d 970

(N.D. Ind. 2004), of the cases cited by the defendant require only a proffer, and not a full hearing;

in that one outlier, the court ultimately admitted the evidence that was the subject of the hearing

during the FDPA sentencing phase.  *Id*. at 971, 974 (admitting evidence that defendant engaged

in adjudicated murder), *aff'd*, *United States v. Corley*, 519 F.3d 716 (7th Cir. 2008).[13]

   3.  The Government's Statutory and Non-Statutory Aggravating Factors are Valid.

  Jacques levels myriad challenges to the facial sufficiency of several statutory and non-

statutory aggravating factors.  Before addressing each challenge, a review of first principles is

useful.

  Aggravating factors serve to channel jury discretion by narrowing the class of death-

eligible defendants and by assisting the jury in reaching an individualized sentencing decision

based on the facts of the crime and the character and background of the offender.  *See Zant v.*

*Stephens*, 462 U.S. 862, 878 (1983).  Statutory and non-statutory aggravating factors are

governed by somewhat distinct constitutional frameworks.

  To comport with the Eight Amendment, a statutory aggravating factor must satisfy two

criteria.  First, the statutory language must be specific enough to furnish adequate guidance to the

fact-finder.  *Arave v. Creech*, 507 U.S. 463, 474 (1993).  Put differently, it must not be too vague.

*See Jones*, 527 U.S. at 400 (requirement is satisfied when the factor, as expressed, furnishes a

---

[13]  Some of the cases cited by Jacques do *not* involve the court ordering the government to
divulge additional evidence of its aggravating factors.  *See, e.g., United States v. Frank*, 8 F.
Supp. 2d 253, 265 (1998); *United States v. Karake*, 370 F. Supp. 2d 275 (D.D.C. 2005).

commonsense core of meaning that a factfinder can understand); *Tuilaepa v. California*, 512 U.S. 967, 972-73 (1994).  Second, the factor must provide a principled basis for distinguishing between those who are particularly morally blameworthy, and thus deserve capital punishment, and those who do not.  *Arave*, 507 U.S. at 474; *accord Gregg*, 428 U.S. at 192.  In other words, an aggravating factor cannot be overbroad by applying to every defendant convicted of murder; it must apply to only a subclass of offenders.  *Tuilaepa*, 512 U.S. at 972.

Whereas statutory aggravators serve to "narrow the class" of eligible capital offenders, *see Arave*, 507 U.S. at 474; *Gregg*, 428 U.S. at 192, non-statutory aggravators primarily serve to "individualize" a capital sentencing determination after a defendant has been found eligible for capital punishment.  *See Zant*, 462 U.S. at 878-89 (holding use of non-statutory aggravating factors is appropriate in selection process).

"What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime."  *Id.* at 879; *see also Woodson*, 428 U.S. at 303-04 (plurality opinion); *United States v. Regan*, 228 F. Supp. 2d 742, 749-50 (E.D. Va. 2002) (the intent of non-statutory factors is to individualize sentencing based upon the character of the individual and the circumstances of the case); *Karake*, 370 F.Supp. 2d at 279.  At this second stage of the capital punishment decision-making process, the Supreme Court has instructed that the jury can consider relevant mitigating evidence of the character and record of the defendant, as well as the circumstances of the crime.  *Blystone v. Pennsylvania*, 494 U.S. 299, 307 (1990) ("requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence"); *accord Johnson v. Texas*, 509 U.S. 350, 361 (1993).

Similar to statutory aggravating factors, non-statutory aggravating factors must satisfy a number of requirements in order to pass constitutional muster. *See, e.g., United States v. Cheever*, 423 F. Supp. 2d 1181, 1206-07 (D.Kan. 2006) (summarizing constitutional requirements of aggravating factors); *Fell*, 372 F. Supp. 2d at 763-64 (same).

First, the information must be "relevant," meaning that it must be "sufficiently relevant to the consideration of who should live and who should die." *United States v. Davis*, 912 F.Supp. 938, 943 (E.D. La.1996). Aggravating factors in death penalty cases must be "particularly relevant to the sentencing decision," not "merely relevant, in some generalized sense, to whether the defendant might be considered a bad person." *Gregg*, 428 U.S. at 192. "[A]ggravating circumstances must be construed to permit the sentencer to make a principled distinction between those who deserve the death penalty and those who do not." *Lewis v. Jeffers*, 497 U.S. 764, 776 (1990).

Second, an aggravating factor must meet the "heightened standard of reliability" the Supreme Court has required in death penalty cases. *Ford v. Wainwright*, 477 U.S. 399, 411 (1986). Thus, an aggravating factor is invalid if it cannot be established by reliable evidence. *See United States v. Gilbert*, 120 F. Supp. 2d 147, 153 (D. Mass. 2000) (striking two aggravating factors that were based on stale and questionable evidence). Similarly, any aggravating factor should be excluded if it is based on evidence the probative value of which is outweighed by the danger of unfair prejudice to the defendant, confusion of the issues, or a likelihood that the jury will be misled. *See* § 3593(c).

District courts have scrutinized non-statutory aggravating factors to ensure that they meet a "strikingly high level of relevance and reliability." *United States v. Bin Laden*, 126 F. Supp. 2d

290, 302 (S.D.N.Y. 2001).  The court in *United States v. Friend*, 92 F. Supp. 2d 534 (E.D.Va.

2000), summarized these two requirements as follows:

> Relevance and heightened reliability, in the context of assessing a non-statutory
> aggravating factor in a death penalty scheme, are two sides of the same coin.
> Together, they assure the twin constitutional prerequisites of affording a rational
> basis for deciding that in a particular case death is the appropriate punishment and
> of providing measured guidance for making that determination.  Those objectives
> can only be accomplished if the proposed aggravating factor raises an issue which
> (a) is of sufficient seriousness in the scale of societal values to be weighed in
> selecting who is to live or die; and (b) is imbued with a sufficient degree of logical
> and legal probity to permit the weighing process to produce a reliable outcome.

92 F. Supp.2d at 543.

Third, the Constitution requires that aggravating factors not be overly broad.  This

means that a factor "may not apply to every defendant convicted of a murder; it must apply only to

a subclass of defendants convicted of murder."  *Tuilaepa, supra*, 512 U.S. at 972 (citing *Arave,

supra*, 507 U.S. at 474).   If the non-statutory aggravating factors are used to direct the jury to the

individual circumstances of the case, then those non-statutory aggravating factors are not overly

broad.

Fourth, the Eighth Amendment also requires that aggravating factors may not be too

vague.  *Id.* at 973.  The vagueness review is "quite deferential" and "a factor is not

unconstitutional if it has some common-sense core of meaning" that criminal juries should be able

to understand.  *Id.* (quotation marks and citation omitted).

Last, districts courts should favor the admission of as much information as possible to

allow the jury to make an individualized determination of whether the defendant merits the death

penalty.  Indeed, the Supreme Court has held that "in all capital cases the sentencer must be

allowed to weigh the facts and circumstances that arguably justify a death sentence against the

defendant's mitigating evidence." *Brown, supra*, 546 U.S. at 216-17.

Generally, in *Gregg* the Supreme Court expressed itself in favor of allowing more rather than less information in capital sentencing hearings:

> We think that the Georgia court wisely has chosen not to impose unnecessary restrictions on the evidence that can be offered at such a hearing and to approve open and far-ranging argument. *See, e. g., Brown v. State*, 235 Ga. 644, 220 S.E.2d 922 (1975). So long as the evidence introduced and the arguments made at the presentence hearing do not prejudice a defendant, it is preferable not to impose restrictions. We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision.

428 U.S. at 203-04 (citation omitted). Therefore, this Court should consider non-statutory aggravating factors, and associated evidence, favoring inclusion rather than exclusion.

In all instances, review of the validity of aggravating factors should be deferential. *Tuilaepa*, 512 U.S. at 974; *Payne v. Tennessee*, 501 U.S. 808, 824 (1991) (designation of statutory aggravating factor reflects Legislative judgment).

It is within this legal framework that defendant's arguments to strike the Notice's aggravating factors should be considered.

### 1.  Death during the Commission of Another Crime

Jacques asks the Court to strike this statutory aggravating factor because it is "plainly and simply duplicative of the elements of the underlying offense." Motion at 144-45. Tellingly, he cites no support for this request.

The FDPA provides that the jury, in determining whether a sentence of death is to be imposed, "shall consider" whether death occurred during the commission of an another qualifying crime – in this case kidnaping. §§ 3592(c) and (c)(1). The unsupported claim that this requirement is duplicative reflects a misunderstanding of relevant law.

