UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF VERMONT

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | No. 2:08-cr-117 |
| ) | |
| MICHAEL JACQUES ) | |

**OPPOSITION OF THE UNITED STATES TO**
**DEFENDANT'S MOTION TO TRANSFER VENUE**

NOW COMES the United States of America, by and through its attorney, Tristram J. Coffin, United States Attorney for the District of Vermont, and opposes defendant's motion to transfer venue. Defendant contends that the circumstances of this case warrant a departure from the ordinary requirement that he establish during voir dire actual prejudgment by the venire of trial issues. In the absence of evidence adduced from a searching voir dire by this Court, defendant cannot demonstrate a reasonable likelihood that pretrial publicity will prevent a fair trial in Vermont. For these reasons, the motion should be denied or a ruling deferred until voir dire.

**BACKGROUND**

On June 25, 2008, defendant Michael Jacques lured 12-year-old Brooke Bennett to his residence and then drugged, raped, and murdered her. The crime had its origins in Jacques' years-long sexual abuse of J1, whom Jacques manipulated to assist him in committing his crimes against Brooke. Years earlier Jacques had deceived J1 into believing that she had been inducted into the "Breckenridge Program," a powerful cartel providing sex training to girls. J1 was taught that she had to comply with Program directives to submit to sexual abuse by Jacques – her "trainer" – or risk that she or her family members be killed. As J1 grew older, Jacques directed

communications purportedly from Program leaders to J1 from email accounts and via cell phone text messages.

In May 2008, Jacques indicated in email to J1 that the Program had decided to "terminate" Brooke, and Jacques and J1 were to take Brooke and turn her over to Program operatives. Using a series of Program email and text messages, as well as direct communications, during May and June 2008, Jacques arranged for J1 to assist him in luring Brooke to his residence so that he could rape and kill her.

On June 20, 2008, Jacques caused J1 to send Brooke four text messages designed to deceive Brooke into believing that a local boy of whom she was fond would be present at the Jacques residence on June 25th for a pool party. Jacques also directed J1 to invite Brooke to spend the night of June 24th at the Jacques residence. On the morning of June 25, 2008, Jacques dropped off Brooke in Randolph Center and then picked her up minutes later. Jacques drove Brooke to his residence purportedly for the pool party, lured her upstairs under the pretense of performing a "magic trick," and then drugged, raped, and murdered her.

Subsequent to defendant's arrest, the grand jury charged him for his crimes against Brooke and J1. The October 1, 2008, indictment charges Jacques with kidnaping resulting in death, in violation of 18 U.S.C. § 1201(a) (Count 1), producing child pornography, in violation of 18 U.S.C. § 2251(a) (Counts 2 - 5), and knowingly possessing child pornography, in violation of 18 U.S.C. § 2251(a)(4)(B)(I).

**ARGUMENT**

Rule 21(a) of the Federal Rules of Criminal Procedure requires a district court to transfer a criminal proceeding to another district if the court is satisfied that there exists "so great a

prejudice against the defendant" in the district where the prosecution is pending "that the defendant cannot obtain a fair and impartial trial at any place fixed by law for holding court in that district."  Fed. R. Crim. P. 21(a); *see United States v. Sabhnani*, 599 F.3d 215, 232 (2d Cir. 2010).  A defendant "must show 'a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial.'"  *Sabhnani*, 599 F.3d at 232 (quoting *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966)).  A defendant can satisfy this burden in two ways.  He can demonstrate that a presumption of prejudice should apply because the community has been so saturated with inflammatory pretrial publicity that it would pervade the proceedings and override notions of fairness in the determination of guilt or innocence.  *See id.* at 233 (citing *Rideau v. Louisiana*, 373 U.S. 723, 726-27 (1963)).  Alternatively, a defendant can demonstrate actual prejudgment by the venire of the issues to be decided at trial.  *See id.* (citing *Murphy v. Florida*, 421 U.S. 794, 800 n.4 (1975)).

Jacques fails to make either showing required to prevail under Rule 21(a).  The pretrial publicity associated with this case neither rises to the extraordinary level required for presuming prejudice, nor demonstrates actual prejudgment of trial issues by the venire.  The polling data offered by defendant indicates that a fair and impartial jury can be selected in Vermont.  In the absence of a voir dire record to the contrary, defendant's motion must be denied.

