UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA      :
                              :
                              :
                              :    Case no. 2:08-cr-117
            v.                :
                              :
MICHAEL JACQUES,              :
                              :
            Defendant.        :

## OPINION and ORDER Re: Defendant's Motion to Strike or Modify Notice of Intent to Seek the Death Penalty

Defendant Michael Jacques has moved this Court to strike or modify the Government's notice of intent to seek the death penalty. Def.'s Mot. to Strike, ECF No. 146. Jacques advances several arguments that the Court should strike the notice in its entirety because the Federal Death Penalty Act of 1994 (FDPA), 18 U.S.C. § 3591 et seq., and the federal death penalty itself, must be declared unconstitutional. In the alternative, he argues that certain of the statutory and non-statutory aggravating factors identified in the Government's notice should be struck or that the Government should be required to provide a more detailed offer of proof with regard to each of these factors.

For the reasons that follow, the Court declines to declare either the FDPA or the federal death penalty itself unconstitutional and **denies** the motion to strike on those grounds. The Court **grants in part** and **denies in part** the motion to strike certain of the aggravating factors and to require the

Government to provide a more detailed offer of proof with regard to some of these factors.  In particular, the Court orders that the non-statutory aggravating factors pertaining to Jacques' alleged "manipulation and deception of the Vermont criminal justice system," to "witness elimination," and to unadjudicated allegations of sexual misconduct from the 1970s and 1980s be struck from the notice of intent.  Furthermore, the Court orders the Government to provide the defendant and the Court with a written outline of the victim impact evidence it intends to offer as a non-statutory aggravating factor.  The other statutory and non-statutory aggravating factors need not be struck from the notice of intent.  However, the Court will of course retain the option to exclude at the sentencing phase any evidence the "probative value [of which] is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury."  18 U.S.C. § 3593(c).

## I. Background

In October 2008, Michael Jacques was indicted on one count of kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a), and on several counts of producing and possessing child pornography, in violation of 18 U.S.C. § 2251(a).  The kidnapping charge arose out of the abduction and killing of twelve-year-old Brook Bennett on June 25, 2008.

Section 1201(a) provides that a violation of the statute

2

that results in the death of a victim "shall be punished by death or life imprisonment." *Id*. Under the FDPA, 18 U.S.C. § 3591 et seq., if the Government wishes to seek the death penalty in a case, the Government must, at a reasonable time before trial, serve on the defendant a notice stating that death will be sought and "setting forth the aggravating factor or factors that the government, if the defendant is convicted, proposes to prove as justifying a sentence of death." 18 U.S.C. § 3593. In order to impose a death sentence under the FDPA, at a separate sentencing phase, the jury must first find beyond a reasonable doubt that a defendant convicted of a crime punishable by death acted with the requisite intent. *See* 18 U.S.C. § 3591.[1] The jury must then find beyond a reasonable doubt that at least one enumerated statutory aggravating factor exists. *See* 18 U.S.C. § 3592(c). Only if these two preconditions are satisfied is a defendant eligible to receive a death sentence. In order to decide whether to impose a capital sentence, the jury must

---

[1] Specifically, the jury must find that the defendant "intentionally killed the victim; [] intentionally inflicted serious bodily injury that resulted in the death of the victim; [] intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or [] intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act." 18 U.S.C. § 3591.

balance the statutory and non-statutory aggravating factors it
finds the Government has proved beyond a reasonable doubt against
the mitigating factors it finds the defendant has proved by a
preponderance of the evidence at the sentencing hearing.  The
jury imposes a capital sentence only if it finds by unanimous
vote that the aggravating factors outweigh the mitigating factors
sufficiently to warrant the death penalty.  *See* 18 U.S.C. §
3593(e).

On August 29, 2009, the Government filed a notice of intent
to seek the death penalty in this case, as prescribed by the
FDPA.  18 U.S.C. § 3593(a).


**II. Constitutional Challenges to the FDPA**

Jacques raises several claims attacking the
constitutionality of the federal death penalty in general and the
FDPA specifically.  Each of these claims is addressed in turn.

**A. Arbitrary, Capricious, Irrational and Discriminatory Operation**

Jacques's first constitutional claim asserts that the
federal death penalty operates in an "arbitrary, capricious,
irrational and discriminatory manner" in violation of the Fifth
and Eighth Amendments.  He relies on three purported indicators
of arbitrary and discriminatory operation: 1) the infrequency
with which the death penalty is sought and imposed; 2) the
apparent lack of a principled basis for distinguishing between

4

the cases where the death penalty is imposed and those where it is not; and 3) statistical evidence of discrepancies in the application of the death penalty based on race, gender, and geography.

### 1) Infrequency of the Death Penalty's Application

Jacques's first line of argument – that the infrequency with which the federal death penalty is sought and imposed is indicative of arbitrariness – relies heavily on language from the concurring opinions in *Furman v. Georgia*, 408 U.S. 238 (1972). In *Furman*, the Supreme Court held in a per curiam, one paragraph opinion that Georgia's then existing capital punishment scheme was unconstitutional under the Eighth and Fourteenth Amendments. More than one of the Justices commented in their concurring opinions that the infrequency with which death sentences were imposed was one factor that led them to conclude that the Georgia statute was unconstitutional. *Id*. at 293 (Brennan, J., concurring); *id.* at 309-10 (Stewart, J., concurring); *id.* at 312-13 (White, J., concurring). In particular, Jacques relies on one portion of Justice Stewart's concurring opinion:

> These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual. For, of all the people convicted of rapes and murders in 1967 and 1968, many just as reprehensible as these, the petitioners are among a capriciously selected random handful upon whom the sentence of death has in fact been imposed. . . I simply conclude that the Eighth and Fourteenth Amendments cannot

5

> tolerate the infliction of a sentence of
> death under legal systems that permit this
> unique penalty to be so wantonly and so
> freakishly imposed.

*Id.* at 309-10 (Stewart, J., concurring) (footnotes and citations

omitted).  Citing a statistical summary of the disposition of all

potential federal capital cases from 1988 to 2010, Jacques

observes that the "federal death penalty is sought and imposed

far more rarely than in the cases examined by *Furman*[.]"  Def.'s

Mot. to Strike, 29-31.[2]  He argues that application of the

constitutional principles recognized in the *Furman* opinions

therefore must lead this Court to conclude that "[b]ecause the

federal death penalty is so infrequently sought, imposed, or

carried out, it operates in an unconstitutionally arbitrary and

capricious manner."  *Id.* at 33.

Other courts that have considered the assertion that the

federal death penalty is unconstitutionally arbitrary in its

operation because it is infrequently imposed have rejected this

argument.  *See e.g. United States v. Sampson*, 486 F.3d 13, 19-23

(1st Cir. 2007); *United States v. Mitchell*, 502 F.3d 931, 983

(9th Cir. 2007); *United States v. Barnes*, 532 F. Supp. 2d 625,

631-32 (S.D.N.Y. 2008); *United States v. Hammer*, 25 F. Supp. 2d

518, 546-47 (M.D. Pa. 1998); *United States v. O'Driscoll*, 203 F.

Supp. 2d 334, 341 (M.D. Pa. 2002).  As a number of these courts

---

[2] For the purposes of this opinion, the Court assumes that
these statistical summaries are accurate.

6

have pointed out, in its post-*Furman* jurisprudence, the Supreme

Court has indicated that the problem of arbitrariness may be

addressed by a capital punishment scheme that guides the

discretion of the decision-makers responsible for imposing the

death penalty.

> [T]he concerns expressed in Furman that the
> penalty of death not be imposed in an
> arbitrary or capricious manner can be met by
> a carefully drafted statute that ensures that
> the sentencing authority is given adequate
> information and guidance.  As a general
> proposition these concerns are best met by a
> system that provides for a bifurcated
> proceeding at which the sentencing authority
> is apprised of the information relevant to
> the imposition of sentence and provided with
> standards to guide its use of the
> information.

*Gregg v. Georgia*, 428 U.S. 153, 195 (1976).  More specifically,

the Supreme Court has indicated that, "[t]ogether . . . *Furman* .

. . and *Gregg* . . . establish that a []capital sentencing system

must: (1) rationally narrow the class of death-eligible

defendants; and (2) permit a jury to render a reasoned,

individualized sentencing determination based on a death-eligible

defendant's record, personal characteristics, and the

circumstances of his crime." *Kansas v. Marsh*, 548 U.S. 163, 173-

74 (2006) (citations omitted).

Because the FDPA creates a bifurcated scheme which narrows

the class of death-eligible defendants using statutory and non-

statutory aggravating factors and which permits the jury to make

an individualized sentencing determination, the statute "meets the requirements of guided discretion, suitably directing and limiting the leeway afforded to the decisionmakers." *Sampson*, 486 F.3d at 24; *see also Barnes*, 532 F. Supp. 2d at 632.  And because FDPA addresses concerns of arbitrariness in the manner prescribed by the Supreme Court's post-*Furman* cases, this Court must reject Jacques's argument that infrequency with which the federal death penalty is imposed renders the FDPA unconstitutional.  *See Barnes*, 532 F. Supp. 2d at 631 ("Only the Supreme Court can overrule its conclusion in *Gregg* to find that the FDPA, even though it satisfies *Gregg*, is unconstitutional.").

**2) Lack of Principled Basis for Distinguishing Between Cases Where the Death Penalty is Imposed and Those Where It Is Not**

Jacques next argues that "the absence of a principled basis for distinguishing between cases where the federal death penalty is imposed from cases where it is not imposed renders the federal death penalty unconstitutional."  Def.'s Mot. to Strike, 33.  In support of this argument, Jacques has provided the Court with case summaries of every completed authorized federal death penalty case since 1988 as well as verdict sheets reflecting findings with regard to aggravating and mitigating factors for 207 cases that reached the penalty phase.  Jacques asserts that this data illustrates that "[t]here is no rhyme, reason, or predictability to who is sentenced to death and who is not" and that the verdict sheets therefore "provide valuable insight into

8

the hopelessly irremediable problem of arbitrariness and caprice that marks the administration of the federal death penalty system." *Id*. at 34.  He argues that this Court should "declare that the FDPA must be interpreted so as to allow for proportionality and comparative review of the universe of federal death sentences to determine if they are imposed irrationally[.]" He asserts that "a finding that such is the case would lead to a conclusion that the FDPA cannot meet the requirements of *Furman* and would have to be invalidated until Congress could devise a mechanism for checking the arbitrary and irrational imposition of the ultimate punishment." *Id*. at 40-41.

Jacques's argument that a review of the case summaries he has provided must lead this Court to conclude that the federal death penalty is unconstitutionally arbitrary in its operation relies primarily on *Eddings v. Oklahoma*, 455 U.S. 104, in which the Supreme Court stated that "capital punishment must be imposed fairly, and with reasonable consistency, or not at all." *Id*. at 112.  However, other courts that have rejected similar arguments have remarked that such reliance on *Eddings* is problematic. "*Eddings* cannot stand for the result Defendant advocates because, in the same breath as the statement that Defendant cites, *Eddings* reaffirmed the rule, first articulated in [*Lockett v. Ohio*, 438 U.S. 586 (1978),] that the jury's discretion to consider mitigating evidence may not be limited." *Barnes*, 532 F. Supp. 2d

at 634 (quoting *United States v. Williams*, S1 00 Cr. 1008, 2004
U.S. Dist. LEXIS 25644, at *24 n.13 (S.D.N.Y. December 22,
2004)).  "The [*Eddings*] Court explicitly stated that the *Lockett*
rule 'recognizes that a consistency produced by ignoring
individual differences is a false consistency.'"  *Id.* (quoting
*Eddings*, 455 U.S. at 112); *see also Sampson*, 486 F.3d at 24.

Furthermore, as the Supreme Court stated in *McCleskey v.
Kemp*, 481 U.S. 279 (1987), the Court's post-*Furman* jurisprudence
requires that jurors making capital sentencing decisions be able
to exercise discretion in making individualized sentencing
determinations based on the nuances of each case:

> Individual jurors bring to their
> deliberations qualities of human nature and
> varieties of human experience, the range of
> which is unknown and perhaps unknowable.  The
> capital sentencing decision requires the
> individual jurors to focus their collective
> judgment on the unique characteristics of a
> particular criminal defendant.  It is not
> surprising that such collective judgments
> often are difficult to explain.  But the
> inherent lack of predictability of jury
> decisions does not justify their
> condemnation.  On the contrary, it is the
> jury's function to make the difficult and
> uniquely human judgments that defy
> codification and that build discretion,
> equity, and flexibility into a legal system.

*Id.* at 311 (quotations omitted).  Accordingly, "*McCleskey* []
recognized that the jury's mandatory discretion will result in
the inexplicability to which [the] defendant[] point[s] in
support of [his] constitutional argument. . . [and held] that

[the] constitutionally required opportunity for [the] jury to exercise discretionary leniency does not render those capital sentences that juries do impose arbitrary and capricious." *Williams*, 2004 U.S. Dist. LEXIS 25644, at *22-23 (citing *McCleskey*, 481 U.S. at 306-07.

