UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA          :
                                  :
                                  :
          v.                      :     Case No. 2:08-cr-117
                                  :
MICHAEL JACQUES,                  :
                                  :
          Defendant.              :

**OPINION and ORDER Re: Motion to Dismiss Count 1**

Defendant Michael Jacques has moved to dismiss Count 1 of
the indictment filed on October 1, 2008, that charges him with
kidnapping in violation of 18 U.S.C. § 1201(a)(1), on the grounds
that the statute as amended by the Adam Walsh Child Protection
and Safety Act of 2006, Pub. L. No. 109-248, 120 Stat. 587
(codified in scattered sections of 8, 18, 21 & 42 U.S.C.), is
unconstitutional facially and as applied.  For the reasons that
follow, the motion, ECF No. 125, is **denied.**

**Background**

Count I of the six-count Indictment charges Michael Jacques
with kidnapping Brooke Bennett, in violation of 18 U.S.C. §
1201(a)(1).  Specifically, the Government alleges that

> On or about and between June 20-25, 2008, in the
> District of Vermont, Jacques unlawfully seized,
> confined, inveigled, decoyed, kidnapped, abducted, and
> carried away Brooke Bennett, and held her for his own
> benefit and purpose, and used means, facilities, and
> instrumentalities of interstate commerce, namely, cell
> phone text messages, internet email messages, and an
> internet MySpace posting, in committing or in
> furtherance of the commission of the offense, which
> resulted in the death of Brooke Bennett.

Indictment ¶ 8, ECF No. 59.

On August 25, 2009, the Government filed a Notice of Intent to Seek a Sentence of Death in this case, advising that if Jacques is convicted on Count I, then the circumstances of the crime and Jacques's criminal history would justify his execution. ECF No. 106.

According to the Indictment, Jacques lured his twelve-year-old step-niece Brooke Bennett from her home in Braintree, Vermont, to his residence in Randolph Center, Vermont, where he drugged, raped and murdered her.  In order to commit this crime, Jacques manipulated another juvenile, "J1" into assisting him. Jacques had convinced J1 as early as 2003 when she was nine years old that she had been inducted into a fictitious "Breckenridge Program," a powerful secret organization that provided sex training to girls.  J1 was induced to believe that she must comply with orders from members of the Program or risk death to herself or members of her family.  From 2003 to 2008 J1 received communications purportedly from Program members via notes and letters, emails and cell phone text messages.

As of August 2007, J1 had become convinced through emails ostensibly from Program members that she might be required to assist in "terminating" girls who were not succeeding in the Program.  In May 2008, emails purportedly from Program members, indicated that the Program had decided to "terminate" Brooke

Bennett.  J1 was induced to believe that Miss Bennett was blackmailing Jacques.

According to discovery provided to the defense, the Government intends to show that in June 2008 Jacques devised and implemented a plan requiring J1 1) to forward to Brooke Bennett cell phone text messages supposedly originating from a boy she admired, indicating that he was attracted to her; 2) to invite her to the Jacques residence for a pool party on June 25, at which the boy would be a guest; 3) to ask her to come the night before the party to help prepare; and 4) to inform her that each party attender had to do something "weird" beforehand, and that she was to allow Jacques and J1 to drop her off at a local convenience store on the morning of the party and then be picked up by them some distance from the store.

The Government also intends to show that in furtherance of the plan, and to divert suspicion from himself, Jacques arranged to lay a false trail for the police.  He arranged to provide a false story to police and others about leaving his niece at the convenience store at her request so that she could meet a friend and visit another friend at the hospital.  On June 23, email messages supposedly from a Program member directed J1 to obtain a semen sample from a local young man.  On the evening of June 24, a posting on Brooke Bennett's MySpace web page indicated that she intended to sneak away to meet an unknown individual.  The

3

Government intends to show that Jacques sent the email messages to J1, and posted the entry his niece's MySpace page.

Jacques and J1 dropped Brooke Bennett off at the convenience store in Randolph, Vermont, on the morning of June 25, where she was photographed by a surveillance camera.  According to the Government, they then picked her up at the other location, off camera, and brought her back to the Jacques residence, supposedly for the pool party.  The Government charges that Jacques sexually assaulted and killed Miss Bennett there.

On the day she died, Jacques took one of her shoes, her underwear and a handkerchief containing the semen obtained by J1, and placed them by the road near the Floating Bridge, in the neighboring town of Brookfield.

On the evening of June 25, 2008, Jacques contacted the police and informed them that Brooke Bennett was missing. Jacques told police officers that she had asked to be taken to the convenience store where she would be picked up by a friend in order to go to the hospital to visit the friend's sick relative. While police were at the Jacques residence investigating her disappearance, Jacques showed police officers her MySpace page on his computer, with the posting suggesting that she was running off to meet someone.

