UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA        :
                                :
                                :
          v.                    :    Case No. 2:08-cr-117
                                :
MICHAEL JACQUES,                :
                                :
          Defendant.            :

**OPINION and ORDER Re: Change of Venue**

On October 1, 2008, Defendant Michael Jacques was indicted by a grand jury and charged with kidnapping resulting in death, a capital crime under 18 U.S.C. § 1201(a)(1).  Jacques was arrested in connection with the abduction and death of his twelve-year-old niece, Brooke Bennett.  The indictment alleges that on or about June 25, 2008, Jacques lured Miss Bennett to his home in Randolph, Vermont, where he drugged, sexually assaulted and murdered her.  The Government has given notice that it intends to seek a sentence of death in this case should Jacques be convicted, due to the aggravated nature of the crime.

Jacques has moved to transfer the proceedings against him from the District of Vermont to the Northern District of New York,[1] pursuant to Federal Rule of Criminal Procedure 21(a). Jacques claims that it is impossible for him to receive a fair trial in the District of Vermont because the jury pool has been tainted by inflammatory pretrial publicity of his case.  He

---

[1] At oral argument, the defense clarified that transfer to any district within the circuit was acceptable.

believes that prospective jurors within the Northern District of
New York or another district within the Second Circuit are less
likely to have formed an opinion of his guilt.  For the reasons
set forth below, the motion to transfer venue, ECF No. 133, is
denied without prejudice and may be reasserted at voir dire.

I.   **Background**

On June 25, 2008, twelve-year-old Brooke Bennett was
reported missing.  The following day, for the first time in its
history, the state of Vermont issued a nationwide Amber Alert
notifying the public of a suspected child abduction.  The story
was carried statewide, by television stations and newspapers, and
was picked up on several national newscasts.  She was last seen
parting from her uncle, Defendant Michael Jacques, at a
convenience store.

Initially the investigation was driven by the theory that
Miss Bennett had run away to meet someone with whom she had
communicated over the Internet.  Some days later, information
obtained during the investigation of the case led to Jacques's
arrest for sexual assault on another juvenile.  The media learned
and reported that Jacques was a convicted sex offender and was
accused of having deceived and manipulated the juvenile into
becoming involved in a sex ring.

When Brooke Bennett's former stepfather was arrested on
related obstruction of justice charges in early July, the media

learned and reported that the juvenile had last seen Miss Bennett with Jacques at his house on the morning of June 25 after the supposed drop-off at the convenience store.  Media also reported that the state police believed that Jacques had invented her Internet connection, and had posted an Internet message, purportedly from her, from his computer.

A week after she disappeared, Brooke Bennett's body was found in a shallow grave near Jacques's home, and Jacques was charged with her kidnapping.

After Jacques's arrest the details of Miss Bennett's death and Jacques's alleged role in her kidnapping continued to be a major news topic for television stations, radio broadcasts, Internet blogs and newspapers around the country, as well as in Vermont.  Media coverage addressed every aspect of the case, including Jacques's alleged efforts to avoid detection by falsifying evidence, his long-time sexual abuse of a minor and his formation of an elaborate fictitious sex ring, of which Bennett was supposedly the next victim.  Major Vermont publications continued to report on the progress of Jacques's case well after his arrest.  The story of Miss Bennett's alleged abduction and murder by her uncle was one of the most widely covered stories in Vermont during 2008.

The crime sparked sweeping reform of Vermont laws pertaining to sex crimes, sex offenders, and registration for sex offenders.

The Governor called for an overhaul of corrections policy, and tougher penalties for sex crimes.  The Lieutenant Governor collected signatures of Vermonters who supported more severe penalties for sex offenders.  Eventually some 52,000 petition signatures were collected, approximately one-fifth of the adult population of Vermont.  The state Senate Judiciary Committee held a series of hearings, which included testimony from a woman who alleged that Jacques raped her in 1985 when she was thirteen years old.

In response, the Department of Corrections instituted internal reforms.  The state legislature enacted "Brooke's Law," which provides for twenty-five year mandatory minimum sentences for sex crimes against children.

