UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No.  2:08-CR-117 |
| | ) | |
| MICHAEL JACQUES, | ) | |
|     Defendant. | ) | |

## DEFENDANT'S MOTION TO RECONSIDER POINT EIGHT IN FAVOR OF STRIKING THE DEATH PENALTY

NOW COMES Michael Jacques, by counsel, and pursuant to Local Civil Rule 7(c) and Local Criminal Rule 1(b) respectfully requests that the Court reconsider its ruling denying his motion to strike the death penalty because the death penalty is not available in the State of Vermont.

In his Motion to Strike or Modify The Notice of Intent to Seek the Death Penalty the Defendant incorporated by reference the argument that the Eighth Amendment should be read to prohibit the federal government from imposing the death penalty in states that do not authorize capital punishment, citing Michael J.Z. Mannheimer, *When the Federal Death Penalty is "Cruel and Unusual,"* 74 U. CIN. L. REV. 819 (2006).  The Court denied this aspect of the Defendant's motion because it was "unable to conclude that Jacques has met his burden on the basis of the one paragraph he devotes to the federalism argument in his briefing and his citation to the Mannheimer article."  Doc. 279 at 43.  The Court nonetheless cited to the opinions concurring and dissenting from the denial of rehearing en banc in *United States v. Fell*, 571 F.3d 264 (2d Cir. 2009) (hereafter "*Fell III*," as in the Court's Order), when it noted that "the federalism question raised by Jacques appears to remain an open one in this circuit."  Doc. 279 at 43.

The Court's May 4, 2011 opinion thus leaves unresolved the extent to which principles of federalism may preclude the application of the Federal Death Penalty Act in a federal judicial district where, as with the District of Vermont, the state does not have the death penalty. The Defendant therefore reiterates his motion to strike the notice of intent to seek a sentence of death on federalism grounds and moves that the Court reconsider its May 4, 2011 order.

Specifically, Mr. Jacques moves to strike the notice because the death penalty is cruel and unusual punishment within the meaning of the Eighth Amendment[1] because it is not available in the State of Vermont and because the recent federalization of essentially state-law offenses and the corresponding increase in the penalty beyond what is possible for a traditionally state-law offense. Application of the death penalty in these circumstances raises profound federalism concerns and violates the Tenth Amendment.

### Application Of The Death Penalty Violates The Eighth And Tenth Amendments Because Is Not Authorized Under Vermont State Law And Is An Unconstitutional Increase In The Penalty For What Was Until Recently A State-Law Offense

The application of the death penalty in this case is unconstitutional because it is not available in the State of Vermont.[2] In that sense the death penalty is "unusual" in a constitutional sense as explained by Judge Calabresi:

> Constitutionally, one cannot look at the individual case, but must instead consider whether the presence of important generalized values has made the particular death sentence constitutionally unusual. It seems to me at least arguable that the application of the death penalty in situations that involve predominantly local crimes in non-death penalty states may be sufficiently rare as to be constitutionally prohibited. And this may be so even though the conduct at issue constitutes a federal crime.

---

[1] U.S. Const., amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.").

[2] On Vermont and the death penalty, see Michael Mello, *Certain Blood for Uncertain Reasons: A Love Letter to the Vermont Legislature on Not Reinstating Capital Punishment*, 32 Vt. L. Rev. 765, 768 (2008).

[2]

*Fell III*, 571 F.3d at 289-290 (Calabresi, J., dissenting).  Judge Calabresi's suggestion that the death penalty may be unusual in a constitutional sense when applied to primarily local crimes in non-death penalty states is consistent with the modern current of legal scholarship on the meaning of the Eighth Amendment's prohibition on cruel and unusual punishment.[3]

This argument follows from the widespread recognition that at its core the ban on cruel and unusual punishment operates as a prohibition on punishments not authorized by law. Mannheimer, 74 U. CIN. L. REV. at 837; *Harmelin v Michigan*, 501 U.S. 957, 974 (1991) (plurality opinion).  In *Harmelin*, Justice Scalia discussed the 1689 English Declaration of Rights, after which the Eighth Amendment was patterned:

> In the legal world of the time, and in the context of restricting punishment determined by the Crown (or the Crown's judges), "illegall" and "unusuall" were identical for practical purposes.  Not all punishments were specified by statute; many were determined by the common law.  Departures from the common law were lawful only if authorized by statute.