56

The jury may consider whether death occurred during the commission of a kidnaping twice: during the guilt stage, and as a statutory aggravating factor during the death penalty eligibility stage.  The purpose of such consideration is different at each stage.  Trial involves adjudication of guilt or innocence; the death penalty eligibility phase serves to narrow the class of offenders subject to the death penalty.  *See Fell*, 360 F.3d at 143; *Zant*, 462 U.S. at 877.  The latter endeavor – a component of sentencing – may rely on evidence introduced at trial, as well as "far more diffuse" facts.  *See Fell*, 360 F.3d at 143.  In other words, introduction at the eligibility phase of facts used to prove the elements of the offense is perfectly legitimate, although the sentencing process should, and likely will, involve this information and more.  *See Higgs*, 353 F.3d at 315 ("the Eighth Amendment does not prohibit the use of an aggravating factor during the sentencing phase that duplicates one or more elements of the offense of the crime found at the guilt phase"); *Lowenfeld v. Philips*, 484 U.S. 231, 246 (1988) ("narrowing function" mandated by the Eighth Amendment may be performed by jury findings at either the sentencing phase of the trial or the guilt phase); *Deputy v. Taylor*, 19 F.3d 1485, 1502 (3d Cir. 1994) ("federal courts of appeals have consistently held that a sentencing jury can consider an element of the capital offense as an aggravating factor even if it is duplicitous").

In short, just as the trial phase and eligibility phases are distinct, overlap in trial evidence and eligibility evidence is not unconstitutionally "duplicative."  Courts have thus permitted introduction of the statutory aggravator "death during commission of a crime" in FDPA prosecutions.  *See, e.g., Mitchell*, 502 F.3d at 978 (upholding jury's consideration "as a statutory aggravating factor that 'the death of [Jane Doe] occurred during the commission and attempted commission of [her kidnaping].  *See* 18 U.S.C. § 3592(c)(1)"); *Higgs*, 353 F.3d at 315

(government can present aggravating factor that killing occurred during the commission of a kidnaping where one of substantive offenses was kidnaping resulting in death, citing *Lowenfield*, 484 U.S. at 246); *United States v. Hall*, 152 F.3d 381, 416-17 (5th Cir. 1998) (upholding submission of § 3592(c)(1) statutory aggravating factor in prosecution for kidnaping resulting in death); *Jones*, 132 F.3d at 249 (same).

Accordingly, the Court should reject the request to strike this statutory aggravating factor.

### 2. Especially heinous, cruel and depraved ("EHCD")

Jaques's objection to this statutory aggravating factor is muddled. He appears to admit that the EHCD factor is not unconstitutionally vague because the FDPA makes it applicable only where the offense was "especially heinous, cruel or depraved *in that it involved torture or serious physical abuse to the victim*." § 3592(c)(6) (emphasis added). Motion at 145-46 (citing various circuit courts of appeals that have ruled that this factor is not unconstitutionally vague provided "the jury is properly instructed on the requirement of torture or serious physical abuse"). Yet he then contends that "to establish this factor . . . the case law is settled that the defendant must have intended to do more than cause the death of another [] [a]nd this is where the concept becomes almost impossible to grasp." Motion at 147.

This is a non sequitur. The EHCD factor cannot logically (1) pass constitutional muster when accompanied by proper jury instructions regarding the need for an intent to inflict harm, apart from that necessary intent to kill – as he admits it does – *and* (2) be "almost impossible to grasp." *See, e.g., Mitchell*, 502 F.3d at 975-76 ("Mitchell submits that th[e ECHD] factor is unconstitutional, but this can't be so given that Congress defined what it meant by 'especially heinous, cruel or depraved' and the district court gave proper instructions on the meaning of

"torture or serious physical abuse to the victim") (collecting Supreme Court and Circuit Court cases that support and adopt the view the EHCD factor is constitutional); *Sampson*, 486 F.3d at 38 (same).

Jacques also appears to suggest that this aggravator is inapplicable, and that the government has not provided him with enough of a factual basis. Yet the government's discovery and allegations clearly indicate that the defendant intended to do much more than simply kill 12-year-old Brooke Bennett. The government has alleged and the evidence provided to the defense shows that after plotting for weeks, Jacques kidnaped the girl by means of an elaborate ruse,[14] he then held her captive for about 12 hours while repeatedly raping her, he drugged her, and he murdered her by smothering and strangling. The ECHD factor is properly alleged, and may be challenged at trial, when it should be considered by the jury with appropriate instructions.

The Court should reject the challenge to the constitutionality of the ECHD factor, as well as the assertion that it is inapplicable, or that the government should explain its applicability through a factual proffer.

### 3. Substantial Planning or Premeditation

Jacques claims that this statutory aggravating factor, set forth in § 3592(c)(9), should be stricken because the modifier "substantial" is a "vice" of "such slippery and nuanced vagueness." Motion at 149.[15] His colorful language provides no cover for the absence of any federal case law

---

[14] In addition to serious physical harm, the government may also rely on the defendant's alleged prolonged mental abuse of Brooke in establishing the EHCD factor. 1 Leonard B. Sand, et. al., MODERN FEDERAL JURY INSTRUCTIONS, Inst. 9A-11 (2008) (torture includes mental as well as physical abuse).

[15] Jacques does not deny the existence of a factual underpinning for this factor or its applicability to his case.

supporting his claim.  As legal support, Jacques cites only stale state court decisions commenting

on the word "substantial" in the context of entirely different statutory schemes; he acknowledges,

as he must, that an overwhelming number of federal courts, including courts of appeals, have

rejected challenges this statutory aggravating factor.  Motion at 149-50.

"Substantial planning and premeditation," as included in the statutory aggravating factor

of § 3592(c)(9), means "a higher degree of planning than would have the words 'planning and

premeditation' alone – *i.e.*, more than the minimum amount sufficient to commit the offense."

*Barnette*, 390 F.3d at 786 (quoting *Tipton*, 90 F.3d 861, 896 (4th Cir. 1996)).  The case law is clear

that use of the word "substantial" to modify "planning and premeditation" does not render the

aggravating factor unconstitutionally vague, but instead, conveys with "adequate precision a

commonly understood meaning of 'considerable,' or 'more than merely adequate,'" thereby

ensuring that the aggravating factor "served sufficiently to channel the jury's discretion in

assessing eligibility for the death penalty."  *Tipton*, 90 F.3d at 896; *see also United States v.*

*McCullah*, 76 F.3d 1087, 1110-11 (10th Cir. 1996) (approving of the aggravating factor for same

reasons); *Bourgeois*, 423 F.3d at 511 (holding the substantial planning and premeditation

aggravating factor "obviously narrow[s] the class of murderers who could be eligible for the death

penalty because not every murder involves substantial planning or premeditation"); *Bin Laden*,

126 F. Supp. 2d at 297 n.7 (collecting cases); *United States v. McVeigh*, 944 F. Supp. 1478, 1490

(D. Colo 1996) ("substantial is one of those everyday words having a common sense core

meaning that jurors will be able to understand").

The Court should hew to this authority, and reject the virtually unsupported request that

the "substantial planning or premeditation factor" be stricken.

4.  Vulnerable Victim

Jacques seeks to strike the government's vulnerable victim statutory aggravator, making the surprising assertion that 12-year-old Brooke Bennett's youth could not have rendered her more vulnerable to him.  He also requests that the government proffer its evidence concerning the nexus between the girl's youth and her murder.  This is nothing more than a pretext to preview the government's evidence.

Discovery to date affords a fulsome understanding of how Jacques exploited Brooke's youth to lure her into captivity, and then to rape and murder her.  As Jacques knows well, a drugged child is no match for a predatory adult male.  Courts have routinely held that age is a constitutional sentencing factor, appropriately applied where, as here, the victim is a child.  The defendant does not and cannot argue otherwise.  *See, e.g., Tuilaepa*, 512 U.S. at 977 (finding defendant's challenge to factor requiring sentencer to consider age "unusual in light of our precedents"); *Mitchell*, 502 F.3d at 978 (upholding vulnerable victim aggravating factor where defendant killed a 9-year-old girl; "[a]ggravating factors are by necessity somewhat general, and the Constitution does not demand mathematical precision"); *Jones*, 527 U.S. at 395 ("The Eighth Amendment, as the Court of Appeals correctly recognized, permits capital sentencing juries to consider evidence relating to the victim's personal characteristics"; case involved a young victim).[16]  In short, the nexus between youth and vulnerability is obvious, and well-established in

---

[16]  Jacques cites two cases in support of his argument: *United States v. Johnson*, 136 F. Supp. 2d 553 (W.D. Va. 2001), and *United States v. Mikos*, 539 F.3d 706 (7th Cir. 2008).  The former case is wholly inapposite.  The decision struck an aggravating factor alleging vulnerable victim, based on pregnancy, where death was instantaneous from an exploding pipe bomb.  Here, the alleged crimes did not happen in an instant; it allegedly occurred over an extended period, when Jacques had opportunity to exploit Brooke's vulnerability as a child.  The latter case cited by the defendant supports the government's argument, if anything.  It held that the victim's

the case law.  *See Eddings*, 455 U.S. at 115-117 (upholding age as a sentencing factor).  As the *Eddings* Court explained:

> Our history is replete with laws and judicial recognition that minors, especially in their earlier years, generally are less mature and responsible than adults.  Particularly during the formative years of childhood and adolescence, minors often lack the experience, perspective, and judgment expected of adults.