      **I.**      **Jacques Has Not Established an Irrebuttable Presumption of Pervasive Prejudice**

In urging this Court to take the extraordinary step of presuming that no Vermont jury can be fair and impartial after a searching voir dire by this Court, defendant relies exclusively on two Supreme Court decisions.  *See* Mot. at 29-31 (citing *Rideau v. Louisiana*, 373 U.S. 723 (1963), and *Irvin v. Dowd*, 366 U.S. 717 (1961)).  Neither decision supports his argument.  *Rideau*

turned on unique circumstances not present here.  *Irvin* was decided based on actual, not presumed, prejudice among petit jurors.

The only decision in which the Supreme Court has "presumed" juror prejudice based solely on pretrial publicity is *Rideau*, which turned on the unique circumstance that the defendant's jailhouse confession was repeatedly televised in a small community.  In *Rideau* the morning after a bank employee in a small town was kidnaped and murdered, police subjected the defendant to jail-cell questioning that resulted in his detailed confession to the crimes.  *See Rideau*, 373 U.S. at 723-24.  The confession was filmed and, for the next several days, the 20-minute film of defendant's confession was broadcast on local television and viewed by as much as two-thirds of the community.  *See id.* at 724.  Two months later the defendant was convicted by a jury that included three members who saw and heard his confession.  *See id.* at 725, 728.  In light of the televised confession, the Court characterized the ensuing trial as a "kangaroo court proceeding[]."  *Id.* at 726.

Given its unique facts, *Rideau* does not establish a general rule that courts may presume prejudice among all potential jurors whenever a case results in heavy media coverage.  Indeed, the Court has yet to find a parallel to *Rideau* in nearly 50 years.  *See United States v. Washington*, 813 F. Supp. 269, 272 (D. Vt. 1993), *aff'd*, 48 F.3d 73 (2d Cir. 1995) ("[T]he Supreme Court has reversed a conviction solely on the basis of presumed prejudice due to pretrial publicity only once . . . .").  As the Court has since explained, "pretrial publicity – even pervasive, adverse publicity – does not inevitably lead to an unfair trial."  *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 554 (1976).  *Rideau* involved what the Court viewed as exposure of parish residents to essentially an out-of-court "trial," presided over by a sheriff, and conducted as

the defendant confessed in jail without counsel. 373 U.S. at 727. The Court's holding that it did not need to review the voir dire transcript to conclude that the capital trial violated due process provides little precedent for an irrebuttable presumption of prejudice for cases involving significant media reporting. Nor does the decision provide any guidance as to the timing and type of evidence to be considered when a court is faced with a change-of-venue motion.

*Irvin*, also cited by defendant, is not a presumed prejudice case and provides no support for a presumption in the instant case. In *Irvin* "the Court readily found actual prejudice" after carefully reviewing the voir dire and determining that "eight of the 12 [seated] jurors had formed an opinion that the defendant was guilty before the trial began." *Murphy,* 421 U.S. at 798; *see Irvin*, 366 U.S. at 727-28 (conducting an "examination of the 2,783-page voir dire record" and focusing in particular on the "voir dire examination . . . of the jurors finally placed in the jury box"); *see also* Mot. at 30 ("During voir dire of the seated jurors it was discovered that two-thirds of them already believed the petitioner to be guilty."). One member of the petit jury could not apply the presumption of innocence, explaining he "could not . . . give the defendant the benefit of the doubt that he is innocent." *Id.* Other jurors stated "it would take evidence to overcome their belief" in defendant's guilt, thereby signaling that they would shift the burden of proof to the defendant. *Id.* With the voir dire record as the basis of the Court's decision, *Irvin* stands not as an example of prejudice presumed by the Court, but rather as a case in which a trial court erred by seating jurors who had demonstrated actual prejudice. *Irvin* is simply inapposite to a presumed prejudice analysis.[1]

---

[1] Defendant suggests that actual prejudice is a basis for granting a motion to transfer venue. *See* Mot. at 28. Actual prejudice is viewed more accurately as a basis for granting a new trial when a court determines that jurors with actual prejudice have been seated, *see, e.g., Irvin*,