In light of the Supreme Court's pronouncements in *Eddings* and *McCleskey*, this Court agrees with other courts that have rejected arguments similar to Jacques's in the past.  The Court concludes that "Defendant's premise – that an examination of the case summaries and verdict sheets that they have submitted must reveal a principled basis on which to distinguish cases in which federal juries have imposed the death penalty from those in which they have not – is not supported by the case law." *Barnes*, 532 F. Supp. 2d at 633 (quotation omitted).

### 3) Statistical Evidence of Discrepancies Based on Race, Gender, and Geography

Finally, Jacques presents statistical evidence of discrepancies in the application of the death penalty that are based on race, gender, and geography.  He argues that this statistical evidence is proof that the federal death penalty "operates fundamentally unfairly and with arbitrariness and caprice."  Def.'s Mot. to Strike, 54.

The statistical evidence presented in the briefing suggests that it is black defendants, defendants suspected of killing white females, and defendants from southern states who are

11

disproportionately likely to receive death sentences.  Def.'s
Mot. to Strike, 41-49, 57-62; Def.'s Mem. Submitting New
Authority, ECF No. 194-1.  In light of this, Jacques concedes
that, as a white male being prosecuted in a northern state, he
cannot assert a "personal Equal Protection claim." *Id*.  However,
he argues that he "has standing pursuant to the Eighth Amendment
and Fifth Amendment Due Process [Clause] not to be subjected to
an arbitrary system of capital punishment." *Id*.  This Court
assumes, without deciding, that Jacques does in fact have
standing to raise claims premised on racial, gender-based and
geographic disparities. *See Sampson*, 486 F.3d at 25 ("Because
there is no Supreme Court precedent directly on point and because
'death is . . . different', we will assume arguendo that [the
defendant] has standing to pursue these arguments." (quoting
*Gardner v. Florida*, 430 U.S. 349, 357 (1977))).

As troubling as the statistical evidence presented by
Jacques may be, the Supreme Court's decision in *McCleskey*
precludes Jacques from prevailing on either his Fifth or Eighth
Amendment claims.  481 U.S. 279.  In *McCleskey* the Supreme Court
rejected claims brought under the Eighth Amendment and the Equal
Protection Clause that were based on statistical evidence of
racial disparities in capital sentencing.  In rejecting
McCleskey's Equal Protection claim, the Court held that "to
prevail under the Equal Protection Clause, [a defendant] must

12

prove that the decisionmakers in *his* case acted with discriminatory purpose." *Id*. at 292.  The Court also held that statistical evidence alone was not sufficient to sustain McCleskey's Eighth Amendment claim, commenting that:

> Apparent disparities in sentencing are an inevitable part of our criminal justice system. . .  As this Court has recognized, any mode for determining guilt or punishment has its weaknesses and the potential for misuse. . .  Despite these imperfections, our consistent rule has been that constitutional guarantees are met when the mode for determining guilt or punishment itself has been surrounded with safeguards to make it as fair as possible.  Where the discretion that is fundamental to our criminal process is involved, we decline to assume that what is unexplained is invidious.

*Id*. at 312-13 (quotations omitted).

The *McCleskey* Court did not explicitly hold that statistical evidence alone is insufficient to sustain a claim, such as Jacques's, brought under the Due Process Clause of the Fifth Amendment.[3]  However, as articulated in his briefing, Jacques's Fifth Amendment claim is materially indistinguishable from his Eighth Amendment claim – both claims assert that he has a right

---

[3] In rejecting a Due Process claim which, like Jacques's, was supported by statistical evidence of racial and geographic disparities in capital sentencing, the First Circuit appeared to assume, without expressly stating, that the *McCleskey* Court's holding with regard to Equal Protection claims should be extended to claims brought under the Due Process Clause of the Fifth Amendment.  *See Sampson*, 486 F.3d at 26 ("Bare statistical discrepancies are insufficient to prove a *Fifth Amendment* violation with respect to the implementation of a statute."(citing *McCleskey*, 481 U.S. at 292)).

"not to be subjected to an arbitrary system of capital punishment" and both claims rely solely upon statistical evidence to prove this arbitrariness.  Def.'s Mot. to Strike, 54.  The *McCleskey* Court's rejection of an Eighth Amendment claim based solely upon statistical evidence of discrimination therefore precludes Jacques from succeeding on a Fifth Amendment that is indistinguishable from his Eighth Amendment claim.  Accordingly, this Court must reject Jacques's Fifth and Eighth Amendment arguments, insofar as they are based upon statistical evidence of racial, geographic and gender-based disparities and not on any proof of case-specific discrimination or arbitrariness.

## B. *Ring* Argument

Jacques argues that the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002) has rendered the FDPA unconstitutional.  In *Ring*, the Court overturned *Walton v. Arizona*, 497 U.S. 639 (1990), and held that the Sixth Amendment's jury trial guarantee requires that aggravating factors necessary for imposing the death penalty be found by a jury beyond a reasonable doubt.  Read together with related cases such as *Jones v. United States*, 526 U.S. 227 (1999) (holding that all elements of a federal offense must be charged in the indictment and found by a jury beyond a reasonable doubt under the Fifth and Sixth Amendments) and *Harris v. United States*, 536 U.S. 545 (2002), *Ring* requires that the statutory aggravating factors necessary to

14

make the defendant eligible for a capital sentence under the FDPA must be pleaded in the indictment and proved to a jury beyond a reasonable doubt.

Jacques argues that the FDPA violates the requirements of *Ring* and *Jones*, because the statute "does not provide for presentation of aggravating factors to a grand jury [and inclusion of these factors in the indictment], but instead vests authority to identify aggravating factors exclusively with the prosecutor."  Def.'s Mot. to Strike, 68-69.  He asserts that, although federal prosecutors seeking the death penalty have attempted to comply with the requirements of *Ring* and *Jones* by electing to plead aggravating factors in their indictments, this Court must hold the FDPA unconstitutional because "the FDPA cannot be amended by the prosecutor or the courts to permit presentation of aggravating factors to a grand jury because . . . it is for the legislature, not the courts or the prosecutor, to define crimes and punishment and the contours of a statute."  *Id.* at 69.

As Jacques acknowledges, courts that have considered this *Ring* argument in the past, including this court, have uniformly rejected it.  *See e.g., Sampson*, 486 F.3d at 20-23; *United States v. Brown*, 441 F.3d 1330, 1367 (11th Cir. 2006), *cert. denied*, 127 S. Ct. 1149 (2007); *United States v. Allen*, 406 F.3d 940, 949 (8th Cir. 2005), *cert. denied*, 127 S. Ct. 826 (2006); *United*

15

*States v. Barnette*, 390 F.3d 775, 788-90 (4th Cir. 2004), *vacated on other grounds*, 546 U.S. 803 (2005); *United States v. Robinson*, 367 F.3d 278, 290 (5th Cir. 2004); *Williams*, 2004 U.S. Dist. LEXIS 25644, at *36-47; *Barnes*, 532 F. Supp. 2d at 637-641; *United States v. Fell*, 217 F. Supp. 2d 469, 484 (D. Vt. 2002).

While it is true that FDPA does not explicitly provide for grand jury presentment of the aggravating factors, "[t]he FDPA does not, as [the defendant] suggests, grant to prosecutors exclusive authority for determining the likely existence of aggravating factors." *Sampson*, 486 F.3d at 21. "No provision of the FDPA prohibits a grand jury from considering those factors necessary for imposition of a death sentence[,] rather [t]he statute simply is silent with respect to the function of the grand jury." *Id*. As Judge Buchwald of the Southern District of New York observed, "[i]n light of the positive background law giving the grand jury authority to return the findings at issue here, we would expect a clear statement in the statute expressing an intent to abrogate that authority if Congress truly intended to do so." *Williams*, 2004 U.S. Dist. LEXIS 25644, at *41; *see also*, *United States v. LeCroy*, 441 F.3d 914, 921 (11th Cir. 2006) ("The major flaw in [the defendant's] argument is that nothing in the [FDPA] forbids, or is inconsistent with, prosecutors' taking the additional step of including the statutory aggravating factors in the indictment and submitting [them] to the grand

16

jury.  Indeed, a statute will seldom expressly provide for submitting elements of an offense to the grand jury.  It is simply well established law – the background against which statutes are enacted – which indicates that elements of a crime should be submitted to the grand jury.").  Like the courts that have addressed this issue before, this Court must conclude that the FDPA does not preclude the prosecutor from charging the aggravating factors in the indictment.  Accordingly, the statute is not rendered facially unconstitutional by *Ring*.

Relatedly, allowing federal prosecutors to comply with *Ring* in capital cases by charging aggravating factors in their indictments does not constitute impermissible amendment of the FDPA by the executive branch or the courts.  Jacques argues that "the Separation of Powers Doctrine demonstrate[s] that the FDPA cannot be amended by the prosecutor or the courts to permit presentation of aggravating factors to a grand jury."  Def.'s Mot. to Strike, 76.  Jacques begins with the well established principle that "[i]t is the legislature, not the court, which is to define a crime and ordain its punishment."  *United States v. Wiltberger*, 18 U.S. 76, 93 (1820); *see also United States v. Hudson*, 11 U.S. 32 (1812).  In essence, Jacques then asks the Court to interpret the decision by federal prosecutors to charge aggravating factors in the indictment as the equivalent of redefining "crimes and punishment and the contours of a statute."

17

Def.'s Mot. to Strike, 69.   Jacques's argument fails to give due

weight to the distinction between substantive criminal law and

criminal procedure.   As the First Circuit observed in *Sampson*:

> What is involved in the application of *Ring*
> is a matter of procedure, not substantive
> definition regarding death-penalty
> eligibility. . .  The constitutional
> guarantees that gave rise to [the *Jones*
> Court's] concern in no way restrict the
> ability of legislatures to identify the
> conduct they wish to characterize as criminal
> or to define the facts whose proof is
> essential to the establishment of criminal
> liability. . .  It follows, then, that the
> rule against massive judicial rewriting of
> statutes simply is not implicated here.
> Adhering to a court-crafted rule of criminal
> procedure when applying the FDPA does not
> constitute impermissible statutory
> redrafting.

*Sampson*, 486 F.3d at 21-22 (quotation omitted) (*citing United

States v. Brown*, 305 F.3d 304, 308-09 (5th Cir. 2002); *Cannon v.

Mullin*, 297 F.3d 989, 994 (10th Cir. 2002); *United States v.

Warden*, 286 F.3d 1059, 1063 (8th Cir. 2002); *United States v.

Sanchez-Cervantes*, 282 F.3d 664, 668 (9th Cir. 2002); *McCoy v.

United States*, 266 F.3d 1245, 1257 n.16 (11th Cir. 2001); *Jones*,

526 U.S. at 243 n.6.).

Nor is Jacques's reliance on *United States v. Jackson*, 390

U.S. 570 (1968), persuasive.   In *Jackson*, the Supreme Court

struck down the death penalty provision of the Federal Kidnapping

Act because it infringed upon the right to a jury trial by

permitting only a jury to impose a death sentence (thereby

18

encouraging waiver of the right).  *Id*.  The Government proposed
that the statute could be saved by reading it to allow the trial
judge to convene a "special jury" to decide if the penalty was
warranted, but the Supreme Court refused to accept this proposal,
explaining that it could not  "create from whole cloth a complex
and completely novel procedure . . . for the sole purpose of
rescuing a statute from a charge of unconstitutionality."  *Id*. at
580.

Jacques argues that the courts of appeals that have rejected
the *Ring* argument he advances here have not adequately addressed
*Jackson*.  Def.'s Mot. to Strike, 87-89.  While Jacques is correct
that many of the decisions rejecting this argument have not
discussed *Jackson*, the First Circuit did persuasively distinguish
*Jackson* in the *Sampson* decision.  486 F.3d at 22.  As the First
Circuit explained, allowing prosecutors to plead aggravating
factors in their indictments in capital cases under the FDPA
"does not require [courts] to 'create from whole cloth a complex
and completely novel procedure[,]' [because] the role of the
grand jury in charging the elements of an offense has long been
established."  *Id*. (quoting *Jackson*, 390 U.S. at 580) (other
citations omitted).  This Court agrees that the novelty of the
procedure the Government proposed to add to the kidnapping
statute in *Jackson* distinguishes that case from the instant one,
where the Government seeks to utilize the well-established

process of grand jury indictment in its implementation of the
FDPA.[4]  *See Jackson*, 390 U.S. at 578 ("If the [procedure proposed
by the Government] had been recognized elsewhere in the federal
system when Congress enacted the Federal Kidnaping Act, perhaps
Congress' total silence on the subject could be viewed as a tacit
incorporation of this sentencing practice into the new law.  But
the background against which Congress legislated was barren of
any precedent for the sort of sentencing procedure we are told
Congress impliedly authorized.").