Also that evening Jacques texted J1, instructing her to disclose a false story that Miss Bennett had mentioned to J1 the

night before that the Floating Bridge was a good location to meet a guy. Jacques's wife Denise heard the story and related it to Jacques. Jacques related the story to the state police. Early in the morning on June 26, Jacques and his wife drove to the Floating Bridge. Denise spotted the shoe, and they called 911. Detectives arrived and located the handkerchief and the underwear. Forensic testing later revealed that DNA extracted from the underwear and the handkerchief were consistent with DNA extracted from a hair from Miss Bennett's hairbrush. The DNA profile of the seminal fluid on the handkerchief was consistent with the DNA from the young man from whom J1 had obtained the semen.

On July 2, 2008, the body of Brooke Bennett was recovered from a shallow grave approximately one mile from the Jacques residence. Jacques was subsequently arrested on federal charges of kidnapping resulting in the death of Brooke Bennett.

## Discussion

### I.   Federal Kidnapping Act

The Federal Kidnapping Act, enacted in 1932 in the aftermath of the infamous Lindbergh kidnapping, was intended to outlaw interstate kidnappings. *Chatwin v. United States*, 326 U.S. 455, 464 (1946). Prior to the statute's enactment, kidnappers were able to evade state law enforcement authorities by crossing state lines with their victims. The so-called "Lindbergh Law"

5

authorized federal prosecution for anyone "who knowingly transports or aids in transporting in interstate or foreign commerce 'any person who shall have been unlawfully seized, confined, inveigled, decoyed, kidnapped, abducted, or carried away by any means whatsoever and held for ransom or reward . . .'"  *Id*. at 456-57; *see also United States v. Moore*, 571 F.2d 76, 83 (2d Cir. 1978) (discussing the background for the enactment of the federal statute).

The statute has been amended from time to time since its enactment.  In 1934, Congress amended the Act to extend federal jurisdiction over kidnappings for any reason, not only for ransom or reward, with the exception of a parent's kidnapping his or her child.  *See Gooch v. United States*, 297 U.S. 124, 128 (1936).  In 1972, following the deaths of Israeli athletes and trainers taken hostage at the Munich Olympic games, Congress passed the Act for the Protection of Foreign Officials and Official Guests of the United States, Pub. L. 92-539, 86 Stat. 1070 (1972) (codified in scattered sections of 18 U.S.C.).  Among other provisions, the Act provided for federal jurisdiction over kidnappings of foreign officials and official guests of the United States, as well as kidnappings which occurred within the special maritime and territorial jurisdiction or the special aircraft jurisdiction of the United States.  *See id.*, 86 Stat. at 1072; 18 U.S.C. §§ 1201 (a)(2), (3), (4).  Section 2 of the Act contained a Statement of

6

Findings and Declaration of Policy:

> The Congress recognizes that from the beginning of our history as a nation, the police power to investigate, prosecute, and punish common crimes such as murder, kidnaping, and assault has resided in the several States, and that such power should remain with the States.
> The Congress finds, however, that harassment, intimidation, obstruction, coercion, and acts of violence committed against foreign officials or their family members in the United States or against official guests of the United States adversely affect the foreign relations of the United States.
> Accordingly, this legislation is intended to afford the United States jurisdiction concurrent with that of the several States to proceed against those who by such acts interfere with its conduct of foreign affairs.

86 Stat. at 1070-71.  Included in the Senate Report accompanying the bill was the statement that "the prime responsibility to investigate, prosecute and punish common law crimes such as murder, kidnapping and assault should remain in the several States."  S. Rep. No. 92-1105, at 2 (1972), *reprinted in* 1972 U.S.C.C.A.N. 4316, 4317.

Title VII of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub. L. 104-132, 110 Stat. 1214 (codified in scattered sections of 8, 18, 22, 28, 42 & 49 U.S.C.), included an amendment to § 1201 to extend federal criminal jurisdiction over certain kidnapping offenses overseas.  *Id.* sec. 721(f), 110 Stat. at 1299.  AEDPA also created a new offense--acts of terrorism transcending national boundaries--that made it a federal crime to kidnap any person within the United States when

7

the conduct transcended national boundaries and "the mail or any facility of interstate or foreign commerce is used in furtherance of the offense."  18 U.S.C. §§ 2332b(a)(1)(A), (b)(1)(A); Pub. L. 104-132, Sec. 702, 110 Stat. at 1291-94.

The Protection of Children From Sexual Predators Act of 1998, Pub. L. 105-314, 112 Stat. 2974 (codified in scattered sections of 18, 28 & 42 U.S.C.), amended the Federal Kidnapping Act to clarify that the transportation element of the offense of kidnapping is satisfied if the victim is transported across a state boundary and was alive when the transportation began.  *Id.* Sec. 702, 112 Stat. at 2987.  The House Committee on the Judiciary had recommended that federal jurisdiction be expanded to "include other traditional bases for federal jurisdiction such as travel by the offender in interstate commerce, or the use of a facility of interstate commerce or the mails in the commission of the crime."  H.R. Rep. No. 105-557, at 24 (1998), *reprinted in* 1998 U.S.C.C.A.N. 678, 692.  An expanded federal jurisdictional provision was deleted from the bill as enacted, however.  The Act did make it a federal crime to "us[e] the mail or any facility or means of interstate or foreign commerce . . . [to] knowingly persuade[], induce[], entice[], or coerce[] any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense . . . ."  Pub. L. 105-314, sec. 102, 112 Stat.

at 2975-76, 18 U.S.C. § 2422(b).