On the anniversary of Brooke Bennett's death, media revisited the case, detailing the investigation, the manipulation of emails to create the appearance of multiple people involved in a sex ring, the scheme to kidnap and rape, and the changes to Vermont laws and policies with respect to sexual abuse of children.  Shortly thereafter, the Vermont United States Attorney's Office announced that it would seek the death penalty in the case should Jacques be convicted, and media attention spiked once again.  At each stage of the prosecution, the press recapped the story and reported recent developments.  The news stories have highlighted the fact that Jacques is a convicted sex

offender who served four years of a six to twenty year sentence imposed in 1993, and achieved release from probation in 2006. The stories repeat what the media believe are the facts surrounding Miss Bennett's abduction and murder, the prolonged sexual abuse of another juvenile, the fabrication and planting of evidence, and the attempted enlistment of others to lay false trails.

Some commentators have blamed the state of Vermont for what they perceived as lax or lenient treatment of sex offenders. Members of the public have posted numerous comments online that vilify the defendant and excoriate the state of Vermont--its people, courts, defense attorneys and legislators--for allowing such a crime to occur, and for what they perceive as shortcomings in the judicial process.

Jacques has submitted exhibits containing hundreds of newspaper articles, online stories, transcripts of television broadcasts, Internet blogs and other publicly available accounts of this case.  He has also submitted the results of a telephone survey of approximately 400 potential jurors in the three divisions of the District of Vermont and the Albany Division of the Northern District of New York conducted between December 3, 2009 and January 8, 2010.[2]  *See* Vermont Change of Venue Survey 4,

---

[2]  The total sample for the survey contained 411 Vermont respondents and 381 respondents from the Albany Division of the Northern District of New York.

ECF No. 133, Ex. A ("Venue Survey").  The same polling firm conducted an additional survey of 400 randomly selected Vermont households in October, 2010.  *See* ICF Macro letter dated December 7, 2010, ECF No. 257-1 ("ICF Macro letter").

The results of the Venue Survey revealed that 80% of the Vermont respondents eligible for jury duty in this case[3] had heard something about the case.  By comparison, only 21% of the Albany Division respondents eligible for jury duty in this case had heard something about the case.  Venue Survey 6.  Of the Vermont respondents who were aware of the case, about half had formed an opinion that Jacques was guilty.  *Id.* at 7.  Of the Albany Division respondents who were aware of the case, 12% had formed an opinion about guilt, and only 2% of all eligible jurors believed that Jacques was guilty.  *Id.* at 7-8.  The follow-up letter reported that in October 2010, a telephone survey of a sample of 400 Vermont households weighted to represent the Vermont adult population showed that 81% of adult Vermonters were aware of the Jacques case.  ICF Macro letter 1.  This survey did not screen respondents for jury eligibility, nor did it inquire about any opinions they might have formed about the case.

---

[3]  Respondents generally eligible for jury duty who knew the defendant, the victim, any member of their families or who indicated they would always or never vote for the death penalty were excluded from the analyses.  Venue Survey 2-5.

## II.  Discussion

One who is accused of committing a federal crime has the right to be tried in the federal judicial district in which the crime occurred.  *See* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the rights to a speedy and public trial by an impartial jury of the State and District wherein the crime shall have been committed . . . ."); Fed. R. Crim. P. 18 ("[T]he government must prosecute an offense in a district where the offense was committed."); *see also* U.S. Const. Art. III § 2 cl. 3 ("The Trial of all Crimes, . . . shall be by jury; and Such Trial shall be held in the State where the said Crimes shall have been committed . . . .").

A criminal defendant also has the right to trial by an impartial jury.  *See* U.S. Const. amend. VI.  "[I]f extraordinary local prejudice will prevent a fair trial," due process requires that a defendant be permitted to transfer the proceedings to a different district.  *Skilling v. United States*, 130 S. Ct. 2896, 2913 (2010).  Rule 21(a) of the Federal Rules of Criminal Procedure provides that "[u]pon the defendant's motion, the court must transfer the proceeding against that defendant to another district if the court is satisfied that so great a prejudice against the defendant exists in the transferring district that the defendant cannot obtain a fair and impartial trial there." Fed. R. Crim. P. 21(a).