*Harmelin*, 501 U.S. at 974.  Properly understood, punishments that are not authorized by law—as the death penalty is not authorized under Vermont state law—are illegal or unusual, and therefore prohibited.  In addition to *Harmlin*, this principle is evident in other Supreme Court cases considering Eighth Amendment claims.

For example, in *Trop v. Dulles*, 356 U.S. 86 (1958), the Supreme Court considered a law that stripped a soldier of his citizenship once the soldier had been convicted of desertion.  Justice Brennan's concurring opinion specifically concluded that expatriation is a "novel[]" punishment that "is beyond the power of Congress to enact."  *Id*. at 111, 114.  For its part, the plurality opinion noted that the law "gives the military authorities complete discretion to decide who

---

[3] The crime charged in Count 1 of the indictment is primarily local as explained in Section III and in the Defendant's Motion to Dismiss Count 1.

[3]

among convicted deserters shall continue to be Americans and who shall be stateless." *Id.* at 90. And,

> If the word "unusual" is to have any meaning apart from the word "cruel," however, the meaning should be the ordinary one, signifying something different from that which is generally done. Denationalization, as a punishment, certainly meets this test. It was never explicitly sanctioned by this Government until 1940, and never tested against the Constitution until this day.

*Id*. at 101 n. 32.  Thus, in striking down the expatriation provision, one theme in the plurality opinion is the fact that the challenged law conferred on the military authorities exclusively a power not previously conferred on it.

*Weems v. United States*, 217 U.S. 349 (1910), also supports this proposition.  Although *Weems* is often thought of as standing for the proposition that the Eighth Amendment has a proportionality requirement, it is also the case that the punishment complained of—*cadena temporal*, a sentence of between twelve and twenty years of hard labor in chains for falsifying public documents—came from the Spanish Penal Code, which had been retained by the Philippine Commission that ruled the Philippines after the Spanish-American War.  *See* Margaret Raymond, *"No Fellow in American Legislation": Weems v. United States and the Doctrine of Proportionality*, 30 Vt. L. Rev. 251, 276 (2006).  In this sense, the punishment was not authorized and was therefore illegal or unusual.

> It has no fellow in American legislation.  Let us remember that it has come to us from a government of a different form and genius from ours.  It is cruel in its excess of imprisonment and that which accompanies and follows imprisonment.  It is unusual in its character.  Its punishments come under the condemnation of the Bill of Rights, both on account of their degree and kind.  And they would have those bad attributes even if they were found in a Federal enactment, and not taken from an alien source.

*Weems*, 217 U.S. at 377.

[4]