*Id.* (internal quotations and citations omitted).

Jacques has no need to review the government's evidence to grasp how a 12-year-old girl was especially vulnerable to him.[17]  The Court should reject his attempt to obfuscate the law's longstanding recognition of the vulnerabilities of youth in order to gain a preview the government's evidence.

### 5.  The Sexual Abuse and Manipulation of J1

Jacques challenges this non-statutory aggravating factor on grounds that it "presents a risk that the jury will sentence him to death because of his conduct toward J1 and not because he is alleged to have murdered Ms. Bennett."  He argues that the factor is prejudicial and not "particularly relevant" to sentencing.  Motion at 151.  He fails to cite any supporting case law.  Numerous courts have recognized that a defendant's other crimes are highly relevant to capital sentencing.

To begin with, the FDPA expressly provides that, once the jury has found the threshold

---

obesity rendered her vulnerable to her attacker, and thus rejected a challenge to the vulnerable victim aggravating factor.

[17]  Of course, Jacques is free to argue at sentencing that, under the circumstances, Brooke's youth had no particular bearing on the crimes.  The potential for "[c]ompeting arguments by adversary parties . . . provid[es] guidance . . to jurors," but does not dictate that a sentencing factor should be deemed invalid in advance of trial.  *Tuilaepa*, 512 U.S. at 976.

eligibility factors, the jury "may consider whether *any other* aggravating factor for which notice

has been given exists." § 3592(c) (emphasis added). Nowhere in the FDPA has Congress limited

the jury's ability to hear non-statutory aggravating factors consisting of prior misconduct.

Moreover, the defendant, in making this challenge, overlooks – or perhaps ignores – a

basic tenet of capital sentencing jurisprudence. As the Second Circuit has explained, the Supreme

Court's mandate of "heightened reliability" in capital sentencing is achieved through admission of

"*more* evidence, not less . . . on the presence or absence of aggravating and mitigating factors."

*Fell*, 360 F.3d at 143 (emphasis in original) (citing *Gregg*, 428 U.S. at 203-04). It further

explained:

> Facts relevant to sentencing are far more diffuse than matters relevant to guilt for a
> particular crime. Adjudications of guilt are deliberately cabined to focus on the particulars
> of the criminal conduct at issue and to avoid inquiries in tangential matters that may bear
> on the defendant's character. By contrast, in determining the appropriate punishment, it is
> appropriate for the sentencing authority, whether jury or judge, to consider a defendant's
> *whole life* and personal make-up.

*Id.* (emphasis added) (internal citations omitted) (citing *Williams*, 337 U.S. at 247). Thus, far

from irrelevant, evidence concerning the defendant's history, including additional misconduct, is

precisely the information that belongs in the sentencing analysis. It is central to individualized

and informed penalty phase consideration.

For this reason, capital punishment jurisprudence is replete with decisions that have

allowed admission of other unadjudicated criminal conduct at sentencing. *See Tuilaepa*, 512 U.S.

at 976 (approving as an aggravating factor the defendant's participation in prior unadjudicated

acts of violence); *Williams*, 337 U.S. at 244 (1949) (holding in pre-*Furman* case that a judge's

consideration of unadjudicated crimes in sentencing a defendant to death did not violate due

process); *Hall*, 152 F.3d at 404, *abrogated on other grounds by United States v. Martinez-Salazar*, 528 U.S. 304, 310-11 (2000) (expressly allowing the introduction of unadjudicated acts during capital sentencing); *Milton v. Procunier*, 744 F.2d 1090, 1097 (5th Cir. 1984) (same); *United States v. Johnny Davis*, No. CR 01-282, 2003 WL 1873088, at *3 (E.D. La. Apr. 10, 2003); s*ee also Gilbert*, 120 F. Supp. 2d at 152 ("[f]or the court to impose a *per se* ban on such evidence would give juries a far more positive view of many capital defendants than is true and accurate").

Indeed, the exclusion of such evidence during the penalty phase of an FDPA trial may well constitute reversible error, given its high probative value.  *United States v. Lujan*, No. 09-2406, 2010 WL 1711494, at *4-8 (10th Cir. April 29, 2010) (reversing district court's exclusion of evidence that defendant engaged in other unadjudicated murders in FDPA case; the "Supreme Court . . . ha[s] repeatedly held that the district court may admit evidence of such unadjudicated conduct in the penalty phase of a capital trial . . .", and district court committed "an abuse of discretion" in excluding evidence of the murders "given its high probative value and the availability of curative measures") (collecting cases upholding admission of unadjudicated misconduct).

The bad act evidence at issue here – sexual abuse and manipulation of J1 – is inextricably intertwined with the charged crimes in any event.  The defendant's physical and mental control and abuse of J1 was, the evidence indicates and the government contends, an integral component of his plot to kidnap, rape, and murder Brooke Bennett.  Jacques could not have lured the girl to his house for the "pool party," or hoped to conceal her rape and murder, without assistance.

Accordingly, the Court should reject the unsupported challenge to this aggravating factor.

6.  Misleading the State of Vermont Criminal Justice System

The government included the following non-statutory aggravating factor in its Notice of Intent: "The defendant . . . during approximately 2003 - 2006, manipulated and deceived representatives of the State of Vermont's criminal justice system into believing that, in the wake of completing a term of imprisonment and Vermont's sex offender treatment program, he had been rehabilitated."  Notice at C2.  Jacques argues that this allegation has "almost a bizarre quality," and asks that be stricken for three reasons: (1) "it transforms jurors . . . into the role of victims"; (2) its relevance "is far outweighed by its danger of unfair prejudice"; and (3) it is "duplicative of several other of the non-statutory factors set out by the government."  Motion at 152.  He cites no authority for any of these arguments.  In any event, he is incorrect on each point.

In 1993 Jacques was convicted of aggravated sexual assault and kidnaping based upon his attack upon a Vermont highschool girl.  During the offense – which went on all night – he repeatedly threatened to kill her.  He gagged the girl with a cloth in her mouth, held a knife to her throat, and tightened and jerked a rope around her neck.  Sentenced to six to 20 years in prison, in 1996 the State released him on probation.  During his State custody, Jacques completed Vermont's sex offender treatment program.  In 2004, Jacques petitioned a State court to discharge him from further probation supervision.  His request was granted in 2006.  During the 2004 - 2006 period in which Jacques  persuaded his Probation Officer and a Vermont State judge that he was fully rehabilitated, he was regularly sexually abusing J1, then aged 10 - 12, using his Breckenridge deceit.  As a result of his success in persuading the State to discharge him from probation, he was free of Vermont supervision from 2004 through his 2008 arrest, during which time he continued to sexually assault J1, and raped and murdered Brooke Bennett.

65

First, this non-statutory aggravating factor would not turn all potential jurors into victims. It clearly references a small segment of Vermont citizens, *i.e.,* those representatives of the State criminal justice system who worked with the defendant over the years and believed his claim to be rehabilitated.  The handful of individuals falling into that category obviously would never be allowed on the jury panel.  More importantly, inclusion of this non-statutory aggravating factor at sentencing does not create any new victims.  The defendant is not being charged with a crime for misleading employees of the criminal justice system; that conduct is being added to a mix of considerations that inform the individualized sentencing determination.   Jurors may find this conduct probative – as with other aggravating factors, or proof of the underlying crime – but it does not turn them into the defendant's victims.