Defendant's argument that prejudice should be presumed here rests on equating this case to *Rideau* and its extraordinary and unique facts. But this case is not *Rideau*. Jacques did not confess. There is no video or audio recording of a confession. No recorded confession has been broadcast. Two-thirds of this jurisdiction's population has not viewed a recording of a confession. Although a case could present a circumstance as extraordinary as *Rideau*, "[c]ases presenting [a presumed prejudice] scenario are very rare . . . and have been characterized by [the] circuits as 'extreme situation[s],' . . . in which the 'publicity in essence displaced the judicial process.'" *Sabhnani*, 599 F.3d at 232 (quoting *United States v. Campa*, 459 F.3d 1121, 1143 (11th Cir. 2006) (*en banc*) (upholding rejection of motion to transfer venue of accused Cuban spies from Miami despite alleged pervasive prejudice against the Cuban government in the district), and *United States v. McVeigh*, 153 F.3d 1166, 1181 (10th Cir. 1998) (declining, with respect to request for second venue change, to presume prejudice despite, *inter alia*, media reports that the Oklahoma City bomber had confessed to his attorneys)); *see United States v. Haldeman*, 559 F.2d 31, 61-62, 63 n.40 (D.C. Cir. 1976) (declining to presume prejudice against Watergate defendants because publicity, which included extensive Congressional hearings, "although massive, was neither as inherently prejudicial nor as unforgettable as the spectacle of Rideau's dramatically staged and broadcast confession" despite some reports being "hostile in tone and accusatory in content "). This case does not meet that extremely high threshold.

**II.   Jacques Has Not Demonstrated Actual Prejudgment by the Venire of the**

---

366 U.S. at 727-28, or when events during trial cause seated jurors to become prejudiced, *see, e.g., Marshall v. United States*, 360 U.S. 310, 312-13 (1959) (during trial jurors exposed to reports of defendant's prior convictions that had been excluded from evidence). Evidence of actual prejudice in connection with the first trial would logically be relevant to whether venue of the new trial should be transferred.

**Issues to Be Decided at Trial**

This case is one among many high profile cases that have captured the attention of the press and stakeholders in the criminal justice system. Fair and impartial Vermont juries have been drawn in many highly publicized cases, such as those against Brian Rooney, Donald Fell, Howard Godfrey, Christopher Williams, Beverly Holland, and Jerome Washington. The central issue for the Court is whether media coverage of this case has resulted in actual prejudgment by the venire of trial issues. In the absence of a searching voir dire by this Court, we cannot know.

Although media coverage of this case has been more extensive than most cases prosecuted in the District, the amount of press coverage is not dispositive. *See United States v. Maldonado-Rivera*, 922 F.2d 934, 967 (2d Cir. 1990) (affirming denial of a motion to transfer venue despite district judge's finding that press coverage was "continuing and prominent" and consisted of "slightly more than one article per week over a three-year period"); *United States v. Gaggi*, 811 F.2d 47, 52 (2d Cir. 1987) (explaining with regard to publicity during trial, "[i]t is the impartiality of the jurors – not the quantum of publicity – that determines whether the trial proceedings may be fairly conducted") (citing *Dobbert v. Florida*, 432 U.S. 282, 303 (1977) (finding no error as a result of pretrial publicity)). Further, the methodology used by Jacques in collecting media reports overstates the amount of coverage. As acknowledged by defendant, *see* Mot. at 4-6, the reports collected and indexed for his motion include identical reports appearing in different media outlets, reports republished by the same source via different media formats such as internet and print, and reports that are merely re-edited or revised versions of earlier reports. The amount of information disseminated by the media is not, therefore, commensurate with the number of reports appended to defendant's motion.

The content of most media reports about this case has not been prejudicial.  The nature of the media reports are largely factual in nature and have focused on the progress of the investigation and prosecution.  "Coverage of actual developments in a criminal case generally will not rise to the level of prejudicial publicity that will warrant a venue change."  *Sabhnani*, 599 F.3d at 233.  Absent from the reports are prejudicial extra-judicial statements by prosecutors concerning the guilt or innocence of defendant, the facts of the case, or the sentence that should be imposed by the jury.  "While a district court may consider the government's role in generating adverse publicity in deciding a motion for change of venue, legitimate advocacy at a court proceeding – even advocacy resulting in adverse pretrial publicity – does not constitute conduct for which the government is properly held responsible in a Rule 21(a) inquiry."  *Id.* at 232.

In assessing defendant's request, the Court must instead focus on the impact of media reports on potential jurors.