Jacques's reliance on *United States v. Booker*, 543 U.S. 220
(2005), is also misplaced.  In *Booker*, the Supreme Court elected
to make the federal sentencing guidelines advisory because, in
their mandatory iteration, they violated the Sixth Amendment by
permitting the sentencing judge to find sentence-enhancing facts
by a preponderance of the evidence.  *Id*.  In drafting the
remedial opinion in *Booker*, the Court explicitly declined to
"engraft" onto the guidelines a procedure for presenting
sentence-enhancing facts to a jury, because doing so "would so
transform the scheme that Congress created that Congress likely

---

[4] Jacques argues that the First Circuit's attempt to
distinguish *Jackson* is "flawed" because that court's "reasoning
requires that the plain language of the statute which ordains a
procedure completely at odds with presentment to a grand jury be
ignored."  Def.'s Mot. to Strike, 88.  This argument is
unavailing because, as discussed *supra*, the language of the FDPA
is not in fact at odds with grand jury presentment of the
aggravating factors.

would not have intended the Act as so modified to stand." *Id*. at 246-250. "In contrast, allowing a grand jury to consider and charge aggravating factors under the FDPA does not have any effect either on the substantive aspects of the statute or on the discrete roles that the statute assigns to the judge, the prosecutor, and the jury, respectively." *Sampson*, 486 U.S. 23.

As a corollary to his separation of powers argument, Jacques asserts that the non-delegation doctrine prohibits "the prosecution's proposed unilateral *Ring* fix for the FDPA[.]" Def.'s Mot. to Strike, 84. The non-delegation doctrine "mandate[s] that Congress generally cannot delegate its legislative power to another Branch." *Mistretta v. United States*, 488 U.S. 361 (1989). However, delegation of legislative power is permissible where Congress "lay[s] down . . . an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform." *Id*. (quoting *J. W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 409 (1928)). As a logical matter, Jacques's non-delegation argument fails on its own terms. In the case of the FDPA, the executive branch elected to provide for grand jury presentment of aggravating factors in response to the *Ring* decision, without any prompting from Congress. Accordingly, this Court has no basis to conclude that there has been any delegation of legislative power *by Congress* with regard to the FDPA, let alone an improper

delegation of legislative power.[5]

_____

[5] Jacques argues that, "[s]ince Congress could not delegate to the Executive Branch the power to rewrite the FDPA to its post-*Ring* liking, *a fortiori* the Executive Branch can not simply assume that power by attempting to substitute new procedures and elements for those originally provided by Congress, but rendered constitutionally infirm by the *Ring, Jones, Apprendi* trilogy." Def.'s Mot. to Strike, 85.  However,  Jacques provides no authority to support his assertion that this Court may find a violation of the non-delegation doctrine where there has been no identifiable delegation of legislative power by Congress.

The non-delegation argument articulated in Jacques's briefing appears to be limited to challenging changes made by the Executive Branch in its handling of cases under the FDPA in the wake of *Ring*.  However, to the extent that Jacques also contends that the FDPA violated the non-delegation doctrine even before *Ring* was decided because it gives prosecutors the discretion to define non-statutory aggravating factors, this argument is also unavailing.  As the Fourth Circuit has stated,

> [The FDPA] does not delegate a legislative
> function to the prosecutor. The prosecutor's
> discretion with regard to defining what is a
> death-eligible offense is wholly
> circumscribed by the statute's requirement
> that the jury unanimously find at least one
> intent factor and one statutory aggravating
> factor before the defendant becomes death
> eligible. . .  Only after the selection of
> those critical, legislatively-defined factors
> is made is the prosecutor afforded discretion
> to argue that additional nonstatutory
> aggravators combine with the statutory
> aggravators to outweigh any mitigating
> factors that have been submitted for
> consideration, thus assisting the jury in its
> task of determining whether a death-eligible
> defendant should indeed receive that maximum
> sentence. . .  Moreover, to the extent that
> this discretion could be viewed as a
> delegation of legislative power, such
> delegation is constitutionally permissible
> [because it is accompanied by intelligible
> principles].

*United States v. Higgs*, 353 F.3d 281, 321 (4th Cir. 2003); *see also United States v. Quinones*, No. 00 Cr. 761, 2004 U.S. Dist. LEXIS 10052, at *2 (S.D.N.Y. June 3, 2004); *United States v.*

Finally, Jacques argues that the "prosecutor's attempt to rescue the FDPA via the grand jury's 'Special Findings' is void." Def.'s Mot. to Strike, 86.  He asserts that the grand jury lacks the authority to issue special findings alleging aggravating factors because "nothing in the text of the [Federal Rules of Criminal Procedure] and nothing in the Indictment Clause of the Fifth Amendment [] contemplates or permits a grand jury to make 'Special Findings' that serve the function of the triggering requirements of the FDPA[.]"  *Id.*  This argument is without merit.  As discussed *supra*, Jacques's reliance on *Jackson* to suggest that federal prosecutors may not utilize the process of grand jury indictment in its implementation of the FDPA is misplaced.  While it is true that neither the Federal Rules nor the Indictment Clause specifically provides for the issuance of special findings by the grand jury, it is also the case that nothing in either of these authorities (or in any other authority cited by Jacques) prohibits the grand jury from issuing such findings.  In fact, these special findings are merely a mechanism that enables the indictment to perform its well-established "function of providing notice to [the defendant] of every element of the capital offenses with which he is charged."  *United States*

---

*Perez*, No. 02 Cr. 7, 2004 U.S. Dist. LEXIS 7500, at *11-*13 (D. Conn. Apr. 29, 2004); *United States v. Bin Laden*, 126 F. Supp. 2d 290, 296-97 (S.D.N.Y. 2001); *United States v. Fell I*, 360 F.3d 135, 138 (2004).

*v. Fell,* 217 F. Supp. 2d 469, 484 (D. Vt. 2002); *see also*
*Sampson*, 486 F.3d at 23 n.2 (rejecting defendant's argument that
the grand jury lacked authority to issue special findings in a
death penalty case); *United States v. Haynes*, 269 F. Supp. 2d
970, 981–82 (W.D. Tenn. 2003) ("[T]he federal criminal code,
outside of a few unrelated provisions, contains virtually no
rules governing grand jury practice. . . . The grand jury, born
out of the Common Law, 'is a constitutional fixture in its own
right,' . . . with 'functional independence . . . to initiate
investigations, examine witnesses and to conduct its
deliberations.' 'Given the grand jury's operational
separateness[,] [the Supreme Court has been averse to]
prescribing modes of grand jury procedure.' As a result, the
Court will not prohibit the grand jury, absent express
Congressional action, from returning superceding indictments in
capital cases." (quoting United States v. Williams, 504 U.S. 36,
47 (1992))).

In summary, having evaluated defendant's multi-faceted
argument, this Court determines that *Ring* has not rendered the
FDPA unconstitutional.[6]

---

[6] In his briefing on the *Ring* issue, Jacques preemptively
refutes anticipated arguments by the Government based on post-
*Apprendi* drug cases, severability analysis, and the doctrine of
constitutional avoidance. Def.'s Mot. to Strike, 89-95. Because
the Government has explicitly stated that it does not rely on the
post-*Apprendi* drug quantity cases, severability analysis, or the
doctrine of "constitutional avoidance," Govt.'s Opp'n to Mot. to

**C. Compliance of the Indictment with the Fifth Amendment**

Jacques argues that the indictment violates the Fifth Amendment because the grand jury 1) was not informed that its special findings could lead to imposition of the death penalty, 2) did not consider whether the aggravating factors outweigh potential mitigating factors, and 3) was not presented with the non-statutory aggravating factors.  Def.'s Mot. to Strike, 96-109.

The first prong of this argument – that, in a capital case, an indictment violates the Fifth Amendment if it does not inform the grand jury that its special findings could lead to imposition of the death penalty – relies on Jacques's historical analysis of the function of the grand jury.  Jacques argues that, when the Bill of Rights was drafted, grand juries knew which crimes carried a mandatory death sentence and which did not and therefore that, in deciding which crimes to include in indictments, they served as a powerful check on the use of capital punishment.  Jacques argues that, because the Grand Jury in his case was not informed of the consequences of the special findings, it was unable to perform this gate-keeping function adequately.  While he recognizes that, under the capital sentencing scheme created by the FDPA, it is the petit jury (and not the prosecutor) that ultimately determines whether the death

Strike, 31 n.6, the Court need not address these arguments.

25

penalty is to be imposed, Jacques asserts that the "petit jury in a capital case [is not] a meaningful barrier between the 'liberties of the people and the prerogative of the [government].'" *Id*. at 100 (quoting *Harris v. United States*, 536 U.S. 545, 564 (2002). He asserts that this is the case because petit juries, by virtue of being death qualified,[7] represent "a small segment of the community" that is more likely to support use of capital punishment and less likely to contain African Americans and women. *Id*. at 100-01.

Jacques is correct that a fundamental role of the grand jury is to act as a check on prosecutorial power. However, his argument fails to take adequate account of the fact that the manner in which the grand jury has historically performed this function has been by evaluating the factual bases for charges brought by the government and not by considering the appropriateness of particular sentences. "The grand jury's role is not to decide whether probable cause supports the imposition of a particular *sentence* against a charged individual; rather, the grand jury check on prosecutorial power stems from its independent *factual* determination of the existence of probable

---

[7] "Death qualification" refers to the process of removing from the jury pool potential jurors who are categorically opposed to the death penalty. The Supreme Court has held that "the Constitution does not prohibit the States from 'death qualifying' juries in capital cases." *Lockhart v. McCree*, 476 U.S. 162, 173 (1986).

cause for the essential elements of the charged offense." *United States v. Haynes*, 269 F. Supp. 2d 970, 981 (W.D. Tenn. 2003) (citing *Branzburg v. Hayes,* 408 U.S. 665, 686-87); *Stirone v. United States,* 361 U.S. 212, 217-19, (1960)). *See also United States v. Matthews*, 246 F. Supp. 2d 137, 146-47 (N.D.N.Y. 2002) ("Grand juries do not make findings or recommendations concerning punishment or sentencing and such considerations should not influence their decision.  It is for the petit jury to make that determination.  The role of the grand jury simply is to investigate possible crimes against the sovereign so that it can make a judgment whether a trial on specific charges is necessary." (quoting United States v. Suleiman, 208 F.3d 32, 39 (2d Cir. 2000)) (internal quotations omitted)).

Jacques fails to cite any authority that dictates that the grand jury must be informed that its special findings might make the defendant eligible for the death penalty.  Because of this lack of support in the case law, and because Jacques's argument appears to rely upon a somewhat distorted characterization of the historical role of the grand jury, this Court must agree with the analysis of a number of other courts that have rejected this argument. *See Haynes*, 269 F. Supp. 2d at 981 (W.D. Tenn. 2003); *United States v. Diaz*, 2007 U.S. Dist. LEXIS 18442, at *6 (N.D. Cal. Feb. 28, 2007); *United States v. Talik*, 2007 U.S. Dist. LEXIS 94218, at *7 (N.D. W. Va. Dec. 26, 2007); *United States v.*

27

*Williams*, 2007 U.S. Dist. LEXIS 73775, at *4 (D. Haw. Oct. 2, 2007).

Jacques next argues that indictment did not comply with the requirements of the Fifth Amendment because it did not allow the grand jury to make a finding as to whether the aggravating factors outweigh the mitigating factors in this case.  Jacques asserts that because the petit jury, in order to impose the death penalty, must make a finding that the aggravating factors outweigh the mitigating factors and that this outweighing is sufficient to justify a death sentence, these weighing considerations are elements of a capital crime under the FDPA. Jacques argues that, as elements of the crime, these weighing considerations must be submitted to the grand jury.  Def.'s Mot. to Strike, 102-03 (citing *Jones*, 526 U.S. 251-52).

The Eighth Circuit has explicitly rejected the argument that the weighing consideration is actually an element that must be presented to the Grand Jury.  *United States v. Purkey*, 428 F.3d 738, 749-50 (8th Cir. 2005):

> [I]t makes no sense to speak of the weighing
> process  mandated by 18 U.S.C. § 3593(e) as
> an elemental fact for which a grand jury must
> find probable cause.  In the words of the
> statute, it is a 'consideration,' . . . -
> that is, the lens through which the jury must
> focus the facts that it has found to produce
> an individualized  determination regarding
> 'whether the defendant should be sentenced to
> death, to life  imprisonment without
> possibility of release or some other lesser
> sentence.' Id.

28

*United States v. Purkey*, 428 F.3d 738, 750 (8th Cir. Mo. 2005) (quoting 18 U.S.C. § 3593(e)).  While it is true that the weighing consideration has some of the trappings an element, in that it must be found by the jury unanimously, *see* 18 U.S.C. § 3593(e), this Court agrees with the reasoning of the Eighth Circuit that this consideration does not actually function as an element of the capital crime.  Because the weighing consideration is not an element of the crime it need not be included in the indictment.[8]

Finally, Jacques urges the Court to adopt and extend the reasoning of Judge Gertner's opinion in *United States v. Green*, 372 F. Supp. 2d 168 (D. Mass. 2005) to hold that non-statutory aggravating factors not charged in the indictment must be dismissed from the notice to seek the death penalty.  As Jacques acknowledges, this argument is foreclosed by the Second Circuit's decision in *United States v. Fell II*.  531 F.3d 197, 238 (2d Cir. 2008) ("[T]he government's failure to include the non-statutory aggravating factors in the indictment did not violate the Fifth Amendment."); *see also*, *United States v. Higgs*, 353 F.3d 281, 299 (4th Cir. 2003); *United States v. Mitchell,* 502 F.3d 931, 979 (9th Cir. 2007); *United States v. Brown*, 441 F.3d 1330, 1368

---

[8] Practical considerations also argue against requiring inclusion of the weighing consideration in the indictment.  Doing so would put the Government in the position of having to introduce mitigating factors to the jury at the same time as it argues in favor of the death penalty.