In 2003, the PROTECT Act, Pub. L. 108-21, 117 Stat. 650 (2003) (codified in scattered sections of 18, 21, 28, 42 & 47 U.S.C.), provided for a mandatory minimum sentence of twenty years of imprisonment if the victim of a non-family kidnapping was younger than eighteen.

In 2006 an expanded federal jurisdictional provision was included in the Adam Walsh Act.  Pub. L. 109-248, sec. 213, 120 Stat. at 616.  The principal purposes of the Adam Walsh Act were to establish a national system for registration of sex offenders and to prescribe penalties for sex offenders who fail to comply with registration requirements, and to curb use of the Internet for the sexual exploitation of children.  *See id.* Title I, 120 Stat. at 590; Title VII, 120 Stat. at 647-49.

Section 213 of Title II of the Act amended § 1201(a)(1) of Title 18 to provide for federal jurisdiction over kidnappings when "the offender travels in interstate or foreign commerce or uses the mail or any means, facility or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense." *Id.* 120 Stat. at 616; 18 U.S.C. § 1201(a)(1).  Thus, a federal court may now exercise jurisdiction over a kidnapping that involves the interstate transport of a victim, or the interstate travel of an offender or the offender's use of the mail or any means, facility, or

9

instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense.[1]

The legislation, introduced in the House of Representatives as H.R. 4472, passed by a voice vote and was sent to the Senate, where with minor amendments, it passed, also by a voice vote. The legislative history does not reveal how the amendment to § 1201(a)(1) came to be included in the bill, and no discussion of the expansion of federal jurisdiction for kidnapping appeared in any activity on the bill preserved in the Congressional Record, other than the statement in an earlier version of the bill: "This section expands the federal jurisdiction nexus for kidnapping comparable to that of many other federal crimes to include travel by the offender in interstate or foreign commerce, or use of the mails or other means, facilities, or instrumentalities of interstate or foreign commerce in furtherance of the offense."  Children's Safety and Violent Crime Reduction Act of 2006, 152 Cong. Rec. H657-02, H684 (2006).

Thus, over the years, the federal kidnapping statute as

_____

[1]  States, of course, retain the ability to punish the same conduct.  *See* 18 U.S.C. § 3231 ("Nothing in [Title 18] shall be held to take away or impair the jurisdiction of the courts of the several States under the laws thereof."); *Com. of Pa. v. Nelson*, 350 U.S. 497, 480 n. 10 (1956) (noting that the intent of this language is to limit the effect of the grant of jurisdiction over federal criminal offenses to federal district courts); *cf. United States v. Lanza*, 260 U.S. 377, 382 (1922) ("[A]n act denounced as a crime by both national and state sovereignties is an offense against the peace of dignity of both and may be punished by each.").

amended has come to embrace more than the prosecution of
kidnappers who cross state lines with their victims.  As our
society and crime in our society has become more global, the
statue has been extended to encompass kidnapping offenses with a
federal component, whether that is to protect foreign officials
and official guests or the use of the Internet to further the
commission of the offense.

## II.  Federal Authority to Regulate Crimes Under the Commerce Clause

Jacques argues first that the Adam Walsh Act's amendment of
§ 1201(a)(1) is facially unconstitutional; that is, Jacques
contends that under no circumstances does Congress have the power
to proscribe a kidnapping where the perpetrator used the mail or
any means, facility, or instrumentality of interstate or foreign
commerce in committing or in furtherance of the offense.  *See
United States v. Salerno*, 481 U.S. 739, 745 (1987); *accord Sabri
v. United States*, 541 U.S. 600, 604 (2004).  Second, Jacques
argues that the statute is unconstitutional as applied to the
facts of this case.

The United States Constitution defines and limits the power
of Congress to legislate.  *Marbury v. Madison*, 1 Cranch 137, 176
(1802).  Article I, § 8 of the Constitution gives Congress the
power "[t]o regulate Commerce with foreign Nations, and among the
several States, and with the Indian Tribes."  U.S. Const. art. I,
§ 8, cl. 3.

11

In *United States v. Lopez*, 514 U.S. 549 (1995), the United States Supreme Court described three categories of activity that Congress may regulate pursuant to its commerce power. *Id.* at 558 (citing *Perez v. United States*, 402 U.S. 146, 150 (1971)). "Congress may regulate the use of the channels of interstate commerce;" it may "regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce;" and it may "regulate those activities having a substantial relation to interstate commerce . . . *i.e.*, those activities that substantially affect interstate commerce." *Lopez*, 514 U.S. at 558-59; *accord Gonzales v. Raich*, 545 U.S. 16-17 (2005).