7

In order to prevail on a Rule 21(a) motion, a defendant must show "a reasonable likelihood that prejudicial news prior to trial will prevent a fair trial." *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966); *accord United States v. Sabhnani*, 599 F.3d 215, 232 (2d Cir. 2010).  Prospective jurors in an important or notorious criminal case will in all likelihood have heard something about the case, and may have formed an opinion about the guilt of the accused.  *See Knapp v. Leonardo*, 46 F.3d 170, 176 (2d Cir. 1995) ("[I]n the era of modern communications, it is nearly impossible to find a juror who has not been exposed to some measure of information regarding a highly publicized case.").  The standard for determining a prospective juror's impartiality, therefore, is whether "the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 723 (1961); *accord United States v. Campa*, 459 F.3d 1121, 1147 (11th Cir. 2006) (en banc).

In *Irvin*, the United States Supreme Court found that pretrial publicity had fostered a "pattern of deep and bitter prejudice . . . present throughout the community."  366 U.S. at 727.  Irvin was arrested and charged with murder in Evansville, Indiana.  Shortly after his arrest, prosecution and police officials issued press releases, which were widely publicized, that Irvin had confessed to six murders, including the one for

8

which he was to be tried.  The case became a cause celebre; a
roving reporter solicited opinions from passers-by concerning
Irvin's guilt and what punishment he should receive; newspapers,
radio and television blanketed the county for months before the
trial with stories that covered the crimes, Irvin's background
and psychological profile, his criminal history, his confession
to the six murders, his offer to plead guilty, and the
prosecutor's determination to secure the death penalty.  *Id.* at
725-26.  Nearly all the homes in the county received the
newspapers that carried the stories.  *Id.* at 725.  During jury
selection the newspapers reported the strong prejudice against
Irvin that existed among the people of the county, and commented
that impartial jurors were proving hard to find.  *Id.* at 726-27.
During voir dire eight out of the twelve jurors eventually seated
thought Irvin was guilty, and many were familiar with the
material facts of the case, including that he was accused of
other murders.  *Id.* at 727-28.  Despite their avowal of their
ability to be fair and impartial, the Court concluded that such
statements could be given little weight, given the circumstances:

> With his life at stake, it is not requiring too much
> that petitioner be tried in an atmosphere undisturbed
> by so huge a wave of public passion and by a jury other
> than one in which two-thirds of the members admit,
> before hearing any testimony, to possessing a belief in
> his guilt.

*Id.* at 728.  Thus, in *Irvin*, the Court found actual prejudice
among the seated jurors, due to continued adverse publicity.  *Id.*

9

at 726.

Ordinarily, "'the key to determining the appropriateness of a change of venue is a searching voir dire.'" *Sabhnani*, 599 F.3d at 234 (quoting *United States v. Yousef*, 327 F.3d 56, 155 (2d Cir. 2003)).  In rare cases, however, pretrial publicity may be so prejudicial and inflammatory as to give rise to a presumption of prejudice.  *E.g.*, *Skilling*, 130 S. Ct. at 2915; *Sabhnani*, 599 F.3d at 233.

In *Rideau v. Louisiana*, 373 U.S. 723, 726 (1963), for example, the United States Supreme Court concluded "that it was a denial of due process of law to refuse the request for a change of venue," after the residents of a rural parish had been repeatedly exposed to television coverage of a jailhouse interview in which the defendant confessed in detail to bank robbery, kidnap and murder.  According to the Court, "[a]ny subsequent court proceedings in a community so pervasively exposed to such a spectacle could be but a hollow formality." *Id*.  And in *Sheppard*, the Supreme Court found that "inherently prejudicial publicity which saturated the community," when coupled with media-created "bedlam" during the trial, deprived the defendant of due process.  384 U.S. at 355, 362-63.  Under "the totality of circumstances," the Court did not require a showing of actual prejudice.  *Id*. at 351-52; *see also, e.g.*, *Daniels v. Woodford*, 428 F.3d 1181, 1211 (9th Cir. 2005)

10

(granting habeas corpus relief where, *inter alia*, venue was
saturated with prejudicial and inflammatory media publicity and
change of venue was denied); *Coleman v. Kemp*, 778 F.2d 1487, 1543
(11th Cir. 1985) (granting habeas corpus relief on claim of
presumed prejudice based on pervasive inflammatory pretrial
publicity).