Crucial to this understanding of the Eighth Amendment is the fact that the Eighth Amendment was part of an effort not simply to secure individual rights but also to put in place structural constraints on the power of the federal government.  It was the concern about a potentially overweening federal government that led the Anti-Federalists to seek, and obtain, the criminal procedure protections found in the Bill of Rights.  Mannheimer, 74 U. CIN. L. REV. at 851 ("Though framed in terms of protecting the rights of individuals, the Bill of Rights was viewed in 1791 as a barrier between the States and the national government."); *Ingraham v. Wright*, 430 U.S. 651, 665 (1977) ("The Americans who adopted the language of this part of the English Bill of Rights in framing their own State and Federal Constitutions 100 years later feared the imposition of torture and other cruel punishments not only by judges acting beyond their lawful authority, but also by legislatures engaged in making the laws by which judicial authority would be measured.  Indeed, the principal concern of the American Framers appears to have been with the legislative definition of crimes and punishments."); George C. Thomas, III, *When Constitutional Worlds Collide: Resurrecting the Framers' Bill of Rights and Criminal Procedure*, 100 MICH L. REV. 145, 149 (2001) ("Return to the 1790s.  The States eye the central government, to which they have just ceded much of their sovereignty, as a potential bully or, worse, as a tyrant.  The States look upon the freshly minted central government as it looms above them, and it reminds them of King George III and Parliament."); Akhil R. Amar, *The Bill of Rights as a Constitution*, 100 YALE L. J. 1131, 1205 (1991) ("My point is not that substantive "rights" are unimportant, but that these rights were intimately intertwined with structural considerations.").  Indeed, it is common to view the enactment of the Bill of Rights as the compromise that allowed the Constitution to be ratified.  *See, e.g.,* John F. Stinneford, *The*

*Original Meaning of 'Unusual': The Eighth Amendment as a Bar to Cruel Innovation*, 102 Nw. U. L. Rev. 1739, 1807 (2008).

That the Bill of Rights was designed not merely as a set of individual protections, but was intended fundamentally to maintain the balance between the federal government and the states, speaks to the role that the Eighth Amendment has in a situation such as is present in the case at hand.

> The Anti-Federalists wanted to reserve to the States not only the power to investigate, prosecute, and convict people for crimes, but also the authority to determine what kind of punishment, and how much, each type of transgression would merit. They did not wish this power to reside in the new federal government, because such authority was part and parcel of the power to re-shape communities that the Anti-Federalists so feared would fall into the hands of the central government.

Mannheimer, 74 U. Cin. L. Rev. at 864. When the Eighth Amendment is properly understood as part of an effort to rein in the power of the federal government, it will prohibit the federal government from applying a punishment for a crime where that punishment is not authorized by state law. *Id.* at 874-876. In this scenario, the punishment is "cruel and unusual" in that the proposed federal penalty is one illegal or unusual because it is not authorized by state law. *Fell III*, 571 F.3d at 289-290 (Calabresi, J., dissenting). In the present case, the Eighth Amendment prohibits the application of the death penalty because the death penalty is not authorized or is illegal under Vermont law and is therefore unusual in the constitutional sense.

That this view of the Eighth Amendment is one that has not yet been applied is due in part to the fact that the vast majority of Eighth Amendment cases deal with the Eighth Amendment as incorporated against the states through the Fourteenth Amendment. Mannheimer, 74 U. Cin. L. Rev. at 853-854 (noting at 854 that "this original view of the Bill of Rights has been lost to the courts and all but a few scholars. Because most of the modern

[6]

Supreme Court cases interpreting the Bill of Rights have come from the States, they have really been interpretations of the Fourteenth Amendment."). The Fourteenth Amendment was itself not adopted until 1868 and the doctrine of incorporation did not take hold until the end of the nineteenth century. Thus, as late as 1892 the Supreme Court could only say that "it has always been ruled that the eighth amendment to the constitution of the United States does not apply to the states." *O'Neil v. Vermont*, 144 U.S. 323, 332 (1892).

      The distinction noted by Mannheimer is meaningful because much of the existing jurisprudence on the Eighth Amendment involves rather the inverse of the present scenario: cases in which the Fourteenth Amendment serves as a protection against a state or local actor.

> Given the focus of the framers and ratifiers of the Fourteenth Amendment on the protection of former slaves and other minorities—ethnic, religious, and political—from dominant local majorities, that Amendment has a distinctively individual-rights hue. This, in turn, has colored the way we think about the provisions of the Bill of Rights itself, since, through the fiction of incorporation, we pretend we are interpreting the first eight amendments rather than the Fourteenth.

Mannheimer, 74 U. CIN. L. REV. at 854. Given this crucial distinction, in a federal criminal prosecution, it is the original view of the Eighth Amendment that governs the case and that forbids the application of the death penalty where that penalty is not authorized by the state.