Second, Jacques does not explain why he believes the danger of prejudice from this factor "far outweighs" its relevance.  If anything, the balance is reversed.  The allegation that he misled state workers is closely related to the core criminal conduct at issue.  The government alleges that the defendant's ability to evade state oversight and treatment, by resourcefully convincing criminal justice officials that he had been cured of his sex offender proclivities, was contemporaneous with his "Breckenridge" sexual abuse of J1 and may have enabled that offense to continue.  That offense, in turn seamlessly led to his manipulation of J1 into facilitating the kidnaping of Brooke.  The law favors admission of "*more* evidence, not less," during FDPA sentencing, *Fell*, 360 F.3d at 143 (emphasis in original), and this circumstance is relevant to "an *individualized* determination on the basis of character of the individual and the circumstances of the crime."  *Tuilaepa*, 512 U.S. at 972 (emphasis in original) (internal quotation marks omitted); *see also Gregg*, 428 U.S. at 203-04 ("We think it desirable for the jury to have as much

information before it as possible when it makes the sentencing decision."); *Williams*, 337 U.S. at 247 ("Highly relevant - if not essential is the possession of the fullest information possible concerning the defendant's life and characteristics").

Third and finally, the complaint that this factor is impermissibly duplicative of other factors is entirely conclusory. Jacques does not explain which factor it duplicates or how it does so. Regardless, he is wrong. To be duplicative, aggravating factors must "necessarily subsume" one another. Under this test, described in detail in the next section, this aggravating factor is obviously not duplicative of any other.

Accordingly, the Court should reject the request that this aggravating factor be stricken.

### 7.   The Use of J1 to Commit Kidnaping and Murder

Jacques assails this non-statutory aggravating factor as (1) "certainly duplicative of the allegation that Mr. Jacques manipulated J1," because "the kidnaping and murder . . . were part and parcel of the manipulation," (2) and more prejudicial than probative. Motion at 152. He cites no authority for either proposition.

As an initial matter, there is a split among the courts of appeals concerning whether the jury can be presented with duplicative aggravating factors at sentencing. *Compare Purkey*, 428 F.3d at 762 (presentation of factors that duplicate each other is permissible) *with McCullah*, 76 F.3d 1087, 1111-12 (factors may not be duplicative; question is whether any one factor "necessarily subsumes" another). When confronted with the question, both the Supreme Court and the Second Circuit have declined to definitively adopt one approach or the other, instead deciding that, under the *McCullah* test, the factors at issue in the case before it were not duplicative. *Jones*, 527 U.S. at 398-400; *Fell II*, 531 F.3d at 235-36.

Assuming, for argument's sake, that this case will be governed by the *McCullah* standard, the question becomes whether this factor ("the use of J1 to commit kidnaping and murder") "necessarily subsumes" the other ("sexual abuse and manipulation of J1"), or *vice versa*. *Fell II*, 531 F.3d at 235-26. The answer is "no," unless "a jury would necessarily have to find one in order to find the other." *Id.* at 236 (quotations omitted). "Two factors are not duplicative merely because they are supported by the same evidence." *Id.* (citing *Jones*, 527 U.S. at 399). Thus, two aggravating factors may bear resemblances or similarities, may be related, may overlap – even substantially overlap – but this does not make them *per se* duplicative. *Id.*

*Fell II* illustrates the nuance. In that case, the defendant claimed that the following three aggravating factors were duplicative:

> (1) Donald Fell participated in the abduction of Teresca King to facilitate his escape from the area in which he and an accomplice had committed a double murder.

> (2) Donald Fell participated in the murder of King to prevent her from reporting the kidnaping and car-jacking.

> (3) Donald Fell participated in the murder of King after substantial premeditation to commit the crime of carjacking.

*Id.* at 234. In finding no impermissible duplication, this Court explained:

> Factors one and two both address the motive for Fell's acts of violence against King – that he had committed a double murder and wanted to avoid capture. But these two factors differ because the first refers to the abduction of King and the second specifically to her murder . . . . Nor does factor two subsume factor three . . . . While addressing the same carjacking conduct as the other two factors, factor three focuses on premeditation rather than motive. These are similar but nonetheless distinct concepts, justifying separate consideration and separate findings.

*Id.* at 236; *see also Jones*, 527 U.S. at 378 n.3, 398-400 (finding that the two non-statutory factors at issue (1) the victim's "young age, her slight stature, her background, and her

unfamiliarity with San Angelo, Texas," and (2) the victim's "personal characteristics and the effect of the instant offense on [her] family," were not duplicative; "at best, certain evidence was relevant to two different aggravating factors").

Under these standards, the aggravating factor "use of J1 to commit kidnaping and murder" is plainly not duplicative of the aggravating factor "sexual abuse and manipulation of J1." One does not "necessarily subsume" the other, for a jury could find the existence of one, but not the other. It could, for instance, decide that Jacques used J1 to carry out the kidnaping and murder, without also believing that he sexually abused her or manipulated her; the hypothetical works in the reverse. It is also possible that jurors could find similarities or overlap between the two factors, or view certain evidence as probative of both. But they are "nonetheless distinct concepts, justifying separate consideration and separate findings." *See Fell II*, 531 F.3d at 235-36. Accordingly, the Court should reject the Defendant's claim that "use of J1 to commit kidnaping and murder" is a duplicative aggravating factor.

The argument that the risk of prejudice associated with this factor outweighs its probative value is also unavailing. The use of a minor for such purposes as kidnaping and murder is highly relevant to "an individualized determination" at sentencing; if believed, it would speak volumes "about the character of the individual and the circumstances of the crime." *See Tuilaepa*, 512 U.S. at 972 (emphasis omitted) (quotations omitted). What's more, the facts underlying this aggravating factor are integral to the allegations of the substantive offense. The government alleges that the defendant used J1 to help him kidnap, rape, and murder Brooke Bennett. Such evidence can hardly be called irrelevant or distracting to the sentencing equation.

Finally, any concern about prejudice caused by similar – or purportedly duplicative –

aggravating factors can be cured with the proper jury instructions. *Jones*, 527 U.S. at 399-400 ("any risk that the weighing process would be skewed was eliminated by the District Court's instruction" to the jury that it should weigh the value of each factor rather than counting the number of factors on each side); *Fell II*, 531 F.3d at 236 (same).

The Court should reject the challenge to this aggravating factor.

### 8.   Witness Elimination

Jacques claims he cannot discern from discovery or other sources any evidence of a motivation to eliminate a witness, and speculates, "neither does that appear to be the government's theory of the case." He then asks the court to order the government to produce an outline of proofs on this point "in light of the uncertain nature of the proofs on this issue." Motion at 152-53. Once again, he cites no case law or other supporting authority.

The "witness elimination" aggravating factor, as set forth in the Notice, reads: *"The Murder of Brooke Bennett to Eliminate a Witness.* The defendant . . . murdered Brooke Bennett in part to eliminate her as a witness to her own kidnaping and rape." *Id*. at C4. The government submits that the motive to eliminate Ms. Bennett as a witness is plain: killing her eliminated a critical witness to his kidnaping and rape. This non-statutory aggravating factor is very similar to the one approved by the Second Circuit in *Fell. See Fell II*, 531 F.3d at 234, 236 (government alleged "Donald Fell participated in the murder of King to prevent her from reporting the kidnaping and carjacking"; approving the factor, court noted that it "address[ed] the motive for Fell's acts of violence against King – that he committed a double murder and wanted to avoid capture"). The challenge to this factor, therefore, appears to be aimed at previewing the government's evidence.

70

The Court should reject the challenge to the witness elimination factor.

### 9.   Exploitation of a Family Relationship with Ms. Bennett

Jacques asks the Court to exclude this factor because he does not view it "to be of sufficient gravity and or [sic] relevance to serve as a basis for the death sentence."  Motion at 153. He cites no support for this request.

 What is of insufficient gravity to the defendant may well be of tremendous importance to jurors in their task of making "an *individualized* determination on the basis of character of the individual and the circumstances of the crime."  *Tuilaepa*, 512 U.S. at 972 (emphasis in original) (internal quotation marks omitted).  The government submits that this  circumstance easily falls within the broad scope of information relevant to the sentencing  assessment.  *See Fell*, 360 F.3d at 143 (noting Supreme Court's command that, to achieve heightened reliability in death sentencing, decision should entail consideration of "more evidence, not less" concerning aggravating and mitigating factors).

That conclusion is bolstered by the linkage between this factor and the core criminal conduct.  The discovery and information to date reveals that the defendant well knew Brooke via family connections.  She was his niece by marriage, and called him "Uncle Mike."  His close relations and proximity to her as her uncle allowed him effectively to targeted her as a victim, and exploit familial trust (both her's and her mother's), to gain an opportunity to rape and kill her, and attempt to conceal his offense.  Jacques opines that this factor does "not seem 'particularly relevant,'" but it is obviously an important circumstance associated with the crime, which also reflects on his character.  *See Tuilaepa*,  512 U.S. at 972.