> It is not required . . . that the jurors be totally ignorant of the facts and issues involved.  In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.  This is particularly true in criminal cases.  To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard.  It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

*Irvin*, 366 U.S. at 722-23.  Consequently, courts must "draw a clear distinction between mere exposure to pretrial publicity and actual prejudgment by the venire of the issues to be decided in the case."  *Sabhnani*, 599 F.3d at 233; *see Murphy*, 421 U.S. at 800 n.4 ("[Courts] must

distinguish between mere familiarity with [a defendant] or his past and an actual predisposition against him.").[2]

Public opinion polling – though a common tactic by defendants – is not a substitute for a record created through a court's searching voir dire. *See United States v. Rodriguez*, 581 F.3d 775, 786 (8th Cir. 2009). In *Rodriguez* a jury imposed the death penalty after finding the defendant guilty of kidnaping resulting in death. 581 F.3d at 783. Prior to trial the defendant moved for change of venue, relying on two public opinion polls, as well as a record of extensive media coverage, including 241 articles in the local newspaper, statements by public officials about the case, statements by 98 of 214 examined venirepersons indicating a belief in Rodriguez's guilt, and statements by serving jurors about public animosity toward Rodriguez. *Id.* at 785. The trial court denied the venue motion and the Court of Appeals affirmed. *See id.* at 786.

The Eight Circuit explained that trial courts were not required to consider opinion polls, finding polls' relevance to such motions questionable. *See id.* at 785-86 (noting also that at least three other circuits had declined to rely on polls). The court nonetheless examined the polling presented by the defendant. Noting that the first poll was conducted two years prior to trial, the court observed that the poll "offered little insight into community views at the time of the . . . trial." *Id.* at 786. With regard to the second poll, which had been conducted six months before

---

[2] Jacques seems to suggest just the opposite when he relies principally on *Marshall v. United States*, 360 U.S. 310 (1959), to argue that there exists a reasonable likelihood that pretrial publicity will prevent a fair trial. *See* Mot. at 32-33. As defendant acknowledges, *Marshall* established a rule (applicable to federal cases) of presumptive prejudice when *seated jurors* learn from the media *during the course of the trial* of a defendant's prior criminal convictions that have been excluded from evidence. *See* Mot. at 33 (quoting *Murphy*, 421 at 798). That scenario presents the issue whether seated jurors are actually prejudiced.

trial and showed that 42% of respondents "strongly held an opinion of [the defendant's] guilt," the Circuit Court held that the trial court had not abused in discretion in finding that its special voir dire protocols had been sufficient to screen-out prejudiced jurors. *Id.*; *accord Haldeman*, 559 F.2d at 64 n.43 ("It is our judgment that in determining whether a fair and impartial jury could be empanelled the trial court did not err in relying less heavily on a poll taken in private by private pollsters and paid for by one side than on a recorded, comprehensive voir dire examination conducted by the judge in the presence of all parties and their counsel pursuant to procedures, practices and principles developed by the common law since the reign of Henry II."); *United States v. Malmay*, 671 F.2d 869, 875-76 (5th Cir. 1982) (district court did not err by denying change-of-venue motion when public opinion poll revealed only general public awareness of the crime rather than widespread belief about defendant's guilt); *cf. Campa*, 459 F.3d at 1145-46 (district court did not err by refusing to rely on public opinion poll when it had methodological problems).

      As in *Rodriguez*, the public opinion polling commissioned by Jacques will be stale at the time of trial. Defendant's poll was conducted between December 3, 2009 and January 8, 2010. *See* Def.'s Ex. A at 1. Although no trial date has been set, trial is not expected to begin prior to January 2011 – at least one year after the survey was completed. Certainly, the impact of media reports diminishes with the passage of time, particularly, where, as here, media reporting is at its most intense years prior to trial. *See Patton v. Yount*, 467 U.S. 1025, 1025-26 (1984) ("The record shows that prejudicial publicity was greatly diminished and community sentiment had softened when the jury for the second trial was selected four years later."); Def.'s Ex. B (indicating that 81% of press coverage occurred during 2008).