(11th Cir. 2006) *Brown*, 441 F.3d at 1368; *United States v. Bourgeois*, 423 F.3d 501, 507 (5th Cir. 2005); *Purkey*, 428 F.3d at 749-50.  While Jacques urges reconsideration of this holding, the Court is not at liberty to disregard the binding precedent of the Second Circuit.

**D. Failure to Provide a Structure that Permits Capital Juries to Make a Reasoned Choice**

Jacques argues that the complex process the FDPA prescribes for making sentencing decisions – with its varying burdens of proof and roles for mitigating and aggravating factors – is so confusing to jurors that it prevents juries from making reasoned sentencing decisions:

> The FDPA has created a scheme that mixes concepts, burdens of proof, and an overall process which is likely incomprehensible to jurors.  In the penalty phase of the trial, [twelve] jurors previously indoctrinated in the traditional culture of unanimity will be expected to understand that, unlike in the guilt phase, a lack of unanimity is not a failure but a legally cognizable outcome. Jurors schooled in the burden of proof in the guilt phase, *beyond a reasonable doubt*, will be expected in the penalty phase to apply that burden to aggravating factors and another burden, *preponderance of the evidence*, to mitigating factors.  Jurors will be expected to segregate the mental state threshold factors from aggravating and mitigating factors, and from the weighing process, by not considering them, in determining the appropriateness of a death sentence.  In the final analysis, jurors are asked, under the FDPA, to determine at what point aggravating factors outweigh mitigating factors 'sufficiently' to justify a sentence

> of death.   It is unreasonable to expect even
> the most conscientious and reasonably
> intelligent jurors to parse this melange of
> concepts and come out with an understanding
> of the process or a principled verdict.

Def.'s Mot. to Strike, 110.  Jacques argues that the risk of

juror confusion makes the FDPA unconstitutional under the Eighth

Amendment and the Due Process Clause of the Fifth Amendment,

which require that "where discretion is afforded a sentencing

body on a matter so grave as the determination of whether a human

life should be taken or spared, that discretion must be suitably

directed and limited so as to minimize the risk of wholly

arbitrary and capricious action."  *Id*. at 111 (quoting *Gregg*, 428

U.S. at 189).

As evidence of this risk of confusion, Jacques relies on

several studies that present evidence that jurors in capital

cases misunderstand what they are supposed to do during the

penalty phase in ways that systematically bias their decision-

making in favor of imposing the death penalty.  *Id*. at 111-15.[9]

---

[9] Jacques cites a myriad of studies and journal articles: C.
Haney, L. Sontag and S. Constanzo, "Deciding to Take a Life:
Capital Juries, Sentencing Instructions, and the Jurisprudence of
Death," 50 Journal of Social Issues 149 (1994); C. Haney and M.
Lynch, "Comprehending Life and Death Matters: A Preliminary Study
of California's Capital Penalty Instructions," 18 Law and Human
Behavior 411 (1994); "Dictionaries and Death: Do Capital Jurors
Understand Mitigation?", Utah Law Review 1 (1995); J. Luginbuhl,
"Comprehension of Judges' Instructions in the Penalty Phase of a
Capital Trial: Focus on Mitigating Circumstances," 16 Law and
Human Behavior 203 (April 1992); M. Constanzo and S. Constanzo,
"Jury Decision Making in the Capital Penalty Phase: Legal
Assumptions, Empirical Findings and a Research Agenda," 16 Law

31

The Government replies that this argument must fail because
it violates a "'crucial assumption' underlying the system of
trial by jury[:] that juries will follow the instructions given
them by the trial judge." *Marshall v. Lonberger*, 459 U.S. 422,
438, n.6 (1983).  The Government cites *Boyde v. California* for
the proposition that jury instructions are constitutionally
defective only if there is a "reasonable likelihood" that they
misled the jury into sentencing the defendant to death and argues
that instructions that are only arguably ambiguous or create
"only a possibility of . . . [jury] inhibition" are not
unconstitutional.   Govt.'s Opp'n to Mot. to Strike, 39-40
(quoting 494 U.S. 370, 380 (1990)).  The Government points out

---

and Human Behavior 185 (1992).  U. Bentele and W.J. Bowers, "How
Jurors Decide on Death: Guilt is Overwhelming; Aggravation
Requires Death; and Mitigation is No Excuse," 66 Brooklyn L. Rev.
1011 (2001); W. S. Geimer & J. Amsterdam, "Why Jurors Vote Life
or Death: Operative Factors in Ten Florida Death Penalty Trials,"
15 Am. J. Crim. L. 1, (1989); S. P. Garvey, "Aggravation and
Mitigation in Capital Cases: What do Jurors Think?" 98 Columbia
L. Rev. 1538 (1998); T. Eisenberg, S. P. Garvey & M. T. Wells,
"Jury Responsibility in Capital Sentencing: An Empirical Study,"
44 Buff. L. Rev. 339 (1996); W. S. Bowers, "The Capital Jury
Project: Rationale, Design and Preview of Early Findings," 70
Ind. L. J. 1043 (1995); W. J. Bowers, M. Sandys & B. Steiner,
"Foreclosing Impartiality in Capital Sentencing: Jurors'
Predispositions, Attitudes and Premature Decision-Making," 83
Cornell L.Rev. 1476 (1998); T. Eisenberg and M. T. Wells, "Deadly
Confusion: Juror Instructions in Capital Cases," 79 Cornell L.
Rev. 1 (1992); W. Bowers and W. Foglia, "Still Singularly
Agonizing: Law's Failure to Purge Arbitrariness from Capital
Sentencing," 39 Crim. Law Bulletin 51 (2003).

that much of the empirical work cited by Jacques involved surveys of jurors in state systems.  *Id.* at 41.

The Court agrees with the approach of other district courts that have found that challenges to the death penalty based on the incomprehensibility of jury instructions cannot be adequately addressed at the pre-trial phase.  *See United States v. Mikos,* No. 02-137, 2003 U.S. Dist. LEXIS 16044, at *56-65 (N.D. Ill. Sept. 11, 2003) ("[A]rguments [that the FDPA sentencing scheme is incomprehensible to juries] are not ripe for adjudication and will only be ripe if and when it can be alleged that the instructions given to the sentencing jury were reasonably likely to mislead the jurors into sentencing [the defendant] to death."); *United States v. Llera Plaza*, 179 F. Supp. 2d 444, 449-50 (E.D. Pa. 2001) ("If the case at bar proceeds to a sentencing phase, counsel for the defendants and counsel for the government will have the opportunity to participate fully in the process of formulating the instructions which will frame the jury's deliberations.").  Accordingly, the Court finds that Jacques's claim regarding the incomprehensibility of the FDPA sentencing scheme is not yet ripe.  Of course, if this case does proceed to the sentencing phase, Jacques will have ample opportunity to participate in formulating the jury instructions and, if he is unhappy with the results, to challenge those instructions under the standard set forth in *Boyde*.

33

**E. Risk of Executing Innocent People**

Jacques argues that "in light of overwhelming evidence that continued enforcement of the federal death penalty will lead to the execution of a meaningful number of innocent people, the federal death penalty should be declared unconstitutional." Def.'s Mot. to Strike, 120.  He urges this Court to "determine whether, in fact, the federal death penalty is likely to lead to the execution of one or more innocent people." *Id*. at 118. Jacques acknowledges that "this issue may be seen as foreclosed by the Second Circuit's decision in *United States v. Quinones*, 313 F.3d 49 (2d Cir. 2002)." *Id*. at 118 n.70.  However, he requests that this Court consider the issue in light of the fact that "in the eight years that have passed since that decision, a steadily increasing number of innocent prisoners have been released from this nation's death rows." *Id*.

The risk of wrongful convictions is incredibly troubling, especially in the capital punishment context.  However, even if Jacques is correct that evidence of wrongful convictions has grown over the past eight years, the controlling precedent of the Second Circuit and the Supreme Court precludes this Court from holding the federal death penalty unconstitutional based upon the risk of executing the innocent.

> We hold that, to the extent the defendants'
> arguments [regarding the risk of executing
> the innocent] rely upon the Eighth Amendment,
> their argument is foreclosed by the Supreme

34

> Court's decision in *Gregg* . . . .  With
> respect to the defendants' Fifth Amendment
> due process claim, . . . the Supreme Court
> expressly held in *Herrera v. Collins* . . .
> that, while the Due Process Clause protects
> against government infringement upon rights
> that are so rooted in the traditions and
> conscience of our people as to be ranked as
> fundamental, there is no fundamental right to
> a continued opportunity for exoneration
> throughout the course of one's natural life.

*Quinones*, 313 F.3d at 68-69 (citing *Gregg*, 428 U.S. 153; *Herrera v. Collins*, 506 U.S. 390 (1993)); *see also Barnes*, 532 F. Supp at 641; *Williams*, 2004 U.S. Dist. Lexis 25644, at *35; *Sampson*, 468 F.3d at 27 n.6.

**F. Use of Non-Statutory Aggravating Factors**

Jacques argues that the use of non-statutory aggravating factors is unlawful 1) because use of non-statutory aggravating is not authorized by the language of the FDPA, 2) because use of non-statutory aggravating factors leads to imposition of arbitrary and capricious death sentences, and 3) because allowing prosecutors to define non-statutory aggravating factors violates the ban on ex post facto laws.  All three arguments fail.

Jacques's statutory argument relies on a purported contradiction in the language of the FDPA.  Section 3591(a) of the FDPA provides that a defendant who has been convicted of a death-eligible offense and who meets the requisite culpability factors set forth in Section 3591(a)(2)"shall be sentenced to death if, after consideration of *the factors set forth in section*

*3592* in the course of a hearing held pursuant to section 3593, it
is determined that imposition of a sentence of death is justified
. . . ." (emphasis added).  Section 3592(c) provides:

> In determining whether a sentence of death is
> justified for an offense described in Section
> 3591(a)(2), the jury, or if there is no jury,
> the court, shall consider each of the
> following aggravating factors for which
> notice has been given and determine which, if
> any, exist . . . [Sections 3592(c)(1)-(16) go
> on list the specific statutory aggravating
> factors authorized by the Act.]
>
> The jury, or if there is no jury, the court,
> may consider whether any other aggravating
> factor for which notice has been given
> exists.

Jacques argues that Section 3591(a) contradicts Section 3592(c),
because while the former states that a defendant may be sentenced
to death only after the jury considers "the [statutory
aggravating] factors set forth in § 3592," the latter allows the
jury to consider any non-statutory aggravating factors for which
notice is given.

Jacques acknowledges that this statutory argument has been
rejected as "hyper-literal."  *United States v. Nguyen*, 928 F.
Supp. 1525, 1535 (D. Kans. 1996).  As Judge Buchwald commented:

> Section 3592(c) explicitly authorizes the
> jury to consider 'any other aggravating
> factor for which notice has been given.'
> Moreover, Section 3593 contains multiple
> references to jury consideration of
> non-statutory aggravating factors in the
> FDPA's contemplated sentencing phase. . .
> Taken together, these provisions plainly
> demonstrate Congress's intent to allow the

36

> jury to consider non-statutory aggravating
> factors in determining whether a death
> sentence is appropriate.  At best, Section
> 3591(a)'s reference to jury consideration of
> the factors 'set forth' in Section 3592 is
> inartful legislative drafting that, under
> established principles of construction,
> cannot be construed to create a conflict or
> render other references to non-statutory
> aggravating factors superfluous.

*Williams*, 2004 U.S. Dist. LEXIS 25644**,** at *52-53 (citing *Beck v.

Prupis*, 529 U.S. 494, 506 (2000); *see also Barnes*, 532 F. Supp.

2d at 643.  This Court agrees with Judge Buchwald's assessment of

this argument.

Jacques next argues that the use of non-statutory

aggravating factors is antithetical to principals of due process

and the requirement of guided discretion set forth in the Supreme

Court's Eighth Amendment jurisprudence.  *See McCleskey*, 481 U.S.

at 304 (The capital sentencing decision must be guided by

"carefully designed standards that must narrow a sentencer's

discretion.").  He asserts that "construing Section 3592(c) as

authorizing the government to unilaterally expand the list of

aggravating factors on a case-by-case basis injects into capital

proceedings precisely the uncertainty and disparate case results

that *Furman* found to violate the Eighth Amendment."  Def.'s Mot.

to Strike, 128.