*Lopez* was a challenge to the Gun-Free School Zones Act of 1990, Pub. L. 101-647, § 1702, 104 Stat. 4789, 4844 (codified at 18 U.S.C. § 922(q)), which prohibited any individual from knowingly possessing a firearm at a place that the individual knew to be a school zone. By its terms the statute had nothing to do with commerce or any sort of economic activity, however broadly defined. *Lopez*, 514 U.S. at 561. Nor was the statute "an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Id.* And it contained no jurisdictional element, to ensure a nexus to interstate commerce. *Id.* Because § 922(q) was not a regulation of the use of the

12

channels of interstate commerce, or an attempt to prohibit the
interstate transportation of a commodity through the channels of
interstate commerce, or an attempt to protect an instrumentality
of interstate commerce or a thing in interstate commerce, §
922(q) could only survive Commerce Clause scrutiny as a
regulation under the third category, a regulation of an activity
that substantially affects interstate commerce.  *Id.* at 559.
Acknowledging "that the question of congressional power under the
Commerce Clause is necessarily one of degree," the Court
nevertheless refused to "pile inference upon inference in a
manner that would bid fair to convert congressional authority
under the Commerce Clause to a general police power of the sort
retained by the States."  *Id.* at 566-67.  The Court concluded
that Congress exceeded its Commerce Clause authority, and it
struck down the statute.  *Id.* at 567.

Five years later, in *United States v. Morrison*, 529 U.S. 598
(2000), the Supreme Court reaffirmed these four "significant
considerations" when determining whether a Congressional
enactment can be sustained under *Lopez*'s third category.  *Id.* at
609.  First, a court must examine whether the activity in
question involves "some sort of economic endeavor."  *Id.* at 611.
Second, an express jurisdictional element may establish its
connection with or effect on interstate commerce.  *Id.* at 611-12.
Third, the statute or its legislative history may include express

congressional findings of the activity's effects on interstate commerce. *Id.* at 612. Fourth, the link between the activity and a substantial effect on interstate commerce may be too attenuated. *Id.* Examining these four considerations led the Court to strike down 42 U.S.C. § 13981, which provided a civil remedy for victims of gender-motivated violence. *Id.* at 619. Again, the Court noted that the statute at issue "contained no express jurisdictional element" establishing that the federal cause of action has "an explicit connection with or effect on interstate commerce." *Id.* at 611-12 (quoting *Lopez*, 514 U.S. at 562.

## III. Constitutionality of the Federal Kidnapping Act

### A.   Facial Challenge

Jacques contends that *Lopez* and *Morrison*'s four considerations must be applied in every commerce clause challenge to a federal statute. This is incorrect. *Lopez* and *Morrison* did not involve statutes which purported to regulate the channels or instrumentalities of interstate commerce under *Lopez*'s first or second category. The four considerations assist a court to determine whether an activity substantially affects interstate commerce, a determination that is unnecessary if the statute at issue regulates the channels or instrumentalities of commerce. *See United States v. Alderman*, 565 F.3d 641, 647 (9th Cir. 2009) ("In *Morrison*, the Supreme Court established what is now the

14

controlling four-factor test for determining whether a regulated activity substantially affects interstate commerce.")(quotation marks omitted), *cert. denied*, 131 S. Ct. 700 (2011). "A showing that a regulated activity substantially affects interstate commerce (as required for the third category) is not needed when Congress regulates activity in the first two categories." *United States v. Gil*, 297 F.3d 93, 100 (2d Cir. 2002) (holding that an amendment to the mail fraud statute extending federal jurisdiction over private or commercial interstate mail carriers was a permissible exercise of Congress's power under the second *Lopez* category); *accord United States v. McGriff*, 287 F. App'x 916, 918 (2d Cir. 2008) (summary order) (holding that wholly intrastate use of a two-way pager constituted use of a facility of interstate commerce for purposes of establishing the federal crime of murder-for-hire), *cert. denied*, 129 S. Ct. 1652 (2009); *United States v. Gilbert*, 181 F.3d 152, 158-59 (1st Cir. 1999) (holding that use of the telephone to make a bomb threat was sufficient to sustain jurisdiction under the commerce clause: "*Lopez* does not apply because a telephone is an instrumentality of interstate commerce and this alone is a sufficient basis for jurisdiction based on interstate commerce.").

Jacques also contends that the test for analyzing Congressional authority to regulate intrastate activity under the Commerce Clause is "different" when Congress enacts legislation

concerning state law crimes, and that such legislation must pass the *Lopez/Morrison* four-factor test in order to determine whether the activity substantially affects interstate commerce.  In effect, Jacques would invalidate any federal statute that proscribes an activity that is also proscribed by a state's criminal laws unless the activity substantially affects interstate commerce.  This approach appears to be foreclosed by the Second Circuit's opinion in *United States v. Giordano*, which acknowledged limits to "Congress's power to create federal criminal prohibitions on traditionally state-regulated spheres of noneconomic activity," but declined to apply a *Lopez* category three analysis to a statute that explicitly proscribed using the mail or any means or facility of interstate commerce.[2]  442 F.3d

---

[2]  The Supreme Court's decision in *Jones v. United States*, 529 U.S. 848 (2000), cited by Jacques, does not support his contention that the test is "different" when Congress enacts a criminal statute involving a traditional state law crime.  In this as-applied challenge, the Court held that an owner-occupied private residence not used for any commercial purpose did not qualify as property "used in" commerce or in any activity affecting interstate commerce; therefore, arson of this property was not subject to federal prosecution under 18 U.S.C. § 844(i). *Id.* at 850-51.  The crime was defined as requiring that the property itself have been used in commerce or in an activity affecting commerce, and not that the arson have the potential to affect interstate commerce. *Id.* at 854.  The Court therefore examined the function of the building, and whether that function affected interstate commerce. *Id.* at 856.  A prosecution under the relevant clause of § 1201(a) requires proof that the offender used a facility or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense.  18 U.S.C. § 1201(a).  Whether the arson of a private residence substantially affected interstate commerce was not an issue in *Jones*; likewise, whether an intrastate kidnapping

16

30, 41 (2d Cir. 2006), *cert. denied*, 549 U.S. 1213 (2007).