    Jacques argues that in his case pretrial publicity has been
so extensive, pervasive and inflammatory that prejudice must be
presumed.  A presumption of prejudice "applies when . . . the
community has been so saturated with inflammatory pre-trial
publicity that it pervades the proceedings and overrides notions
of fairness in the determination of guilt or innocence." *United
States v. Washington*, 813 F. Supp. 269, 271 (D. Vt. 1993), *aff'd*,
48 F.3d 73 (2d Cir. 1995); *accord United States v. McVeigh*, 153
F.3d 1166, 1181 (10th Cir. 1998) ("In order . . . to reach a
presumption that inflammatory pretrial publicity so permeated the
community as to render impossible the seating of an impartial
jury, the court must find that the publicity in essence displaced
the judicial process . . . ."). In this Circuit, factors to be
taken into consideration when evaluating a motion for change of
venue include "'the extent to which the government is responsible
for generating the publicity, the extent to which the publicity
focuses on the crime rather than on the individual defendants
charged with it, and other factors reflecting on the likely

11

effect of the publicity on the ability of potential jurors in the district to hear the evidence impartially.'" *Sabhnani*, 599 F.3d at 232 (quoting *United States v. Maldonado-Rivera*, 922 F.2d 934, 967 (2d Cir. 1990)).

Recently the Supreme Court reiterated its commentary on *Rideau*, *Sheppard* and *Estes v. Texas*, 381 U.S. 532 (1965), all cases in which media coverage tainted a criminal prosecution. *See Skilling*, 130 S. Ct. at 2913-14. In its 2010 decision in *Skilling*, the Court stated: "In each of these cases, we overturned a 'conviction obtained in a trial atmosphere that [was] utterly corrupted by press coverage.'" *Skilling*, 130 S. Ct. at 2914 (quoting *Murphy v. Florida*, 421 U.S. 794, 798 (1975)). In *Murphy*, the Court had emphasized that the cases "'cannot be made to stand for the proposition that juror exposure to information about a . . . defendant's prior convictions or to news accounts of the crime . . . alone presumptively deprives the defendant of due process.'" *Murphy*, 421 U.S. at 799; *accord Skilling*, 130 S. Ct. at 2914.

"Prominence does not necessarily produce prejudice, and juror *impartiality*, we have reiterated, does not require *ignorance*." *Id.* at 2914-15. "A presumption of prejudice," therefore, "attends only the extreme case." *Id.* at 2915; *accord McVeigh*, 153 F.3d at 1181 ("[P]resumed prejudice is rarely invoked and only in extreme situations.") (quotation marks

omitted).

Jeffrey Skilling was the chief executive officer of Enron Corporation until a few months before its catastrophic plunge into bankruptcy.  In Houston, Texas, the corporation's home, thousands of Enron employees lost their jobs and their retirement funds, and "Enron's demise spilled over into other industries," affecting "countless people in the Houston area."  *United States v. Skilling*, 554 F.3d 529, 560 (5th Cir. 2009), *aff'd in part, vacated in part* 130 S. Ct. 2896 (2010).  Skilling was charged with conspiracy to commit securities and wire fraud and more than twenty-five counts of securities fraud, wire fraud, false representations and insider trading, in connection with a scheme to inflate the company's stock prices.  *Skilling*, 130 S. Ct. at 2907-08.

Skilling moved to transfer venue, contending that hostility toward him in the corporation's home district, along with extensive pretrial publicity, had made it impossible to select an impartial jury.  In concluding that a presumption of juror prejudice was not warranted, the Supreme Court stressed four factors: 1) the size and characteristics of the community in which the crime occurred; 2) the absence of a confession or other blatantly prejudicial information in the news coverage; 3) the passage of time between the crime and the trial; and 4) the jury's actual ability to acquit the defendant of some of the

charges.  *Id.* at 2915-16.  Jacques argues that consideration of
the first three factors[4] demonstrates that prejudice must be
presumed.