      The application of the death penalty in this case is unconstitutional under the Eighth Amendment in another sense as well in that the recent federalization of essentially state-law offenses and the corresponding increase in the penalty beyond what is possible for the state-law offense renders the death penalty cruel and unusual under the Eighth Amendment.

      As has been noted before, kidnapping is generally a state-law crime, *MTN* at 11 (Doc. 125), and that it was not until 2006 that the federal law was expanded to reach the conduct here. *United States v. Jacques*, 2011 WL 1706765 at *4 (D.Vt. 2011). The Eighth Amendment

[7]

renders the death penalty cruel and unusual in this case because the federalization of a traditionally state-law crime must not be accompanied by the imposition of this most extreme punishment un-enacted by the people of Vermont.  *See* Stinneford, 102 Nw.U. L. Rev. at 1766-1768.  There is no question but that an increase in the penalty for a crime from a period of years to death is constitutionally significant.  *Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) ("[T]he penalty of death is qualitatively different from a sentence of imprisonment, however long.  Death, in its finality, differs more from life imprisonment than a 100-year prison term differs from one of only a year or two.").

It is a fundamental principle that "[u]nder our federal system[,] the administration of criminal justice rests with the States except as Congress, acting within the scope of [its] delegated powers, has created offenses against the United States."  *Screws v. United States*, 325 U.S. 91, 109 (1945); *Patterson v. New York*, 432 U.S. 197, 201 (1977) ("preventing and dealing with crime is much more the business of the States than it is of the Federal government").  The Supreme Court has noted that where "Congress criminalizes conduct already denounced as criminal by the States, it effects a 'change in the sensitive relation between federal and state criminal jurisdiction.'"  *United States v. Lopez*, 514 U.S. 549, 561 n.3 (quoting *United States v. Enmons*, 410 U.S. 396, 411-12 (1973)).  The federalization of state-law offenses is especially damaging in a scenario such as the one at hand where the federal government seeks to impose a penalty not authorized by state law.  Consequently, the application of the death penalty to a traditionally state-law crime, not-punishable by death, violates both the Eighth and Tenth Amendments.

**Conclusion**

    For the reasons stated above, the Defendant respectfully requests that the Court reconsider its ruling denying his motion to strike the death penalty because the death penalty is not available in the State of Vermont.

Dated at Burlington, Vermont, June 15, 2011.

                                              Respectfully submitted,

                                              MICHAEL JACQUES

By:    */s/ Michael L. Desautels*
         MICHAEL L. DESAUTELS
         BARCLAY T. JOHNSON
         Federal Public Defender
         Office of the Federal Public Defender
         126 College Street, Suite 410
         Burlington, VT 05401
         (802) 862-6990
         (802) 862-7836 (Fax)

         JEAN DeSALES BARRETT
         DAVID A. RUHNKE
         Ruhnke and Barrett
         47 Park Street
         Montclair, New Jersey 07042
         (973) 744-1000

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| | ) | |
| v. | ) | Case No.  2:08-CR-117 |
| | ) | |
| MICHAEL JACQUES, | ) | |
| Defendant. | ) | |

CERTIFICATE OF SERVICE

I hereby certify that on the 15th day of June, 2011, I electronically filed DEFENDANT'S MOTION TO RECONSIDER POINT EIGHT IN FAVOR OF STRIKING THE DEATH PENALTY with the Clerk of Court using the CM/ECF system, which will send notification of such filing(s) to the following: Craig Nolan and William Darrow, Assistant United States Attorneys, United States Attorney's Office, via Craig.Nolan@usdoj.gov and bill.darrow@usdoj.gov.

*/s/ Elizabeth K. Melcher*
Elizabeth K. Melcher
Paralegal
Federal Public Defender Office
126 College Street, Suite 410
Burlington, Vermont  05401
802/862-6990