The Court should reject the unsupported request to exclude the aggravating factor

71

concerning exploitation of a family relationship.

### 10.  Orchestrating J1's Sexual Assault by Another Adult Male

Jacques seeks to have this aggravating factor stricken on grounds that it is "prejudicial," and not "particularly relevant," without citation to any authority.  The evidence indicates that, approximately a year before his murder of Brooke, Jacques furthered his "Breckenridge" exploitation of J1 by arranging for her sexual liaison with another adult male.  Cases permitting capital juries to consider unadjudicated acts of misconduct at sentencing are legion, as set forth above.  This factor brings to the jury's attention the fact that Jacques not only repeatedly victimized J1 sexually himself, but also orchestrated her sexual assault by another male.  It also further demonstrates the remarkable control Jacques exercised over the girl.   For those reasons, the challenge to this factor should be rejected.

### 11.  The Allegations of Decades Old, Largely Unadjudicated, Sexual Misconduct

Jacques argues that four prior rapes of immature females, one that resulted in a criminal conviction for rape and kidnaping, should be excluded because they are more prejudicial than probative, and, in particular, too remote to have significant probative value.  Again he cites no legal support, other than boilerplate language about the need to exclude information where danger of unfair prejudice outweighs probative value.  The government once again incorporates its argument above, delineating the relevance and importance of prior misconduct to capital sentencing and citing cases that exemplify this principle.

Calling Jacques a recidivist sex offender is an understatement.  Prior to the 2008 rape of the 12-year-old Brooke, he raped other immature Vermont females.  The government submits, and

the Notice alleges, that these prior sexual assaults are appropriate circumstances for a jury tasked with considering the penalty for his sexual assault and murder of Brooke Bennett.  The  claim that a history of prior sexual assaults on immature females is irrelevant or improper is preposterous.

The alleged remoteness of prior acts of sexual misconduct does not render them irrelevant. *See e.g., Lujan*, 2010 WL 1711494, at *2, *10 (reversing district court's exclusion of defendant's commission of unadjudicated murders in 1998); *Caro*, 2010 WL 963201, at *11-13 (upholding jury's consideration in a 2006 FDPA sentencing of defendant's admission to possession with intent to distribute marijuana in 1988 and 1994 and possession with intent to distribute cocaine in 2001); *Johnny Davis*, 2003 WL 1873088 at *3-4 (admitting acts of prior misconduct from 1998). Here, the alleged prior misconduct, which includes sexual assault and kidnaping, may be all the more relevant, because it is akin to the criminal conduct charged in this case.  *See Davis*, 912 F. Supp. at 948 (admitting prior unadjudicated acts of misconduct in FDPA case; noting "[p]roof of commission of *other acts of violence* by a defendant is arguably more relevant and probative than any other type of aggravating evidence supporting imposition of the death penalty") (emphasis added).

Finally, one of the alleged prior acts of sexual misconduct resulted in a conviction for rape and kidnaping.  During that offense, Jacques threatened to kill the female victim.  Prior convictions are "properly and routinely considered" in federal sentencing because unwillingness to abide the law warrants increased retribution and deterrence.  *Caro*, 2010 WL 963201 at *13 (upholding admission of prior convictions in FDPA case); *Almendarez-Torres v. United States*, 523 U.S. 224, 230 (1998) ("Prior commission of a serious crime . . . is as typical a sentencing factor as one might imagine").

73

Accordingly, the Court should deny the request that aggravating factors concerning the defendant's alleged prior sexual misconduct be stricken.

### 12.  Possession of Child Pornography

Jacques raises a bare bones challenge to this non-statutory aggravating factor on relevance grounds.  He does not elaborate on his reasons, and cites no supporting authority.  Jacques's fixation on J1 and Brooke, two immature girls, is reflected in an abundance of  pornography that he possessed contemporaneously, depicting other immature girls.  A jury should not be barred from considering that evidence (which is, in any event, charged as a separate offense).  The government incorporates its above arguments and positions, and asks the Court to reject the defendant's request to strike this factor.

### 13.  Lack of Remorse

Jacques claims that this non-statutory aggravating factor must be stricken, because consideration of it by the jury penalizes the exercise of his Fifth and Sixth Amendment Rights. He is wrong.  The government will introduce evidence beyond his mere silence or decision to go to trial to establish lack of remorse.

Within hours of murdering and burying Brooke, Jacques discussed her disappearance with her distraught mother and older sister, calmly explaining that he had last seen Brooke at Cumberland Farms that morning and had no idea where she was.  During a lengthy interview of Jacques the day after the murder, he further articulated his false narrative of her disappearance and denied any knowledge of her whereabouts.  His demeanor and attitude during the interview was relaxed and engaging.  Further, he went to truly extraordinary lengths to plan the murder of his niece before the fact, and to conceal it, and after the fact planned to obstruct and divert the

74

investigation with threats to kill other children. To the government's knowledge, he has never demonstrated any remorse.

The Supreme Court has endorsed lack of remorse as an appropriate factor for the jury to consider during the selection phase of sentencing. In *Zant*, the Court stated that "any lawful evidence which tends to show the motive of the defendant, *his lack of remorse*, his general moral character, and his predisposition to commit other crimes is admissible in aggravation." *Zant*, 462 U.S. at 885, n. 22 (emphasis added).

In the FDPA context, federal courts have likewise found no *per se* constitutional problem with this aggravating factor. *See Johnny Davis*, 2003 WL 1873088, at *9 (noting no *per se* constitutional problem with "lack of remorse factors"); *Nguyen*, 928 F. Supp. at 1541-42 (same) (citing and quoting *Zant*, 462 U.S. at 885 n. 22). To the contrary, because there is a preference for "more evidence, not less," at the selection stage of sentencing, *see Fell*, 360 F.3d at 143, and because the proposed lack of remorse factor is relevant to the defendant's general moral character, *see Zant*, 462 U.S. at 885 n.22, this non-statutory aggravating factor is valid. Courts across the country have approved lack of remorse as a stand alone non-statutory aggravating factor, so long as the government complies with the constitutional requirements as to proof. *Nguyen*, 928 F. Supp. 2d at 1541-42 (upholding lack of remorse as factor, cautioning government must not implicate defendant's constitutional right to remain silent); *Roman*, 371 F. Supp. 2d at 50-51; *United States v. Rivera*, 405 F. Supp. 2d 662, 672-73 (E.D. Va. 2005).

The government appreciates that it cannot premise this aggravating factor solely on the defendant's silence or his jury trial election. *See Caro*, 2010 WL 963201, at *16-19. It intends to demonstrate lack of remorse by presenting other affirmative evidence, such as that summarized

above, *see Nguyen*, 928 F. Supp. at 1542 (noting the government intended to show the defendant's

lack of remorse "through his actions, statements, and demeanor"); *Johnny Davis*, 2003 WL

1873088, at *9 (noting the government will "introduce evidence of continuing glee, or

boastfulness, or other affirmative words or conduct . . ."); *United States v. Kaczynski*, No. CR. 96-

259, 1997 WL 34626785, at *25 (E.D. Cal. Nov. 7, 1997) (allowing lack of remorse factor where

government intended to introduce "affirmative evidence – the defendant's own writings"), and not

by implicating the defendant's constitutional rights to remain silent and to trial by jury. *See*

*Nguyen*, 928 F. Supp. at 1543.

In the only case cited by the defendant that seems to squarely support his view, the

government did just the opposite. *United States v. Davis*, 912 F. Supp. 938, 946 (E.D. La. 1996)

("The government does not propose to introduce evidence of continuing glee, or boastfulness, or

the affirmative words or conduct that would indicate a pervading and continuing lack of remorse.

Furthermore, as already noted, the allegation of lack of remorse encroaches dangerously on an

offender's constitutional right to put the government to its proof"). That case is, therefore,

distinguishable. Notably, the *Davis* court issued the caveat that its ruling did not "pass[] on

whether lack of remorse is per se an inappropriate factor to consider" and actually allowed the

government to introduce "lack of remorse" evidence under the heading of the future

dangerousness aggravating factor. *Id.*

Jacques also relies on *Nguyen*, 928 F. Supp. at 1542, for the unremarkable and uncontested

propositions that evidence of lack of remorse must be "more than mere silence" and "its probative

value must outweigh any danger of unfair prejudice." The government concurs, but stresses that

in *Nguyen* the court *refused to strike* the lack of remorse factor.