Moreover, the public opinion data proffered by Jacques indicates that a fair and impartial jury can be seated.[3] Extrapolating from defendant's data, 20% of jury eligible persons[4] – 62,006 of 310,132[5] – are unaware of the crime.[6] *See* Def.'s Ex. A at 6, Table 3.  Among those jury eligible persons who *are* aware of the crime, 44% – 109,703 of 249,326 – do *not* hold an opinion on the issue of guilt or innocence.  *See* Def.'s Ex. A at 7, Table 4.  With regard to opinion about punishment in the event of conviction, 41% of jury eligible persons with awareness of the case – 102,223 of 249,326 – believe that defendant should receive life imprisonment or another punishment other than death or stated that they do not know what the penalty should be.[7] *See* Def.'s Ex. A at 9, Table 7.  Although polling data is, as courts have found, not a substitute for a

---

[3] The government does not contest the results of defendant's polling.  Having consulted an expert, the government is satisfied that the survey's methodology is basically sound.  Although the leading phrasing of questions "Awareness AID2" and "Penalty PNLTY1" likely inflated the number of responses indicating awareness of the crime and predisposition toward imposition of the death penalty, respectively, *see* Def.'s Ex. A at A-12, A-14, the government does not quibble with the survey's results.

[4] Defendant's pollsters excluded from this group persons who did not meet the District's juror qualifications, those who knew defendant, Brooke Bennett or a member of either's family, and those who would not consider imposing the death penalty upon a conviction.  *See* Def.'s Ex. A at 2-3, 12 n.5.

[5] Defendant's pollsters surveyed the three jury divisions of this District proportionately and present aggregate results for the District.  *See* Def.'s Ex. A at 1.  The Northern Jury Division includes 53% of the District's population.  *See id.*  In empaneling a jury, the Court has the discretion to expand the jury pool to include some or all of the counties in the Southwestern and Southeastern Jury Divisions.  If the Court limits the pool to the Northern Jury Division, then the above numbers would be reduced by about half.

[6] These persons were unaware of the crime despite being presented with the leading inquiry, "Michael Jacques has been accused of murder in the death of Brooke Bennett.  The murder took place in 2008 in Vermont.  Have you heard about this incident?"

[7] Interestingly, among those aware of the case, the percentage believing death appropriate upon a guilty verdict do not differ significantly between Vermont (54%) and the Albany Division of Northern District of New York (49%).  *See* Def.'s Ex. A at 9, Table 7.

11

searching voir dire, defendant's data indicates that the Court would have as many as 164,000 jury eligible persons from whom to draw a jury.

Presented with venue motions claiming prejudice from pretrial publicity, courts emphasize that voir dire is the best opportunity for determining whether a fair and impartial jury can be empaneled.  Earlier this year, the Second Circuit reiterated its view that conducting voir dire in these circumstances is of paramount importance:  "We have noted, in the context of the appeal from a conviction involving crimes far more notorious than the ones in this case, that 'the key to determining the appropriateness of a change of venue is a searching voir dire.'"  *Sabhnani*, 599 F.3d at 234 (quoting *United States v. Yousef*, 327 F.3d 56, 155 (2003) (affirming denial of motion to transfer venue in World Trade Center bombing trial that occurred two years after co-defendant's trial)); *see also United States v. Pedraza*, 27 F.3d 1515, 1525 (10th Cir. 1994) ("Whether a jury harbors prejudice related to pretrial publicity is best determined during voir dire examination.").  Consequently, the preferred practice of courts is to defer ruling on such motions until voir dire is conducted.  *See Campa*, 459 F.3d at 1146-47 ("[H]olding [the] decision on a Rule 21 motion for change of venue in abeyance until the conclusion of the voir dire is clearly the preferable procedure.").  As observed by Judge Parker not too long ago,

> [Whether] a reasonable likelihood that pretrial publicity will prejudice [a defendant's] trial . . . is most appropriately considered either during or after voir dire examinations.  In our jury trial system, voir dire examinations, when conducted in a careful and thorough manner, have long been considered an effective tool for rooting out prejudice or bias.

*Washington*, 813 F. Supp. at 273.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the government respectfully requests that the

Court deny defendant's motion to transfer venue or defer a ruling until voir dire is conducted.

Dated at Burlington, in the District of Vermont, this 24th day of May, 2010.

             Respectfully submitted,

             UNITED STATES OF AMERICA

             TRISTRAM J. COFFIN
             United States Attorney

By: */s/ Craig S. Nolan*
   CRAIG S. NOLAN
   WILLIAM B. DARROW
   Assistant U.S. Attorneys
   P.O. Box 10
   Rutland, VT 05702-0010
   (802) 773-0231
   Craig.Nolan@usdoj.gov