Jacques's argument correctly observes that there is somewhat

of a tension between individualization and guided discretion in

the Supreme Court's post-Furman jurisprudence.  Nevertheless, as

37

the Government points out, the "FDPA, including its provisions
concerning non-statutory aggravating factors . . . essentially
codifies the two-step process prescribed by the Supreme Court for
death penalty sentencing by 1) narrowing the sentencer's
discretion through eligibility factors (i.e., gateway intent
factors under § 3591(a) and the statutory aggravating factors
under § 3592(c)), and 2) individualizing the sentencing
determination."  Govt.'s Opp'n to Mot. to Strike, 46 (citing
*Marsh*, 548 U.S. at 173-74).  Accordingly, the Fifth Circuit has
explicitly rejected the argument that the submission of non-
statutory aggravating factors at the penalty phase under the FDPA
violates the Eighth Amendment and the Due Process Clause of the
Fourteenth Amendment.  *Higgs*, 353 F.3d at 320 (citing *Zant v.
Stephens*, 462 U.S. 862, 878-79 (1983) ("Once a defendant has been
rendered eligible for the death penalty by the jury's finding of
a statutory aggravating factor, the use of nonstatutory
aggravating factors serves only to individualize the sentencing
determination. . .  Thus, we reject the contention that the FDPA
is unconstitutional merely because it allows the sentencing jury
to weigh nonstatutory aggravating factors when deciding whether
to impose the sentence of death upon a defendant convicted of a
death-eligible offense."); *see also Fell I*, 360 F.3d at 144
("[The FDPA] standard permits 'the jury [to] have before it all
possible relevant information about the individual defendant

38

whose fate it must determine.'" (quoting *Jurek v. Texas*, 428 U.S. 262, 276 (1976))).  This Court agrees with the Fifth Circuit that Supreme Court precedent forecloses Jacques's argument that the use of non-statutory aggravating factors under the FDPA violates the Eighth Amendment or the Due Process Clause.

Finally, Jacques argues that the use of non-statutory aggravating factors violates the ban on ex post facto laws set forth in Article I, Section 9 of the Constitution.  *See Bouie v. City of Columbia*, 378 U.S. 347, 350-51 ("The basic principle that a criminal statute must give fair warning of the conduct that it makes a crime has often been recognized by this Court.").  Jacques asserts that, in the wake of *Ring*, non-statutory aggravating factors act as the functional equivalents of elements of the crime because they are "just as necessary to a jury's finding that the death penalty shall apply as are statutory aggravating factors."  Def.'s Mot. to Strike, 129-30.  Reasoning from this premise, he argues that because the FDPA "permits the prosecution to manufacture out of whole cloth aggravating factors to be applied retroactively to crimes committed before the aggravating factors are identified," the statute "'makes more burdensome the punishment for a crime, after its commission[.]'"  *Id*. at 129 (quoting *Beazell v. Ohio*, 269 U.S. 167, 169 (1925)).

The foundational premise of Jacques's argument - that non-statutory aggravating factors are the functional equivalents of

elements of the crime - has been rejected by two circuit courts

of appeal.  *See Higgs,* 353 F.3d at 322; *Allen*, 247 F.3d 741, 759

(8th Cir. 2001).  In *Higgs*, a case which was decided after *Ring*,

the Fourth Circuit held that non-statutory aggravating factors

are not elements because, by virtue of the fact that they are

weighed only once the defendant is found eligible for capital

punishment, "[t]hey do not increase the possible punishment or

alter the elements of the offense." *Id*.  This Court agrees with

the reasoning of the Fourth Circuit.  Because non-statutory

aggravating factors are not elements of the crime, or the

functional equivalents thereof, the FDPA does not violate the ex

post facto clause by allowing prosecutors to define and allege

these factors on a case-by-case basis.

## G. The Constitutionality of the Federal Death Penalty in a State that Does Not Authorize Capital Punishment as a Matter of State Law

Jacques adopts "by reference" arguments from a law review

article that asserts that the federal government may not proceed

with a federal capital prosecution in a state, such as Vermont,

that does not authorize capital punishment as a matter of state

law.  Def.'s Mot. to Strike, 169 (citing M. Mannheimer, "When the

Federal Death Penalty is 'Cruel and Unusual,'" 74 U. Cin. L. Rev.

819 (2006)).  The article argues that because one of the original

and central purposes of the Bill of Rights was to prevent federal

encroachment on state sovereignty and local values, the Eighth
Amendment should be read to prohibit the federal government from
imposing the death penalty in states that do not authorize
capital punishment.  The Government, noting the brevity of
Jacques's briefing of the issue, indicates that its response is
not intended "to address every point in the article, but
observes, respectfully, that adoption of its overarching
viewpoint would be an affront to binding Supreme Court and Second
Circuit precedent[.]"

The Government, to the extent that it asserts that the
argument adopted by Jacques is foreclosed by the binding
precedent of the Second Circuit in *United States v. Fell III*, 571
F.3d 264 (2d Cir. 2009) (en banc), overstates the reach of that
decision.  The opinion and order of the Second Circuit in that
case merely denied the defendant's petition for panel rehearing
or rehearing en banc.  *Id*. at 264.  The language that the
Government relies upon in its briefing is drawn entirely from
Judge Raggi's concurring opinion, in which Chief Judge Jacobs,
Judge Cabranes, Judge Livingston, Judge Parker, and Judge Wesley
joined.  *Id*. at 264-82 (Raggi, J., concurring).  While this
concurring opinion is not "binding precedent," as the government
seems to suggest, Govt.'s Opp'n to Mot. to Strike, 85, it does
identify some serious problems with the argument that the Eighth

Amendment should be read to prohibit imposition of the federal
death penalty in a state such as Vermont.

Judge Raggi's opinion discussed these issues in the context
of addressing the question, raised in Judge Calabresi's dissent,
of "whether a district court selecting a federal capital jury in
a state . . . that does not itself provide for the death penalty,
must somehow take that fact into account in deciding whether to
excuse jurors who express opposition to the death penalty." *Id.*
at 265-66 (Raggi, J., concurring). In response to the federalism
concern raised in the dissent, Judge Raggi stated that, "[t]he
selection of a federal jury to hear a case arising under federal
law involves the exercise of exclusive federal power." *Id.* at
269 (Raggi, J., concurring). "It does not intrude on any state
function; much less does it trench on the exercise of any state
power." *Id.* Furthermore, she observed that constraining the
federal government's ability to impose the death penalty in
certain states could create equal protection problems:

> The Eighth Amendment, no less than other
> provisions of the Constitution, must apply
> equally throughout the states. Nothing in the
> Court's jurisprudence has ever suggested that
> federalism warrants re-tailoring the Eighth
> Amendment in each state . . . to test federal
> death sentences by reference to local
> practices.  In the absence of any supporting
> authority, it is no mere formalism for this
> court to decline to convene en banc to
> explore the dissent's novel theory of
> federalism.

*Id.* at 274 (Raggi, J., concurring).

42

As the party challenging the statute, Jacques bears "the burden of proving that the FDPA is unconstitutional[.]"  *Sampson*, 486 F.3d at 20; *see INS v. Chadha*, 462 U.S. 919, 944 (1983) (statutes enacted by Congress are presumed constitutional); *Lujan v. G & G Fire Sprinklers*, 532 U.S. 189, 198 (U.S. 2001) ("[T]he party challenging the statutory [] scheme . . . bears the burden of demonstrating its unconstitutionality.").  In light of the significant constitutional issues identified in Judge Raggi's *Fell III* concurrence, this Court is unable to conclude that Jacques has met his burden on the basis of the one paragraph he devotes to the federalism argument in his briefing and his citation to the Mannheimer article.  Accordingly, the Court denies the motion to strike on these grounds, but observes that the federalism question raised by Jacques appears to remain an open one in this circuit.  *See Fell III*, 571 F.3d 264 (Raggi, J., concurring; Calabresi, J., dissenting).

**H. The Death Penalty as a Per Se Denial of Due Process and Violation of the Eighth Amendment**

Finally, Jacques argues that this Court should find that the death penalty is unconstitutional *per se* because it is cruel and unusual punishment and violates the Due Process Clause. Jacques's argument here reiterates the grounds for several of his earlier claims: that the death penalty operates in a racially discriminatory manner, leads to the execution of innocent people, and is applied in an arbitrary and capricious manner.  He

43

concludes that "evolving standards of decency have reached the point where this Court can declare that the death penalty is no longer consistent with the values embodied in the Eighth Amendment." Def.'s Mot. to Strike, 170.

Jacques "recognizes, as he must, that a majority of the United States Supreme Court accepts the proposition that the death penalty, under some circumstances, is constitutional." *Id.* Because this Court is bound by the precedent of the Supreme Court, Jacques's claim that the death penalty is unconstitutional *per se* must be rejected. *See Quinones*, 313 F.3d at 61-62 ("[T]he Supreme Court expressly held in *Gregg* that, to the extent our standards of decency have evolved since the enactment of the Constitution, they still permit punishment by death for certain heinous crimes such as murder.") (citing *Gregg*, 428 U.S. at 186-87); *Sampson*, 486 F.3d at 30; *Barnes*, 532 F. Supp. 2d at 641 ("If [the Supreme Court's] decisions are to be reevaluated in light of evolving 'standards of decency' under the Eighth Amendment, as defendants urge, they must be reevaluated by the Supreme Court, not us." (quoting *Williams*, 2004 U.S. Dist. LEXIS 25644, at *5)).

## III. Challenges to Particular Non-statutory Aggravating Factors

Jacques has also moved the court to strike certain of the statutory and non-statutory aggravating factors identified in the Government's notice of intent to seek the death penalty. *See*

44

Notice of Intent (ECF No. 106).  In the alternative, he asks the Court to require that the Government provide a detailed offer of proof with respect to each of these factors and to hold a hearing to test the particular relevance and reliability of the evidence to be offered.

Before addressing Jacques's challenges to particular aggravating factors, it may be helpful to lay out some of the constitutional and statutory limitations on aggravating factors that may be submitted to a capital jury.

First, an aggravating factor may not be unconstitutionally vague.  That is to say, an aggravating factor must have some "common-sense core of meaning . . . that criminal juries should be capable of understanding." *Tuilaepa v. California*, 512 U.S. 967, 973 (1994) (quoting *Jurek*, 428 U.S. at 279).

Second, an aggravating factor may not be overly broad.  It must serve a narrowing function, in that it "may not apply to every defendant convicted of [the underlying capital offense]." *Tuilaepa*, 512 U.S. at 972.  Specifically, an "aggravating factor must make [the] defendant's conduct 'worse or more heinous'" than that of other defendants charged with capital crimes. *Williams*, 2004 U.S. Dist. LEXIS 25644, at *60 (quoting *States v. Perez*, No. 02 Cr. 7, 2004 U.S. Dist. LEXIS 7500, at *12 (D. Conn. Apr. 29, 2004)).

Third, an aggravating factor must be "particularly relevant to the sentencing decision." *Gregg*, 428 U.S. at 192. The requirement of particular relevance means that an aggravating factor must help the jury to distinguish "those who deserve capital punishment from those who do not." Arave v. Creech, 507 U.S. 463, 474 (1993); *see also Fell*, 372 F. Supp. 2d at 763 ("Aggravating factors in death penalty cases must be 'particularly relevant to the sentencing decision,' not merely relevant, in some generalized sense, to whether the defendant might be considered a bad person.").

Fourth, an aggravating factor must meet the "heightened standard of reliability" that the Supreme Court "has demanded [of] factfinding procedures" in capital cases. *Ford v. Wainwright*, 477 U.S. 399, 411 (1986); *see United States v. Friend*, 92 F. Supp. 2d 534, 541 (E.D.Va. 2000).

Fifth, an aggravating factor may not be put before the jury if it is impermissibly duplicative of another aggravating factor. *United States v. McCullah*, 76 F.3d 1087, 1111-12 (10th Cir. 1996) (noting that "double counting of aggravating factors, especially under a weighing scheme, has a tendency to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally"); *see also United States v. Bin Laden*, 126 F. Supp. 2d 290, 298 (S.D.N.Y. 2001).

46

Relatedly, while not an express limitation on aggravating factors, Section 3593(c) of the FDPA provides that "information relevant to an aggravating factor . . . may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury."  18 U.S.C. § 3593(c).  *See United States v. Pepin*, 514 F.3d 193, 204 (2d Cir. 2008) (While "[i]t is true . . . that . . . 'the Supreme Court has . . . made [it] clear that in order to achieve [the required] 'heightened reliability[]' [in the penalty phase of a capital case], more evidence, not less, should be admitted on the presence or absence of aggravating and mitigating factors[,]' it hardly follows from that general observation that relevant evidence is always permitted.  Acceptance of that reasoning would eviscerate the trial court's ability to exclude unduly prejudicial material from the penalty hearing inasmuch as any decision to exclude necessarily means less evidence, not more." (quoting *Fell I*, 360 F.3d at 143 (citing *Gregg*, 428 U.S. at 203-04))).

With this legal framework in mind, the Court will address Jacques' particular challenges to the aggravating factors alleged in the notice of intent to seek the death penalty.