*Giordano* involved a prosecution and conviction for multiple counts of use of a facility of interstate commerce to transmit information about a person under the age of sixteen years, with the intent to entice that person to engage in sexual activity, in violation of 18 U.S.C. § 2425.[3]  Giordano had made and received multiple cell phone calls to a prostitute concerning obtaining sexual services from her daughter and niece, aged eight and ten. All of the calls were sent and received within the state of Connecticut, although some of the signals traveled through New York.  Responding to the defendant's Commerce Clause challenge, the Second Circuit panel rejected the argument that the statute should be analyzed under *Lopez*'s third category, as a federal criminal prohibition on a traditionally state-regulated sphere of non-economic activity.  *Id.* at 41.  Then Circuit Judge Sotomayor

---

offense substantially affects interstate commerce is not at issue here.

   [3]  Section 2425 of Title 18 of the United States Code provides in relevant part that

> [w]hoever, using the mail or any facility or means of interstate or foreign commerce, . . . knowingly initiates the transmission of the name, address, telephone number, social security number, or electronic mail address of another individual, knowing that such other individual has not attained the age of 16 years, with the intent to entice, encourage, offer, or solicit any person to engage in any sexual activity for which the person can be charged with a criminal offense, or attempts to do so, shall be fined under this title, imprisoned not more than 5 years, or both.

18 U.S.C. § 2425.

wrote for the panel:

> § 2425, which explicitly proscribes 'us[e of] the mail
> or any facility or means of interstate . . . commerce'
> to specified ends, is clearly founded on the second
> type of Commerce Clause power categorized in *Lopez*,
> that is, the power to regulate and protect the
> instrumentalities of interstate commerce 'even though
> the threat may only come from intrastate activities.'

*Id.* (quoting *Lopez*, 514 U.S. at 558).  Purely intrastate use of

cell phones constituted use of a facility of interstate commerce.

*Id.* at 40.

Jacques attempts to distinguish *Giordano* by arguing that §

2425 directly regulates the use of the instrumentalities of

interstate commerce, while § 1201(a)(1) only indirectly regulates

the instrumentalities of interstate commerce.  He stresses that

the federal kidnapping statute punishes the crime of kidnapping,

not a crime of using a means, facility or instrumentality of

interstate commerce to commit an offense.  He offers no other

basis for creating a distinction, for purposes of Commerce Clause

analysis, between a federal statute that criminalizes use of the

instrumentalities of interstate commerce to further certain ends-

-such as § 2425--and a federal statute that criminalizes certain

conduct when the instrumentalities of interstate commerce are

used to facilitate that conduct--such as § 1201(a).

In an "indirect" case, as Jacques terms it, he would have

the court follow the approach used by the Second Circuit in

*United States v. Holston*, 343 F.3d 83 (2d Cir. 2003), and *United*

*States v. Harris*, 358 F.3d 221 (2d Cir. 2004), which considered whether the statutes in question regulated activity that substantially affects interstate commerce.  In *Holston*, the Second Circuit considered the constitutionality of a provision of 18 U.S.C. § 2251(a),[4] which among other things prohibits the production of depictions of sexually explicit conduct involving a minor using materials that have been transported in interstate commerce.  In *Harris*, the Second Circuit considered the constitutionality of 18 U.S.C. § 2252A(a)(5)(B),[5] which prohibits the possession of child pornography that has been transported in

_____

[4] At the time Holston was convicted, Section 2251(a) of Title 18 United States Code provided in relevant part that [a]ny person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in interstate or foreign commerce, . . . with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct, shall be punished . . . if such person knows or has reason to know that such visual depiction will be transported in interstate or foreign commerce or mailed, if that visual depiction was produced using materials that have been mailed, shipped or transported in interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported in interstate or foreign commerce or mailed.  18 U.S.C. § 2251(a) (2000).