## A.   Size and characteristics of the community

Unlike the community and the jury pool in *Skilling*, the
District of Vermont is small, with fewer than 500,000 people
eligible for jury duty, compared with Houston, where 4.5 million
people were eligible for jury duty.  *Id.* at 2915.  However, the
parish where Rideau was tried had a population of approximately
150,000, and therefore a jury pool of considerably fewer
individuals.  A jury pool drawn from a population of similar size
to that of the District of Vermont reduces the likelihood of
prejudice, except for "the most damaging of information."
*Gentile v. State Bar of Nevada*, 501 U.S. 1030, 1044 (1991)
(plurality op.) (holding that "only the most damaging of
information could give rise to any likelihood of prejudice,"
given a county population in excess of 600,000 persons from which
a jury would be drawn).  Moreover, potential jurors will be drawn
from the entire state of Vermont, rather than a single county or
parish as was the case in *Rideau* and *Irvin*.

The Venue Survey and the October 2010 follow-up statistics
suggest that a substantial number of eligible jurors in the

---

[4]  The ability of a seated jury to acquit the defendant of
some of the charges obviously does not apply when evaluating a
claim of presumed prejudice in advance of voir dire.

District of Vermont are aware of the Jacques case.[5]  The Venue
Survey statistics also suggest that many of those eligible jurors
who are aware of the case will have formed an opinion that
Jacques is guilty.  The follow-up survey did not inquire into
respondents' opinions.  Neither the Venue Survey nor the follow-
up inquired whether a respondent who had formed an opinion
concerning Jacques's guilt could set aside that opinion and base
a verdict solely on the evidence presented.  The Venue Survey and
the follow-up thus offer little assistance in determining whether
an impartial jury can be empaneled.

**B.  News coverage**

Inherently prejudicial pretrial publicity must be
distinguished from mere exposure to adverse pretrial publicity.
*Sabhnani*, 599 F.3d at 233.  The extensive Vermont press coverage
has been largely factual[6] and focused on the investigation and
prosecution of the case.  Jacques does not claim that the

---

[5]  The Court expresses no opinion on the adequacy of the
sample size, except to note that the Venue Survey sample
represents approximately 0.09% of the eligible jurors in the
District, as reported by Jacques, and the sample was intended to
correlate to a 95% confidence level.  The Government has not
contested the opinion polling results.

[6]  One local television's website posted a story on February
22, 2009 with the erroneous subheading "Uncle Convicted of
Raping, Killing Girl."  The content of the story accurately
reported that Jacques had been charged, not convicted, however.
*See Brooke Bennett's Stepfather Negotiating Plea Deal*, wptz.com
(Feb. 22, 2009), http://wptz.com/news/18771359/detail.html, ECF
No. 133, Ex. R.

government is responsible for generating prejudicial extra-judicial publicity.  The local press has largely avoided comment on Jacques's guilt or innocence, or on an appropriate sentence should he be convicted.  There are no reported admissions or confessions in the case.

According to the defendant's submissions, approximately 150 articles mentioning the Jacques case have appeared in the *Burlington Free Press*[7] or on www.burlingtonfreepress.com between June 2008 and February 2011.  Some dozen of those articles are opinion pieces, mostly written in the months following the crime. The opinion pieces are not particularly hostile to Jacques personally, and many do not mention his name at all.  For the most part, the opinion pieces express sorrow at the Bennetts' tragedy, or call for policy review and statutory reform.  The language used in the *Free Press* to describe Jacques is far from inflammatory, referring to him as "the accused,"[8] the "primary suspect,"[9] and the "man charged with abducting Bennett."[10]

Other Vermont publications have taken a similarly

---

[7]  The *Burlington Free Press* is the newspaper with the largest circulation in Vermont.

[8] Teri Hallenbeck, *Jacques: Sex Offender Met Obligations, Probation Officer Says*, Burlington Free Press, August 8, 2008, at 1A.

[9] Jim Black, *Will Jessica's Law be Brooke Bennett's Legacy?*, Burlington Free Press, July 22, 2008.