The citation to *United States v. Walker*, 910 F. Supp. 837, 855 (N.D.N.Y. 1995), is also somewhat perplexing.  That case also *permitted the government to introduce evidence of lack of remorse*.  The *Walker* court, however, viewed the government's evidence of this factor as "trivial" and prejudicial in the context of the facts before it, and therefore, like the *Davis* court, did not allow the evidence to come in under the mantle of a separate aggravating factor.  The government submits that its evidence will not trigger the concerns of the *Walker* and *Davis* courts, and is therefore not governed by their reasoning.

In any event, to the extent the Court has concerns about the government's proof of lack of remorse and its implications for the defendant's constitutional rights, the government suggests that the Court should withhold ruling until after it is presented with the evidence.  *See Nguyen*, 928 F. Supp. at 1542 ("the court is not comfortable with striking one of the government's aggravating factors without first knowing what evidence the government intends to introduce"; distinguishing *Davis*, because the court in that case had a detailed awareness of the evidence at the time it made its decision).

Accordingly, the Court should deny the defendant's request to strike the lack of remorse aggravating factor.

### 14.  Low Potential for Rehabilitation

Jacques asks the Court to strike the non-statutory aggravating factor "low potential for rehabilitation," on grounds that "[r]ehabilitation is really not the issue here."  Motion at 162.  Specifically, he argues, without citing any authority, that "[i]f convicted, but spared a sentence of death, [he] will spend the remainder of his life incarcerated . . . ," and thus, potential for rehabilitation is not relevant.  *Id.* at 162-63.

Jacques is simply wrong.  As courts have recognized, rehabilitative potential is especially germane to the sentencing process.  *See Johnny Davis*, 2003 WL 1873088, at *10 (holding in FDPA prosecution that "the concept of examining a defendant's rehabilitative potential is firmly rooted in criminal sentencing practices"); *United States v. Spivey*, 958 F. Supp. 1523, 1535 ("The criminal justice system regularly assesses a defendant's potential for rehabilitation, as, for example, when a court determines the appropriate sentence"); *McCullah*, 76 F.3d at 1108 (indicating relevance of low potential for rehabilitation for purposes of sentencing).

The Supreme Court has expressly approved consideration at sentencing of the closely-related aggravating factor, future dangerousness,[18] noting its essential role in the criminal justice system.  *See Jurek*, 428 U.S. at 275-76 ("what is essential is that the jury have before it all possible information about the individual whose fate it must determine"; noting task of evaluating future dangerousness is performed countless times each day in the American justice system); *California v. Ramos*, 463 U.S. 992, 1002-03 (1983) (consideration in capital sentencing of whether probable future behavior made it desirable for the defendant to return to society was proper).

That the defendant's sentence upon conviction will be either death or life in prison without possibility of parole does not obviate the relevance of this aggravating factor.  The defendant is, however, entitled to rebut the government's evidence of low potential for rehabilitation by

---

[18]  The two factors are so closely related that courts have deemed them unconstitutionally duplicative and stricken one or the other from the sentencing calculus where the government alleged both.  *See, e.g, Nguyen*, 928 F. Supp. at 1543-44; *Davis*, 912 F. Supp. at 946.  These courts have acknowledged the relevance of both factors, in permitting the government to proceed with evidence of one, but not both.  Here, there is no duplication problem, because the government has not included future dangerousness in its Notice.

informing the jury that he is not eligible for parole.  *Simmons v. South Carolina*, 512 U.S. 154, 169 (1994); *Allen*, 247 F.3d at 788-89.

The aggravating factor remains relevant because "[a] defendant in prison for life is still a risk to prison officials and to other inmates, and even though a life sentence without the possibility of parole greatly reduces the future danger to society from that particular defendant, there is still a chance that the defendant might escape from prison or receive a pardon or commutation."  *Allen*, 247 F.3d at 788; *see also Zant*, 462 U.S. at 885 ("predisposition to commit other crimes is admissible in aggravation").  Moreover, the jury may find innate relevance in the defendant's potential for rehabilitation.

Accordingly, the Court should deny the request to strike the low potential for rehabilitation aggravating factor.

### 15.  Two Obstructions of Justice

Jacques makes the conclusory and unsupported claim that aggravating factors alleging that he obstructed justice before and after his arrest should be stricken, because they "do[] not satisfy constitutional standards for an aggravating factor."  Motion at 163.  Reading between the lines, he appears to be asserting that this factor is duplicative because it is "part and parcel of the criminal conduct with which [he] is charged."  *Id.*   The argument fails for reasons outlined above.  The proposed aggravating factors would be offered at sentencing, not trial – and therefore for entirely different purposes – and they do not "necessarily subsume" and any other aggravating factor.[19]

_____

[19]  The defendant's other argument – that these factors can be relevant only if the court finds that "it is permissible for a jury to find that [he] should be sentenced to death because he obstructed justice" – is way off the mark.  *See* Motion at 163.  The Court need find no such thing.  The government has offered these factors as part of the total mix of information the jury will weigh in determining the defendant's sentence if he is convicted.  As set forth repeatedly herein,

16.  Victim Impact Evidence

Jacques mounts a three-pronged attack on the government's victim impact non-statutory aggravating factor.  With regard to this factor, the Notice states: "The defendant . . . caused injury, harm, and loss to Brooke Bennett's family, friends, and classmates because of Brooke Bennett's personal characteristics as an individual human being and the impact of her death upon her family, friends, and classmates."  Notice at ¶ 17.  The FDPA expressly invites introduction of victim impact evidence at sentencing.  *See* § 3593(a) (aggravating factors for capital sentencing "may include factors concerning the effect of the offense on the victim and the victim's family, and may include oral testimony, a victim impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information").

Jacques nonetheless asserts that this factor (1) is unconstitutionally vague and overbroad; (2) is alleged in nearly every capital prosecution and therefore does not sufficiently narrow the class of murderers subject to the death penalty; and (3) should be excluded for failure to meet the Eighth Amendment standard of heightened reliability.

These assertions are without merit.  Again, the defendant's arguments are virtually unsupported, foreclosed by Supreme Court precedent, and at odds with the large body of case law approving victim impact evidence.

---

the relevant question is whether aggravating factors are part of the universe of information about "a defendant's whole life and personal make-up" and contribute to the gathering of "full and complete information about the defendant."  *Fell*, 360 F.3d at 143 (citing *Gregg*, 428 U.S. at 203-04, and *Williams*, 337 U.S. at 247).  Clearly, consideration of these alleged obstructions of justice would serve that end.

(a)  The Victim Impact Factor is Not Too Vague or Overbroad.

The Supreme Court has upheld admission of precisely this type of evidence for purposes of federal sentencing, over the defendant's vagueness objection.  *See Jones*, 527 U.S. at 400-01 (holding victim impact factor not vague, which read in its entirety that "Tracie Joy McBride's personal characteristics and the effect of the instant offense on Tracie Joy McBride's family constitute an aggravating factor for the offense," citing *Tuilaepa's* deferential standard for review of aggravating factors)[20]; *Payne v. Tennessee*, 501 U.S. at 825-26 (deeming victim impact aggravating evidence constitutional, citing deferential standard of review of aggravating factors); *see also, e.g., Barnette*, 211 F.3d at 817 (holding victim impact factor was not vague, which read in its entirety that "[t]he defendant caused harm to the [families] of [the victims] as a result of the impact of the killing[s] on the [families]"); *Higgs*, 353 F.3d at 320-21; *Fields*, 516 F.3d at 944-45; *Mitchell*, 502 F.3d at 998; *Barrett*, 496 F.3d at 1099.  These decisions present an insurmountable obstacle to the defendant's challenge.

As to overbreadth, the defendant appears to take issue with the government's inclusion of Ms. Bennett's "friends and classmates," because the statute purportedly limits victim impact evidence to effects on "victim and victim's family."  Motion at 163.  This claim falters on the plain language of the statutory provision, 18 U.S.C. § 3593(a) (permitting consideration of "any other relevant information"), and, as with so many other of defendant's claims, on the case law. *See Barrett*, 496 F.3d at 1098-1100 (statutory language from § 3593(a) stating that the "factors for which notice is provided may include . . . and any other relevant information" allowed

---

[20]  The victim impact factor endorsed by the Court in *Jones* is arguably more susceptible to a vagueness challenge than the government's proposed version.