## A) Statutory Aggravating Factors

### 1) Death During the Commission of Another Crime

The notice of intent alleges that the death of the victim occurred during the commission of an offense under the kidnapping statute, 18 U.S.C. § 1201(a)(1).  Notice of Intent 2.  Jacques argues that this factor "is plainly and simply duplicative of the elements of the underlying offense."

While an aggravating factor may not be put before the jury if it is duplicative of *another aggravating factor*, *McCullah*, 76 F.3d at 1111-12, the Supreme Court has stated that "the fact that [an] aggravating circumstance duplicate[s] one of the *elements* of the crime does not make [a capital] sentence constitutionally infirm." *Lowenfield v. Phelps*, 484 U.S. 231, 246 (1988) (emphasis added).[10]  For this reason, other courts have rejected the argument that the Government may not allege death during the commission of another crime as an aggravating factor in a capital

---

[10] That it is permissible to put before the jury an aggravating factor that duplicates an element of the underlying crime, but not one which duplicates another aggravating factor, makes sense if one considers the rationale for striking duplicative aggravating factors articulated by the Tenth Circuit in *McCullah*.  76 F.3d at 1111-12.  The *McCullah* court indicated that "double counting of aggravating factors, especially under a weighing scheme, has a tendency to skew the weighing process and creates the risk that the death sentence will be imposed arbitrarily and thus, unconstitutionally." *Id*.  The FDPA instructs jurors at the sentencing phase to weigh the aggravating factors against the mitigating factors in deciding whether a capital sentence is justified.  18 U.S.C. § 3593(e).  Because, under the FDPA, the jury is not instructed to include the elements of the crime in its weighing consideration, allowing jurors to consider aggravating factors that duplicate elements of the crime does not lead to double counting of the same factors during the weighing process.

48

prosecution where the underlying offense is kidnapping resulting in death, in violation of 18 U.S.C. § 1201(a).  *United States v. Hall*, 152 F.3d 381, 416-17 (5th Cir. 1998); *United States v. Jones*, 132 F.3d 232, 248-49 (5th Cir. 1998); *see also Deputy v. Taylor*, 19 F.3d 1485, 1502 (3d Cir. 1994) ("[F]ederal courts of appeals have consistently held that a sentencing jury can consider an element of the capital offense as an aggravating circumstance even if it is duplicitous.").  The motion to strike this factor is **denied**.

### 2) Especially Heinous, Cruel, or Depraved (EHCD) Manner of Committing Offense

The notice of intent alleges that Jacques "committed the offense described in Count 1 in an especially heinous, cruel, or depraved manner, in that it involved torture or serious physical abuse to the victim[.]"  Notice 2.  Jacques recognizes that "the circuits which have considered the issue have found that [the EHCD factor] is not unconstitutionally vague under the Eighth Amendment as long as the jury is properly instructed on the requirement of torture and serious physical abuse."  Def.'s Mot. to Strike, 145-46 (citing *Mitchell*, 502 F.3d 931; *Sampson*, 486 F.3d 13; *United States v. Bourgeois,* 423 F.3d 501 (5th Cir. 2005); *United States v. Paul,* 217 F.3d 989 (8th Cir. 2000); *United States v. Webster,* 162 F.3d 308 (5th Cir. 1998); *Hall,* 152 F.3d 381; *Jones,* 132 F.3d 232).  He asserts that "[i]t is, thus,

49

settled law that the ECHD aggravating factor is
unconstitutionally vague unless accompanied by a proper limiting
instruction, and by a narrowing construction." *Id*. at 147.  He
then argues that "[i]n the wake of *Ring*, analysis of ECHD
represents and requires, in effect, an effort to define the
precise 'sub-elements' of an aggravating factor that is in and of
itself . . . an element of the undefined and unenacted offense of
federal capital murder." *Id*. at 148.  He suggests that the ECHD
statutory aggravating factor is invalid because "sub-elements of
capital murder . . . should not be so vague that they remain
undefined until jury instructions." *Id*. at 148 n.85.

While there is merit to Jacques's characterization of
statutory aggravating factors as elements,[11] his suggestion that
an element is unconstitutionally vague where it requires some
explication in the jury instructions is without support.  Indeed,
it is difficult to think of an example of an element of any
offense in criminal law that does not require some elaboration in
the jury instructions before the jury can give it adequate
consideration.  An aggravating factor is unconstitutionally vague
where it lacks a "common-sense core of meaning . . . that
criminal juries should be capable of understanding." *Tuilaepa*,
512 U.S. at 973 (quotation omitted).   There is no reason to

---

[11] As discussed *supra*, under the FDPA, statutory aggravating
factors must be proven beyond a reasonable doubt in order to
authorize use of the death penalty.

believe that, when coupled with an appropriate jury instruction, the language of the statutory aggravating factor in question – "especially heinous, cruel, or depraved manner in that it involved torture or serious physical abuse to the victim" – lacks a common-sense core of meaning that is understandable to jurors. Like the other courts that have considered this issue before, this Court agrees that the ECHD factor, as set out in the FDPA, "avoids facial vagueness by requiring that the offense involve serious physical abuse or torture." *Sampson*, 486 F.3d at 38; *see also Bourgeois,* 423 F.3d at 511; *Paul,* 217 F.3d at 1001; *United States v. Chanthadara*, 230 F.3d 1237, 1262 (10th Cir. 2000).

Jacques further argues that "[i]n the absence of any apparent factual basis [for the ECHD factor] in the discovery . . . this Court should require the government to come forward with an outline of its proofs on this factor[.]" Def.'s Mot. to Strike, 149.  The Government responds that it has disclosed the factual basis it intends to offer to prove this factor in the form of its allegations that Jacques "held [the victim] captive for about 12 hours while repeatedly raping her, [] drugged her, and [] murdered her by smothering and strangling."  Govt.'s Opp'n to Mot. to Strike, 59.  Because the Government has represented that it has already disclosed the factual basis it intends to use to prove the ECHD factor, the Court need not order any additional disclosure with regard to this particular factor at this time.

Whether or not this factual basis, if it is in fact proved by the Government at trial, sufficiently establishes the ECHD factor will be a question for the jury. *See Williams*, 2004 U.S. Dist. LEXIS 25644, at \*61 ("a pre-trial motion such as the one under consideration here is normally not the place to test the sufficiency of the government's evidence with respect to aggravating factors") (citing *United States v. Battle*, 173 F.3d 1343, 1347 (11th Cir. 1999); *United States v. Kee*, No. S1 98 Cr. 778, 2000 U.S. Dist. LEXIS 8784, \*9 (S.D.N.Y. June 27, 2000); *United States v. McVeigh*, 944 F. Supp. 1478, 1490 (D. Colo. 1996)). The motion to strike this factor is **denied**.

### 3) Substantial Planning or Premeditation

The notice of intent alleges that Jacques "committed the offense described in Count 1 after substantial planning and premeditation to cause the death of the victim." Notice 2. Jacques alleges that this factor is unconstitutionally vague because "it requires jurors to fix the illusive and highly subjective point at which 'planning and premeditation' crosses an imaginary dividing line and becomes '*substantial* planning and premeditation.'" Def.'s Mot. to Strike, 149. Jacques acknowledges that several other circuits which have considered this argument have rejected it. *Id*. at 149-50 (citing *Bourgeois,* 423 F.3d 501; *United States v. Jackson,* 327 F.3d 273 (4th Cir. 2003); *Webster,* 162 F.3d 308; *United States v. Tipton,* 90 F.3d

861 (4th Cir. 1996); *United States v. McCullah,* 76 F.3d 1087
(10th Cir. 1996); *United States v. Flores,* 63 F.3d 1342 (5th Cir.
1995); *bin Laden*, 126 F.Supp.2d at 297 n.7).  However, he notes
that this is an argument that has not yet been considered by the
Second Circuit or the Supreme Court.  Like the courts that have
considered this question before, this Court finds that the "use
of the word 'substantial' to modify 'planning and premeditation'
does not render [this factor] unconstitutionally vague, but
instead, conveys with adequate precision a commonly understood
meaning of 'considerable,' or 'more than merely adequate[.]'"
*Tipton*, 90 F.3d at 896 (citing *McCullah*, 76 F.3d at 1111).  The
motion to strike this factor is **denied**.

    **4) Vulnerable Victim**

    As the final statutory aggravating factor, the notice of
intent alleges that the victim in this case, Brooke Bennet, "who
was 12 years old at the time of her death, was particularly
vulnerable due to her youth."  Notice 3.  Jacques argues that "it
is not immediately apparent from discovery or elsewhere how her
youth rendered her more vulnerable to the murder."  Def.'s Mot.
to Strike, 150.  He suggests that because the Government alleges
that she was drugged into unconsciousness "her vulnerability may
have played no role in her murder."  *Id*.  Jacques asks that
Government be required to come forward with an outline of its

proofs with regard to this factor so that the Court may decide whether it should be struck from the notice of intent.

Jacques is correct that, in order for an aggravating factor alleging that the victim was vulnerable to be put before a jury, jury, there must be a "connection between the victim's vulnerability and the offense committed upon the victim."  1 L. Sand, Modern  Federal Jury Instructions ¶ 9A.14; *see United States v. Johnson,* 136 F.Supp.2d 553 (W.D. Va.2001) (vulnerable victim factor struck where there was no nexus between victims vulnerable condition, pregnancy, and her instantaneous death in a pipe bomb explosion); *United States v. Mikos*, 539 F.3d 706 (7th Cir. 2008) (shooting victim's obesity was properly considered as an aggravating factor where it made it difficult to run, fight back, or seek help).  The Government argues that the discovery it has already provided "affords a fulsome understanding" of its allegation that Jacques exploited Ms. Bennet's youth "to lure her into captivity, and then to rape and murder her."  The Court agrees with the Government that the discovery provided to date – which includes text messages allegedly used to lure Ms. Bennet to the Defendant's house by telling her that there was to be a pool party there and that a boy whom she was fond of would attend – alleges a sufficient nexus between the victim's youth and the offense of kidnapping resulting in death.  Accordingly, the motion to strike this factor or, in the alternative, to order the

Government to provide a more detailed offer of proof for this factor is **denied**.

**B) Non-statutory Aggravating Factors**

   **1) Sexual Abuse and Manipulation of J1**

   The Government has given notice that it intends to introduce as a non-statutory aggravating factor evidence that Jacques sexually abused J1 from the time she was nine to the time she was fourteen years old and that Jacques "controlled and manipulated J1 into believing that Breckenridge[12] was real, to be obeyed, and capable of killing her and her family." Notice 3. Jacques urges the Court to strike this factor either because it is not particularly relevant or because "its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c).

   In particular, Jacques worries that admission of this factor presents the "risk that a jury will sentence [him] to death because of his conduct toward J1 and not because he is alleged to have murdered Ms. Bennett." Motion to Strike, 151. Jacques provides no authority to support his assertion that, at the

---

   [12] The Government alleges that "Breckenridge" is a fictitious internet sex ring which Jacques invented in order to manipulate and intimidate Ms. Bennett and J1 in furtherance of his crimes against them. Jacques allegedly sent electronic communications, which appeared to come from various members of Breckenridge, giving various directives to Ms. Bennett and J1. It is alleged that Jacques used such communications to lure Ms. Bennett to the location of the kidnapping.

sentencing phase, a defendant's criminal conduct fails to meet the requirement of particular relevance or is unduly prejudicial where it involves a victim other than the victim of the offense of which the defendant was convicted at the guilt phase.

In support of its argument that this factor should be considered by the jury at the penalty phase, the Government observes that the Supreme Court and the Second Circuit have expressed that "in order to achieve [] 'heightened reliability,' more evidence, not less, should be admitted on the presence or absence of aggravating and mitigating factors." *Fell I*, 360 F.3d at 143 (citing *Gregg*, 428 U.S. at 203-04).  The Government further relies on several cases in which courts have allowed the admission of unadjudicated criminal conduct in capital sentencing proceedings.  *See e.g. Tuilaepa*, 512 U.S. at 976; *Williams*, 337 U.S. at 244 (1949); *Milton v. Procunier*, 744 F.2d 1090, 1097 (5th Cir. 1984).

Pursuant to the FDPA, this Court is authorized to exclude from the penalty phase evidence of unadjudicated criminal conduct relating to an aggravating factor if "its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury."  18 U.S.C. § 3593(c).  The Court will be in a better position to rule on the appropriateness of this factor at the close of the guilt phase of the trial, when it may consider the evidence adduced at the guilt phase in

evaluating the relative prejudice and probative value of this factor and in conducting the balancing analysis required by § 3593(c).  Accordingly, at this juncture, the Court **denies without prejudice** the motion to strike this factor.

### 2) Manipulation and Deception of the Vermont Criminal Justice System

The notice of intent alleges as a non-statutory aggravating factor that "Jacques, during approximately 2003 - 2006, manipulated and deceived representatives of the State of Vermont's criminal justice system into believing that, in the wake of completing a term of imprisonment and Vermont's sex offender treatment program, he had been rehabilitated."  Notice 3.  Jacques argues that any relevance this factor has is outweighed by its danger of unfair prejudice.  He further asserts that this factor is also problematic because "it transforms jurors . . . into the role of victims" and is duplicative of several other of the non-statutory aggravating factors alleged in the notice of intent.