[5] At the time Harris was convicted, Section 2252A(a)(5)(B) provided that "[a]ny person who--knowingly possesses any book, magazine, periodical, film, videotape, computer disk, or any other material that contains an image of child pornography that has been mailed, or shipped or transported in interstate or foreign commerce or in or affecting interstate or foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped or transported in interstate or foreign commerce by any means including by computer . . . shall be punished . . . .  28 U.S.C. § 2252A(a)(5)(B) (2000).

interstate commerce.  Both statutes survived constitutional
scrutiny as valid exercises of Congress's commerce power under
*Lopez*'s third category.  *See Harris*, 358 F.3d at 223; *Holston*,
343 F.3d at 88-91.[6]

The statutes at issue in *Harris* and *Holston* criminalize
certain activity if the offender uses or possesses materials that
have been transported in commerce.  *See Harris*, 358 F.3d at 222;
*Holston*, 343 F.3d at 86.  The federal kidnapping statute directly
prohibits the use of "any means, facility, or instrumentality of
interstate . . . commerce" to facilitate a kidnapping.  18 U.S.C.
§ 1201(a).  Federal statutes with similar jurisdictional language
have repeatedly withstood Commerce Clause challenges.  For

---

[6]  The Third Circuit concluded that another subsection of
the statute at issue in *Harris* was appropriately evaluated under
*Lopez*'s second category, however.  In *United States v. MacEwan*,
445 F.3d 237, 245 (3d Cir.), *cert. denied*, 549 U.S. 882 (2006),
it declined the invitation to conduct an analysis under *Lopez*'s
third category, holding that 18 U.S.C. § 2252A(a)(2)(B), which
prohibits the receipt or distribution of any material that
contains child pornography that has been transported in
interstate commerce, is a valid exercise of Congress's power to
regulate the channels and instrumentalities of commerce.  MacEwan
was convicted of downloading images of child pornography from the
Internet.  He argued that § 2252A did not reach purely intrastate
possession of child pornography, and if it did, Congress did not
have power under the Commerce Clause to punish this activity.
*Id*. at 243.  The *MacEwan* court stated:  "In addressing the
transmission of child pornography images over the Internet, we
need not proceed to an analysis of *Lopez*'s third category when
Congress clearly has the power to regulate such an activity under
the first two. . . . Indeed, it is difficult to find an act more
intertwined with the use of the channels and instrumentalities of
interstate commerce than that of downloading an image from the
Internet."  *Id*. at 245.

example, the federal murder-for-hire statute provides in

pertinent part:

> Whoever . . . uses or causes another (including the
> intended victim) to use the mail or any facility of
> interstate or foreign commerce, with intent that a
> murder be committed in violation of the laws of any
> State or the United States as consideration for the
> receipt of, or as consideration for a promise or
> agreement to pay, anything of pecuniary value, or who
> conspires to do so, shall be fined under this title or
> imprisoned for not more than ten years, or both . . . .

18 U.S.C. § 1958(a).  Like kidnapping, murder has traditionally

been proscribed under state law.  Yet courts have not hesitated

to consider the murder-for-hire statute a valid regulation of

activity involving an instrumentality of interstate commerce.

*See McGriff*, 287 F. App'x at 918; *see also United States v.

Ballinger*, 395 F.3d 1218, 1229 (11th Cir.) (en banc) ("[18 U.S.C.

§ 1958, among other statutes] clearly illustrate[s] Congress'

power to punish offenders . . . who rely on the channels and

instrumentalities of commerce in committing criminal acts."),

*cert. denied*, 546 U.S. 829 (2005); *United States v. Richeson*, 338

F.3d 653, 660-61 (7th Cir.) ("[T]he statute's history indicates

that Congress sought to punish contract killings pursuant to its

authority to regulate the instrumentalities of interstate

commerce . . . ."), *cert. denied*, 540 U.S. 934 (2003); *United

States v. Marek*, 238 F.3d 310, 317 (5th Cir.) (en banc) ("When it

adopted § 1958, Congress was acting within the second of three

broad categories identified by the Supreme Court in *United States

21

*v. Lopez*. . . . When Congress regulates and protects under the
second *Lopez* category, . . . federal jurisdiction is supplied by
the nature of the instrumentality or facility used. . . .”),
*cert. denied*, 534 U.S. 813 (2001); *Krantz v. United States*, No.
98-CV-7218 JG, 1999 WL 557524 at *5 (E.D.N.Y. July 27, 1999) (“§
1958 represents a permissible regulation of the mails as an
‘instrumentality’ of interstate commerce.”).

     Another example is 18 U.S.C. § 1952, the Travel Act, which
among other things, prohibits use of “the mail or any facility in
interstate or foreign commerce, with intent to--(1) distribute
the proceeds of any unlawful activity; or (2) commit any crime of
violence to further any unlawful activity; or (3) otherwise
promote, manage, establish, carry on, or facilitate the
promotion, management, establishment, or carrying on, of any
unlawful activity,” and the subsequent performance or attempt to
perform one of the three categories of acts described.  18 U.S.C.
§ 1952(a).  “Unlawful activity” as defined in the statute
includes, among other things, crimes punishable under state law
such as prostitution offenses, extortion, bribery or arson.  *See*
*id.* § 1952(b).  In a case holding that intrastate telephone calls
in furtherance of an unlawful prostitution business could violate
the Travel Act, the Ninth Circuit observed that there was no
question that Congress had the power under the Commerce Clause to
regulate this activity:  “Telephones are instrumentalities of