[10] Wilson Ring, *State May Reconsider Death Penalty,* Burlington Free Press, July 6, 2008.

noninflammatory course.  For example, of the more than 300 news articles about the Jacques case published in the *Rutland Herald*[11] or on www.rutlandherald.com between June 2008 and February 2011, and submitted by the defendant, none used inflammatory language. The articles provided factual accounts of Jacques's alleged involvement in Brooke Bennett's disappearance.  Jacques was "charged" with "allegedly" kidnapping her.[12]

The thorough coverage of the case in the *Burlington Free Press* and the *Rutland Herald* exemplifies the journalism practiced by the Vermont media in general.  After reviewing the local press articles submitted, the Court has found no incendiary language. A substantial amount of press coverage shortly after the crime occurred focused on Vermont's treatment of sex offenders, and the outcry for legislative and policy reform, matters that do not tend to inflame public passion against Jacques personally.  *See, e.g.*, *Mu'Min v. Virginia*, 500 U.S. 415, 429 (1991) (holding that where a substantial amount of pretrial publicity was aimed at the Department of Corrections and the criminal justice system in general, substantial unfavorable pretrial publicity did not give rise to a presumption of prejudice).  Recent coverage is largely

---

[11]  The *Rutland Herald* is the newspaper with the second largest circulation in Vermont.

[12] *See, e.g.,* Peter Hirschfeld, *Uncle Allegedly Misled Investigators*, Rutland Herald, July 3, 2008; Daniel Barlow, *Uncle May Face Death if Convicted*, Rutland Herald, July 4, 2008.

confined to reporting on developments in the case. "Coverage of actual developments in a criminal case generally will not rise to the level of prejudicial publicity that will warrant a venue change." *Sabhnani*, 599 F.3d at 233.

National and regional press attention has largely abated,[13] and is not particularly persuasive with respect to whether the District of Vermont has been saturated with inflammatory pretrial publicity. Local media publicity is more relevant than national and regional publicity when determining whether pretrial publicity has been sensational enough to warrant application of a presumption of prejudice to transfer venue. *See* Fed. R. Crim. P. 21(a) (stating that transfer is appropriate where "so great a prejudice against the defendant exists *in the transferring district* that the defendant cannot obtain a fair and impartial trial there") (emphasis added). Pretrial publicity that reaches both the transferor and potential transferee districts does not particularly assist the Court in ascertaining whether the transferor district has been tainted. Because national television networks and newspapers and the Internet are presumably as available to potential jurors within the Northern

_____

[13] The evidence submitted shows that following each filing or hearing some non-local press carry articles reporting on the progress of the case. *See, e.g.*, Supplemental. Mem. & Ex. in Supp. of Mot. to Transfer Venue, Ex. E, H, Q, Y, QQ, RR, ECF No. 257. The number and length of these articles has decreased over time, as Jacques concedes.

District of New York as they are to potential jurors in the
District of Vermont, any inflammatory publicity in the national
media or on the Internet does not support a conclusion that
impartial jurors cannot be found in Vermont.

Many of the online postings to various Internet websites use
intemperate language to vilify Jacques, his lawyers and Vermont's
criminal justice system.  There is of course no way of knowing
whether the holders of these opinions are eligible jurors, or
whether they are Vermont residents, or even whether they are
identifiable individuals.  The Court has not been provided with
any information indicating how many eligible jurors may have been
exposed to the postings.  Access to Vermont media websites is not
limited to subscribers or to residents of the District of
Vermont.  Access to Facebook pages and blogs is similarly open.
That there are individuals with access to the Internet who are
willing to post their strong opinions about the case does not
provide evidence that potential jurors in the District of Vermont
believe that Jacques is guilty and/or that he should be sentenced
to death if he is convicted.  Nor by itself does it provide
evidence that the local venue is so saturated with poisonous
outpourings that Jacques will be unable to receive a fair trial
in the District of Vermont.

Repeated airing of Jacques's criminal history has
significant potential to prejudice the venire, given that it is

19

unlikely that this information will be admissible at trial. *Cf.*
*United States ex rel. Owen v. McMann*, 435 F.2d 813, 818-19 (2d
Cir. 1970) (affirming grant of petition for habeas corpus where
jurors were told by other jurors of defendant's criminal conduct
unrelated to the charges, information "which had not been and
probably could not have been received in evidence") (Friendly,
J.); *see also Marshall v. United States*, 360 U.S. 310, 313 (1959)
(per curiam) (exercising Court's supervisory power to order a new
trial where seated jurors were exposed to news accounts
containing inadmissible evidence of the defendant's criminal
history).  In this regard, the Court must "distinguish between
mere familiarity with [Jacques] or his past and an actual
predisposition against him. . . ." *Murphy*, 421 U.S. at 801 n.4.
Although it is highly likely that many prospective jurors will
have some knowledge of Jacques's past as well as about the case,
voir dire should expose whether they can set aside any prior
impressions. *See id*. at 800-01; *Irvin*, 366 U.S. at 723.