81

introduction of evidence of impact on victim's friends).  Indeed, the *Barrett* Court determined that victim impact testimony from the victim's friends may show the victim's "uniqueness as a human being," consistent with the spirit of the FDPA and *Payne, id*. at 1099; *see also, e.g., United States v. Nelson*, 347 F.3d 701, 712-13 (8th Cir. 2003) (finding admission of victim impact evidence permissible and proper where two sisters, two neighbors and friends, a teacher, and the victim's mother testified at penalty phase; noting such testimony was blunted by defendant's overwhelming character evidence); *Barnette*, 211 F.3d at 818-19 (affirming admission of victim impact testimony of friends and others outside victim's family); *Gooch*, 2006 WL3780781, at *1 (allowing family and friends to testify).

Nor is there any weight to the claim that the government's notice of the victim impact factor is insufficiently specific or provides inadequate guidance.  The factor has a "common sense core meaning" that is readily understandable.  *See Jones*, 527 U.S. at 400 (holding the jury should not have "had difficulty comprehending that [the victim impact] factor asked it to consider the victim's personal traits and the effect of the crime on her family"); *Barnette*, 211 F.3d at 818 ("The jury knew it was to consider the impact on the families that resulted from the deaths of [the victims] from the language of the factor alone.").  The government urges the Court to follow the many cases that have refused to grant the defendant access to evidence of aggravating factors in advance of trial, cited above.  *E.g., Solomon*, 513 F. Supp. 2d at 539 (denying request for particulars concerning victim impact, among other things).  If the Court is, however, inclined to adhere to the approach of district courts cited by the defendant, *see* Motion at 163-65, the government suggests that the Court follow those decisions and order additional specificity in the form of an outline, rather than a hearing.

For these reasons, the Court should reject the defendant's claim that the victim impact aggravating factor is vague, overbroad, or insufficiently detailed.

> (b)  The Victim Impact Factor is Not Required to Narrow the Class of Eligible Offenders.

The defendant's claim that the Court should strike the victim impact factor because it does not sufficiently narrow the class of death penalty eligible murderers misapprehends the constitutional purpose of non-statutory aggravating factors, such as victim impact.   The jury conducts the narrowing process during the eligibility stage of its deliberations – that is, in its inquiry into intent and statutory aggravating factors.  The victim impact factor, as a non-statutory aggravating factor, has no bearing on the eligibility decision; it is vehicle for selection – *i.e.,* tailoring the death penalty determination to the unique circumstances of each defendant.  By the time the jury examines the victim impact factor, the narrowing process will be accomplished; the jury will have decided beyond a reasonable doubt that the defendant is eligible to receive the death penalty.  Accordingly, the defendant's claim that the victim impact factor must contribute to narrowing is meritless and should be disregarded.  *See Zant*, 462 U.S. at 878-79.

> (c)  The Victim Impact Factor is Not Unreliable.

In a last ditch effort to carve the victim impact factor out of sentencing, Jacques claims that such evidence falls short of the "heightened reliability" standard for capital prosecutions, "noted by this Court in *United States v. Fell*," and is "overwhelmingly prejudicial."  Motion at 166.  His exclusive support for this argument is a windy quote from a district court opinion out of Northern Iowa.  *Id.* at 166-67.  Because his argument is contrary to – and entirely ignores – binding Supreme Court and Second Circuit precedent, it must fail.

Jacques is correct insofar as this Court articulated and applied the heightened reliability standard in *Fell*, 217 F. Supp. 2d 469, but that is where the correctness of his argument ends.  As noted elsewhere, "the Supreme Court has [] made clear that in order to achieve such 'heightened reliability,' more evidence, not less, less should be admitted on the presence of aggravating and mitigating factors."  *Fell*, 360 F.3d at 143.  Accordingly, the defendant's citation to "heightened reliability," while apt, actually counsels in favor of admitting victim impact evidence, not excluding it.  *See id.*; *Gregg*, 428 U.S. at 203-04 ("We think it desirable for the jury to have as much information before it as possible when it makes the sentencing decision" in a capital case).

And, finally, the apparent view of a district judge in another jurisdiction that victim impact evidence is always unfairly prejudicial or unreliable – and that *Payne* might have come out differently had the Supreme Court justices first sat in on one of his trials, *United States v. Johnson*, 362 F. Supp. 2d 1043, 1107 (N.D. Iowa 2005) – simply cannot stand up to *Payne*, *Jones* and the other binding precedent to the contrary.  As the Supreme Court instructed in *Payne*:

> We think the *Booth* Court was wrong in stating that this kind of evidence leads to the arbitrary imposition of the death penalty.  In the majority of cases, and in this case, victim impact evidence serves entirely legitimate purposes . . . to assess meaningfully the defendant's moral culpability and blameworthiness, [the jury] should have before it at the sentencing phase evidence of the specific harm caused by the defendant  . . . . 'It is an affront to the civilized members of the human race to say that at sentencing in a capital case, a parade of witnesses may praise the background, character, and good deeds of the defendant . . . without limitation as to relevancy, but nothing may be said that bears upon the character of, or the harm imposed, upon the victims.'

501 U.S. at 825-26 (quoting lower court approvingly).

The Supreme Court has also observed that the force of victim impact evidence and the risk of prejudice are mollified by the defendant's mitigating evidence.  *Id.* at 825.  In fact, as the Court has noted, victim impact evidence may be necessary to counteract the parade of mitigating proof

typically adduced by convicted capital defendants.  *Id.*

Under *Payne* and its progeny, the Court should reject the claim that the victim impact factor is inherently unreliable and prejudicial.[21]

### H.  THE ABSENCE OF A CURRENT VERMONT STATE CAPITAL PUNISHMENT STATUTE DOES NOT BAR CONSIDERATION BY A FEDERAL JURY OF THE PENALTY ESTABLISHED BY CONGRESS FOR THE FEDERAL OFFENSE OF KIDNAPING WITH DEATH RESULTING.

Jacques contends that the federal government may not proceed with this case under the Eighth Amendment's ban on cruel and unusual punishment, because Vermont state law does not authorize capital punishment.  His one-paragraph argument is premised not on case law, but on a law review article, which he adopts by reference without further discussion or elaboration.  The gravamen of the article is the claim that a historical analysis of the criminal procedure protections of the Bill of Rights, including the Eighth Amendment, reveals their purpose to stave off federal encroachment on state sovereignty and local values with respect to punishment – and that these provisions should, therefore, be read to prohibit the federal government from imposing the death penalty in a state that does not accept capital punishment.

The government will not use this forum to address every point in the article, but observes, respectfully, that adoption of its overarching viewpoint would be an affront to binding Supreme Court and Second Circuit precedent, and the plain language of the Constitution.  Some of the major pitfalls in the article are set forth below.

---

[21] Of course, victim impact evidence will most certainly be prejudicial to the defendant; virtually all evidence in any trial carries with it some prejudice to one party or the other, as is the nature of our adversarial system.  "In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief."  *Id.* (citing *Darden v. Wainwright*, 477 U.S. 168, 179-83 (1968)).

1.   The Second Circuit Has Rejected the Article's Thesis.

The Second Circuit rejected the thesis in a thorough opinion handed down during post-conviction proceedings in *United States v. Fell*, 571 F.3d 264 (2d Cir. 2009) ("*Fell III*").  In *Fell III*, the court considered a claim that the composition of the jury panel that convicted the defendant of FDPA charges should have reflected the local values of the state that hosted the trial, *i.e.,* Vermont.  *Id.* at 265-78.  The court, examining the issue through the prism of the Eight and Sixth Amendments and principles of federalism, was not persuaded.  *Id.*

The court began by stating that "[f]ederalism is a principle concerned with the constitutional distribution of *power* as between the Nation and the States," which "ensures a proper respect for state functions by limiting the exercise of federal authority when it unduly interferes with the legitimate activities of the States."  *Id.* at 268 (quoting *Staub v. City of Baxley*, 355 U.S. 313, 325-26 (1958) (emphasis in original), and *Younger v. Harris*, 401 U.S. 37, 44 (1971)).  The exercise of federal power under the auspices of a trial for a federal capital crime, the court observed, does *not* implicate these federalism concerns.  *Id.* at 269 ("The selection of a federal jury to hear a case arising under federal law involves the exercise of an exclusive federal power.  It does not intrude on any state *function*; much less does it trench on the exercise of any state *power*.  It poses no interference with legitimate state *activities*") (emphasis in original).  Thus, the Court concluded, federalism does not "confer[] an additional right on the citizens of states that choose not to enact similar local laws to have their opposition to the federal law given special consideration in the selection of a federal jury."  *Id.* at 270 (emphasis omitted); *see also id.* at 271 ("[N]o recognized theory of federalism supports the dissent's assertion that federal petit juries must be selected in light of the particular vicinage's support for or opposition to the federal

law").