Putting aside, for the moment, Jacques's arguments that this factor is duplicative of others and transforms the jurors into victims, the Court finds that the factor does not meet the requirement of particular relevance.  To be particularly relevant, an aggravating factor must help the jury to distinguish "those who deserve capital punishment from those who do not."

*Arave v. Creech*, 507 U.S. 463, 474 (1993).  In other words, an aggravating factor must assist the jury in narrowing the class of offenders eligible for the death penalty.  It is a dubious proposition that a capital defendant's attempt to convince authorities of his rehabilitation while serving a sentence on a prior conviction actually narrows the class of death eligible offenders.  Most, if not all, offenders who appear before a parole board, or some other authority charged with deciding upon the timing of their release, attempt to convince that authority that they are rehabilitated and worthy of release.  Furthermore, it strikes this Court that a defendant's attempt to convince authorities that he is a suitable candidate for release, even if it is based upon dishonest representations, is not particularly relevant to whether he is deserving of the death penalty.  Simply put, dishonesty to authorities is not salient enough a characteristic to factor into the decision of whether a person should live or die.

Furthermore, even if this Court were convinced that evidence of a defendant's alleged attempt to convince authorities of his rehabilitation during a prior term of incarceration were relevant to the capital sentencing decision, the probative value of this evidence would likely be "outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c).  In particular, the Court would be hesitant

to admit such evidence during the penalty phase of an FDPA trial because of the potential that it might incorrectly suggest to the jury that, if not given the death penalty, the defendant might have the opportunity to be released from prison again if he were to convince authorities of his rehabilitation at a later date.

The Court **grants** the motion to strike this factor from the notice of intent.

### 3) The Use of J1 to Commit Kidnapping and Murder

The notice of intent alleges that Jacques "used J1 to commit the kidnapping and murder of Brooke Bennett." Notice 3. Jacques argues that this aggravating factor duplicates the factor alleging that he sexually assaulted and manipulated J1 and that it is not particularly relevant to the sentencing decision.

"[A]ggravating factors are duplicative when one 'necessarily subsumes' the other or, in other words, when a jury would 'necessarily have to find one in order to find the other[.]'" *Fell II*, 531 F.3d at 235–36 (quoting *Cooks v. Ward*, 165 F.3d 1283, 1289 (10th Cir. 1998); *Johnson v. Gibson*, 169 F.3d 1239, 1252 (10th Cir. 1999)). "Two factors are not duplicative merely because they are supported by the same evidence." *Id.* (citing *Jones*, 527 U.S. at 399). The factor alleging that Jacques used J1 to commit the kidnapping and murder neither subsumes nor is subsumed by the factor alleging that he sexually assaulted and

manipulated her.[13]  Accordingly, neither of the factors need be struck from the notice of intent as duplicative of one another.

Furthermore, this Court cannot conclude that the alleged use of a juvenile to facilitate a kidnapping and murder is not particularly relevant to the capital sentencing decision.  The motion to strike this factor is **denied**.

**4) Witness Elimination**

The notice of intent alleges that Jacques "murdered Brooke Bennett in part to eliminate her as a witness to her own kidnapping and rape."  Notice at 3.  Jacques asks the Court to strike the factor or require the Government to come forward with an outline of its proofs because this factor appears to conflict with the Government's theory of the case: that Jacques "deliberately set out to murder Ms. Bennett."  Motion to Strike, 152-53.  The Government argues that such an offer of proof is unnecessary because "the motive to eliminate Ms. Bennett as a

---

[13] That is to say a jury would not necessarily have to find one of these factors in order to find the other.  For example, the jury could find that Jacques used J1 to help him commit the kidnapping and murder without finding that he had sexually assaulted and manipulated her.  Likewise, the jury could find that he sexually assaulted and manipulated her but did not use her to commit kidnapping and murder.  Alternatively, the jury could find that both factors exist but on distinct factual grounds - i.e. the jury could conclude that although Jacques did use J1 to commit the underlying crime, the way in which he used her for that crime was separate and distinct from his sexual abuse and manipulation of her.

witness is plain: killing her eliminated a critical witness to [the] kidnapping and rape."

While the Government's suggestion that the motive to eliminate a witness is self-evident in all murder cases where the perpetrator committed some offense against the victim is dubious, there is another reason for striking this non-statutory aggravating factor in this case.  It is duplicative of one of the statutory aggravating factors alleged in the notice of intent: death during commission of another crime, *see supra*.  The two factors are duplicative because "a jury would 'necessarily have to find one in order to find the other[.]'" *Fell II*, 531 F.3d at 235-36 (quoting *Gibson*, 169 F.3d at 1252).  A jury simply could not find that Jacques "murdered Brooke Bennett in part to eliminate her as a witness to her own kidnapping and rape," Notice 3, without also finding that "[t]he death of the victim . . . occurred during the commission of [the kidnapping offense] ."

Because this factor is duplicative of one of the statutory aggravating factors, the motion to strike it is **granted**.[14]

### 5) Exploitation of a Family Relationship with Brooke Bennett

The notice of intent alleges that Jacques "exploited his family relationship with Brooke Bennet, who was his step-niece,

---

[14] If the Government prefers to strike the statutory aggravating factor of death during commission of another crime so that it may retain this non-statutory aggravating factor, it may elect to do so.

to kidnap, rape, and murder her." Notice 3-4. Jacques argues
that, even if true, this allegation should be struck because it
is not particularly relevant to the sentencing decision.
However, he fails to provide an argument as to why it is not
particularly relevant. The Court agrees with the Government that
this allegation will assist the jurors in their task of making
"an *individualized* determination on the basis of the character of
the individual and the circumstances of the crime." *Tuilaepa*,
512 U.S. at 972 (quoting *Zant*, 462 U.S. at 879). While defense
counsel will of course be free to argue to the jury that this
factor should not be given a great deal of weight in the
balancing of aggravating and mitigating evidence, the Court
concludes that this factor meets the particular relevance
standard. The motion to strike this factor is **denied**.

### 6) Orchestrating J1's Sexual Assault by Another Adult Male

The Government alleges as an aggravating factor that Jacques
orchestrated the sexual assault of J1 by another male in 2007.
Notice 4. Jacques urges the Court to strike this factor either
because it is not particularly relevant and, relatedly, because
"its probative value is outweighed by the danger of creating
unfair prejudice, confusing the issues, or misleading the jury."
18 U.S.C. § 3593(c). For the reasons described in the section
discussing the non-statutory aggravating factor alleging that
Jacques sexually abused and manipulated J1 *supra*, the Court

believes that it will be in a better position to conduct the
balancing analysis required by § 3593(c) at the conclusion of the
guilt phase of the trial.  The Court therefore **denies without
prejudice** the motion to strike this factor.

### 7) Allegations of Decades-Old, Largely Unadjudicated Sexual Misconduct

The notice of intent alleges as non-statutory aggravating
factors the rapes and sexual assaults of at least four young
women who, unlike J1, were not involved in the instant offense.
Notice 4.  Specifically, Jacques is alleged 1) to have raped and
sexually abused then-juvenile J2 during 1977-1984; 2) to have
raped then-juvenile J3 during 1980-1982; 3) to have raped then-
juvenile J4 in or about 1987 and to have engaged in sexually
inappropriate conduct with other girls living in Barre, Vermont
at that time; and 4) to have kidnapped, raped, and threatened to
kill then 18-year-old A2 in 1992.  *Id.*  Jacques pled guilty to
the rape and kidnapping of A2, but the other alleged offenses
were never adjudicated.

Jacques argues that the Court should strike these factors
pursuant to 18 U.S.C. § 3593(c) because "the probative value of
the information is outweighed by other considerations, such as
remoteness in time [and] danger of unfair prejudice."  Def.'s
Mot. to Strike, 154 (quoting *United States v. O'Driscoll*, 250 F.
Supp. 2d 432, 436 (M.D. Pa. 2002)).  In the alternative, he asks

the Court to require that the Government provide further information about these allegations and to conduct a hearing to test the reliability of this evidence.

Taking the most recent conduct first, the Court finds that the allegations pertaining to A2, which occurred in 1992 and resulted in a criminal conviction, are admissible at the sentencing phase.  As the Fourth Circuit noted while evaluating the admissibility of prior convicted conduct in the sentencing phase of a capital case, "[p]rior convictions are [] properly and routinely considered in federal sentencing."  *United States v. Caro*, 597 F.3d 608, 623 (4th Cir. 2010) (citing *Almendarez-Torres v. United States*, 523 U.S. 224, 230 (1998)).  This makes sense in light of "congressional wisdom that recidivism justifies harsher sentencing."  *Id*.  Here, the rationale for admitting the prior convicted conduct is especially compelling since the prior conduct involves the kidnapping and sexual victimization of a young woman.  That the prior conduct is similar to the capitally charged conduct that is the subject of the instant case suggests that it is "particularly relevant to the sentencing decision." *Gregg*, 428 U.S. at 192.  *See United States v. Davis*, 912 F. Supp. 938, 948 (E.D. La. 1996*)* ("[P]roof . . . of other acts of violence by a defendant is arguably more relevant and probative than any other type of aggravating evidence supporting imposition of the death penalty.")

64

The Government's case for admitting the older, unadjudicated conduct is much weaker.  While it is true that there is no *per se* rule barring the admission of unadjudicated criminal conduct at capital sentencing proceedings, *see Hatch v. State,* 58 F.3d 1447, 1465 (10th Cir. 1995) (upholding use of prior unadjudicated conduct from due process challenge); *United States v. Bradley,* 880 F. Supp. 271, 287 (M.D.Pa. 1994), the Court has grave concerns that the unadjudicated allegations at issue here, which all occurred 33 to 23 years ago,[15] do not pass muster under the "heightened standard of reliability" that the Supreme Court "has demanded [of] factfinding procedures" in capital cases.  *Ford*, 477 U.S. at 411.  Accordingly, the Court finds that the "the probative value [of the unadjudicated conduct] is outweighed by the danger of creating unfair prejudice[.]"  18 U.S.C. § 3593(c).  The motion to strike the unadjudicated sexual misconduct is **granted**, while the motion to strike the conduct that was the subject of the 1992 conviction is **denied**.

---

[15] Jacques observes that a court would be prohibited from considering conduct this old in several other criminal law contexts.  He points out that the general statute of limitations for the prosecution of criminal conduct under federal law is five years, 18 U.S.C. § 3282(a), that the Sentencing Guidelines generally do not include convictions that date back more than 15 years in calculating an offender's criminal history, U.S.S.G. § 4A1.2(e), and that the Federal Rules of Evidence impose a presumptive 10-year limitation on the use of felony convictions for impeachment purposes.  Fed. R. Evid. 609(b).

### 8) Possession of Child Pornography

The notice of intent alleges that Jacques, "during 2003 – 2008, produced, distributed, and possessed child pornography." Notice 4.  Jacques argues that involvement with child pornography is "not particularly relevant to the sentencing decision or should otherwise be excluded pursuant to 18 U.S.C. § 3593(c)." Mot. to Strike, 156.  The Government argues that this allegation, which has been charged as a separate offense in the indictment in the instant case, does meet the particular relevance requirement because Jacques's "fixation on J1 and Brooke, two immature girls, is reflected in an abundance of pornography he possessed contemporaneously, depicting other immature girls."  Opp'n to Mot. to Strike, 74.  The Court agrees that this aggravating factor is particularly relevant in that it pertains not just generally to Jacques's character but also specifically to the circumstances of the capitally charged offense, particularly the motive for the alleged offense.  See *Zant*, 462 U.S. at 878 ("What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime.").  The motion to strike this factor is **denied**.

### 9) Lack of Remorse

The Government has indicated in the notice of intent that it plans to introduce evidence that Jacques "has demonstrated a lack

of remorse for the kidnapping, rape, and murder of Brooke Bennett, and the manipulation, sexual abuse, and rape of J1." Notice 4. Jacques rases two general objections to this aggravating factor. First, he argues that, to the extent the Government intends to rely upon his failure to admit he committed the offenses charged to show his lack of remorse, this would violate his Fifth Amendment right to remain silent and his Sixth Amendment right to a fair trial, "because it [would] impose[] an impermissible penalty upon the exercise of those rights." Mot. to Strike, 157. Second, he argues that "use of lack of remorse as an aggravating factor violates the Eighth Amendment because it is inherently unreliable." *Id*.