interstate commerce that fall within the second *Lopez* category." *United States v. Nader*, 542 F.3d 713, 717 (9th Cir. 2008), *cert. denied*, 129 S. Ct. 1984 (2009); *see also United States v. Baker*, 82 F.3d 273, 275 (8th Cir.) (holding that causing the use of an ATM to generate an intrastate electronic transfer in the commission of extortion satisfied the jurisdictional prerequisite of the Travel Act, and noting that this was an example of the regulation and protection of the instrumentalities of interstate commerce), *cert. denied*, 519 U.S. 1020 (1996); *United States v. Gluzman*, 953 F. Supp. 84, 91 (S.D.N.Y. 1997) (observing that the Travel Act "has long been upheld as well within Congress' authority to legislate under the Commerce Clause . . . [given its] plenary power . . . to regulate the channels of interstate commerce."), *aff'd per curiam*, 154 F.3d 49, 50 (2d Cir. 1998); *United States v. Goldberg*, 928 F. Supp. 89, 98 (D. Mass. 1996) (holding that the Travel Act is an example of regulation of the instrumentalities of interstate commerce, or persons or things in interstate commerce).

Yet another example is 18 U.S.C. § 2422(b), which prohibits use of "the mail or any facility or means of interstate or foreign commerce, . . . [to] knowingly persuade[], induce[], entice[], or coerce[] any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or [to]

attempt[] to do so.  18 U.S.C. § 2422(b).  In affirming a conviction under the statute for using the Internet to arrange for sex with two children, the 11th Circuit disposed of the defendant's Commerce Clause challenge:

> Congress clearly has the power to regulate the internet, as it does other instrumentalities and channels of interstate commerce, and to prohibit its use for harmful or immoral purposes regardless of whether those purposes would have a primarily intrastate impact. . . . Congress may reach and prohibit the use of a telephone or the internet to set up the sexual abuse of children through intermediaries, just as it may prohibit the use of those instrumentalities to set up a fraudulent scheme or to arrange a contract murder.

*United States v. Hornaday*, 392 F.3d 1306, 1311 (11th Cir. 2004), *cert. denied*, 545 U.S. 1134 (2005); *accord United States v. Tykarsky*, 446 F.3d 458, 470 (3d Cir. 2006) (holding that § 2422(b) is a "constitutional exercise[] of Congress's Commerce Clause power to regulate the use of the channels and instrumentalities of interstate commerce"), *cert. denied*, 129 S. Ct. 1929 (2009).

Two district courts to date have addressed the constitutionality of the Federal Kidnapping Act as amended by the Adam Walsh Act, and both have upheld the statute as a valid exercise of Congress's power to regulate the instrumentalities of interstate commerce.  *See United States v. Augustin*, No. 1:09-CR-187, 2010 WL 2639966 at *4 (E.D. Tenn. June 28, 2010); *United States v. Ochoa*, No. 8-CR-1980 WJ, 2009 WL 3878520 at *3 (D.N.M.

24

Nov. 12, 2009).[7]  Both district courts analyzed the statute as an expression of Congress's power to legislate under *Lopez*'s category two.  *See id.*

This Court agrees with the approach taken by the *Augustin* and *Ochoa* courts, and considers that § 1201(a) is an example of Congress exerting its power to regulate the use of the instrumentalities of interstate commerce under *Lopez*'s second category.  Jacques's attempt to align the Federal Kidnapping Act with those statutes that punish conduct where an individual has used materials that have moved in commerce is unpersuasive.  The provisions discussed in *Holston* and *Harris* did not prohibit the use of channels or instrumentalities of interstate commerce to commit or facilitate the commission of a crime, and therefore were examined to determine if the prohibited activity had a substantial effect on interstate commerce under *Lopez*'s third category.  A federal crime that by its terms does prohibit the use of instrumentalities of interstate commerce to commit or facilitate the commission of a crime is an example of Congress's power to regulate under *Lopez*'s second category.

If the broad reach of the murder-for-hire statute--which makes it a federal crime to use a facility of interstate commerce

---

[7]  The *Ochoa* court held that the statute was constitutional as applied.  *Ochoa*, 2009 WL 3878520 at *2 n.3, *4; *but see id.* at *1 ("[T]he Federal Kidnapping Act is a constitutional exercise of Congress's power under the Commerce Clause, both on its face and as applied . . .").

merely with the intent that a murder-for-hire be committed--is a valid exercise of Congress's Commerce Clause power under *Lopez*'s second category, then the kidnapping statute--which more narrowly makes it a federal crime to use a facility or instrumentality of interstate commerce to commit or to further the commission of the crime itself--must likewise pass muster under *Lopez*'s second category. The Court holds that § 1201(a) is an unremarkable and facially valid exercise of Congress's long-established power to regulate the channels and instrumentalities of interstate commerce under the Commerce Clause, regardless of whether the underlying conduct is also amenable to proscription under a state's police power. *See Cleveland v. United States*, 329 U.S. 14, 19 (1946) ("The power of Congress over the instrumentalities of interstate commerce is plenary; . . . the fact that the means used may have 'the quality of police regulations' is not consequential."). As the 11th Circuit stated: "Plainly congressional power to regulate the channels and instrumentalities of commerce includes the power to prohibit their use for harmful purposes, even if the targeted harm itself occurs outside the flow of commerce and is purely local in nature. *Ballinger*, 395 F.3d at 1226; *see also id.* at 1228 ("[T]he commerce power contemplates congressional regulation of the channels and instrumentalities of commerce in order to prevent their use to facilitate harmful acts, which may be

consummated--and whose effects ultimately may be felt--outside the flow of commerce.").