C. **Passage of time**

By the time this case goes to trial, more than three years
will have elapsed since Brooke Bennett died.  Granted that this
case has generated publicity at every new development, filing or
hearing, press coverage--whether potentially inflammatory or no--

20

has diminished.[14]  Adverse publicity and community outrage were
at their strongest in the months immediately following the crime;
Jacques's most recent submission in connection with the motion to
transfer venue demonstrates continued awareness of the case, but,
absent any information about opinions on guilt or punishment on
the part of prospective jurors, does not demonstrate pervasive
hostility on the part of the community.  *See Patton v. Yount*, 467
U.S. 1025, 1032 (1984) (rejecting presumption-of-prejudice claim
where four years had elapsed).

## III. Conclusion

There is no question that this case has generated an immense
amount of pretrial publicity.  The allegations in the case have
provoked strong public reaction, from calls for increased
penalties for sex offenders and an overhaul of corrections policy
to vituperative condemnation in Internet postings.  To warrant a
presumption of prejudice--a conclusion that inflammatory pretrial
publicity threatens to displace the judicial process--Jacques
must show more than pervasive adverse publicity, however.  *See*
*Skilling*, 130 S. Ct. at 2916.  Overall, the pretrial publicity in

---

[14]  The exhibits filed with the Motion to Transfer Venue,
twenty months after Brooke Bennett's disappearance, included
twelve looseleaf binders of local, regional and national news
coverage.  Five months later, the exhibits of additional news
coverage filed with Jacques's Reply Memorandum filled two
looseleaf binders.  Six months after that filing, a supplemental
filing of news coverage showed that media attention had dwindled
to local and regional reporting on the filings and hearings in
the case.  *See* ECF Nos. 133-1, 176-1, 257-46.

this case does "not present the kind of vivid, unforgettable information [that is] particularly likely to produce prejudice." *Id.*

It remains for the jury selection process to ensure that community passion or enmity does not find its way into the jury box, and that jurors are seated who reach their conclusions "based on evidence and argument in open court, and not by any outside influence, whether of private talk or public print." *Patterson v. Colorado*, 205 U.S. 454, 462 (1907) (Holmes, J.); *see also Skilling*, 130 S. Ct. at 2950 (Sotomayor, J., dissenting) ("To assure an impartial jury in . . . adverse circumstances [when antipathy toward a defendant pervades the community], a trial court must carefully scrutinize the knowledge and attitudes of prospective jurors and then closely scrutinize the reliability of their assurances of fairness.").

"No hard-and-fast formula dictates the necessary depth or breadth of voir dire." *Skilling*, 130 S. Ct. at 2917.  In addition to careful and searching voir dire on the particulars and effect of pretrial publicity, the jury pool will be expanded statewide to include jurors from all three divisions in the District of Vermont.  If after thorough voir dire of potential jurors, it becomes apparent that pretrial publicity has prejudiced the venire, the Court will entertain a renewed motion for change of venue, pursuant to Federal Rule of Criminal

Procedure 21(a).  As this Court has previously stated:  "voir dire examinations, when conducted in a careful and thorough manner, have long been considered an effective tool for rooting out prejudice or bias," *Washington*, 813 F. Supp. at 273, and if prospective jurors admit to being or appear to be unable to set aside any opinions they may have formed, Jacques may satisfy his burden of demonstrating a reasonable likelihood that pretrial publicity will prevent his obtaining a fair trial.

For the reasons stated above, the Motion to Transfer Venue, ECF No. 133, is therefore denied without prejudice.


Dated at Burlington, Vermont this 4th day of May, 2011.


/s/ William K. Sessions III
William K. Sessions III
District Judge