If, as the Second Circuit has established, local sentiment against the death penalty may not play a role in FDPA jury selection, it follows that such sentiment may not preclude the federal government from seeking to apply federal law in that locality.  The Court said so explicitly when it pronounced that "[n]othing in the [Supreme] Court's jurisprudence has ever suggested that federalism warrants re-tailoring in each state – or each vicinage – to test federal death sentences by reference to local practices."  *Id.* at 274.[22]

Accordingly, the defendant's effort to import a vicinage concern into the Eighth Amendment – by channeling a law professor – is misguided, and his request that the FDPA be deemed unconstitutional on this basis should be rejected.  *Id.* at 274.

> 2.  Adoption of the Article's View Would Contravene the Supremacy Clause.

The defects in the theory can be seen through the lens of Supremacy Clause jurisprudence as well.  In particular, the article extols a form of reverse preemption, whereby a state's choice to have no death penalty would eviscerate the federal government's power and prerogative to proceed with a federal death penalty prosecution in that state.  This idea, while perhaps interesting and provocative, is at loggerheads with the Supremacy Clause.

The Supremacy Clause of the Constitution provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of Any State to the Contrary

---

[22]  The article's discussion of the history of the Eighth Amendment and other constitutional rights of the accused does not change the analysis.  The Second Circuit reads history differently.  *See id.* at 269 (noting that constitutional protections for the accused regarding trial venue do not "reach[] beyond geography to local ideology").

notwithstanding.

U.S. Const., Article VI, Clause 2.  It is beyond dispute that, under this provision, a "state law [that] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" is void.  *E.g., Edgar v. Mite Corporation*, 457 U.S. 624 (1982)  Relatedly, a state may not, consistent with the Supremacy Clause, legislate concerning areas of exclusive federal jurisdiction.  *McCulloch v. Maryland*, 17 U.S. 316 (1819) (striking down state tax on Second Bank of the United States).  Nor may a state law "stand in the way of a federal court's remedial scheme."  *Stone v. City and County of San Francisco*, 968 F.2d 850 (9th Cir. 1992).

These hoary precepts preclude the article's thesis.  State sentiment against the death penalty, if construed as precluding the FDPA, would frustrate "accomplishment and execution of the full purposes and objectives of Congress," *Edgar*, 457 U.S. at 624.  Such state action in an area of federal jurisdiction is void under the Supremacy Clause.  *See McCulloch*, 17 U.S. at 316.

The article foresees the Supremacy Clause objection to its thesis, and acknowledges its force.  But its preemptive response is unsatisfactory to say the least; it is, literally, "So what?" 74 U. CIN. L. REV. at 880 ("This principle does appear to allow a State to, in effect 'reverse preempt' federal legislation.  The answer to this must be a resounding: 'So what?'").  That answer may (or may not) have force in academic discussion, but does not pass muster in federal court, where the Constitution and binding precedent have weight.[23]

---

[23]  The article purports to "put [its argument] another way," stating that "the Supremacy Clause makes supreme only those 'Laws of the United States . . . made in Pursuance' of the Constitution, but a federal law that purports to impose the death penalty within States that do not authorize capital punishment has not been 'made in Pursuance of' the Constitution, but rather in violation of it, at least in those States."  *Id.*  This tautology might rise to the level of question-begging, if only the Supremacy Clause weren't part of the Constitution.  To close out the response to the Supremacy Clause objection, the article trails off into a discussion of parallel

### 3.  Equal Protection Problems

The article's concession that his reading of the Eighth Amendment "will lead to different sentences for similarly-situated offenders, depending on the State in which the crime occurred" understates the problem.  *Id.* at 888.  The article's theory would not only foster disparate imposition of the federal death sentence, but unequal application and sentencing under every provision of the federal criminal code – and the infection likely would not stop there.  The Second Circuit invoked this facet of the article's constitutional dilemma in *Fell III*, explaining why local proclivities concerning the death penalty cannot be permitted to infect FDPA cases.  *Fell III*, 571 F.3d at 271, 274 ("[p]lainly, the Constitution must apply equally throughout the states . . . . the Eighth Amendment no less than any other provision . . . ."; explaining that capital defendants in Vermont cannot be treated differently for purposes of FDPA than capital defendants in Texas due to different death penalty laws).  Under the Equal Protection guarantees of the Constitution, the article's theory cannot stand.[24]

### 4.  Separation of Powers Problems

Another glaring problem with the article's proposal – one which it does not appear to anticipate – is that it would undermine the separation of powers doctrine underlying American jurisprudence.  *See City of New York v. Beretta U.S.A. Corp.*, 524 F.3d 384, 395 (2d Cir. 2008)

---

reverse preemption arguments made under the Ninth Amendment, by a scholar who admitted his theory was "radical stuff."  *Id.*

[24]  The article concedes as much, but chalks it up to "The price of Federalism."  74 U. CIN. L. REV. at 878.  It goes on to criticize decisions applying the Bill of Rights to the federal government under the Fifth Amendment, *id.*, and to persist in not quite begging the question.  *Id.* at 888-89 ("where one provision of the Constitution forces the federal government to distinguish between otherwise similarly situated persons, one would be hard pressed to argue that, in so doing, it violates a different provision of Constitution").

(the "doctrine of separation of powers is 'one of the organizing principles of our system of government,' *Nixon v. Adm'n of Gen. Servs.*, 433 U.S. 429, 465 (1977)," and "essential to the successful working of this system . . ."). Undoubtedly it is the province of the judiciary to interpret the law. *Marbury v. Madison*, 5 U.S. 137 (1803). Federal courts are the arbiter of the meaning of federal laws, including the Constitution and its Bill of Rights. *Id.* To allow the people of each state to decide through their representatives what is cruel and unusual punishment for purposes of the Eighth Amendment – thereby crippling the capacity of federal judges to conduct FDPA trials – would undermine the separation of powers doctrine. *See Beretta*, 524 F.3d at 395 (Constitution "forbids legislatures from prescribing rules of decision to the Judicial Department of the government in cases pending before it") (internal quotations omitted).

Put simply, the meaning of the Eighth Amendment is not a question of popular will, as the article would have it. *See Fell III*, 571 F.3d at 274-75 (noting the problems with requiring federal judges to construe constitutional provisions by reference to local values, which are often shifting).

For at least these reasons, the Court should reject the defendant's urging to adopt the article's thesis that local values trump the FDPA and define the scope of the Eighth Amendment.

## I. THE DEATH PENALTY DOES NOT CONSTITUTE CRUEL AND UNUSUAL PUNISHMENT OR A *PER SE* DENIAL OF DUE PROCESS IN ALL CASES.

Jacques claims that the death penalty is, under all circumstances, cruel and unusual punishment in violation of the Eighth Amendment and a violation of due process under the Fifth Amendment. He concedes, however, that the constitutionality of the death penalty is the "rule of law" in this country. Indeed, this claim is foreclosed by Supreme Court and Second Circuit precedent. *See, e.g., McCleskey*, 481 U.S. at 296-97, 300-02 (rejecting the various claims that the

death penalty violates the Constitution under all circumstances); *Gregg*, 428 U.S. at 169, 187

(holding that the death penalty is not cruel and unusual punishment and explaining that capital

punishment is an essential function as an expression of society's moral outrage at particularly

offensive conduct); *id*. at 207, 226 (White, J., concurring); *Quinones*, 313 F.3d at 61 (". . . the

Supreme Court expressly held in *Gregg* that, to the extent our standards fo decency have evolved

since the enactment of the Constitution, they still permit punishment by death for certain heinous

crimes such as murder") (citing *Gregg*, 428 U.S. at 186-87); *id.* at 70 (". . . under the standard

articulated by the Supreme Court . . . capital punishment cannot constitute a per se violation of the

Due Process Clause).

Accordingly, the defendant's closing argument in support of his motion should be rejected.

V.  CONCLUSION

For the reasons set forth above, the Court should deny the Motion.

Dated at Burlington, in the District of Vermont, this 17th day of May, 2010.

Respectfully submitted,

UNITED STATES OF AMERICA

TRISTRAM J. COFFIN
United States Attorney

By:   /s/ *William B. Darrow*
CRAIG S. NOLAN
WILLIAM B. DARROW
CHRISTINA E. NOLAN
Assistant U.S. Attorneys
P.O. Box 570
Burlington, VT 05402-0570
(802) 951-6725
Bill.Darrow@usdoj.gov