With regard to the first concern, Jacques is correct that the Government may not rely upon his exercise of his rights to remain silent and to trial by jury as evidence of his lack of remorse. *Malloy v. Hogan*, 378 U.S. 1, 8 (1964) (defendant has right "to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence"); *Griffin v. California*, 380 U.S. 609, 615 (1965) ("[T]he Fifth Amendment prohibits comment on the defendant's silence."); *Agard v. Portuondo*, 117 F.3d 696, 709-10 (2d Cir. 1997) (applying "principles of *Griffin*" to a case involving Sixth Amendment rights); *United States v. Jackson*, 390 U.S. 570, 583 (U.S. 1968) ("Whatever the power of Congress to

67

impose a death penalty for violation of the Federal Kidnapping
Act, Congress cannot impose such a penalty in a manner that
needlessly penalizes the assertion of a constitutional right."").
The Government acknowledges this point and represents that it
"intends to demonstrate lack of remorse by presenting other
affirmative evidence . . . and not by implicating the defendant's
constitutional rights to remain silent and to trial by jury."
Opp'n. to Mot. to Strike, 75-76.  Specifically, the Government
indicates that it will present evidence that Jacques was
dishonest about his knowledge of Brooke Bennett's whereabouts
when he spoke with her family and with law enforcement officers
in the immediate aftermath of her disappearance and that he "went
to truly extraordinary lengths to plan the murder of his niece
before the fact, and to conceal it, and after the fact planned to
obstruct and divert the investigation with threats to kill other
children."  *Id*. at 74-75.

Jacques' second concern is that lack of remorse, because it
is "a subjective state of mind [which is] difficult to gauge
objectively since behavior and words don't necessarily correlate
with internal feelings," *Davis*, 912 F. Supp. at 946, fails to
meet the heightened reliability standard.  Other courts that have
considered this issue have found no per se constitutional problem
with using lack of remorse as an aggravating factor.  *See e.g.*
*Nguyen*, 928 F. Supp. at 1541; *Zant*, 462 U.S. at 885 n.22

("[L]awful evidence which tends to show the motive of the
defendant, his lack of remorse, his general moral character, and
his predisposition to commit other crimes is admissible in
aggravation."). This court shares the concerns articulated by
the *Davis* court about including an aggravating factor based
entirely on a subjective state of mind, *see* 912 F. Supp. at 946
(striking lack of remorse factor where "the only information
proposed to sustain the factor was [defendant's] alleged
jubilation in learning that [the victim] had been killed," but
then allowing this evidence in to show future dangerousness).
Nevertheless, the Court finds that, in this case, the evidence
that the Government represents it will introduce concerning
Jacques's alleged behavior before and after the kidnapping of Ms.
Bennett would provide a sufficiently reliable basis upon which
the jury could make of a finding of lack of remorse. The motion
to strike this factor is **denied**.

### 10) Low Potential for Rehabilitation

As a non-statutory aggravating factor, the Government
intends to show that Jacques has low rehabilitative potential
because he "committed the capital offense after being afforded
multiple opportunities to rehabilitate, in that he completed a
prison sentence and probationary term, as well as the State of
Vermont's sex offender treatment program, yet continued to engage
in manipulative, deceitful, and violent criminal behavior."

Notice, 5.  Jacques argues that, because the only sentencing options for the capital offense in this case are death or life in prison without parole, "whether or not he will or will not be rehabilitated is not germane to the sentencing decision."  Mot. to Strike 162-63.

The Government points out that other courts have allowed capital sentencing juries to consider rehabilitative potential as a non-statutory aggravating factor in the FDPA context, *see e.g.* *McCullah*, 76 F.3d at 1108, and that the Supreme Court has approved consideration of the closely-related factor of future dangerousness in other contexts.  *Jurek*, 428 U.S. at 275-76.  As the Eighth Circuit has observed, future dangerousness (and by implication, the closely related factor of rehabilitative potential) are relevant to sentencing under the FDPA because "[a] defendant in prison for life is still a risk to prison officials and to other inmates, and even though a life sentence without the possibility of parole greatly reduces the future danger to society from that particular defendant, there is still a chance that the defendant might escape from prison or receive a pardon or commutation of sentence."  *United States v. Allen*, 247 F.3d 741, 788 (8th Cir. 2001).  Of course, the Government concedes that, if it does introduce evidence of Jacques's low potential for rehabilitation as an aggravating factor, he will be entitled

to inform the jury that there is no possibility of parole. *Simmons v. South Carolina*, 512 U.S. 154, 169 (1994).

While it is true that, in other cases, juries have been permitted to consider low rehabilitative potential as a non-statutory aggravating factor, the Court finds that, given the particular facts of this case, Jacques's rehabilitative potential is not particularly relevant to the choice between death or life imprisonment without the possibility of parole.  The Government's allegations with regard to the instant offense and Jacques' past criminal conduct suggest that his victims have been under-aged females.  Given that there is nothing in the record indicating that Jacques presents an escape risk and that the nature of his alleged criminal behavior suggests he is unlikely to victimize prison officials or fellow prisoners, the Court **grants** the motion to strike this factor on the grounds that it is not particularly relevant to the sentencing decision.

**11) Pre-Arrest Obstruction of Justice**

The notice of intent alleges that Jacques, "prior to his arrest on June 29, 2008, attempted to and did obstruct justice in connection with his offenses involving Brooke Bennett and J1." Jacques suggests that this factor should be stricken both because it is duplicative "as part and parcel of the criminal conduct with which [he] is charged."  As explained *supra*, an aggravating factors is to be struck as duplicative only where it

71

necessarily subsumes or is necessarily subsumed by another aggravating factor, and not where it is supported by the same evidence that was adduced during the guilt phase of the trial. *Fell II*, 531 F.3d at 235-36.  Accordingly, this factor need not be struck as duplicative.

Jacques also argues that evidence of obstruction of justice is not particularly relevant to the capital sentencing decision. The Court disagrees.  Rather than being "merely relevant, in some generalized sense, to whether the defendant might be considered a bad person," *Fell*, 372 F. Supp. 2d at 763, the alleged pre-arrest obstruction of justice by Jacques pertains to the specific circumstances of the capitally charged offense.  See *Zant*, 462 U.S. at 878 ("What is important at the selection stage is an individualized determination on the basis of the character of the individual and the circumstances of the crime.").  The motion to strike this factor is **denied**.

**12) Post-Arrest Obstruction of Justice**

The Government alleges as a separate non-statutory aggravating factor Jacques's alleged post-arrest attempts to obstruct justice.  Notice, 5.  Specifically, the notice of intent alleges that Jacques, "while in detention after his June 29, 2008 arrest, attempted to obstruct justice, by seeking to recruit a third party to send email messages indicating Breckenridge was real to J1, threatening to kill J1 and members of her family

unless she gave false information to the police, and also to law enforcement officials and the press, claiming that Jacques had been falsely accused." *Id*.

In a separate motion, Jacques has moved to suppress the post-arrest obstruction evidence on the grounds that its introduction would violate his Sixth Amendment right to counsel. As discussed *infra*, the motion to suppress is being granted in part and denied in part, and the Government will be given the opportunity to "scrub" the evidence of all references to the underlying kidnapping offense. Accordingly the motion to strike this factor is **denied as moot**. The Court will reconsider Jacques's arguments that the obstruction evidence is not particularly relevant to the sentencing decision once the Government makes this evidence available.

### 13) Victim Impact Evidence

The notice of intent indicates that the Government intends to introduce victim impact evidence as a non-statutory aggravating factor. Specifically, the notice states that Jacques "caused injury, harm, and loss to Brooke Bennett's family, friends, and classmates because of Brooke Bennett's personal characteristics as an individual human being and the impact of her death upon her family, friends, and classmates." Jacques raises several challenges to this factor.

First, Jacques argues that the factor is vague and overbroad.  He asserts that the factor described in the notice, because it includes the impact on Brooke's friends and classmates, strays beyond the scope of victim impact evidence authorized in the FDPA.  While it is true that the FDPA specifies that victim impact evidence "may include factors concerning the effect of the offense on the victim and the victim's family," in the same sentence it also authorizes the Government to provide notice of "any other relevant information" that it seeks to use in aggravation.  Accordingly, the FDPA does not in fact limit the permissible scope of victim impact evidence strictly to the impact the crime has on the victim and the victim's family. Because the impact of this crime on Ms. Bennett's community is relevant to the sentencing determination, the factor is not overbroad on these grounds.

Jacques also argues that the notice of this factor is impermissibly vague because "it does nothing to guide the defendant's penalty phase preparation or assist the Court in performing the crucial task of limiting the scope of victim impact evidence or determining if it is indeed aggravating." Jacques cites several cases in which courts have required the notice of intent to provide a greater degree of specificity than that provided by the Government here.  *See, e.g., United States v. Glover*, 43 F. Supp. 2d 1217, 1224 (D. Kan. 1999)("The court

74

finds that the defendant is entitled to greater specificity as to the 'serious physical and emotional injury' the government claims the defendant caused [the victim]."); *United States v. Rodriguez*, 380 F. Supp. 2d 1041, 1058 (D.N.D. 2005) (court has "inherent authority" to require Government to provide more detailed description of victim impact evidence where "factual particularity requested is justified to fulfill Defendant's objective of meaningful notice to adequately prepare a defense and meet the allegations against him"); *United States v. Bin Laden*, 126 F. Supp. 2d 290, 304 (S.D.N.Y. 2001) ("An oblique reference to victims' "injury, harm, and loss," without more, does nothing to guide Defendants' vital task of preparing for the penalty phase of trial."); *United States v. Cooper*, 91 F. Supp. 2d 90, 111 (D.D.C. 2000) (requiring Government to include "more specific information concerning the extent and scope of the injuries and loss suffered by each victim, his or her family members, and other relevant individuals, and as to each victim's 'personal characteristics' that the government intends to prove"). This Court agrees with the approach taken in these cases and orders the Government to provide the defendant and the Court with a written outline of the victim impact evidence it intends to offer.

Jacques next argues that victim impact non-statutory aggravating factor "fails to channel the sentencer's discretion"

75

because it is "alleged in nearly every capital prosecution." Mot. to Strike, 165-66.  He points out that "every murder of a family member undeniably causes 'injury, harm, and loss' to the victim's family, and that harm is in every case irreparable[.]" *Id*.  He argues that "[i]f the harm shown is nothing more and nothing less than the harm implicit in any murder, it violates the Eighth Amendment, as well as the [FDPA], to permit the jury to weigh it in deciding whether to impose the death penalty.

To the extent that Jacques is arguing that victim impact evidence cannot be included as an aggravating factor because it duplicates evidence used to prove the underlying offense, this argument is without merit.  As explained *supra*, an aggravating factors is to be struck as duplicative only where it necessarily subsumes or is necessarily subsumed by another aggravating factor, and not where it is supported by the same evidence that was adduced during the guilt phase of the trial. *Fell II*, 531 F.3d at 235-36.

Furthermore, Jacque's assertion that victim impact evidence fails to channel the jury's discretion because it is alleged in the vast majority of death penalty cases misses the mark.  Even if it is true that victim impact is alleged as a non-statutory aggravating factor "in nearly every capital prosecution," Mot. to Strike 165, it goes without saying that particular victim impact evidence presented in each case is unique.  Accordingly, although

76

it may not "channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance," *Lewis v. Jeffers*, 497 U.S. 764, 774 (1990) (internal quotations omitted), it does further the twin constitutional requirement of enabling the jury "to render a reasoned, individualized sentencing determination based [in part] on . . . the circumstances of [the] crime." "Victim impact evidence is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question, evidence of a general type long considered by sentencing authorities;" *Kansas v. Marsh*, 548 U.S. 173-74.  *See Payne v. Tennessee*, 501 U.S. 808, 824 (U.S. 1991) (holding that "the Eighth Amendment erects no per se bar" to the introduction of victim impact evidence).

Finally, Jacques argues that the victim impact evidence must be excluded because it fails to meet the heightened standard of reliability required in death penalty cases in that it is inherently prejudicial.  Mot. to Strike, 166-67 (citing *United States v. Johnson*, 362 F. Supp. 2d 1043, 1107 (N. Dist. Iowa 2005) ("I cannot help but wonder if *Payne* [], which held that victim impact evidence is legitimate information for a jury to hear to determine the proper punishment for capital murder, would have been decided the same way if the Supreme Court Justices in the majority had ever sat as trial court judges in a federal

77

death penalty case and had observed first hand, rather than through review of a cold record, the unsurpassed emotional power of victim impact testimony on a jury.").  Insofar as Jacques argues that the admission of victim impact evidence is inherently unconstitutional under the Eighth Amendment, this argument is foreclosed by *Payne*.  501 U.S. at 827.  Accordingly, based on the general description of the victim impact evidence set forth in the Government's notice of intent, this Court lacks any basis upon which to strike this aggravating factor.  Of course, once the Government provides a more detailed outline of the victim impact evidence it intends to introduce, as required by this order, this Court may exclude any portion that evidence "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury."  18 U.S.C. § 3593(c).  The motion to strike this factor is **denied.**

## IV. Conclusion

For the foregoing reasons the Court **denies** the motion to strike the notice of intent to seek the death penalty on the grounds that FDPA, along with the federal death penalty itself, is unconstitutional.  The motion to strike certain of the aggravating factors from the notice of intent and to order the Government to provide a more detailed offer of proof with regard to these factors is **granted in part** and **denied in part**.

Dated at Burlington, in the District of Vermont, this 4th
day of May, 2011.

/s/ William K. Sessions III
William K. Sessions III
District Court Judge