## B.   As-Applied Challenge

Finally, Jacques asserts that any use of cell phone text messages was too attenuated from the kidnapping to support a conviction.[8]  Conceding that the text messages sent by J1 may have lured Brooke Bennett to the Jacques residence on the evening of June 24, Jacques argues that she was not kidnapped at that time.  Only after she left the next morning, returned to the house, and J1 left the house did the kidnapping take place, according to Jacques's view of the Government's evidence.

The Government's view differs.  According to the Government, Jacques inveigled, enticed and/or lured Brooke Bennett over a six-day period by causing her to receive text messages concerning the pool party to take place on June 25; by sending J1 emails and text messages designed to manipulate her into assisting him to commit the offense; by posting an Internet MySpace entry to suggest an explanation for Miss Bennett's disappearance prior to completion of the offense.

---

[8]   Jacques apparently concedes that cell phones, text messaging, email and the Internet are instrumentalities of interstate commerce.  *See, e.g.*, *United States v. Barlow*, 568 F.3d 215, 220 (5th Cir. 2009) ("[I]t is beyond debate that the Internet and email are facilities or means of interstate commerce."); *see also Giordano*, 442 F.3d at 39-40 (relying on *United States v. Perez*, 414 F.3d 302, 304 (2d Cir. 2005) (per curiam), to hold that intrastate use of cell phones is use of a facility or means of interstate commerce).

The first element of kidnapping requires proof that a defendant "seize[d], confine[d], inveigle[d], decoy[ed], kidnap[ped], abduct[ed], or carrie[d] away" a person.  18 U.S.C. § 1201(a).  Of these seven methods of kidnapping, two--inveigling or decoying--"involve nonphysical takings by which the kidnapper, through deception or some other means, lures the victim into accompanying him." *United States v. Macklin*, 671 F.2d 60, 66 (2d Cir. 1982).  The Government's theory is that Jacques inveigled or decoyed Brooke Bennett into accompanying him.  "Inveigled" "may be defined as enticing, cajoling, or tempting the victim, usually through some deceitful means such as false promises." *Id*.  The Government's theory is that Jacques enticed and tempted Miss Bennett by fabricating the pool party and the young man with an interest in her.  He had J1 send her text messages to persuade her to come to his house to prepare for the supposed pool party. In order to manipulate J1 into assisting him in this inveiglement, he emailed and texted J1 with false messages.  In order to divert any possible suspicion from himself, or to lay a false trail, Jacques posted an Internet message to Brooke Bennett's MySpace page on June 24, the night before she was killed.

Jacques argues that these deceptions did not facilitate a kidnapping because Miss Bennett was not kidnapped until the morning of June 25, and there is no evidence that the lies, if

proven, caused her to accompany Jacques or to remain anywhere against her will.  A kidnapping that begins with an inveiglement and evolves into a confinement by force is one offense, not two, and begins with the inveiglement, not the confinement by force. *See United States v. Redmond*, 803 F.2d 438, 439 (9th Cir. 1986). To prove that Miss Bennett was held against her will, the Government may produce evidence that Jacques deceived or coerced her so that she remained at his house or under his control.  *See United States v. Si Lu Tian*, 339 F.3d 143, 153 (2d Cir. 2003); *see also United States v. Wills*, 234 F.3d 174, 178 (4th Cir. 2000) ("The core inquiry in a § 1201 analysis is whether the 'kidnapper has interfered with, and exercised control over, [the victim's] actions.'") (quoting *United States v. Hughes*, 716 F.2d 234, 239 (4th Cir. 1983)).

Contrary to Jacques's opinion, the Government's evidence could permit a jury to conclude that the layers of deception enabled Jacques to entice Miss Bennett to come to his house, to go to the store, to leave him briefly, and to return with him to his house, all in order to keep her within his control and for his own illicit purposes. *See Hughes*, 716 F.2d at 239 ("By inducing his victim by misrepresentations to . . . accompany him, and knowing that the victim's belief as to their purpose and destination is different from his actual illicit purpose, the kidnapper has interfered with, and exercised control over, her

29

actions."). Because, at a minimum, cell phone text messaging was allegedly used to convince Brooke Bennett that she was assisting in the preparations for a pool party on June 24 and 25, there is probable cause to believe that an instrumentality of interstate commerce was used to commit or to facilitate the commission of kidnapping. The application of § 1201(a) to Jacques's conduct as alleged in Count 1 of the indictment is constitutional. The Government of course will bear the burden at trial of proving as an element of the offense that Jacques used cell phone text messaging, email and/or an Internet posting to commit or in furtherance of the commission of the offense as charged.

## Conclusion

The Defendant's Motion to Dismiss Count 1 of the Indictment (ECF No. 125) is **denied.**

Dated at Burlington, Vermont this 4th day of May, 2011.

/s/William K. Sessions III
William K. Sessions III
District Judge